# Exhibit B

Daniel S. Elliott, M.D.

```
 1   ------------------------------
     IN RE:  PELVIC MESH/GYNECARE  :
 2           LITIGATION            :
     ------------------------------
 3   PATRICIA L. HAMMONS,          :COURT OF COMMON PLEAS
                                   :PHILADELPHIA COUNTY
 4           Plaintiff,            :MAY TERM, 2013
     vs.                           :
 5                                 :
     ETHICON, INC., et al.,        :
 6                                 :
             Defendants.           :No. 003913
 7   ------------------------------
 8
 9                   November 21, 2015
10
11
12           Oral sworn videotaped de bene esse
13       at deposition of DANIEL S. ELLIOTT, M.D.,
14       held MAZIE SLATER KATZ & FREEMAN, LLC, 103
15       Eisenhower Parkway, 2nd Floor, Roseland, New
16       Jersey, before Margaret M. Reihl, RPR, CCR,
17       CRR, CLR and Notary Public, on the above date,
18       commencing at 9:20 a.m.
19
20
21
22           GOLKOW TECHNOLOGIES, INC.
             877.370.3377 ph|917.591.5672 fax
23                  deps@golkow.com
24
```

Daniel S. Elliott, M.D.

```
 1   A P P E A R A N C E S:

 2

 3   MAZIE SLATER KATZ & FREEMAN, LLC
     BY:  ADAM M. SLATER, ESQUIRE
 4   103 Eisenhower Parkway, 2nd Floor
     Roseland, New Jersey  07068
 5   (973) 228-9898
     aslater@mskf.net
 6   Counsel for Plaintiff

 7
     KLINE & SPECTER, P.C.
 8   BY:  SHANIN SPECTER, ESQUIRE
     1525 Locust Street, 19th Floor
 9   Philadelphia, Pennsylvania  19102
     (215) 772-1000
10   shanin.specter@klinespecter.com
     Counsel for Plaintiff

11

12   GOLDMAN ISMAIL TOMASELLI BRENNAN & BAUM LLP
     BY:  TAREK ISMAIL, ESQUIRE
13   564 West Randolph Street, Suite 400
     Chicago, Illinois  60661
14   (312) 881-5970
     tismail@goldmanismail.com
15       -AND-
     BY:  JOE W. TOMASELLI, JR., ESQUIRE
16   3131 Turtle Creek, Suite 1210
     Dallas, Texas  75219
17   (214) 880-9903
     jtomaselli@goldmanismail.com
18   Representing Johnson & Johnson and Ethicon

19
     Also Present:  Thomas Keighley, Videographer

20

21

22

23

24
```

Daniel S. Elliott, M.D.

```
 1                    I N D E X
 2   WITNESS:                                   Page
 3   DANIEL S. ELLIOTT, M.D.
 4          By Mr. Slater                    7, 304
            By Mr. Ismail              178, 326
 5                          — — —
 6
                    E X H I B I T S
 7
     DEFENSE DEPOSITION EXHIBIT                MARKED
 8
     No. 1    Article, "Long-term quality of
 9           life outcomes and retreatment
             rates after robotic sacrocolpopexy"   241
10
11                          — — —
12
     PLAINTIFFS' TRIAL EXHIBITS—(previously marked)   PAGE
13
     PLT0011   ACOG Practice Bulletin,
14            Clinical Management Guidelines
              for Obstetrician-Gynecologists
15            Number 79, February 2007           105
16   P0049    Clinical Study Report
              [ETH.MESH.00012009 through
17            12089]                             77
18   PLT0062   Journal De Gynecologie
              Obstetrique, Conceptual advances
19            in the surgical management of
              genital prolapse
20            November 2004                       42
21   PLT0067   Article, "Complications from
              vaginally placed mesh in pelvic
22            reconstructive surgery"             89
23
24
```

Daniel S. Elliott, M.D.

| 1 | PLT0108 | Article, "Transvaginal mesh technique |
| 2 | | for pelvic organ prolapse repair: mesh exposure management and risk factors" |
| 3 | | [ETH-02794 through 02799] | 101 |
| 4 | PLT0139 | Article, "Les protheses synthetiques |
| 5 | | dans la cure de prolapsus genitaux par la voie vaginale : bilan |
| 6 | | en 2005" | 109 |
| | PLT0302 | Article, "Does the Prolift system |
| 7 | | cause dyspareunia?" | 310 |
| 8 | P0980 | E-mail string, top one dated 1/13/05 |
| 9 | | [ETH.MESH.02286052 through 02286053] | 162 |
| | PLT0516 | Article, "Trocar-Guided Mesh Compared |
| 10 | | With Conventional Vaginal Repair in |
| 11 | | Recurrent Prolapse" | 159 |
| | P1005 | Brochure, Gynecare Prolift® |
| 12 | | [ETH.MESH.02341454 through 02341459] | 148 |
| 13 | PLT1093 | Article, "Incidence and risk |
| 14 | | factors for reoperation of surgically treated pelvic organ prolapse" | 69 |
| 15 | PLT1095 | Article, "Surgical management of mesh-related complications after |
| 16 | | prior pelvic floor reconstructive surgery with mesh" | 119 |
| 17 | | |
| | PLT1096 | Journal of Pelvic Medicine & Surgery |
| 18 | | volume 14, Number 2, March/April 2008, excerpt | 311 |
| 19 | | |
| | P1306 | Brochure, Pelvic Organ Prolapse |
| 20 | | "Get the Facts, Be Informed, Make YOUR Best Decision" | 19 |
| 21 | | |
| | P1557 | E-mail dated 10/28/05 |
| 22 | | [ETH-80249] | 166 |
| 23 | | |
| 24 | | |

Daniel S. Elliott, M.D.

| | | | |
|---|---|---|---|
| 1 | P1593 | Slide deck, "Gynecare Prolift, | |
| | | Pelvic Floor Repair Systems" | 31 |
| 2 | | | |
| | P2227 | E-mail dated 9/3/09 | |
| 3 | | [ETH.MESH.00086463 through | |
| | | 86465] | 64 |
| 4 | | | |
| | P2239 | Curriculum Vitae and Bibliography | |
| 5 | | Daniel S. Elliott, MD | 7 |
| 6 | P2402 | Material Safety Data Sheet, | |
| | | Marlex® HGX-030-01 Polypropylene | 315 |
| 7 | | | |
| | P2452 | FDA Letter dated 7/9/12 | |
| 8 | | [ETH.MESH.04474808 through | |
| | | 04474809] | 323 |
| 9 | | | |
| | P2503 | FDA Letter dated April 2012 | |
| 10 | | [ETH.MESH.04474308 through | |
| | | 04474312] | 320 |
| 11 | | | |
| | P2731 | The New England Journal of | |
| 12 | | Medicine, "Corrections" | 127 |
| 13 | | − − − | |
| 14 | | | |

PRIOR TESTIMONY OF DR. ELLIOTT REFERENCED:

TRANSCRIPT OF BELLEW TRIAL DAY 2, March 3, 2015

TRANSCRIPT OF BELLEW TRIAL DAY 3, March 4, 2015

TRANSCRIPT OF DEPOSITION November 15, 2012

TRANSCRIPT OF DEPOSITION November 16, 2012

− − −

Daniel S. Elliott, M.D.

```
 1              THE VIDEOGRAPHER:  All right.  We are now
 2       on the record.  My name is Thomas Keighley, and
 3       I am a videographer for Golkow Technologies.
 4       Today's date is November 21st, 2015.  The time
 5       is approximately 9:20 a.m.  This video
 6       deposition is being held in Roseland, New
 7       Jersey at 103 Eisenhower Parkway at the offices
 8       of Mazie Slater Katz & Freeman.  We are here in
 9       the matter of Pelvic Mesh, specifically Hammons
10       versus Ethicon, Inc., et al.  This is for the
11       Court of Common Pleas, Lehigh County.  The
12       deponent is Dr. Daniel Elliott.
13          Counsel, your appearances will be noted on
14       the stenographic record, and the court reporter
15       is Peg Reihl, if she could swear in the witness
16       and we can proceed.
17              ... DANIEL S. ELLIOTT, M.D., having been
18       duly sworn as a witness, was examined and
19       testified as follows ...
20              MR. ISMAIL:  Just if I can note for the
21       stenographic record, I guess now for the video
22       as well, there was a cross-notice filed for
23       this notice -- of this deposition in the MDL to
24       which Ethicon filed a motion to quash.  That
```

Daniel S. Elliott, M.D.

1           motion is still pending.  I just want to make

2           sure that objection was preserved and noted on

3           this record.

4                MR. SLATER:  My understanding is just from

5           seeing some correspondence that the plaintiffs

6           maintained their cross-notice, and I guess that

7           will be decided by the federal judges.

8                MR. ISMAIL:  Yes, thank you.

9    BY MR. SLATER:

10          Q.   You can look at me when you speak,

11   Dr. Elliott.  It's actually fine either way, okay?

12          A.   Okay.

13               MR. SLATER:  Are we ready to proceed?  Did

14          you swear the witness?  You swore him in?

15          Okay, great.  Okay.  Let's proceed.

16                          - - -

17                    DIRECT EXAMINATION

18                          - - -

19   BY MR. SLATER:

20          Q.   Good morning, Dr. Elliott.

21          A.   Good morning.

22          Q.   Dr. Elliott, we've marked for

23   identification a document P2239.  Can you tell us what

24   that document is?

Daniel S. Elliott, M.D.

1          A.    This is my current Curriculum Vitae.

2          Q.    That's a list of your background, your

3    education, your qualifications, that type of thing?

4          A.    That's correct.

5          Q.    Would you tell the jury what your

6    profession is, please.

7          A.    I am a urologic reconstructive surgeon at

8    the Mayo Clinic.

9          Q.    And tell the jury where you're a licensed

10   physician.

11         A.    In the state of Minnesota.

12         Q.    What is the Mayo Clinic where you work?

13         A.    It's a large tertiary care medical center,

14   meaning -- tertiary care just means the end of the line

15   type thing, you don't get referred on from there, which

16   is a multi-specialty practice.

17         Q.    And where is that located?

18         A.    In Rochester, Minnesota.

19         Q.    Tell the jury a little bit about your

20   educational background, where you went to medical

21   school, your residency, the training you did from that

22   point forward briefly.

23         A.    Medical school was in southern California

24   at Loma Linda University School of Medicine.  Then I

Daniel S. Elliott, M.D.

1   did a one-year general surgery at the Mayo Clinic in

2   Rochester, Minnesota, followed by five years of

3   urologic surgery training at Mayo Clinic.  I was asked

4   to come on staff and then did a one-year advanced

5   surgical fellowship at the Baylor College of Medicine

6   in Houston.

7           Q.   Would you tell the jury about your medical

8   practice, what you do day to day?

9           A.   It's the reconstructive urology means

10  we're taking care of problems that are occurring in the

11  pelvis, complications dealing with males and females.

12  Majority of my practice, probably roughly two-thirds is

13  female, one-third is male.

14          Q.   What are the types of conditions you

15  treat?

16          A.   Breaking down into stress incontinence,

17  both male and female, pelvic organ prolapse for females

18  and then the complications arising from those

19  treatments.

20          Q.   Do you teach, do you have any teaching

21  appointments?

22          A.   Yes.  I'm a teacher at Mayo as far as

23  teaching residents, rotations on my service, lectures

24  for medical students.  Also, I guess you could call it

Daniel S. Elliott, M.D.

 1    an educator with the SUFU, which is Society of

 2    Urodynamics & Female Urology, I'm on the education --

 3         Q.   Say that a little slower.  What is SUFU?

 4         A.   Society of Urodynamics & Female Urology,

 5    that's the large, arguably the most elite in the United

 6    States society dealing with female urology and pelvic

 7    floor function, and so I'm on the education committee

 8    for that.  So that there's education as far as future

 9    education for both residents, though, mainly for

10    individuals who have already graduated and are in

11    practice.

12         Q.   As part of your training and teaching of

13    residents, do you have occasion to teach with regard to

14    IFUs, the instructions for use for medical devices?

15         A.   It would be on a daily basis with

16    residents, especially new residents who are coming on

17    my service, we go over the IFUs, if we're using a

18    medical device, and then if there's a new product that

19    comes out, we'll review those.

20         Q.   When you teach residents about the IFU,

21    what are the types of things you focus on when you're

22    actually teaching day-to-day?

23         A.   Well, we go over everything.  It depends

24    upon if it's a new resident or not.  Let's take a new

Daniel S. Elliott, M.D.

1    resident, typical one, it's every six weeks I have a

2    new resident on my service.  We sit down, we go over

3    the IFU, we go over the procedure, how it's described

4    and then the various different warnings or potential

5    complications.

6           Q.   As part of that process, have you learned

7    what it is that you're looking for in an IFU and what

8    needs to be taught to physicians to look for?

9           A.   Oh, absolutely, but that's not just with

10   IFUs.  That's also as far as paper writing and

11   reviewing of manuscripts.

12          Q.   Do you have involvement with the

13   peer-reviewed literature?

14          A.   Yes.

15          Q.   Tell the jury your involvement -- first of

16   all, what is the peer-reviewed medical literature?

17          A.   Peer reviewed for any article coming out

18   in a reputable journal, it will be reviewed by multiple

19   individuals within your peer group, so that's why it's

20   peer reviewed.  So I'm a reviewer for some 16 different

21   journals, more or less, and so your responsibility is

22   to obtain a manuscript, look at it critically.  The

23   goal is to find weaknesses in the paper, strengths in

24   the paper, what is lacking, where it can be improved.

Daniel S. Elliott, M.D.

1         Q.    Do you act as a peer reviewer?

2         A.    Yes, for I say roughly 16 journals.

3         Q.    Have you published articles in the

4    peer-reviewed medical literature yourself?

5         A.    Yes, I have.

6         Q.    Do you have experience treating prolapse

7    with mesh?

8         A.    Yes.

9         Q.    Tell the jury that experience.

10        A.    Surgically treating prolapse is dealing

11   with only transabdominal or robotic.  I have never

12   placed transvaginal mesh for prolapse.

13        Q.    Do you perform procedures to treat

14   prolapse that do not involve mesh?

15        A.    Yes.

16        Q.    Tell the jury about that.

17        A.    Well, there's going to be a spectrum of

18   different conditions, bladder, rectum or enterocele

19   where the intestines fall down, and I have been trained

20   and daily or every other day perform transvaginal

21   prolapse repairs, but not with mesh.

22        Q.    What do you use to do those procedures?

23        A.    It's the traditional colporrhaphy is the

24   name of it using sutures, absorbable sutures.

Daniel S. Elliott, M.D.

1        Q.    Have you attended at any point training

2  with regard to mesh kits like the Prolift®?

3        A.    Yes.

4        Q.    Tell us about that.

5        A.    It was with AMS, I was an instructor, they

6  had combined incontinence and prolapse.  I taught the

7  incontinence part, but also the cadavers right next to

8  me were where the instructors were teaching the

9  transvaginal prolapse repair, so I went over and then

10  did that with those instructors.

11        Q.    And that was for the AMS Apogee and

12  Perigee?

13        A.    Correct.

14        Q.    Is that a similar product to the Prolift®?

15        A.    Very similar, yes.

16        Q.    Over the years have you become involved in

17  treating patients who had Prolifts® placed by other

18  doctors at other locations where they've had

19  complications?

20        A.    Correct, yes, I have.

21        Q.    Tell us about your treatment of women with

22  Prolift® complications or other mesh complications as

23  well.

24        A.    That began roughly 2006, 2007, in that

Daniel S. Elliott, M.D.

```
 1    time frame, I don't remember the exact time, but that
 2    was the ballpark that we started seeing various
 3    different complications like vaginal extrusion, organ
 4    erosion and more commonly pelvic pain.
 5          Q.    In your practice, have you treated
 6    patients who have had complications from the Prolift®?
 7          A.    Yes.
 8          Q.    And is that what you were just describing?
 9    Is that among the patients that you've treated with
10    those conditions?
11          A.    Correct.
12          Q.    As part of your treatment of patients with
13    Prolift® complications, did you become familiar with
14    the Prolift® system?
15          A.    Yes.
16          Q.    What did you do?
17          A.    Well, initially, besides just when these
18    complications would come in, you know, I'm attending
19    meetings, national, international meetings, we would be
20    discussing it with colleagues in the field,
21    urogynecology colleagues, my institution.  We would go
22    back online and look at the product, because, remember,
23    I chose not to place the product, so we had to learn
24    about how is this put in, reviewing of manuscripts.  We
```

Daniel S. Elliott, M.D.

1    always do that, a PubMed search, which is the largest

2    search engine looking for articles about this and

3    management of complications.

4           Q.   Did you have the opportunity to see the

5    IFU at some point as part of your practice as well?

6           A.   Yes, with the Prolift®, yes.

7           Q.   Was it helpful to you in treating the

8    complications to learn about the Prolift® system?

9           A.   From the IFU?

10          Q.   The IFU and the other material and

11   conversations you had, did you find that was helpful to

12   you in treating the complications?

13          A.   Discussing with colleagues and review of

14   manuscripts was.  I'd have to say that the IFU for the

15   procedure was helpful, how it was going, the management

16   of the complications, no.

17          Q.   How prevalent has been your treatment of

18   mesh complications, including Prolift® complications,

19   in your practice?

20          A.   Well, it depends what time frame you're

21   talking about.  2005, uncommon; as the time goes on,

22   more and more common, such that in any given week I'm

23   seeing three to five or maybe more patients with

24   various different mesh complications, including the

Daniel S. Elliott, M.D.

 1    Prolift®.

 2              Q.   Have you actually spoken at any national

 3    meetings to other physicians about the treatment of

 4    mesh complications?

 5              A.   Well, numerous times, most -- numerous

 6    times and most recently in February, again, at that

 7    SUFU meeting, Society of Urodynamics & Female Urology,

 8    where I was the invited lecturer on management of

 9    complications of the mesh.

10              Q.   Have you previously been qualified as an

11    expert in a Federal Court case with regard to the

12    Prolift®?

13              A.   Yes.

14              MR. ISMAIL:  Objection, 403.

15              MR. SLATER:  We offer Dr. Elliott as an

16         expert in the fields of urology and female

17         pelvic medicine and reconstructive surgery.

18              MR. ISMAIL:  We'll reserve for our

19         qualifications for cross.

20    BY MR. SLATER:

21              Q.   Doctor, in the course of your testimony,

22    I'll be asking you to -- if you have opinions on

23    certain issues.

24              You realize that, right?

Daniel S. Elliott, M.D.

1          A.    Yes.

2          Q.    In the course of your testimony, do you

3    understand that if you offer an opinion, whether I ask

4    you for an opinion or if you offer it in the course of

5    your testimony, that it must be to a reasonable degree

6    of medical certainty?

7          A.    Correct.

8          Q.    So that I don't have to keep repeating

9    that phrase over and over, can we have an understanding

10   that if you offer an opinion, it will be to a

11   reasonable degree of medical certainty, or you will

12   tell us otherwise?

13         A.    Yes.

14         Q.    Okay.  What I'd like to do now is you have

15   a list of materials reviewed, correct?

16         A.    Yes, I do.

17         Q.    And just tell us what that list is.

18         A.    It's a fairly brief summary of all the

19   materials that I've reviewed pertaining to the mesh and

20   specifically Prolift®.  Number one was the medical

21   literature that I reviewed, that would have been mainly

22   through PubMed, which is the largest search engine for

23   medical literature, clinical and preclinical studies.

24   Ethicon and J&J internal documents and videos, surgical

Daniel S. Elliott, M.D.

 1    videos usually.  Ethicon and J&J current and former

 2    employees' depositions, which there's a large number of

 3    those, which we did not glean out each one, but there's

 4    a large number.  Depositions of the Ethicon consultants

 5    and the New England Journal of Medicine editors and,

 6    lastly, Ethicon and J&J product labeling and marketing

 7    documents, like the IFU and patient brochures.

 8            Q.    Those categories of information, you've

 9    set forth a reliance list of what you've relied on in

10    this case?

11            A.    Yes.

12            Q.    Okay.  With regard to the Johnson &

13    Johnson and Ethicon internal documents that were not

14    publicly available, was that significant information to

15    you in forming your opinions in this case?

16            A.    Very much so, yes.

17            Q.    Why is that?

18            A.    Because as a surgeon active in practice,

19    attending meetings, reviewing of the medical

20    literature, that gives me one side of complications or

21    what is known.  What I was unaware of prior to this

22    litigation is what was the degree, severity of the

23    complications that were known prior to that and was not

24    available to the -- say, the average doctor on the

Daniel S. Elliott, M.D.

1    street.

2              Q.    Let's go to an exhibit that's on the top

3    of your pile there P1306, which is Prolift® patient

4    brochure.

5              Is this a document you're familiar with?

6              A.    Yes, it is.

7              Q.    Is this a document you've relied on in

8    part in forming your opinions in this matter?

9              A.    That is correct.

10             Q.    What I'd like to do is just for

11   illustrative purposes turn to Page 5, please, and there

12   is a diagram of normal pelvic anatomy.

13             And the jury will have this up on their screen

14   to see.  Can you just tell the jury very simply what of

15   significance is shown in this simple illustration?

16             A.    Well, it's a cartoon or a schematic of the

17   female pelvis in a coronal or going down the middle,

18   and it's just showing the anatomy with the bladder,

19   urethra, vagina and uterus.  It's a quite simplified

20   anatomy view for a patient.

21             Q.    Now, let's turn to the next page, Page 6,

22   and there's an illustration of a cystocele, and can you

23   tell the jury what they're seeing there?

24             A.    Yes, this in comparison to the first

Daniel S. Elliott, M.D.

1  picture, which was normal anatomy, the second one now

2  has a schematic -- again, understand it's in a very

3  simplified form, which there's nothing wrong with that,

4  but it's just showing the anterior bladder wall falling

5  down, which is called a cystocele.

6          Q.   Why does that happen?  What is it

7  physiologically that happens that allows the bladder to

8  bulge down into the vagina?

9          A.   Be multiple different factors, increasing

10  age, childbirth, possibly hysterectomy, obesity,

11  chronic cough, factors like that that increase the

12  strain on the pelvis that would have the tissue weaken

13  over time and then fall down.

14          Q.   When you refer to the tissue, you're

15  talking about the tissue of the pelvic floor?

16          A.   That's correct, the vaginal tissue,

17  though, technically, it's the tissue underneath the

18  vagina that's holding things up and it's weakened

19  because of those aforementioned factors.

20          Q.   Let's turn to the next page.  Let's turn

21  to Page 7 of the patient brochure.  There's an

22  illustration of a rectocele.  Can you just tell us

23  simply what that is showing.

24          A.   Yeah, a rectocele, think of it as just the

Daniel S. Elliott, M.D.

1    opposite of what I described of where the bladder is

2    falling down, as we say, into the vagina, this is where

3    the rectum is ballooning up into the vagina, again,

4    because of those other issues of pregnancy, childbirth

5    and weakening of the tissues.

6         Q.   There's a diagram on Page 7 of uterine

7    prolapse.  Very simply, what is that?

8         A.   Again, similar to the other issues, this

9    is where the uterus is falling down, again, due to lack

10   of support or weakened support.

11        Q.   Is surgery required for all pelvic organ

12   prolapse?

13        A.   No.

14        Q.   Is it an elective surgery or a surgery

15   that must be done in the vast majority of cases?

16        A.   It is a quality -- it's very important to

17   emphasize this, it's a quality of life problem, meaning

18   the patient is really in charge as far as the

19   decision-making.  So for the majority of individuals in

20   my practice, observation or conservative therapies are

21   done.  It is very rarely in the United States a

22   necessity that surgery has to be done.

23        Q.   Let's turn to the list of treatment

24   options.  It would be the second PowerPoint slide,

Daniel S. Elliott, M.D.

1    treatment options for pelvic organ prolapse, and I'll

2    ask you to briefly go through the list and tell us what

3    each of them -- what each of these options are?

4         A.    It's a summary that made up of options or

5    historical options for treatment of pelvic organ

6    prolapse in women.  As I mentioned, it's a quality of

7    life problem.  So the first option is observation and

8    being conservative, just reassuring the patient that if

9    it's not bothering them, don't do anything.  If it's

10   minimally bothersome, you know, you may or may not

11   choose to do something.

12        Next option is a pessary, which is a -- kind of

13   think of it like a plug, a silicone or a plastic plug

14   being placed in the vagina to help hold things up.

15   Historically, that was done a lot, now a little bit

16   less so, but still it's a conservative, nonsurgical

17   option.

18        Q.    Basically, it would be placed under the

19   bladder to hold the bladder up?

20        A.    It's placed in the vagina underneath the

21   bladder to either hold up the bladder, hold up the

22   uterus or hold up the rectum, dependent upon what

23   problem they're trying to fix.

24        The next one is the traditional sutured

Daniel S. Elliott, M.D.

1    repairs, like the colporrhaphy.  Colporrhaphy just

2    means repair of the vagina, so you can have an anterior

3    colporrhaphy of the bladder, posterior colporrhaphy for

4    rectum, and that's using sutures, the traditional type

5    of repair, which I do very commonly.

6            We also mentioned briefly here the sacrospinous

7    ligament fixation and uterosacral ligament fixation.

8    Those are for what's called vault prolapses, where the

9    whole vagina is falling out, so through the vagina, you

10   can suture it to various different structures to

11   provide support.

12           And then you have the transabdominal

13   sacrocolpopexy.  This is a procedure that can be done

14   either with an incision or done laparoscopically or

15   done with a robot, which is my preferred route.

16           Q.   What does that mean laparoscopically or

17   with a robot?

18           A.   The procedure is fixing the vagina up to

19   the sacrum.  It can be done with an incision, where

20   it's opened up, or using a laparoscope, which is

21   cameras through little ports, four or five ports or

22   using a robot, which is basically a robot attached to

23   the cameras looking in.  It's a different way of doing

24   it.

Daniel S. Elliott, M.D.

```
 1              The next is biologic grafts.  This is where you

 2      can use either tissue from a tissue bank, like

 3      cadaveric tissue, which is not the patient's, but it's

 4      human, or you can use xenografts, which is coming from

 5      a different source, like pig or cow.  And then you also

 6      have synthetic grafts, which is a mesh that's placed in

 7      the vagina.

 8              Last on the list is the mesh kit, in this

 9      particular case the Prolift®, but it can be multiple

10      other mesh kits out there.

11              Q.   What are the most prevalent surgical

12      procedures for the treatment of prolapse?

13              A.   Currently as far -- well, again, it

14      depends upon what type of prolapse you're talking

15      about, because there's going to be a lot of different

16      ones.

17              Q.   Let's talk about, for example, a

18      cystocele.

19              A.   Cystocele would be an anterior

20      colporrhaphy.  The traditional nonsutured repair would

21      be most common.

22              Q.   Are the various abdominal sacrocolpopexies

23      that you described both open and laparoscopic or

24      robotic prevalent as well?
```

Daniel S. Elliott, M.D.

 1          A.   They're very common, but, again, that's

 2     for total vaginal vault prolapse, yes, and depending on

 3     the various different regions, like in the south, it is

 4     the most common procedure performed for that common

 5     problem.

 6          Q.   Doctor, I'm going to now hand across the

 7     table to you what we are marking as P2810, and this

 8     would be the actual Prolift® anterior repair kit, and

 9     what I'll ask you to do first is just to show the jury

10     what the Prolift® kit is.  We've obviously started to

11     open it to save time, and the camera will show the

12     instruments and tell the jury what we're seeing there.

13          A.   Well, important probably, let's go back to

14     the basics.  It comes as a kit.  So what the surgeon

15     gets is a kit in a box.

16          Q.   And I'll hand you the box, which also has

17     the booklet in it as well.

18          A.   Which the nurse brings this to you, takes

19     it out of the box.  The surgeon opens it up, and so

20     it's a contained kit, as opposed to multiple different

21     pieces.  It's a self-contained operation, a kit.

22          So then you're going to have the various

23     different components of the kit, which you will have

24     the trocar, however long that is, 15 inches or so

Daniel S. Elliott, M.D.

1  curved.  It's curved for gaining access, we can go into

2  it later, as far as through the obturator foramen or

3  how this goes in, so it goes in through it and --

4        Q.   What does that mean?  If you're going to

5  say something technical, you might as well tell the

6  jury, obturator foramen.

7        A.   You have the pelvis, male or female,

8  doesn't matter, you have the obturator foramen, which

9  are the holes off to the side, kind of look like this.

10  As I explain it to residents, I go like this is how it

11  is.  So you have the vagina here and then these

12  obturator foramen which are the big bones attached to

13  it with overlying muscles, gracilis, abductor longus, a

14  bunch of -- four or five different muscles overlying

15  this.

16        So when you're gaining access to the vagina,

17  you will go through the obturator foramen from the

18  outside in and go down to the vagina.  So there will be

19  a surgeon's hand in the vagina to grab this.  Again,

20  this is the trocar gaining access going through those

21  muscles, through the obturator foramen into the vagina.

22  You should have this loaded up here, then there's the

23  cannula that actually goes over this.

24        So when the surgeon goes in, then he pulls it

Daniel S. Elliott, M.D.

1    on out, so we don't have to go into detail now, but a

2    cannula is another part of it.  And then the -- you'll

3    have a retrieval system here, and then, lastly, you'll

4    also have the mesh.  Now, again this is an anterior

5    mesh.

6            Q.    What is that used to treat?

7            A.    This is to treat anterior prolapse, okay,

8    the bladder, a cystocele, okay.

9            Q.    So if the bladder is dropping down on to

10   the vagina or into the vagina, this is for the

11   treatment of that condition?

12           A.    Correct.  There will be three different

13   types of meshes predesigned, precut meshes, one for

14   anterior like this one here.  This will show up very

15   well, may show up a little better like this that can be

16   seen with arms on it, four arms going out those

17   obturator foramen, which I had mentioned.  The

18   posterior will have a different configuration, and then

19   the total will be a combination of the anterior and

20   posterior.

21           Q.    When you showed the guide and the cannula,

22   is that ultimately to set the tunnels to pull the arms

23   back out of the body?

24           A.    Correct, correct, yeah.

Daniel S. Elliott, M.D.

1          So this will go from the outside through the

2     obturator foramen into the vagina.  This is pulled out.

3     The retrieval device is placed through it and then the

4     mesh is pulled through it.  So at the at the end of the

5     procedure, this is very important, all of these, the

6     trocar, the retrieval device and the cannula are no

7     longer with the patient.  The only thing that's

8     remaining is the mesh.

9          Q.   Now, we have here -- we've marked this as

10    Exhibit 2292, a total repair kit, and what I'll ask you

11    to do, keep it separate, I really just want you to be

12    able to -- to pull out the mesh part.

13               MR. ISMAIL:  Objection to the relevance.

14    BY MR. SLATER:

15          Q.   If you could, please show the jury the

16    total Prolift® implant.

17          A.   I'll just keep it in the plastic here,

18    actually show it a little better here.

19          So you have the total Prolift®, where you have

20    the anterior component of it or part right here, that's

21    what I showed just a second ago (indicating).

22          Q.   That's for treatment of a bladder

23    prolapse?

24          A.   Bladder or anterior prolapse, a cystocele.

Daniel S. Elliott, M.D.

```
 1   Then you have the posterior aspect up here with the

 2   various different arms, again, the arms are configured

 3   differently because they're exiting out the -- they're

 4   not going through the obturator foramen, they're

 5   actually going through the buttocks.  So you can get an

 6   idea of the volume of the meshes and the arms and the

 7   shape.  This is treating a total vaginal vault

 8   prolapse.

 9        Q.   And the posterior part of the Prolift®,

10   that's to treat a rectocele or rectal prolapse?

11        A.   The posterior is for rectocele, that is

12   correct, yes.  The total would be for anterior

13   cystocele, enterocele like the intestines are pushing

14   down and rectocele, so it's treating the whole vault.

15        Q.   I'll take that.

16        Doctor, in your career have you ever used the

17   Prolift®?

18        A.   No, I have not, by choice.

19        Q.   Do the other doctors at the Mayo Clinic

20   use the Prolift®?

21             MR. ISMAIL:  Objection, lack of

22             foundation.

23             MR. SLATER:  Rephrase.

24   BY MR. SLATER:
```

Daniel S. Elliott, M.D.

1        Q.   Did the other doctors at the Mayo Clinic

2   use the Prolift®?

3             MR. ISMAIL:  Objection, lack of

4             foundation, hearsay, 403.

5             THE WITNESS:  No, all by choice

6             separately, just chose back in 2005 in that

7             time frame not to use it.

8   BY MR. SLATER:

9        Q.   Why did you chose not to use the Prolift®?

10       A.   I didn't see a need for it.

11       Q.   What do you mean by that?

12       A.   In my practice we had good success, good

13  quality of life, low recurrence rate, and I didn't see

14  a purpose for it.

15       Q.   When the Prolift® first came out, did you

16  look to see if there was data to support the use of the

17  Prolift®?

18       A.   Right when it first came out, no.  We're

19  going back a lot of years now.  I remember looking and

20  reviewing it because there was a lot of interest in

21  female urology.  This is my first year -- five years in

22  practice, and it was new, it was different, and so I

23  looked into it.  I don't recall the literature I

24  reviewed at that point in time, but, again, I just

Daniel S. Elliott, M.D.

1    decided I didn't see a need.

2          Q.   Okay.  I'd like you to look now at Exhibit

3    1593 and this is a Prolift® professional education

4    PowerPoint slide deck.

5          Are you familiar with this document?

6          A.   Yes, I am.

7          Q.   Is this something you've relied on in

8    forming your opinions?

9          A.   Yes, it is.

10         Q.   What I'd like to do is turn you towards

11   the back, actually, about seven or eight pages from the

12   back, there's an illustration of the anterior implant

13   position.

14         Do you have that?

15         A.   This one?

16         Q.   Yes.  Great.

17         A.   Doesn't look like we have a page number on

18   it.

19         Q.   There's no page numbers on it but --

20         A.   That one.

21         Q.   Great.  It will certainly be up on the

22   screen for the jury.

23         Can you tell the jury what this is showing,

24   this simple schematic?

Daniel S. Elliott, M.D.

1          A.    This is, assuming we're on the same

2    page -- we are on the same page, correct?

3          Q.    Yes.

4          A.    Okay.  This is a schematic, again, a

5    cartoon or a simplified version of the actual anterior

6    mesh in-situ, meaning in the patient and where it goes,

7    where the arms go and things.

8          Q.    What are the structures that we see, just

9    to orient us?

10          A.    Well, it's quite simplified because a lot

11    of the important things are not there.  But you can see

12    the bladder, you can see underneath it the mesh and

13    then under that you can see the vagina.  And then you

14    see the rectum and you see the obturator foramen and

15    various different ligaments around the pelvis, but,

16    again, it's quite simplified.

17          Q.    The bladder would be to the front, the

18    rectum would be to the back as the jury sees this?

19          A.    As you go down you have bladder, mesh,

20    vagina, rectum from top to bottom.

21          Q.    If you turn -- this is actually the 55th

22    page of the slide deck, just for the record.  If you

23    turn back one page to the -- actually turn forward one

24    page, okay, on the 54th page of the slide deck, I

Daniel S. Elliott, M.D.

1    believe it is -- it says Gynecare Prolift® Total

2    Implant Position.

3            What is that showing us?

4                MR. ISMAIL:  Objection, relevance, 403.

5                THE WITNESS:  Okay.  That's showing --

6            it's a continuation of the volume of mesh

7            that's put in.  It shows the anterior and

8            posterior mesh in place as it would

9            theoretically be supporting the bladder, the

10           apex of the vagina and then the posterior

11           aspect which is where the rectum would be.

12   BY MR. SLATER:

13           Q.  Okay.  Now, what I'd like to do, if we

14   could, is go through some animation video clips.  Are

15   these video clips that you have selected and that you

16   have reviewed as part of your review of this case?

17           A.  That is correct, yes.

18           Q.  Are these animation videos something

19   you've relied on in forming your opinions?

20           A.  Yes.

21           Q.  Do you, in your opinion, feel they would

22   be useful to you in demonstrating aspects of the

23   procedure and illustrating your opinions in this case?

24           A.  Very much so, yes.

Daniel S. Elliott, M.D.

```
 1          Q.   Okay.  We are going to play the video

 2   clips with no sound, and they are short video clips,

 3   and the first one is a short one.  It's 501 for the

 4   record.

 5               MR. ISMAIL:  Just we object under 403 to

 6          the playing or showing to the jury of any of

 7          the video of the actual surgery itself.

 8               MR. SLATER:  Okay.  We're starting with

 9          the animation clips.

10               MR. ISMAIL:  Fair enough.

11               MR. SLATER:  Is there an objection to the

12          animations?

13               MR. ISMAIL:  Depends what you show.

14               MR. SLATER:  There's not a blanket

15          objection, initially?

16               MR. ISMAIL:  Not a blanket objection.

17   BY MR. SLATER:

18          Q.   Okay.  Doctor, what we're going to do,

19   before we show this, clip 501 we're going to put it up

20   on the screen, and then you'll just tell the jury,

21   we'll pause it about halfway through when it gets set

22   up, and then you can tell the jury what they see, okay.

23               (Video played.)

24   BY MR. SLATER:
```

Daniel S. Elliott, M.D.

1          Q.    What is that showing us?

2          A.    Okay.  Again, it's just showing the

3    anterior Prolift® mesh, as it would be placed in the

4    patient as far as somewhat of its orientation, and then

5    the female pelvis in what's called the dorsal lithotomy

6    position, just the way you operate, a woman on her

7    back, legs up in stirrup and then access to the vagina.

8    And then you can see underneath it is the pelvic bones,

9    how they would be in the woman when she's on her back.

10         Q.    Just for the record, you're turned a

11   little to the side because you're looking at a screen

12   on the wall?

13         A.    Yes, I am.  There's a screen over here.

14         Q.    Okay.  We're going to now go to clip 502.

15         What are we going to see here?

16         A.    On 502?

17         Q.    Yeah, let's play -- actually, let's play

18   it and then if you want to have him pause it or you

19   certainly can tell him to pause it at a certain time

20   and explain what we're seeing.

21         A.    Yeah, it's just describing -- you can

22   pause it a second there very quickly.  It initially

23   highlighted the arms, which is a very key component to

24   the Prolift® mesh, which makes it unique compared to

Daniel S. Elliott, M.D.

1   the other operations I discussed, where the arms would

2   be going through the obturator foramen.  That's why it

3   highlighted the more out -- proximal vagina and then

4   deep vagina.  So those arms go in different locations.

5           Q.   What I actually want to do now is I want

6   to go back to the start on this clip.

7           A.   Okay.

8           Q.   Let's go back.  We're not going to be able

9   to pause it because it's going to be played in other

10  courts potentially, and they're not going to be able to

11  know when you paused it.  So what I'm going to do is

12  I'm just going to have the clip played.

13          A.   Okay.

14          Q.   And this is -- I'm just saying this for

15  everyone in the room, probably realize that was kind of

16  silly what I just did, hope everybody had a good giggle

17  out of it.  We're just going to show it from the

18  beginning when I'm ready to start, and then you'll just

19  narrate as it goes, and then when it's done, you can

20  explain if there's anything else you have to explain.

21          So let me start over.  That was just for

22  everyone in the room to know -- get their jollies here.

23          Doctor, we're now going to show animation clip

24  502.  As it plays, would you please explain to the jury

Daniel S. Elliott, M.D.

1    what they're seeing.

2           A.    Sure.   It's a schematic again showing the

3    mesh with highlighting the various different arms that

4    go through the obturator foramen, which I've discussed

5    just a little earlier and then place it in the vagina

6    how it will be done, with an incision.   They described

7    there a fairly small incision.   Now you've turned

8    sideways, and then they'll place the mesh through that.

9           Q.    And the mesh is placed through the vagina

10   through a vaginal incision?

11          A.    Correct.

12          Q.    Next we're going to go to clip 504A, and

13   what we'll do is, again, we'll show it and please tell

14   the jury what of significance they're seeing, please.

15          A.    Okay.   Now, this is a surgeon with a

16   finger placed through the vagina through the vagina

17   incision, now, those trocars, which I showed just a

18   little while ago, going through the obturator foramen

19   through multiple different muscles, there they show one

20   of the muscles.   There's other ones.   Again, there's

21   four or five different large muscle groups that it goes

22   through, through the vagina, on to the surgeon's index

23   finger, and then they will first place the distal most,

24   see there, toward the opening of the vagina.   There's

Daniel S. Elliott, M.D.

 1  where the first one goes through, ideally through the

 2  arcus tendineus, which is an anatomical strong

 3  structure.

 4        Q.   Okay.  Now, let's go to animation clip

 5  505, please, and just again narrate through for the

 6  jury what is significant to you.

 7        A.   Again, we have the schematic and now the

 8  arms are already placed through.  We've actually missed

 9  a step.  There's another video in there describing how

10  they placed the other ones, but this is how the mesh

11  wraps through the retrieval device and then will be

12  pulled out through the skin, through the vagina,

13  through the skin and out.

14        Q.   And I think -- well, rephrase.

15        Let's go to clip 506 now, and can you tell the

16  jury what they're seeing there.

17        A.   Okay.  Again, this is the placement

18  through the retrieval devices of all the four arms that

19  will go through the vagina and out the obturator

20  foramen through those cannula that I described earlier,

21  and now the cannulas are being removed and the mesh is

22  then being slid into place.  The cannulas then are

23  removed.  Here's where it shows the mesh lying flat in

24  there, again, in the cartoon fashion.

Daniel S. Elliott, M.D.

1    Q.   Doctor, we're not going to go through the

2  total or posterior Prolift® procedures in the interest

3  of time.

4       The video animation clips that we just showed

5  for the anterior procedure, are they a fair

6  demonstration of those steps of the procedure in a

7  general sense of what is done to get the mesh into the

8  body and the arms out?

9    A.   Well, it's very -- it's a schematic.  I

10  don't know -- I would argue on the word fair, but it's

11  showing how it goes through because it's very

12  simplified form of it, yes, let's put it that way.

13    Q.   What I meant is does it, in a general

14  sense, demonstrate what would happen in the posterior

15  or total procedures as well?

16    A.   Yes, in a very general sense, but I'd say

17  it would be misleading, though.

18         MR. ISMAIL:  Objection, move to strike,

19         nonresponsive.

20  BY MR. SLATER:

21    Q.   Doctor, the clip that we just -- the clips

22  that we just saw of the anterior procedure, do they

23  generally show how the mesh in an animated, simple form

24  is placed into the body and the arms are pulled out?

Daniel S. Elliott, M.D.

1          A.    Yes.

2          Q.    Doctor, what is the mesh material in the

3    Prolift®, what is it called?

4          A.    It's -- well, the basic is polypropylene

5    mesh.

6          Q.    And what is it called, what's the name of

7    the mesh?

8          A.    Gynemesh®.

9          Q.    And was that originally developed to be

10   used in the pelvis or for another use?

11         A.    Another use.

12         Q.    What's that?

13         A.    For hernia repair, abdominal hernia

14   repair.

15         Q.    And that was called Prolene Soft when it

16   was developed for hernia?

17         A.    That is correct.

18         Q.    When Gynemesh® mesh started -- Prolene

19   Soft mesh started to be marketed for use in the pelvis,

20   it was first marketed in about 2003; is that correct?

21         A.    Roughly in that time frame, yes.

22         Q.    And when it was first sold as Gynemesh®

23   PS, was it sold in a kit like this or was it sold

24   differently?

Daniel S. Elliott, M.D.

1          A.   No, it was not in a kit, it was just a

2   sheet of polypropylene.

3          Q.   And what did doctors do with that mesh

4   when it was first sold as Gynemesh® PS?

5          A.   The surgeon would trim it, tailor it to

6   the given patient and place it through the vagina.

7          Q.   And just would use a portion of the mesh

8   to help support a suture repair as-needed?

9          A.   That is correct.  It would be to tailor,

10   to repair whatever they're repairing.

11          Q.   We're going to talk more about this a

12   little later, but do you have an opinion as to whether

13   the use of Gynemesh®, just cutting a portion of it and

14   placing it in the vagina for a particular patient's

15   needs, whether or not that is a safer alternative than

16   the Prolift® with the larger amount of mesh and the

17   arms that we've seen?

18              MR. ISMAIL:  Objection, lack of

19          foundation.  I don't believe this is a

20          disclosed opinion.

21   BY MR. SLATER:

22          Q.   You can answer.

23          A.   I would be very careful what I say -- I

24   would say it would be a safer procedure.  I do not

Daniel S. Elliott, M.D.

```
 1    agree with it being safe, but it is safer than the kit

 2    with arms, et cetera.

 3            Q.   And we'll talk more about it later, but

 4    very succinctly, what's the reason why?

 5            MR. ISMAIL:  Objection, lack of

 6            foundation, undisclosed opinion.

 7            THE WITNESS:  There would be multiple

 8            factors.  The largest one would be the sheer

 9            volume of mesh, but then also the trocars with

10            the arms going through the various different

11            muscle groups, because that is going to fix

12            this mesh in a completely different way.

13    BY MR. SLATER:

14            Q.   Doctor, next exhibit is PLT0062, not a

15    PowerPoint, but it's an actual document.

16            MR. ISMAIL:  Copy.  While you're at it,

17            can I have the other one.  I didn't want to

18            interrupt while you did the video.  Thank you.

19            These are the 504s and the 506s?

20            MR. SLATER:  They are, and we can -- we'll

21            get you the actual clips if you don't have

22            them.  They're exactly the same as what was

23            utilized in Bellew, so you guys should have

24            them, but we can have them Dropboxed or sent
```

Daniel S. Elliott, M.D.

1              over to you.

2                    MR. ISMAIL:  Thank you.

3    BY MR. SLATER:

4              Q.   Okay.  Doctor, I've handed you PLT0062.

5              Is this a medical journal article you are

6    familiar with?

7              A.   Yes, it is.

8              Q.   Is this an article that you feel and

9    believe to be medically reliable in the field?

10             A.   Yes, it is, yes.

11             Q.   Is this something you've relied on in

12   forming your opinions?

13             A.   Yes.

14             Q.   First of all, who wrote this article?

15             A.   Well, it's a TVM group, as they call them.

16   There's multiple different authors involved, six, I

17   believe.

18             Q.   What was the role of the TVM group, this

19   group of doctors from France, what was their -- very

20   simply their role with the Prolift®?

21             A.   Well, a group of physicians got together,

22   these surgeons that are mentioned here, in France, as

23   you stated, to devise this new technique for prolapse

24   repair using the polypropylene mesh.

Daniel S. Elliott, M.D.

1              Q.   If you could, turn to the fourth page is

2      Page 579, and what I want to focus on in the bottom

3      right corner, there's a -- I guess a blowup of a

4      microscopic picture of the -- or a close-up picture of

5      the soft Prolene mesh.  That's the mesh in the

6      Prolift®?

7              A.   That is correct.

8                   MR. ISMAIL:  Objection, hearsay.

9                   THE WITNESS:  Yes, that's correct.

10     BY MR. SLATER:

11             Q.   And just focusing on that one box that

12     says soft Prolene on it, what are we seeing there?

13     What's of significance?

14                   MR. ISMAIL:  Objection, hearsay.  I don't

15                   want to keep interrupting.  I have a standing

16                   objection to hearsay to the use of this

17                   article.  Okay.  I'll keep objecting.

18                   Objection, hearsay.  Sorry, I didn't mean to

19                   interrupt.

20                   MR. SLATER:  Let me just ask, I don't

21                   understand your hearsay objection.  It's a

22                   medical literature.

23                   MR. ISMAIL:  Objection, hearsay.

24                   MR. SLATER:  You think they're not useful,

Daniel S. Elliott, M.D.

1          you can't use medical literature in a trial?

2                MR. ISMAIL:  This article is hearsay.

3                MR. SLATER:  You don't have to object to

4          the use of my articles on the hearsay basis

5          anymore during this deposition.  That's

6          preserved.

7                MR. ISMAIL:  I'm probably going to, given

8          that I think we have a disagreement as to

9          whether learned treatises are hearsay or not.

10               MR. SLATER:  All right.  But I'm saying

11         I'm granting you a standing objection to my use

12         of learned treatises as hearsay that is

13         inadmissible, so you don't have to object it

14         because you can -- every time I use medical

15         literature, you can object to it and say it was

16         hearsay and shouldn't be allowed to be used, so

17         that way we can move through, is that okay?  It

18         will help me to not have you objecting when I'm

19         already agreeing you have a preserved

20         objection.

21               MR. ISMAIL:  I appreciate that.  What I'll

22         do is every time you introduce a new article,

23         I'll object to that one as being hearsay, and

24         if I have a standing objection to the use of

Daniel S. Elliott, M.D.

 1              that particular article, I won't keep

 2              interrupting.

 3                   MR. SLATER:  You have a standing objection

 4              to my use of medical journal articles.

 5                   MR. ISMAIL:  I have an objection to this

 6              article, Exhibit 62, Plaintiffs' Exhibit 62, as

 7              hearsay, and I appreciate the standing

 8              objection to the use of this article.

 9                   MR. SLATER:  Sure, and it's for the record

10              PLT0062.

11                   MR. ISMAIL:  Yes.  Thank you.

12     BY MR. SLATER:

13              Q.   Okay.  Doctor, I'm going to start over.

14              On Page 579 of this article, there is an

15     illustration and a close-up picture of soft Prolene

16     mesh.

17              Do you see that?

18              A.   That is correct, yes.

19              Q.   Is that the mesh material in the Prolift®?

20              A.   Yes, it is.

21              Q.   What is of significance that we're seeing

22     here?

23              A.   Well, they're just showing -- you have to

24     take it in all -- there's four different photographs.

Daniel S. Elliott, M.D.

1          Q.    We're only looking at the soft Prolene

2    picture.

3          A.    They're just showing the mesh, the weave

4    of the mesh, the space of the meshes.

5          Q.    What do they call -- what are those spaces

6    referred to as?

7          A.    The pore size would be the easiest one,

8    the gate in between them, the space in between the

9    various meshes.

10          Q.    We have -- you see there's some larger

11    spaces and they have a thread right through the middle.

12          Do you see those?

13          A.    Yes, I do.

14          Q.    There's also knots and spaces there.  What

15    are those referred to as?

16          A.    Well, again, there's a -- all the meshes

17    have a different weave to them.  So this is the weave

18    of the mesh and the areas where it's all knotted, as

19    you mentioned.

20          Q.    So it's showing the actual appearance of

21    the pores and the interstices between the mesh?

22          A.    Correct, on a relatively microscopic or

23    magnified view.

24          Q.    When the mesh is in the body after the

Daniel S. Elliott, M.D.

1    surgery, and now that this incision is closed, what is

2    supposed to happen?  What was intended to happen with

3    the healing process and with the mesh in the body?

4            A.   Well, theoretically, as you see here, the

5    picture has large pores, now, again, this is magnified,

6    so we have to take that, but, theoretically, you are

7    going to have the tissues grow through those to get

8    nice healthy tissue in between those pores, that's in

9    theory.  It would be like a scar net is the kind of

10   phrase that was used.  But, again, that's in theory

11   what would happen.

12           Q.   What actually occurs in practice based on

13   your review of the materials, the medical literature,

14   your medical experience, all the materials you

15   reviewed, what is it that actually occurs?

16               MR. ISMAIL:  Objection, lack of

17               foundation, 705.

18               THE WITNESS:  Okay.  In my daily practice

19               on physical exams in people with Prolift®, what

20               actually happens when that Prolift® gets in

21               there, or any mesh, for that matter, not just

22               Prolift®, but let's just talk specific to

23               Prolift®, the mesh is going to be pulled, the

24               pore size is going to decrease, and then

Daniel S. Elliott, M.D.

1              instead of getting this intergrowth through the

2              holes of the mesh and have nice healthy tissue,

3              you then get a scar plate.  So the scar forms

4              around this.

5                   So where it's important for me is then on

6              physical exam, when you do a pelvic exam, you

7              feel this fibrotic or wooden, what you kind of

8              describe it as, again, this firmness within the

9              vagina.

10    BY MR. SLATER:

11         Q.   What is it that leads to the development

12    of scar tissue, what is it about the interaction of the

13    mesh in the body that leads to that?

14         A.   Well, that's a long, drawn out

15    conversation because what you've got, you've got a

16    foreign body --

17         Q.   Let's do it not the long, drawn out

18    conversation version.

19         A.   All right, we'll be specific.  Mesh is not

20    human, it's foreign.  You put it in the body, the body

21    perceives it as foreign.  The body's natural response

22    is to try to get rid of it, and the process starts to

23    create this foreign body reaction, which increases the

24    scar tissue, that causes the mesh to contract or the

Daniel S. Elliott, M.D.

 1    tissue to contract around it, which then perpetuates

 2    the problem.  That's why it's a progressive problem.

 3    So it's a long, drawn out conversation.  That's a very

 4    succinct answer.

 5         Q.   As part of the foreign body reaction, is

 6    there any inflammatory response as well?

 7         A.   Well, that is part of it, okay.  The body

 8    perceives the mesh as foreign, which it is.  The

 9    response of the body is to create inflammatory

10    response.  So as long as that foreign body is in there,

11    you're going to have an inflammatory process.

12         Q.   With regard to the size of the pores in

13    the Prolift® mesh or any mesh, is there an

14    understanding as to whether or not larger spaces or

15    smaller spaces are better in terms of the healing

16    process?

17         A.   The larger the space, the space in between

18    the mesh, the reduced inflammatory and foreign body

19    reaction you're going to have.

20         Q.   There's been reference, and tell me if

21    you're familiar with it, to a 1 millimeter pore size in

22    all directions under strain.

23         Is that a concept that's of any significance to

24    you?

Daniel S. Elliott, M.D.

1           A.    Yeah, it's a very important concept.

2           Q.    Why is that?

3           A.    Saying that -- again, you made a very good

4     point there as far as when it's in the body, under

5     strain.  It doesn't matter what it's doing on the

6     table.  As I hold up this mesh, that doesn't matter.

7     What matters is is when it's in the body and when it's

8     being pulled on when the woman is walking, coughing,

9     doing activities, what those pores do.  Those pores

10    contract down, then you're going to start this whole

11    cascade, the scar plate, the inflammatory response,

12    foreign body reaction.

13          Q.    What happens to the pores when the

14    Prolift®, as we've seen in those schematics, gets put

15    into the body, what happens to the pores?

16          A.    Collapses.

17          Q.    What do you mean by that?

18          A.    Means, again, we have this picture of

19    these large pores, okay, when you start to pull on it,

20    when you place it, just the arms, you're going to have

21    to pull on those arms, you're going to have to tension

22    this, and then those pores go from this to collapsed

23    down like this (indicating).  When that happens, now

24    the body can't grow through it, like that scar net I

Daniel S. Elliott, M.D.

 1    described.  Now you get that caking, and we can feel it

 2    when we do physical exams on Prolift®, the banding we

 3    call it, feel out lateral in the vagina, and you feel

 4    this rod, for lack of a better phrase, you touch it, it

 5    hurts.  It's a whole cascade of everything I've

 6    mentioned several times now.

 7           Q.   What is contraction or shrinkage, what

 8    does that mean?

 9           A.   That's when, again, we go back to this

10    foreign body reaction, inflammatory response, the body

11    is trying to healing itself.  The only way it can is by

12    creating scar.  When that happens, the scar contracts

13    down, pulling the mesh.  The mesh is the ultimate

14    responsibility, but it pulls on it, okay, and the

15    significance of mesh contraction is pain, because, like

16    I mentioned in that video, where these trocars are

17    going through all those muscles and mesh is going

18    through those muscles, muscles hurt when you start to

19    pull on them.  So as the mesh contracts, pulls

20    together, pulls on those muscles of the pelvis and it

21    causes the pain.

22           Q.   Doctor, if you could go back to the

23    professional education PowerPoint, 1593, it's the

24    larger one right there, top left, and it's about the

Daniel S. Elliott, M.D.

```
1    tenth page in, and actually I counted them, I think

2    it's the tenth page, and there is a slide that says

3    "Mesh Use in Hernia Surgery" and has a picture of

4    rebar.

5          A.   Yes.

6          Q.   Is this of significance to you, this

7    illustration and the language next to it?

8          A.   Yes.

9          Q.   Tell the jury, first of all, it says,

10   "Much like rebar in concrete, the stress at any one

11   point is distributed over the entire area of the

12   graft."

13         Do you see that?

14         A.   Yes, I do.

15         Q.   Now, have you seen anything in any medical

16   literature or any material you've ever seen that shows

17   that when the Prolift® is placed, it actually has this

18   distribution of stress across the entire mesh, like

19   they say in the engineering rebar?

20         A.   Well, no, it's the exact opposite,

21   actually.

22         Q.   And so using this diagram, what's the

23   significance of this picture of rebar?

24               MR. ISMAIL:  Objection, lack of
```

Daniel S. Elliott, M.D.

1           foundation, 705.

2                THE WITNESS:  Well, the rebar analogy is

3           accurate and completely inaccurate at the same

4           time.  Yes, I agree, it's a very strong

5           substance, unbending, but when it's placed in

6           the human body, that's not what you want.  You

7           need to have something dynamic that can move,

8           and so that's why I say it's correct and it's

9           incorrect.  It's very, very strong, but that's

10          not what you want having placed in the vagina.

11     BY MR. SLATER:

12          Q.   If rebar has to be removed from the

13     sidewalk, you take the jackhammers and chop down into

14     the concrete and get it out?

15               MR. ISMAIL:  Objection, 403.

16               THE WITNESS:  Which I have done in between

17          high school and college, and it is a bear.

18          That's why I never do it anymore.  Did it once

19          and that's it.

20     BY MR. SLATER:

21          Q.   When mesh has to be removed, how does that

22     analogy apply to the human body?

23          A.   Well, I don't have the luxury of not being

24     able to do that, like I can do with rebar concrete.  It

Daniel S. Elliott, M.D.

```
 1   is very similar.  You have to cut, you have to use big

 2   scissors.  We just did one two or three days ago, large

 3   scissors to cut through this.  It's very stuck, and

 4   it's very tedious surgery because it can be fixed to

 5   the bladder, very difficult -- the bladder is thin, get

 6   into it, you got a mess.  Posteriorly on the rectum or

 7   up top on the intestines, and you can't get it all out.

 8   It's a very tedious -- we call it a train wreck because

 9   it's very difficult to get out.

10            MR. ISMAIL:  Objection, move to strike,

11            nonresponsive, 403.

12   BY MR. SLATER:

13        Q.   Doctor, with regard to the difficulty in

14   removing the mesh, do you have an opinion as to whether

15   or not that is medically safe or unsafe aspect of the

16   Prolift® system?

17        A.   It's quite unsafe.

18        Q.   Doctor, with regard to the reaction of

19   this large mesh implant that you've shown us with the

20   human tissue, the foreign body reaction, the

21   inflammatory response, do you have an opinion as to

22   whether that is medically safe or unsafe?

23        A.   It's unsafe.

24        Q.   We're now, Doctor, going to go to some two
```

Daniel S. Elliott, M.D.

```
 1    clips of video from actual surgical videos from Ethicon

 2    from their professional education department, correct?

 3         A.   That is correct.

 4         Q.   Now, have you reviewed and selected these

 5    short clips to help illustrate your opinions?

 6         A.   Yes, I have.

 7         Q.   Would they be helpful to you in

 8    demonstrating relative aspects of the Prolift®

 9    procedure?

10         A.   Definitely.

11         Q.   The first one that we're going to use is

12    5701, and what we'll do is we'll show the video and

13    while it's playing, please, just as you did before with

14    the animations, narrate and tell us what is of

15    significance to you in explaining your opinions on the

16    Prolift®.

17              MR. ISMAIL:  Objection, 403, to showing

18              the video.

19              THE WITNESS:  It's going to be a surgical

20              video.  It's going to be sort of graphic for

21              people not used to this, but it's showing the

22              mesh trying to be put through the vagina.

23              They're doing actually a stay stitch there

24              first.  And now they've got the retrieval
```

Daniel S. Elliott, M.D.

 1              devices already in there, and there they're

 2              actually stuffing the mesh in there, because,

 3              remember, I showed you the mesh, it's a large

 4              volume of mesh, the vagina is small.  You have

 5              to stuff it in there.  So that was actually a

 6              very good description or visual image for

 7              everybody to just kind of see how you have to

 8              push it through there.

 9   BY MR. SLATER:

10         Q.   When the mesh gets pushed in that way,

11   what impact does that have on the mesh itself?

12         A.   Well, there can be multiple different

13   factors.  You're pushing it through vagina, which can

14   cause infection of it, contamination of it.  You can

15   distort the meshes if you're pulling on it, and it's

16   not going to lay flat.

17         Q.   Let's go to clip -- and one other thing,

18   in that image, in that video there were -- did we see

19   the cannulas actually coming out that were placed for

20   an anterior procedure?

21         A.   Yeah, we saw on that one the retrieval

22   devices were already in.  The cannulas had already been

23   removed.  The retrieval devices were there on the mesh

24   arms, they hadn't been pulled through yet.

Daniel S. Elliott, M.D.

1          Q.   Let me ask you this:  In the image we

2     could actually see the white cannulas.  Were they still

3     in the body, not the next clip, but the clip we just

4     saw?

5          A.   I thought the cannulas had been removed

6     already.  I'd have to look at it then.  If the cannulas

7     were removed, then just the -- yeah, the cannulas are

8     still there, yes.

9          Q.   Let's go to clip 5702, the next clip, and

10    tell us as it plays what we're seeing and what's

11    significant, please.

12               MR. ISMAIL:  Objection, 403.

13               THE WITNESS:  Okay.  So now we see he's

14          pulling out the cannula and then the mesh arms

15          extending out through the obturator foramen,

16          and, again, what's important to note about that

17          as we saw earlier the size of the mesh arms,

18          which are about one centimeter, a little larger

19          going through those cannulas, which are just a

20          couple millimeters and they're rolled, so it

21          will cause the mesh to roll, the arm meshes to

22          roll.

23    BY MR. SLATER:

24          Q.   And what we'll do now is go to the next

Daniel S. Elliott, M.D.

1    PowerPoint slide, which is a side by side comparison of

2    a still shot from the animation and from the video we

3    just saw, and can you tell the jury what of

4    significance this shows?

5              MR. ISMAIL:  Objection, 403.

6              THE WITNESS:  Okay.  The biggest thing to

7         me is if you look at the cartoon first, for me

8         it's on the left, that the mesh arms are laying

9         flat, but then, in reality, when it goes into

10        the human, you can't have a 1 to 1.5 centimeter

11        mesh arm go through a cannula that's a couple

12        millimeters and not get it to roll.  So if you

13        were able to zoom in there where it comes out

14        of the skin, it's going to be rolled.  That's

15        going to also collapse those pores and start

16        that whole cascade of inflammation, foreign

17        body reaction, scarring.

18   BY MR. SLATER:

19        Q.   When the mesh is pulled through the

20   cannulas, as we see illustrated on these still shots,

21   what happens to the mesh when it's being pulled through

22   the cannulas, what happens to the pores and the mesh

23   itself?

24        A.   It can collapse, it will collapse.  If

Daniel S. Elliott, M.D.

 1   you're pulling on it with more than, what, 2.3-kilos,

 2   which is roughly 12 pounds of force, which is not much,

 3   and you'll pull on it, those pores -- remember, they

 4   start like this, you pull on them and they'll collapse

 5   on you.  Again, that increases the foreign body,

 6   prevents that growth through the interspaces and starts

 7   that whole foreign body cascade I talked about.

 8        Q.   With regard to the amount of force you

 9   just stated, was that confirmed to be the amount of

10   force used during the procedure by Scott Ciarracca?

11        A.   Correct.

12             MR. ISMAIL:  Objection, lack of

13        foundation.

14   BY MR. SLATER:

15        Q.   Do you have an opinion -- and we can take

16   that down now.

17        Do you have an opinion, Doctor, as to whether

18   or not the arms and the cannulas are necessary to treat

19   pelvic organ prolapse?

20        A.   I have an opinion, yes.

21        Q.   What's your opinion?

22        A.   They're absolutely not essential.  They're

23   counterproductive.

24        Q.   And do you have an opinion as to whether

Daniel S. Elliott, M.D.

1    or not the use of the arms and the cannulas, as we've

2    seen, is medically safe or unsafe?

3              A.    It's unsafe.

4              Q.    Why is that?

5              A.    Again, like I've mentioned, as far as just

6    multiple different issues.  Number one, the rolling

7    going through the muscles, which will cause contraction

8    and pain.  Then also it fixes the vagina.  The vagina

9    is a dynamic organ.  As a woman stands, lays down,

10   coughs, it's going to move.  Those arms are going to

11   cause it to be fixed, and then so when she does

12   activity, that's what causes the pain, so pull on the

13   muscles and other structures.

14             Q.    Let's go to the next PowerPoint slide.  We

15   have in front of you a slide we've titled tension free

16   and, first of all, we have little footnotes there with

17   respect to the deposition testimony where these pieces

18   of information came from.

19             Have you read those depositions?

20             A.    Yes, I have.

21             Q.    And have you relied on those depositions

22   in part in forming your opinions?

23             A.    Yes.

24             Q.    What is tension free?  In the context of

Daniel S. Elliott, M.D.

1    Prolift® and the concept of the Prolift®, what was the

2    concept of tension free?

3           A.   Well, tension free, if we're talking about

4    the mesh just sitting on the table versus the mesh in

5    real life, okay, I deal with real life.  I don't care

6    what it's like on the table.  I care what's in the

7    patient.

8           So as it sits on the table, it's going to be

9    tension free, there's no pulling on it.  But in order

10   for you to put it in the woman, it's impossible to have

11   something be tension free.  If there's no tension, the

12   prolapse still exists, so it's -- you can't have it in

13   real life in the patient.

14          Q.   Now, the first thing we have on this, on

15   documents, I'm just going to ask you about a phrase

16   tension free, meaning the mesh is in unstretched

17   condition as if laying on a table, okay.

18          Do you have an opinion as to whether or not in

19   actual use in the body, the mesh can be placed tension

20   free, as described there?

21          A.   It cannot be.

22          Q.   And just very simply why?  I think you

23   might have talked about this already, but just very

24   simply.

Daniel S. Elliott, M.D.

1          A.   Again, like we've talked about that the

2    human vagina is not a table, okay.  It's going to be

3    moving, lifting, walking, and it's going to -- in order

4    to hold a prolapse, which is everything is falling

5    down, you've got to hold it up; therefore, there's

6    going to be tension on that device.  Placing it through

7    the body is going to require tension.  You've got to

8    pull it through and adjust it.

9          Q.   And we saw the video of how it was pushed

10   through the vagina and then how the arms were used.

11   Does that impact on that opinion as well?

12         A.   Again, that's consistent with my opinion.

13         Q.   Tension on the mesh plus contraction

14   equals pain.  What is the significance of that?

15         A.   That's what I referred to earlier, that if

16   mesh is pulled with a minimal amount of force,

17   12 pounds of pressure, those pores will collapse.  That

18   will cause this foreign body reaction, inflammation and

19   scarring, that causes the mesh to contract, article

20   like by Tunn, et al., 65, 80% mesh contraction.  When

21   that happens, structures are pulled on, specifically

22   muscles or nerve intergrowth, and that causes pain.

23              MR. ISMAIL:  Objection, move to strike,

24         hearsay.

Daniel S. Elliott, M.D.

1    BY MR. SLATER:

2         Q.   Doctor, look at the next exhibit on the

3    pile.  Take that slide down.

4         It's Exhibit P2227, and it's an e-mail written

5    by Piet Hinoul, medical affairs director, September 3,

6    2009.

7         Is this an e-mail you're familiar with?

8         A.   Yes, it is.

9         Q.   What I'd like to do is turn to the second

10   page.  There are a series of asterisked bullet points.

11   We're going to go to the last one on the page, which

12   starts there is an issue.

13        Do you see where I'm reading?  It's the last

14   asterisk.

15        A.   I'm there, yes.

16        Q.   I'm going to just read it for the record,

17   and then I want to ask you about this, okay?

18        A.   All right.

19        Q.   "There is the issue of being able to

20   adjust, fine tune the position of a Prolift® mesh.

21   This must also be addressed up front; the mesh and

22   Prolift® can indeed be adjusted, but that is because

23   one overcorrects (surgeons not adjusting by loosening

24   after having pulled it too tight have all the problems

Daniel S. Elliott, M.D.

 1    with pain, incontinence, obstructed defecation), again

 2    we adjust to make it tension free not the other way

 3    around."

 4            And then reading a little further, this tension

 5    free concept is something we own, we must also use it

 6    here.  Doctors like the sound of it (despite the fact

 7    that most do not understand it).

 8            Now, is that language I just read written by a

 9    medical affairs director, Piet Hinoul, of significance

10    to you?

11            A.   Yes.

12            Q.   Why?

13            A.   Well, they acknowledge multiple different

14    things in here.  Number one that surgeons don't know

15    how to tension this, and, number two, the tension free

16    concept is something that sounds very good.  The

17    company wants to protect that marketing aspect.  That's

18    a different story here, but the biggest one is that the

19    surgeons don't know how to tension this.

20            MR. ISMAIL:  Objection, move to strike,

21            nonresponsive.

22    BY MR. SLATER:

23            Q.   Let me ask you this question:  I just want

24    to clean something up in case -- that was a great

Daniel S. Elliott, M.D.

1    objection, just got to always hedge against that.

2          Doctor, this language that I just read, why

3    is -- well, let me just say something right now.  When

4    you answer this question, don't talk about marketing at

5    all, okay.  So I'm going to ask the question again.

6          Doctor, I just read language written by Piet

7    Hinoul, medical affairs director.  Why is that language

8    significant to you with regard to the tension free

9    concept?

10          MR. ISMAIL:  Objection, lack of

11          foundation.

12    BY MR. SLATER:

13          Q.   From a medical standpoint, why is that

14    important?

15          A.   From a medical standpoint, you know,

16    again, multiple different aspects of the tendency of

17    surgeons to tighten this up too much.  They don't

18    understand how to tighten this.  It hasn't been

19    explained to them well enough.  And so -- and that

20    tensioning problem is one of the root sources for all

21    the various different complications, pain, obstruction,

22    incontinence, et cetera.

23          Q.   When the mesh is placed under tension, in

24    your opinion, does that lead to any negative side

Daniel S. Elliott, M.D.

1    effects?

2          A.    Yes.

3          Q.    What is that?

4          A.    Again, that's going back to this issue,

5    it's the root source of the problem that tensioning

6    causes the pores to collapse, can cause the tissue

7    integration, which then leads to scarring, inflammatory

8    response and subsequently pain.

9          Q.    Doctor, we'll take that document down.

10         Doctor, there was a theory that this large mesh

11   implant would result in a more durable, longer lasting

12   anatomic repair than with a suture repair.

13         Was that part of the concept?

14         A.    Correct.

15         Q.    When we say the focus was on an

16   anatomic -- correction, the anatomic positioning, what

17   does that mean?

18         A.    It means we have to kind of go back almost

19   a certain step.  When you have a woman with prolapse,

20   it means the bladder or structure has fallen down to

21   the wrong spot.  So you have anatomy is can you restore

22   it to a normal position, okay.  So that's where we talk

23   about anatomical repair, putting it back up to where it

24   should be.

Daniel S. Elliott, M.D.

1          Q.   Now, over time I've seen reference to

2   functional outcomes, quality of life outcomes.

3          What does that mean?

4          A.   That's the other aspect of prolapse,

5   just -- and it's a quality of life problem.  Just

6   because you have an organ that's fallen down, say the

7   bladder, articles like Whiteside, et al. 2004 talk

8   about what we're really after here is this woman's

9   quality of life, is she happy, is the support, the

10  surgery provided an improvement of quality of life.

11          MR. ISMAIL:  Objection, move to strike,

12      hearsay.

13  BY MR. SLATER:

14          Q.   Doctor, I'm going to ask you the question

15  again.  Don't refer to, in case the objection was well

16  done, the Whiteside article in answering the question.

17          MR. SLATER:  I assume that's your

18      objection, right?

19          MR. ISMAIL:  Yes.

20          MR. SLATER:  Okay.  Trying to move this

21      along.

22  BY MR. SLATER:

23          Q.   Doctor, when we talk about functional

24  outcomes, quality of life outcomes as opposed to

Daniel S. Elliott, M.D.

1    anatomic, what's the distinction?

2           A.    Anatomy is just looking at has that

3    prolapse been repaired or not.  It's not taking into

4    account a patient's quality of life, sexual function or

5    just symptoms of prolapse, fullness, pressure.

6           Functional outcomes are looking at if you do

7    this surgery is the woman pleased with the outcome as

8    far as the improvement of the prolapse symptoms.

9           Q.    Doctor, please look at the next exhibit,

10   which is PLT1093.  This is an article titled "Incidence

11   and risk factors for reoperation of surgically treated

12   pelvic organ prolapse" authored by Dällenbach and some

13   other authors in 2011.

14          Are you familiar with this article?

15          A.    Yes, I am.

16          Q.    Is this article, in your opinion,

17   medically reliable and authoritative in the field?

18          A.    Yes, it is.

19          Q.    Is this an article you've relied on in

20   forming your opinions?

21          A.    Yes.

22          Q.    Why is this article important, in general

23   terms?

24                MR. ISMAIL:  Objection, hearsay.

Daniel S. Elliott, M.D.

1    BY MR. SLATER:

2         Q.   Rephrase.  Why is this article of

3    significance to you?

4              MR. ISMAIL:  Objection, hearsay.

5              THE WITNESS:  Because what it's doing is

6              looking at and trying to correct somewhat of

7              the incorrect thinking we have as far as the

8              true recurrence rate and reoperation rate

9              following prolapse repairs.  So what this is

10             doing is breaking it down and looking at the

11             true incidence, which records it at roughly --

12             I think their conclusion is like 6 to 12%

13             reoperation for prolapse.

14   BY MR. SLATER:

15        Q.   Doctor, if you turn to the page that has

16   the discussion on it, I'm not seeing the page numbers.

17   It's the third page from the end.

18        A.   Okay, I'm there.

19        Q.   And it says -- you see discussion?

20        A.   Yes, I do.

21        Q.   Okay.  It says in the first sentence, our

22   study suggests that the risk of reoperation after

23   prolapse surgery is relatively low and associated with

24   variables indicating pre-existing weakness of pelvic

Daniel S. Elliott, M.D.

1    floor tissues.

2            What is that -- is that of significance to you?

3            MR. ISMAIL:  Objection, hearsay.  Do I

4        have a standing objection to Exhibit 1093?

5            MR. SLATER:  You have a standing objection

6        to every one of my articles as hearsay and any

7        questions on them.

8            MR. ISMAIL:  I understand, but I'm going

9        to identify each one to which I have the

10       hearsay objection, and then I won't interrupt

11       your exam on this article.

12           MR. SLATER:  Yeah, please don't.

13           MR. ISMAIL:  Standing objection to 1093 on

14       hearsay.

15           MR. SLATER:  I'll start again.

16           THE WITNESS:  And can you -- I'm trying to

17       track exactly where you are.

18   BY MR. SLATER:

19           Q.   You see Discussion?

20           A.   Yes, I am under Discussion.

21           Q.   Okay.  I'm going to actually go now to the

22   second paragraph.  You see it says, "we

23   systematically"?

24           A.   Yes, I'm there.

Daniel S. Elliott, M.D.

1           Q.    I want to read this and ask you what, if

2    any, significance this has to you.

3           We systematically searched Medline, (search

4    terms: "reoperation for surgically treated/managed

5    pelvic organ prolapse, recurrent pelvic organ prolapse,

6    follow-up studies," all languages, from 1966 to 2010)

7    and found few studies reporting the incidence of

8    reoperation for recurrent prolapse.  Most authors

9    measured the combined risk of reoperation for

10   surgically treated prolapse and urinary incontinence,

11   thus overestimating the rate for pelvic organ prolapse

12   reoperation alone.  The risk of reoperation for

13   prolapse or urinary incontinence of 29.2% frequently

14   quoted as a reference in further studies results in a

15   retrospective cohort study of 384 women.  It goes on to

16   talk about following them prospectively, and at five to

17   ten years their reoperation rate was 13% and 17%.  And

18   then says the risk of re-operation for prolapse alone

19   during a five-year follow-up was much lower (1.5%) in

20   another study.

21          Do you see that?

22          A.    Yes, I do.

23          Q.    Is that of significance to you?

24          A.    Yes.

Daniel S. Elliott, M.D.

 1          Q.   Why is that significant to you in forming

 2    your opinions?

 3          A.   Number one, you cannot describe the

 4    reoperation of prolapse if you're also combining it

 5    with stress incontinence, they're two separate

 6    problems, okay.  So it's going to falsely elevate both

 7    of them in reality, and so that's why they're talking

 8    about the common report of 29.2%, which I've actually

 9    rooted my studies, so it's not accurate.  So what they

10    did then is look at the true reoperation rate, and so

11    for this one, you know, they are down to 1.5% at

12    five-year follow-up, which is obviously a very small

13    number.

14          Q.   Now, they're talking about treating

15    patients with suture repairs, correct; that's what they

16    did?

17          A.   That's correct.

18          Q.   Okay.  Turn to the next page, please.  And

19    it's actually the second to last page of the article,

20    there is a Table 6 at the top left corner, and if you

21    come down that left column, about two-thirds of the way

22    down the page, there's a sentence that says, "The

23    anatomical recurrence rate in our cohort is probably

24    higher; but, in most cases, women are asymptomatic and

Daniel S. Elliott, M.D.

1    do not require surgery."

2            Is that significant to you?

3            A.    That is correct.

4            Q.    Why?

5            A.    Because, again, when you have -- this is a

6    prolapse is a quality of life problem, okay.  So what

7    you want to do and what success is is the woman

8    asymptomatic and her symptoms of prolapse cured.  So

9    they're saying as the anatomy may have come down, but

10   the women are fine.

11           Q.    On the right-hand column almost directly

12   across the page, it says based on previous reports, we

13   would expect a high right of reoperation, which is not

14   the case.  Our study supports the idea that

15   conventional vaginal surgery is effective to treat

16   pelvic organ prolapse.

17           Is that of significance to you?

18           A.    Yes.

19           Q.    Why?

20           A.    Because it's showing that the traditional

21   types of repairs actually work to relieve the patient's

22   symptoms.

23           Q.    And, finally, on the last page in the last

24   paragraph, based on our data and recent studies, we

Daniel S. Elliott, M.D.

```
 1   believe the risk of reoperation for recurrence after

 2   pelvic organ prolapse reconstructive surgery to be

 3   between 6% and 12% rather than 30% as previously

 4   described.

 5         Is that significant?

 6         A.   Yes.

 7         Q.   Why?

 8         A.   Again, it's stating that the 29.2 or 30%,

 9   as they state here, reoperation rate is much higher

10   than in reality, it's down to around 6 to 12%.

11         Q.   Based on the Dällenbach article, your

12   understanding of the overall medical literature, your

13   experience and your knowledge in the field, do you have

14   an opinion as to whether or not the Prolift® was

15   necessary in order to treat pelvic organ prolapse as

16   compared to the existing traditional alternatives?

17             MR. ISMAIL:  Objection, hearsay,

18             cumulative.

19             THE WITNESS:  Based upon this study and

20             others and my own personal experience, it was

21             not needed.

22   BY MR. SLATER:

23         Q.   Meaning that the alternatives were

24   adequate?
```

Daniel S. Elliott, M.D.

1       A.    Correct.

2             MR. ISMAIL:  Objection, same, cumulative,

3       sorry.

4             MR. SLATER:  Go off for a second.

5             THE VIDEOGRAPHER:  Off the record.  The

6       time is 10:32, we are off the record.

7                   (Brief recess.)

8             THE VIDEOGRAPHER:  The time is 10:41, and

9       we are back on the record.

10  BY MR. SLATER:

11      Q.    Doctor, in the course of asking you about

12  your background, I neglected to ask you one question.

13            Are you a board certified physician?

14      A.    Yes, I am.

15      Q.    Who are you board certified by?

16      A.    By urology, American Urologic Association

17  and then also by combined boards of urology and GYN for

18  female pelvic medicine and reconstructive surgery.

19      Q.    And what is the significance of those

20  board certifications?

21      A.    The first one is stating that you have

22  gone through -- for me it was six years of urologic

23  training, including general surgery, and that the board

24  recognizes you having taken three different exams that

Daniel S. Elliott, M.D.

1    you are a qualified urologist.

2            The second one is subspecializing in female

3    urology and pelvic floor reconstruction, so the boards

4    of GYN, urology came together because we have a lot of

5    overlap, and I've had this certificate available since

6    2013.

7            Q.   Okay.  Doctor, we're now going to go to

8    the next exhibit, which we've marked P0049, and if you

9    could, first looking at the front page, what is this

10   document?

11           A.   This is just the -- as it states at the

12   top, the Evaluation of the TVM technique for Ethicon.

13           Q.   It says clinical study report dated

14   June 27, 2006, and it says the principal investigator

15   was Michel Cosson, Dr. Cosson.  Is that what this

16   technically is, is this clinical study report for the

17   French TVM study?

18           A.   That is correct and their 12-month data.

19           Q.   And let's now turn to Page 4.  There's a

20   section that says -- and just very, very briefly and

21   simply, what was the French TVM study; what were they

22   doing?

23           A.   They were looking at the feasibility and

24   the results and the complications, efficacy of the TVM

Daniel S. Elliott, M.D.

1    technique.

2          Q.    And when you say the TVM technique, that's

3    what ultimately became the Prolift® procedure?

4          A.    That is correct, yes.

5          Q.    And we look at the statistical methods

6    section, and I'm going to try to avoid much of the

7    statistical jargon and let you explain it simply, but

8    about six or eight lines down, there's a sentence that

9    says, the criterion for success was that the upper 90%

10   two-tailed confidence interval (same as the tail on a

11   one tail 95% confidence interval) did not exceed 20%.

12   Otherwise, the study would be deemed a failure, as it

13   would not show that the prolapse rate was less than

14   20%.

15          In layman's terms, what is that telling us?

16          A.    Any time you set up a study you establish

17   criteria beforehand of what you expect is defining as

18   success, so they're doing a very good job of that.

19          Then they get into a bunch of statistical

20   stuff, the two-tailed confidence interval, et cetera.

21   It's detailed statistics of how they prove something is

22   a success or not, and then their bottom line saying

23   that if they have a prolapse recurrence greater than

24   20%, that they deemed the procedure as a failure.

Daniel S. Elliott, M.D.

1        Q.   And when they see -- well, I'll withdraw

2   it.  Let me move forward.  Let's go down to the results

3   and conclusions section, the actual results now.  It

4   says, the primary effectiveness variable was recurrence

5   of prolapse at 12 months post-procedure (failure of

6   procedure), with failure being defined as a prolapse of

7   International Continence Society Stage II or more or a

8   surgical re-intervention.

9        So that's telling us the criteria for success

10   or failure?

11        A.   Again, they're going on -- they're

12   defining what we define, the studiers, the researchers

13   as a success or failure.  So they're saying the

14   International -- ICS, International Continence Society

15   Stage II or more or surgical re-intervention is

16   failure.

17        Q.   When they say recurrence of prolapse, does

18   that just mean after you've treated it does it come

19   back at some level?

20        A.   Correct, that's anatomic recurrence, yes.

21        Q.   And they call Stage II being a recurrence.

22   What does that mean?

23        A.   That just means that you grade prolapses.

24   There's multiple different grading systems, but you

Daniel S. Elliott, M.D.

1    grade them.  Easiest way is grade 1 is essentially

2    completely normal.  Grade 2 is little bit of prolapse,

3    grade 3 is more, grade 4 is coming all the way out.

4    That's just a brief way of describing it.  So they're

5    saying Stage II where it's dropped down a fair bit is a

6    failure.

7            Q.   I'm reading now further in the results and

8    conclusions section.  The results show a failure rate

9    at 12 months of 18.4% with a 90% confidence interval of

10   -- I'm going to start over.

11           I'm going to read now within the results and

12   conclusions section.  The results show a failure rate

13   at 12 months of 18.4% with a 90% confidence interval of

14   11.9 to 26.6.  Thus the study did not meet the

15   predefined criteria of a failure rate of less than 20%.

16           What does that mean?

17           A.   It means that at 12 months, which is the

18   absolute minimum you would want to do a study for

19   prolapse, 12 months would be very, very minimum, that

20   based upon the statistical analysis they were above the

21   20% predefined failure rate.  So, subsequently, based

22   upon this data, the TVM system, which became Prolift®

23   did not make anatomical success, did not reach their

24   criteria.

Daniel S. Elliott, M.D.

1        Q.    And just to be clear, they gave a range of

2    11.9 to 26.6, that's the confidence interval where

3    they're saying we can take these results and apply them

4    more broadly, and that's the statistical range?

5        A.    Correct.  That's when statistics --

6    advanced people with biostatistics come in and do their

7    math, and so I have to trust their math on that one.

8    So they're telling me it did not meet the success of

9    the procedure.

10        Q.    The second paragraph of the results and

11    conclusions says the secondary effectiveness parameters

12    show a failure rate at six months of 12.6%, 90%

13    confidence interval, 7.3 to 20.1%.

14        What is that telling us?

15        A.    Again, they're just saying at the short

16    term at six months, the raw number of 12.6 had already

17    recurred, so it was a fast recurrence.

18        Q.    And the 20.1% with the confidence

19    interval, it was already over 20%?

20        A.    Yes, I'm sorry.  Yes, at six months

21    already they had exceeded their predefined success or

22    failure number.

23        Q.    Turn to Page 5, please, the very top of,

24    again, the results and conclusions section, moderate or

Daniel S. Elliott, M.D.

1   severe vaginal retraction was reported in 11 (12.6%)

2   patients.

3            What is that telling us?

4            A.   Vaginal retraction is what we've already

5   mentioned earlier on scarring of the mesh.  They happen

6   to use the word retraction.  It's the same thing, but

7   in these surgeon's hands, high volume surgeons, they

8   had 12.6 of moderate or severe contraction, mesh

9   contraction.

10           Q.   Based on the results of the TVM study, do

11  you have an opinion as to whether or not the Prolift®

12  was a safe and effective procedure to be marketed on

13  the widespread basis it was?

14           A.   Let's break it down in two.  You said safe

15  and effective.  So, number one, effective, no.  These

16  researchers, it failed.  It did not meet the

17  effectiveness, which is purely anatomic.

18           Safety-wise, that was addressed in the second

19  one, that 12.6, so not a small number, had vaginal

20  retraction that was visible or palpable.

21           So on both those aspects, no.

22           Q.   Did you see Axel Arnaud's deposition

23  testimony where he testified that the French TVM study

24  showed a 20.7% exposure rate at one year?

Daniel S. Elliott, M.D.

1                      MR. ISMAIL:  Objection, leading, lack of

2              foundation.

3                      THE WITNESS:  Yes, I read that.

4     BY MR. SLATER:

5              Q.   Is that of significance to you?

6              A.   Very much so, yes.

7              Q.   Why?

8              A.   Because he stated what the true incidence

9     of the vaginal mesh exposure was in the study at 20.7,

10    which the study itself quotes a lower number.

11                     MR. ISMAIL:  Objection, lack of

12             foundation.

13    BY MR. SLATER:

14             Q.   Is a 20.7% exposure rate, in your opinion,

15    a safe rate for that complication?

16             A.   No.

17             Q.   Why not?

18             A.   Well, not just my opinion, my colleagues,

19    internal documentation say, you know, that is a very

20    common number.  It is a very high number, and that

21    ultimately leads to reoperation, which is increased

22    risks there, so, no, it's not a safe number.

23             Q.   Okay.  Let's go to the next PowerPoint

24    slide.  I want to ask you about design challenge is a

Daniel S. Elliott, M.D.

1    controlled foreign body reaction, and we cite to Piet

2    Hinoul.

3         Do you have an opinion as to whether or not the

4    Prolift® achieved the design challenge of a controlled

5    foreign body reaction in women?

6              MR. ISMAIL:  Objection to the use of the

7         slide.

8              THE WITNESS:  It did not.

9    BY MR. SLATER:

10        Q.   And what's your basis for that?

11        A.   The basis is going to be multifactorial.

12   My personal experience day-to-day examining patients,

13   operating on patients, review of the medical

14   literature, a review of internal documentation,

15   attendance at national, international meetings,

16   discussion with colleagues, that the mesh did not have

17   a controlled foreign body reaction and had

18   complications associated with it.

19   BY MR. SLATER:

20        Q.   The concept of a fine balance, if there's

21   too much fibrosis, it would be unsafe, as testified to

22   by Piet Hinoul.

23        Do you have an opinion as to whether or not the

24   Prolift® achieved that fine balance?

Daniel S. Elliott, M.D.

```
1              MR. ISMAIL:  Objection, argumentative,

2         705.

3              THE WITNESS:  It did not meet that fine

4         balance.

5    BY MR. SLATER:

6         Q.   And what's your basis for that opinion?

7         A.   Again, just like I just mentioned, all

8    those aforementioned criteria.  No small issue is my

9    daily or weekly examination of patients with Prolift®,

10   medical literature, review or our attendance at

11   meetings, international, national colleagues,

12   discussing those issues.

13        Q.   And with regard to the concept of too much

14   fibrosis would be unsafe, why is that?  I think you've

15   talked about it, but let's just make it clear for the

16   record right now.

17        A.   Again, fibrosis is a response to the mesh

18   and the decrease in pore size, the small pore size,

19   which causes foreign body reaction, chronic

20   inflammation, which the body responds naturally, just

21   causing scarring.

22             So too much fibrosis is a result of all those

23   other issues, okay, come together, and that's what

24   causes the pain, the vaginal extrusion, et cetera.
```

Daniel S. Elliott, M.D.

1          Q.   There's a concept of scar plating or

2    bridging fibrosis.  You may have -- I think you talked

3    about it earlier, but is that relevant in this context?

4          A.   Yes, that's what I'm referring to, the

5    scar plating is the result of the implantation of the

6    device, the decreased pore size, inflammation, foreign

7    body reaction, more scarring, and then you get that

8    plate.  Remember, I keep going like this.  This is

9    where it goes -- theoretically goes through the tissues

10   versus plating and scarring.

11         Q.   Let's go to the next PowerPoint slide.

12         With regard to the concept of design

13   requirements, are you familiar with testimony from

14   Ethicon witnesses about their design requirements?

15              MR. ISMAIL:  Objection as argumentative,

16         use of the slide, leading, lack of foundation.

17              THE WITNESS:  Yes, I've read all those

18         depositions.

19   BY MR. SLATER:

20         Q.   I want to ask you about a specific design

21   requirement.  The mesh lays flat.  Assuming that the

22   mesh laying flat is a design requirement for the

23   Prolift®, do you have an opinion as to whether or not

24   the Prolift® met that design requirement?

Daniel S. Elliott, M.D.

1        A.    It did not meet that requirement.

2        Q.    And what's your basis for that?

3        A.    Okay.  Basis, again, goes down the line of

4   my physical exam of these patients on a weekly basis,

5   including those with Prolift®, the medical literature,

6   internal documentation, national/international

7   meetings, discussion with colleagues.

8        Q.    With regard to whether the mesh lays flat,

9   we've seen some materials and some videos here today,

10   does that enter into your opinion on that?

11        A.    Yes.

12        Q.    Why is that?

13        A.    The mesh, the Prolift® kit, when the mesh

14   comes it's a one size fits all, okay.  It's analogous

15   to saying everybody should fit in the same size of

16   shoe, doesn't happen.  So if that mesh is, let's say,

17   this long and you have a woman who is shorter or the

18   surgeon does not place it in the correct location or

19   the sufficient location, that mesh is going to bunch

20   up, it's not going to lay flat.  It can't.

21        Q.    With regard to the arms and the use of the

22   cannulas, does that impact on your opinion?

23        A.    Yes, see, the arms, see, that's also

24   another aspect, the arms are going to be pulling on

Daniel S. Elliott, M.D.

1    this.  The pelvis is a dynamic structure, okay.  It's

2    not just like always laying down at the time of

3    surgery.  A woman is going to be getting up, she's

4    going to be moving, she's going to go right, she's to

5    go left, she's going to lean over, and that's going to

6    make the vagina have to move.

7            The pelvis is an incredibly complicated

8    structure, and so these internal organs have to move.

9    Now if they're anchored in and have these arms going

10   out, going through muscles and that's anchored in

11   because of the scarring, foreign body reaction, et

12   cetera, it can't do that.  So when those mesh arms

13   pull, it's going to be causing the pain and also the

14   vaginal extrusion and other factors -- other issues,

15   excuse me.

16           Q.   When the mesh arms came through the

17   cannulas and they come through the cannulas in the

18   body, are they flat or has the shape been changed?

19           A.   No, just like I pointed out, that's why

20   the video was so important, that's why I said the

21   original cartoon is not fair because it shows them

22   laying flat.  You cannot have a flat piece of mesh this

23   wide go through a cannula -- a cannula this big, you

24   can't have a one centimeter thing come out flat, it

Daniel S. Elliott, M.D.

1    won't be, can't do it, physically impossible.

2           Q.    Okay.   A design requirement of the mesh

3    incorporated safely into the woman's pelvis.

4           Assuming that to be one of the design

5    requirements, do you have an opinion as to whether that

6    design requirement was met with the Prolift®?

7           A.    It was not met.

8           Q.    Why is that?

9           A.    Again, that goes back to everything we've

10   said over and over.   The mesh has to be safely

11   incorporated in the pelvis, so no scarring, no

12   extrusion, no fibrosis, no pain, and that was not

13   achieved.

14          Q.    Doctor, we're going to take that slide

15   down.   We're going to go to the next exhibit.   Please

16   look at Exhibit PLT0067 titled "Complications from

17   vaginally placed mesh in pelvic reconstructive

18   surgery."

19          Are you familiar with this article?

20          A.    Very much so, yes.

21          Q.    Is this article, in your opinion,

22   medically reliable and authoritative in the field?

23          A.    Yes, it is.

24          Q.    Is this an article that you've relied on

Daniel S. Elliott, M.D.

1    in forming your opinions?

2            A.   Yes.

3            Q.   Okay.  What is this article?

4                 MR. ISMAIL:  Objection, hearsay.

5                 THE WITNESS:  This is written with my

6            colleagues in the urogynecology department at

7            Mayo.  Roberta Blandon, she was a resident.  I

8            didn't know her, but I know Gebhart, Trabuco

9            and Klingele well.  I operate every other week

10           with three of -- two of those.

11                And so this is summarizing -- this is in

12           the very early days, it was published in 2009,

13           submitted I think probably prior to that in the

14           early days of the mesh complications.  It's one

15           of the first papers out there talking about

16           those complications.

17   BY MR. SLATER:

18           Q.   And I just want to ask you a question

19   because we're going to talk a little bit more about the

20   complications described in this paper.  Rephrase.

21                I want to ask you something baseline before we

22   talk about -- rephrase.

23                I want to ask you a baseline question.

24                When contracted Prolift® mesh is explanted,

Daniel S. Elliott, M.D.

1    when that's being done and when it's taken out, what

2    is -- we've seen what it looks like out of the box and

3    how it feels.  How is it -- is it any different when

4    you're actually removing it from the body?

5         A.   It's a mess.

6         Q.   What do you mean by that?

7         A.   It's a very difficult surgery.  The

8    mesh -- there is actually a picture of explanted mesh

9    here.  Here we go.

10        The picture that they show on Page 529 is

11   explanted mesh, okay.  I, as a surgeon, look at this

12   and that is a human's body attached to that mesh.  They

13   had to use big scissors to cut through this, and you

14   look at the burned edges, that means they're using a

15   cautery to burn through this mesh, okay.  That is mesh,

16   just like the analogous to the rebar, okay, rebar in

17   concrete, okay.  You got to get that out of there.

18   It's a train wreck.  You have to use a jackhammer to

19   get it out.  Obviously, in the human body you don't

20   have to use that, but it's stuck in there because this

21   is caked in scar.

22             MR. ISMAIL:  I'm sorry.  Move to strike,

23        hearsay, 403, nonresponsive.

24   BY MR. SLATER:

Daniel S. Elliott, M.D.

1          Q.   Is the mesh soft when it's coming out when

2     you're taking it out from these complications, or does

3     it have -- what does it feel like?

4          A.   It's encased in scar, you can feel it.  If

5     you want to say a nice thing about mesh is when you can

6     feel it, because it's firm in there, okay.  Normal

7     human body, it's not firm, okay.  And so when you try

8     and get rid of autologous slings, they're very actually

9     difficult to find, but the meshes you can rub back and

10    forth, I tell the residents, I say, feel right here

11    because a lot of times we're working deep down in the

12    pelvis.  We can't see it.  You have to go by

13    proprioception, feel this, feel this band, feel where

14    this is going through the obturator foramen.  So, no,

15    it's not soft at all.

16         Q.   Let's go to Page 529 of this article, and

17    in the left-hand column, the second full paragraph, I

18    want to read a sentence, a short portion of it, and ask

19    you a question.  "One of our most important findings is

20    that only 14% of patients were referred by the original

21    surgeon, which suggests a lack of awareness of these

22    complications by the original treating physician and

23    the potential for underreporting of the rate and extent

24    of these complications due to nonrespondent/volunteer

Daniel S. Elliott, M.D.

1    bias."

2              Is that significant to you?

3                   MR. ISMAIL:  Objection, hearsay.

4                   THE WITNESS:  Yes.

5    BY MR. SLATER:

6              Q.   Why?

7              A.   This mirrors my practice.  Let's just

8    focus on this data here, but the majority, especially

9    in here, of these patients are not being referred by

10   their doctor back home.  Their doctor back home is

11   unaware of the level and the severity of the

12   complication, and the patient is seeking care

13   elsewhere, which, again, that mirrors my practice.

14                  MR. ISMAIL:  Again, I assume we have a

15             standing objection on Plaintiff Exhibit 67 use

16             of hearsay.

17                  MR. SLATER:  You have your standing

18             hearsay objection.

19                  MR. ISMAIL:  Thank you.

20   BY MR. SLATER:

21             Q.   Let's go to the top of page -- of the

22   right hand column on Page 529, about four lines down.

23   I want to read the sentence and ask you a question or

24   two sentences.

Daniel S. Elliott, M.D.

```
 1            With the growing popularity of mesh insertion
 2    kits, in which a large surface area of synthetic
 3    material is placed, the vaginal surgeon is faced with
 4    the challenges of very complex surgical dissections.
 5    If mesh excision is warranted, tissue fibrosis,
 6    scarring, bleeding, and urinary tract and anorectal
 7    injury are easily encountered, which add to patient
 8    morbidity.
 9            Is that of significance to you?
10        A.   Yes.
11        Q.   Why?
12        A.   Well, that mirrors my weekly practice.
13    This is complicated surgery.  You have arguably three
14    of the top urogynecologists in the nation, there's
15    going to be others who are good, but these are top
16    notch guys, highly experienced at a high volume
17    tertiary care center, and they're saying they struggle
18    to do this.  I struggle when I'm getting these things
19    out.  It's a bear.
20        Q.   Let's go to the bottom of that column, the
21    right-hand column on Page 529.  I want to read a
22    sentence and ask you a question.
23            "It is important to remember that a percentage
24    of patients who undergo pelvic reconstructive surgery
```

Daniel S. Elliott, M.D.

1    with vaginally placed mesh will have life-changing

2    complications.  Moreover, whereas minor complications

3    such as small vaginal mesh erosions are simple and easy

4    to manage, incapacitating pelvic pain, dyspareunia, and

5    large-scare erosions can be exceedingly complex and not

6    easily resolved."

7           Is that significant to you?

8           A.   Yes, it is.

9           Q.   Why is that?

10          A.   Well, again, there's a focus on the

11   vaginal extrusion, which the data from other

12   individuals would say that is a much more recurrent

13   problem than we knew at this point in time, but we're

14   saying these are some life-changing, severe,

15   life-altering problems that occurs as a result of the

16   Prolift® mesh.

17          Q.   And this article, the description of these

18   various complications, in your opinion, do they apply

19   to the Prolift®?

20          A.   Absolutely.

21          Q.   I want to go to the bottom of the first

22   full paragraph on Page 530, the last sentence.  This

23   was February 2009, correct?

24          A.   Correct.

Daniel S. Elliott, M.D.

1          Q.    "The widespread marketing of these

2     technologies should be avoided until level I evidence

3     becomes available demonstrating their superiority over

4     traditional repairs, with acceptable rates of

5     morbidity."

6          Is that significant to you?

7          A.    Yes, it is.

8          Q.    And why is that?

9          A.    They're stating here that basically this

10    product is out without high quality studies showing

11    that it's worked and it's safe, and they're saying it

12    should not have been accepted, it should not be

13    performed.

14         Q.    With regard to the Prolift®, do you have

15    an opinion as to whether what I just read is accurate?

16         A.    It is accurate, yes, I support it

17    completely.

18         Q.    Did they -- did Ethicon have level I

19    evidence demonstrating superiority of the Prolift® over

20    traditional repairs with acceptable rates of morbidity

21    before it was marketed, in your opinion?

22         A.    There were no studies, no.

23         Q.    Did such studies ever exist, in your

24    opinion, level I evidence showing the superiority of

Daniel S. Elliott, M.D.

1    the Prolift® over traditional repairs with acceptable

2    rates of morbidity, was that ever produced for the

3    Prolift®?

4         A.   No.  There are studies out there showing

5    efficacy, anatomical success, but we've already talked

6    about that.  That's not quality of life.  So to answer

7    your question specifically, no, that has not been done.

8         Q.   Let's go to the next PowerPoint slide.

9         Doctor, I want to ask you about testimony from

10   David Robinson where he testified that gynecology had

11   not adopted the routine use of meshes due to

12   unacceptably high mesh complication rates.

13        Are you familiar with that testimony?

14        A.   Yes, I am --

15             MR. ISMAIL:  Objection, argumentative,

16             lack of foundation.

17   BY MR. SLATER:

18        Q.   David Robinson, who was the medical

19   affairs director, listed what he perceived to be

20   unacceptably high mesh complication rates, 6 to 25%, 3

21   to 12% and 6 to 12% from various studies.

22        Are you familiar with that?

23        A.   Yes.

24             MR. ISMAIL:  Sorry.  Objection to the use

Daniel S. Elliott, M.D.

```
 1              of the slide, 403, argumentative.

 2    BY MR. SLATER:

 3         Q.   With regard to the use, the routine use of

 4    meshes and the nature of the complications one sees

 5    with the Prolift®, do you agree or disagree with the

 6    medical affairs director that these types -- these

 7    rates of complications with the Prolift® whether that

 8    would be acceptable or unacceptable?

 9              MR. ISMAIL:  Same objection.

10    BY MR. SLATER:

11         Q.   You can answer.

12         A.   I have yet to answer any of the questions

13    yet.

14         Q.   You can answer.

15         A.   Yes, I am familiar with this document,

16    these are the depositions which I read, so I am very

17    familiar with this, and I agree with him that the -- it

18    has not been accepted due to high complication rates,

19    and these are the numbers that he quoted.

20         Q.   Let's go to the next slide.

21              Doctor, we have a PowerPoint slide here

22    entitled "Prolift® TVM Complication Rates."

23              What is this showing us?

24              MR. ISMAIL:  Objection, hearsay.
```

Daniel S. Elliott, M.D.

```
 1                THE WITNESS:  These are multiple different

 2           studies, I reviewed all of these studies.

 3           They're listed here.  There are some --

 4    BY MR. SLATER:

 5           Q.   Let me ask you -- let me stop you.  These

 6    studies, are these studies medically reliable and

 7    authoritative in the field?

 8           A.   Yes, these are good quality studies.

 9           Q.   And did you rely on them for forming your

10    opinions in this case?

11           A.   Yes, I did.

12           Q.   Okay.  Go ahead, tell us what we're seeing

13    here.

14                MR. ISMAIL:  Objection, hearsay.

15                THE WITNESS:  Basically, these are a

16           combination of all the complications reported

17           in these various different studies from these

18           various different surgeons, going from as low

19           of 15.6 to up to 33.6.

20    BY MR. SLATER:

21           Q.   Now let's go to the next slide.  Where we

22    have side by side the rates of complications David

23    Robinson had described as unacceptable versus the rates

24    of complications for various studies of the Prolift®.
```

Daniel S. Elliott, M.D.

```
1            Why did you want to have this slide put

2      together comparing these rates?

3                  MR. ISMAIL:  Objection, hearsay to slides

4            15 and 16.

5                  THE WITNESS:  I put them in here

6            specifically because David Robinson, a person

7            of authority within Ethicon, had stated various

8            different unacceptable rates as listed there

9            from 3% up to 25%, as it states, and then we

10           compare it to the available literature of these

11           selected articles of stating complication rates

12           much higher than that.

13     BY MR. SLATER:

14           Q.  Do you have an opinion when you look at

15     the rates of complications for these various studies of

16     the Prolift® whether or not those rates are acceptable

17     from a medical safety standpoint or not, in your

18     opinion?

19           A.  From my opinion, based upon my daily

20     experience or weekly experience with these individuals

21     is that each one of those complications represent a

22     human being's life who has potentially been devastated,

23     so these are unacceptable rates.

24           Q.  And do you base your opinion also on your
```

Daniel S. Elliott, M.D.

1    reading of that literature and other associated

2    literature?

3            A.   These are just six to eight selected

4    articles.  There's many more articles -- and that's

5    also not including my attendance at national,

6    international meetings about this exact subject or --

7    and lecturing on them.

8                 MR. ISMAIL:  Objection, move to strike,

9            hearsay.

10   BY MR. SLATER:

11           Q.   Let's go to the next exhibit, take the

12   PowerPoint down.  PLT0108, the next exhibit.

13           Doctor, I provided you Exhibit PLT0108.  This

14   is an article by various doctors, including Dr. Cosson.

15           Is this an article that you have relied on for

16   your opinions?

17           A.   Yes, I have.

18           Q.   And is this article, in your opinion,

19   medically reliable and authoritative?

20           A.   Yes, it is.

21           Q.   And this was dated as an accepted date of

22   July 25, 2005, just a few months after the Prolift®

23   went on the market?

24           A.   Correct.

Daniel S. Elliott, M.D.

1          Q.   And, again, Cosson, he's the one who was

2    named in the final study report for the TVM study, he

3    was the lead investigator for the Prolift® prototype

4    study?

5          A.   That is correct, yes.

6          Q.   If we look in the abstract section in the

7    beginning, about halfway down that abstract, they say

8    that 34 cases of mesh exposure were observed within the

9    two months following surgery, which represents an

10   incidence of 12.27%.

11          Do you see that?

12          A.   Yes, I do.

13          MR. ISMAIL:  Objection, hearsay, standing

14          objection to 108, please.

15          MR. SLATER:  Yeah, you have a standing

16          objection to them all.

17          MR. ISMAIL:  I know, but I feel like I

18          have to identify which ones are the

19          inappropriate hearsay for the record.

20          MR. SLATER:  No problem.  You don't have

21          to object again to this article.

22          THE WITNESS:  Yes, I do, I see that.

23   BY MR. SLATER:

24          Q.   Now, what I'd like to do is turn to the

Daniel S. Elliott, M.D.

1    last page -- before I do that, just for the record, you

2    may have talked about it before, what is mesh exposure?

3         A.   Mesh exposure, I have to be very careful

4    on the nomenclature, good you point that out, mesh

5    exposure now is defined as mesh that's coming through

6    the vagina.  If you look back at older report, they may

7    talk about mesh erosion.  Now mesh erosion is reserved

8    for when mesh is eroding into another organ, bladder,

9    rectum or somewhere else.

10        Q.   That's a strict definition you apply in

11   your clinical and academic practice, correct?

12        A.   That is correct, yes.

13        Q.   Do people still interchangeably use those

14   terms?

15        A.   Routinely the terms are used

16   interchangeably, but in academic presentations and in

17   papers now, it's very well-defined.

18        Q.   Looking at the last page, the conclusion

19   to the article written by -- the last author listed is

20   the senior author, that would be Cosson, right?

21        A.   Correct.

22        Q.   Looking at the conclusion, the last

23   paragraph, I want to read something and ask you a

24   question about it.

Daniel S. Elliott, M.D.

```
 1              "Nowadays, based on these data, we can only

 2    advise that caution be exercised when carrying out this

 3    new surgical procedure.  In fact, experimental studies

 4    and clinical trials seem necessary in order to reduce

 5    the level of exposure to less than 5% of cases."

 6              Is that statement of significance to you?

 7         A.   Very much so, yes.

 8         Q.   Why is that?

 9         A.    Well, because you have one of the

10    highest -- at this point in time, one of the highest

11    volume surgeons, Dr. Cosson, who is involved in the

12    original studies of this, who knows it probably better

13    than most -- well, much greater than most surgeons, and

14    he, in his opinion, is saying that we have -- are

15    having basically an unacceptably high complication

16    rate.  This should be reserved as an experimental

17    procedure, meaning not widely accepted, until we can

18    get that exposure rate down to he says 5%.

19         Q.   Was the exposure rate across the board in

20    general in the medical community, when you look at the

21    medical literature, ever brought below 5% for the

22    Prolift®?

23              MR. ISMAIL:  Objection, hearsay.

24              THE WITNESS:  No.
```

Daniel S. Elliott, M.D.

```
 1    BY MR. SLATER:

 2         Q.   We had gone through an exhibit just a few

 3    minutes ago listing exposure rates for various Prolift®

 4    studies.  Were they below or above 5%?

 5              MR. ISMAIL:  Objection, hearsay.

 6              THE WITNESS:  All those are above, and any

 7         studies I've ever reviewed which hint at lower,

 8         they're always short-term studies.

 9    BY MR. SLATER:

10         Q.   Let's go to the next exhibit.

11         Doctor, I've handed you what we've marked as

12    Exhibit PLT0011.  It's an a ACOG Practice Bulletin with

13    regard to Clinical Management Guidelines for

14    Obstetricians-Gynecologists, February 2007, and it says

15    in the left column it was authored with the assistance

16    of Dr. Scott Smilen and Dr. Anne Weber.

17         Are you familiar with this document?

18         A.   Yes, I am.

19         Q.   Is this something you've relied on for

20    your opinions?

21         A.   Yes, I have.

22         Q.   Do you find this to be medically reliable

23    and authoritative in the field?

24         A.   Yes.
```

Daniel S. Elliott, M.D.

1          Q.   I want to now draw your attention in this

2     practice guideline, this is just -- these are

3     recommendations to gynecologists in day-to-day practice

4     for things they should consider and how they should

5     practice routinely?

6          A.   Correct.  It's a bulletin that ACOG, which

7     is the American College of OB-GYN puts out periodically

8     on a routine basis of just updates for people to get a

9     synopsis of what's going on.

10         Q.   If you look at Page 468, the top

11    right-hand portion, the last -- the first full

12    paragraph in the right column, I'm going to read it and

13    ask you a question.

14              MR. ISMAIL:  Before do you, standing

15         objection as hearsay to Exhibit -- Plaintiff

16         Exhibit 11.

17              MR. SLATER:  You have a standing or a

18         sitting objection.

19              MR. ISMAIL:  Thank you.

20    BY MR. SLATER:

21         Q.   I'm going to read the first full paragraph

22    in the right-hand column on Page 468.

23              "Given the limited data and frequent changes in

24    the marketed products (particularly with regard to type

Daniel S. Elliott, M.D.

1    of mesh material itself, which is most closely

2    associated with several of the postoperative risks,

3    especially mesh erosion), the procedures should be

4    considered experimental and patients should consent to

5    surgery with that understanding."

6            Is that significant to you?

7        A.   Yes.

8        Q.   And why is that?

9        A.   That this -- the ACOG board following

10   review of the literature, has come with the opinion

11   that the procedure is experimental, which means it

12   should not be used in widespread for every patient.

13       Q.   Do you have an opinion as to whether or

14   not the Prolift® should or should not have been

15   considered and actually utilized as an experimental

16   procedure?

17            MR. ISMAIL:  Objection, cumulative.

18            THE WITNESS:  I have an opinion and it

19        should have stayed as an experimental.

20   BY MR. SLATER:

21       Q.   When something is experimental, what does

22   that mean?

23       A.   Experimental puts it in a completely

24   different class of surgeries.  The standard anterior

Daniel S. Elliott, M.D.

1    colporrhaphy, the traditional repair is not

2    experimental.  A procedure that is experimental means

3    that it has not been proven safe and efficacious.  It

4    has to be both, can't just be one or the other, and so

5    until it is proven safe, it cannot be for every surgeon

6    to be doing it.  It has to be under very close study

7    guidelines with a highly informed and consented

8    patient.

9          Q.   Are you familiar with the fact that later

10   in 2007, ACOG modified the bulletin to remove the word

11   experimental?

12         A.   Yes, I read that.

13         Q.   Do you know why that was done?

14              MR. ISMAIL:  Objection, first, relevance,

15         403, lack of foundation.

16              THE WITNESS:  I have read the internal

17         documentation e-mails of how that came about,

18         yes.

19   BY MR. SLATER:

20         Q.   In very simple terms, what happened?

21              MR. ISMAIL:  Same objection, also improper

22         expert testimony, doesn't aid the jury.

23              THE WITNESS:  There was pressure put on

24         the ACOG bulletin, the committee that does

Daniel S. Elliott, M.D.

```
 1              this, by individuals paid by Ethicon to

 2              change -- get rid of the experimental.

 3    BY MR. SLATER:

 4         Q.   Do you have an opinion as to whether or

 5    not the word experimental should have remained in that

 6    bulletin or not?

 7              MR. ISMAIL:  Same objections.

 8              THE WITNESS:  Absolutely should have.

 9    BY MR. SLATER:

10         Q.   Should have remained?

11         A.   Should have remain -- absolutely, it

12    should have remained there as experimental.

13         Q.   Let me ask you a question, we just saw an

14    ACOG bulletin in February 2007 saying that these mesh

15    kit procedures should be experimental.

16              Is that the same thing that Cosson, the

17    developer of the procedure, said in 2005?

18              MR. ISMAIL:  Objection, leading.

19              THE WITNESS:  That is what he stated, yes.

20    BY MR. SLATER:

21         Q.   Let's go to the next exhibit, and it is an

22    article that we've marked as PLT0139.

23              Is this an article that you are familiar with?

24         A.   Yes, sir.
```

Daniel S. Elliott, M.D.

1        Q.   Is this an article that you believe to be

2   medically reliable and authoritative?

3        A.   Yes, as it pertains to the abstract.  The

4   remainder of the article is in French, so I have read

5   it and I can (speaking in French), I can read a bit,

6   but I can't read in detail here.

7        Q.   With regard to the English abstract on the

8   second page, is that medically reliable and

9   authoritative?

10       A.   Yes.

11       Q.   And that's something you relied on for

12  your opinions?

13       A.   Definitely, yes.

14       Q.   And this was written by various doctors

15  from the TVM group, including Cosson?

16       A.   Yes.

17       Q.   And let's look at the abstract, let's look

18  at the summary of the study they did?

19            MR. ISMAIL:  Standing objection, hearsay,

20            Plaintiff Exhibit 139.

21            MR. SLATER:  Standing objection.

22            MR. ISMAIL:  Thank you.

23  BY MR. SLATER:

24       Q.   And what I want to do is go through this

Daniel S. Elliott, M.D.

1    in the first sentence, actually, the second sentence,

2    it says, "In light of the growing number of proposed

3    techniques and materials we reviewed the experience of

4    the pioneers in order to provide surgeons with the most

5    objective information available," and they're talking

6    about the use of transvaginal mesh?

7          A.   Correct.

8          Q.   In the body of the article, they talk

9    about certain complication rates with the use of

10   synthetic mesh to treat prolapse, and about halfway

11   down it says, "The rate of erosion was also quite

12   variable, as high as 45%," and then two lines down it

13   says, "the rate of dyspareunia has reached as high as

14   60%.  Here again grades of prosthetic retraction should

15   be better defined."

16         So stopping there, is that information

17   significant to you?

18         A.   Yes, it is.

19         Q.   Why is that?

20         A.   Well, they're reviewing, you know, all the

21   synthetic meshes around, saying there's a high rate of

22   complication specifically when they're talking about

23   the retraction.

24         Q.   The next -- rephrase.

Daniel S. Elliott, M.D.

```
 1              In the middle of the section of the summary it

 2      says, "Proposed to improve these phenomena, soft

 3      Prolene recently used by several authors does not

 4      appear to fulfill expectations."

 5              Is that significant to you?

 6              A.   Yes, it does.

 7              Q.   Why is that?

 8              A.   Because you have to look at, you know,

 9      that's why I mentioned the first part of this.  They're

10      talking about the historical things, the Marlexes and

11      the Gortexes and the complication rates that were found

12      with those; therefore, individuals said, let's use a

13      different mesh.  Let's use Prolene soft, okay.  And

14      then when they did that, and, again, this is the early

15      days, these are the highest volume surgeons probably in

16      the world at that time, and they said the Prolene soft

17      did not meet -- reach the expectations they had hoped

18      it would.

19              Q.   And when they talk about the authors, that

20      includes Cosson, who developed the Prolift®?

21              A.   Yes, Cosson, among others, yes.

22              Q.   And soft Prolene, just to be clear, that's

23      the mesh in the Prolift®?

24              A.   Correct.
```

Daniel S. Elliott, M.D.

1          Q.   Go down towards the bottom, the last

2   paragraph, and it says in part, "The lack of data on

3   the rate of complications and patient quality of life

4   is unacceptable for this functional surgery.  We still

5   have reservations about widespread use of synthetic

6   meshes."

7          Is that significant to you?

8          A.   Yes, very much so.

9          Q.   Why?

10         A.   Okay.  Again, that's what I've been

11  stating all along.  This is a quality of life problem,

12  okay.  And these surgeons when they say functional,

13  that means quality of life.  And so they address what I

14  already mentioned multiple times.

15         Q.   Let's go to the next exhibit PLT0696.

16         Doctor, Exhibit 0696, PLT0696, is an article

17  titled "Evaluation and management of complications from

18  synthetic mesh after pelvic reconstructive surgery: a

19  multicenter study" by Dr. Abbott, et al.

20         Are you familiar with this article?

21         A.   Yes, I am, very much so.

22         Q.   And is this article medically reliable and

23  authoritative in the field, in your opinion?

24         A.   It's a very good article, yes.

Daniel S. Elliott, M.D.

1          Q.   Is this an article you've relied on in

2    forming your opinions?

3          A.   Yes, I have.

4          Q.   What I would like to do first is turn to

5    -- well, rephrase.

6          Very simply, what is this article about; what

7    are they talking about?

8               MR. ISMAIL:  Objection, hearsay, Exhibit

9          696, standing objection.

10              MR. SLATER:  Yep.

11   BY MR. SLATER:

12         Q.   Let me ask the question again.  What is

13   this article about?  Let's start in general, and then

14   we'll go to specifics real quick.

15         A.   The article, as it states, which is

16   important, it's a multicenter study, so it's not just

17   one institution.  So it's experience of multiple

18   different doctors, high volume, high profile, top notch

19   surgeons, and they're evaluating the -- their

20   complications that they have seen and referred in to

21   their institution from meshes and then the outcome

22   following these.  So it's much more advanced study than

23   the original Blandon one.  Blandon one is early is.

24   This is now late with multiple studies looking at this

Daniel S. Elliott, M.D.

1    problem.

2         Q.   The concepts that we're going to talk

3    about in this article, do they apply to the Prolift®,

4    in your opinion?

5         A.   Yes.

6         Q.   Okay.  Let's first turn to Page e3, and

7    there's a Table 2.

8         Do you see that?

9         A.   Yes, I do.

10        Q.   And first at the top it says, there were

11   347 patients?

12        A.   Correct.

13        Q.   And if you go down further it says,

14   "smoking status."  What is that telling us?

15        A.   As it states, did the patient smoke, have

16   they never smoked, past smoker or a lifetime nonsmoker.

17        Q.   And what was the statistics on the 347

18   patients?

19        A.   Well, just reading it right off of there,

20   never smoked was 61%, past smoker 21%, current smoker

21   was 12.4%.

22        Q.   And with regard to the concept of mesh

23   erosion and complications that are discussed in this

24   article, and we're going to get to them in a second,

Daniel S. Elliott, M.D.

1   what does this tell us about whether smoking, in your

2   opinion, factors into that?

3           A.   Well, it's not just my opinion, but the

4   opinion of these authors that smoking was not a factor

5   because if you look at never smoked, 61%.  If you add

6   in there the previous but current nonsmokers, that

7   equals a total of 82% nonsmokers.  So 82% of the people

8   weren't currently smoking and they had complications.

9           Q.   Let's go to page e5, if we could.  And

10  what I would like to do is draw your attention to the

11  middle column, and the first full paragraph, about

12  halfway down, and they're talking about the patients

13  and some statistics on them, and it says, the most

14  common complaints were mesh erosion (42.7%), pelvic

15  pain (34.6%), and dyspareunia (30%), although most

16  women (70.3%) had with greater than one distinct

17  symptom or complaint.

18          What is significant, if anything, about that?

19          A.   It means you have, to be basic, a bunch of

20  problems to fix.  70% were coming in with more than

21  just one problem, and then it breaks it down what those

22  various different problems are, but, I mean, it's not

23  just one thing you have to try and fix.

24          Q.   Turn to the next page, the Comment

Daniel S. Elliott, M.D.

1    section, please, Page e6, and it says a little down

2    from the beginning of the comment section,

3    approximately one half of the women who sought

4    treatment of a mesh-related complication at a tertiary

5    referral center actually underwent their index

6    procedure, or their first procedure, at another

7    facility.  This trend has been reported in other

8    studies as well.  This raises the potential concern

9    that physicians who perform these mesh procedures may

10   not be aware of the complications their patients

11   experience and that these providers may be responsible

12   for future mesh-related complications, with no

13   awareness of the existing magnitude of the issue.

14           Is that significant to you?

15           A.   Yes, it is.

16           Q.   Why is that?

17           A.   Well, for two different reasons.  Number

18   one, 50% of the procedures -- let's break it up into

19   50/50.  50% of these procedures, these complications

20   they're facing were done by high volume, high qualified

21   surgeons, okay, so that raises a problem right there.

22           Number two, the other 50% were done by surgeons

23   who are unaware that this complication is even

24   existing, so it's multiple problems with that statement

Daniel S. Elliott, M.D.

1   right there.

2          Q.   Let's look at the right-hand column on

3   page e6, almost halfway down the page, there's a

4   sentence that starts, "Furthermore, complications after

5   TVM tend to be more severe, are more chronic in nature

6   and can be more difficult to treat.  For instance, mesh

7   erosion, pelvic pain, dyspareunia, vaginal

8   constriction, vaginal spotting and obstructive

9   defecation were all significantly more common after

10  index surgery with TVM than 1 with sling only."

11         Is that significant to you?

12         A.   Oh, absolutely.  They're describing here

13  that this is a problem that we can't fix.  In medical

14  school, residency and advanced training, we are trained

15  to fix problems.  That's what doctors are supposed to

16  do, and they're stating we can't fix it.

17         Q.   Let's go down further on the third column

18  on Page e6, almost to the bottom, about eight lines up,

19  it says, "Most patients (60%) received 2 or more unique

20  interventions; even then, there was no guarantee of

21  symptom resolution."

22         What, if any, significance is that?

23         A.   Okay.  It's that there used to be this

24  dogma of oh, treat a mesh exposure, that's it, it's

Daniel S. Elliott, M.D.

1    gone, no big deal.

2         What they're saying is it requires multiple --

3    60% of their patients required two or more, and I think

4    later on they say there's something like 12% required

5    up to five or six, so it's a much larger number.  I

6    don't have any specifics right here.  So but bottom

7    line, it's a problem that continues to create more

8    problems, and it can't just be resolved quickly.

9         Q.   The description of complications and the

10   issues with treating the complications in this article,

11   in your opinion, do these concepts apply to the

12   Prolift®?

13        A.   Absolutely, yes.

14        Q.   Do you have an opinion as to whether or

15   not this profile of complications is medically safe or

16   unsafe for patients?

17             MR. ISMAIL:  Objection, cumulative.

18   BY MR. SLATER:

19        Q.   What's your opinion?

20        A.   It's unsafe.

21        Q.   Let's go to the next exhibit, which is

22   PLT1095, which I did give you before.

23             MR. ISMAIL:  When we came in first thing

24             the morning?

Daniel S. Elliott, M.D.

```
 1                  MR. SLATER:  Yes.

 2                  MR. ISMAIL:  Thank you.

 3     BY MR. SLATER:

 4          Q.   Doctor, Exhibit PLT1095 is an article

 5     titled "Surgical management of mesh-related

 6     complications after prior pelvic floor reconstructive

 7     surgery with mesh."  There's a few authors,

 8     including -- is it Heesakkers?

 9          A.   John Heesakkers.

10          Q.   Heesakkers and Mariëlla Withagen from

11     2011.

12          Are you familiar with this article?

13          A.   Yes, I am.

14          Q.   Is this article medically reliable and

15     authoritative in the field, in your opinion?

16          A.   Yes, it is.

17          Q.   Is this an article you relied on?

18          A.   Yes.

19          Q.   And do you know any of these authors?

20          A.   I've heard Withagen speak.  John

21     Heesakkers, he is the chair of the European Urology

22     Reconstructive Surgery, which I am a board member of,

23     so I've talked to him, I've talked to him about mesh

24     complications, so I know him personally.
```

Daniel S. Elliott, M.D.

1          Q.   Let's turn -- this is a paper about the

2    treatment of mesh complications, including Prolift®?

3          A.   That's correct.

4               MR. ISMAIL:  Objection to hearsay, Exhibit

5          1095, also, on not disclosed previously as a

6          reliance material for this witness.

7               Standing objection?

8               MR. SLATER:  Standing objection.

9               MR. ISMAIL:  Thank you.

10   BY MR. SLATER:

11         Q.   Let's turn to the fourth page, Page 1398,

12   and first I want to read something in the right-hand

13   column.  About halfway down the right-hand column it

14   says, a distinct difference in frequency of

15   mesh-related symptoms existed between the different

16   types of mesh insertion procedure, especially in

17   sacrocolpopexy compared to the other procedures.  Pain

18   and dyspareunia are mainly seen after mesh insertion

19   and vaginal bleeding and discharge after

20   sacrocolpopexy.

21              Is that significant to you?

22         A.   Yes.

23         Q.   Why is that?

24         A.   Because then they're going back to this

Daniel S. Elliott, M.D.

1    issue of this being a quality of life problem and this

2    patient having with the mesh kits, transvaginal mesh

3    kits having the vaginal pain.

4          Q.   I'm going to ask you to do something.  Can

5    you just grab the mesh from the anterior kit real

6    quick.

7          With the abdominal sacrocolpopexy, is mesh

8    used, where it's put in through the abdomen?

9          A.   Yes, through the abdomen, which is

10   different than through the vagina.

11         Q.   And can you illustrate for the jury

12   holding up the Prolift® how much mesh would be used in

13   a abdominal sacrocolpopexy and give the jury some idea

14   of the difference.

15         A.   Well, you have to break it down so we can

16   see it here.  So this is the mesh for the anterior

17   prolapse, anterior Prolift® and then the --

18         Q.   Hold it up more.

19         A.   The amount in contact with the vagina,

20   we're not talking about the arms, just the vagina is

21   going to be this part here, okay.  And then you also

22   have the arms, okay, which go through the muscles what

23   I've already referred to.

24         Now, for the sacrocolpopexy, the robotic

Daniel S. Elliott, M.D.

1    sacrocolpopexy or the open procedure, the amount in

2    contact with the vagina is going to be about that much,

3    okay, maybe a little bit more, maybe a little bit less,

4    and you'll be able to have it lie flat anteriorly, and

5    there may be also a piece that size going posteriorly.

6    In direct contact with the vagina is significantly

7    less.

8           Q.   That size difference, what's the size of

9    the amount of mesh, can you estimate the size of what's

10   used with the abdominal procedure?

11          A.   Okay.  It's going to be anteriorly, what's

12   that, 2, maybe 3 centimeters, and also what I do is,

13   and most people do, is you trim the top so it's a

14   little more curved so it would actually be less than

15   this.  Let's just say 2 by 2 anteriorly, posteriorly

16   maybe 2 by 3 centimeters, which is going to be

17   significantly less, you can just visualize it,

18   significantly less than the volume of mesh put in

19   otherwise for the Prolift®.

20          Q.   So that's about an inch, 2 centimeters?

21          A.   2.54 centimeters in an inch.

22          Q.   So a little less.

23          A.   That's why I just said, just look at this.

24          Q.   Okay.  Do you have an opinion as within --

Daniel S. Elliott, M.D.

1    as between abdominal sacrocolpopexy and the Prolift®

2    procedure as to which one has a more or less acceptable

3    safety and efficacy profile overall?

4              MR. ISMAIL:  Objection, cumulative.

5              THE WITNESS:  Yeah, the data will show the

6         abdominal sacrocolpopexy, whether it be done

7         robotically, laparoscopically or with an

8         incision is a much safer procedure, with lower

9         incidence of dyspareunia, chronic problems

10        associated with Prolift®.  So it's a -- you

11        can't compare the two.  They're apples and

12        oranges as far as the procedure goes.

13   BY MR. SLATER:

14        Q.   Let's turn now to Page 1402 of the article

15   that we are discussing here.  The Heesakkers-Withagen

16   article and in the right-hand column, towards the top

17   right, top paragraph, last sentence, it says, also, the

18   urologist is always involved in the treatment of

19   patients with (suspected) mesh complications affecting

20   the bladder.

21             Is that significant to you?

22        A.   Yes.

23        Q.   Why is that?

24        A.   Because what Withagen, who's a, you know,

Daniel S. Elliott, M.D.

 1   highly trained, very good pelvic surgeon is what she's

 2   saying, and she gets another expert involved in the

 3   bladder, because these are so difficult to get out.

 4        Q.   Let's go down further in that column to

 5   the last -- the second to last -- really, the last full

 6   paragraph and about halfway down through that it says,

 7   "Of the patients included in this study, 20 underwent

 8   insertion of Prolift® at our hospital between halfway

 9   of 2005 and end of 2009.  In this period, 180 Prolift®

10   meshes were inserted.  So, 20 out of 180, (11%)

11   patients with Prolift® inserted at our center developed

12   complications that required excision."

13        Is that significant to you?

14        A.   Yes, it is, especially given the probably

15   relatively short amount of follow-ups, that's a very

16   high number.

17        Q.   Having over 10% reoperations to remove

18   mesh?

19        A.   It's quite -- that's a very high number,

20   yes.

21        Q.   Finally, I want to go to the last page of

22   the text.  The Conclusion, the very bottom of the left

23   column over to the top, I want to read something and

24   ask you a question.  So we're at the bottom of the left

Daniel S. Elliott, M.D.

1    column under the Conclusion, the last paragraph.

2         A.    I'm there.

3         Q.    It says, "The increasing number of

4    inserted meshes for SUI and POP raises concerns.  Mesh

5    is successfully used for repair of prolapse, but when

6    complications arise, they may be severe in nature and

7    result in a decrease in quality of life.  New meshes

8    are introduced into clinical practice, despite the lack

9    of proper studies showing their safety and

10   effectiveness.  Moreover, the use of easy-to-do mesh

11   kits lowers the threshold for inexperienced surgeons to

12   start operating with meshes.  This can only lead to

13   more complications, which is harmful for the patients."

14         Is that significant to you?

15         A.    Very much so, yes.

16         Q.    Why is that?

17         A.    Well, you go point by point through here

18   is -- in the first line, mesh is successfully used to

19   repair prolapse.  You know, I agree with that, that

20   they can repair prolapses.  Now we had a high failure

21   rate, it's 20% or so, but that's not the issue.  It's

22   that these complications are the problem.  That's the

23   life-changing aspect of it and that they're introduced

24   without any studies, okay.  There were no human studies

Daniel S. Elliott, M.D.

1    on Prolift® prior to release, okay.  To my opinion that

2    is unethical and unacceptable.

3              And then, number three, this gets into more of

4    a discussion, these easy kits allow inexperienced

5    to start -- inexperienced surgeon, to allow them to

6    operate, that's beyond the scope of this here.  But it

7    raises the ability for people who are not advanced

8    surgeons of doing these things.  Again, that's, to a

9    certain degree, a different issue here.

10             MR. ISMAIL:  In addition to hearsay, which

11             has been preserved, move to strike as

12             nonresponsive and not proper grounds for expert

13             testimony.

14   BY MR. SLATER:

15        Q.   Let's go to the next exhibit.

16             Doctor, I've handed you what we've marked as

17   Exhibit -- actually, what number is on that?

18        A.   P2731.

19        Q.   Is it P or PLT?

20        A.   P.

21        Q.   Just P, okay.  Okay.  Let me start over.

22             Doctor, I've handed you Exhibit P2731, and this

23   is a page from the New England Journal of Medicine?

24        A.   That is correct.

Daniel S. Elliott, M.D.

1          Q.   And in the bottom right-hand column

2    there's a set of corrections.

3          Do you see that?

4          A.   Yes, I do.

5          Q.   And the bottom one says that there was a

6    correction to an article titled "Anterior Colporrhaphy

7    versus Transvaginal Mesh for Pelvic Organ Prolapse,"

8    published in the New England Journal of Medicine,

9    May 12, 2011.

10         And are you familiar with that article?

11              MR. ISMAIL:  Objection, hearsay.

12              THE WITNESS:  Yes, I am, the Altman study,

13         I'm familiar.

14   BY MR. SLATER:

15         Q.   And they talk about a correction that was

16   made to some language in the Altman study of the

17   Prolift®?

18         A.   That is correct.

19              MR. ISMAIL:  Objection, hearsay.

20              Standing objection 2731.

21   BY MR. SLATER:

22         Q.   If somebody in this courtroom were to have

23   relied on the Altman study to say that that is proof of

24   the safety or efficacy or that the Prolift® is a

Daniel S. Elliott, M.D.

1    suitable device or system, what would be your response

2    to that based on the correction and the information you

3    have available to you from the depositions of the

4    editors of the New England Journal of Medicine and the

5    internal documents you've seen from the company?

6              MR. ISMAIL:  Objection, hearsay, 403.

7    BY MR. SLATER:

8         Q.   You can answer.

9         A.   Based upon what I have read, as you

10   mentioned, the depositions from the journal -- New

11   England Journal of Medicine editors, what I've read of

12   internal documentation, of correspondence going back

13   and forth between the author and key people, three or

14   four within Ethicon, that the author originally stated

15   that this data was not -- had no industry involvement.

16   And then we come to find out that roughly, what, 100 or

17   so changes were made by Ethicon on this document.

18             Subsequently, there's no disclosure of bias,

19   which is the reason why rules exist is to declare if

20   there's a potential bias.  So that Altman study, along

21   with other errors that were pointed out on POP-Q scores

22   makes that study unreliable and false.

23        Q.   When you talk about errors with POP-Q

24   scores, what are you talking about, and why is that

Daniel S. Elliott, M.D.

1    significant in assessing the validity of the Altman

2    study?

3                    MR. ISMAIL:  Objection, 403, hearsay.

4                    THE WITNESS:  POP-Q is a grading system,

5             POP-Q, pelvic organ prolapse quantification of

6             the prolapse, okay.  It's basic numbers and

7             certain POP-Q scores, we should abbreviate

8             POP-Q, because it's just easier.  It's a very

9             logical system, and so in my review of these

10            internal documents, e-mails back and forth and

11            depositions, we find out that those POP-Q

12            scores are not possible, not physically

13            possible, so, therefore, that data is false.

14            That's why I have been privy to information the

15            average doctor on the street has not been.  So,

16            again that's why it's a major because it

17            undermines the very core and validity of that

18            information.

19                    MR. ISMAIL:  Objection, move to strike,

20            nonresponsive.

21    BY MR. SLATER:

22            Q.    Let's go to the next PowerPoint slide.

23            Doctor, I want to ask you about some

24    characteristics of the Prolift® and ask you a question

Daniel S. Elliott, M.D.

```
 1    about them, okay?

 2            A.   Okay.

 3            Q.   First of all, did you compile a list of

 4    what you believe to be medically unsafe Prolift®

 5    characteristics?

 6            A.   Yes, in an abbreviated form listed here,

 7    yes.

 8            Q.   The first one, "tension is unavoidable/no

 9    'tension free'"

10            MR. ISMAIL:  Object to the -- sorry.

11    BY MR. SLATER:

12            Q.   You've talked about these things, some of

13    them at length, but I just want you to briefly just

14    tell us why you include that in the list?

15            MR. ISMAIL:  Object to the slide as

16            argumentative, object to the testimony as

17            cumulative.

18            THE WITNESS:  Tension free is not

19            physically possible within the female pelvis.

20            So that's why it's tension free is -- tension

21            is going to happen, which then goes down to one

22            of the root sources of problems, where you get

23            tension, you get the pore size collapse, then

24            you cause that inflammation, foreign body
```

Daniel S. Elliott, M.D.

```
 1                reaction, scarring and pain.
 2    BY MR. SLATER:
 3         Q.   Number 2, mesh does not lay flat in an
 4    unstretched condition.
 5              Why do you say that?
 6                MR. ISMAIL:  Objection, cumulative.
 7                THE WITNESS:  As I stated earlier, you
 8                can't get that mesh to lie flat.  If it doesn't
 9                lie flat, it bunches, it curls, ropes and then
10                that causes, again, that cascade of the
11                problem, pore size decrease, foreign body
12                reaction, inflammation, pain.
13    BY MR. SLATER:
14         Q.   With regard to the arms, roping, curling
15    and banding, location in obturator space and deep
16    pelvis, why do you include that?
17                MR. ISMAIL:  Objection, cumulative.
18                THE WITNESS:  The roping, curling and
19                banding, we showed multiple times here, that's
20                going to cause that -- those arms to roll up,
21                scar.  They band, you can feel them on physical
22                exam.  Going through the obturator foramen
23                space and deep pelvis, the significance of that
24                is it's going to anchor it in and those
```

Daniel S. Elliott, M.D.

```
1              muscles, those multiple muscles that have been

2              pierced will then contract with pain -- excuse

3              me -- with activity causing pain.

4    BY MR. SLATER:

5         Q.   Mesh does not incorporate safely in the

6    pelvis.

7              What does that mean?

8              MR. ISMAIL:  Objection, cumulative.

9              THE WITNESS:  That's what we've been

10             stating multiple times.  This mesh is not a

11             safe product to be placed in the female pelvis

12             transvaginally.

13   BY MR. SLATER:

14        Q.   Difficult/impossible to safely and

15   effectively remove the mesh.

16             Why do you say that?

17             MR. ISMAIL:  Objection, cumulative.

18             THE WITNESS:  Because the product when put

19             in for a quality of life issue, it is

20             impossible to get that mesh out completely.

21             You can leave behind or do severe damage to the

22             pelvic structures in trying to take it out.

23   BY MR. SLATER:

24        Q.   Do you hold those opinions to a reasonable
```

Daniel S. Elliott, M.D.

```
 1   degree of medical certainty?

 2          A.   Yes, those are based upon my personal

 3   experience, review of the literature, internal

 4   documentations, everything.

 5          Q.   Based upon the list of medically unsafe

 6   Prolift® characteristics that you have compiled, do you

 7   have an opinion as to whether or not the Prolift®

 8   system is a defective -- defectively designed system

 9   and procedure for the treatment of pelvic organ

10   prolapse?

11               MR. ISMAIL:  Objection, cumulative, lack

12          of foundation, lack of qualifications.

13               THE WITNESS:  As I've mentioned, based

14          upon my experience in taking care of these

15          complications, my experience performing the

16          traditional repairs without mesh, that this was

17          an unsafe, poorly designed product that has no

18          role being placed in the female pelvis.

19   BY MR. SLATER:

20          Q.   Let's go to the next slide.

21          Doctor, did you compile a list of injuries

22   caused by medically unsafe Prolift® characteristics,

23   meaning what the consequences are of the list of

24   characteristics you listed on the prior slide?
```

Daniel S. Elliott, M.D.

```
 1                  MR. ISMAIL:  Objection.  Sorry.

 2             Objection, the slide is argumentative, also 403

 3             as being -- many of these being irrelevant to

 4             the plaintiff at issue.

 5                  MR. SLATER:  I'm going to ask the question

 6             differently.

 7    BY MR. SLATER:

 8        Q.   Doctor, I'd like to talk about a list of

 9    injuries caused by medically unsafe Prolift®

10    characteristics, a list that we have here to talk

11    through, okay?

12        A.   Okay.

13        Q.   Is this list applicable to the Prolift® in

14    those issues that you just went through on the prior

15    slide?

16                  MR. ISMAIL:  Same objection.

17                  THE WITNESS:  Yes.

18    BY MR. SLATER:

19        Q.   Doctor, I'm going to walk through these

20    one at a time.

21             Chronic, severe inflammation, why is that, in

22    your opinion, a result of a medically unsafe

23    characteristic of the Prolift®?

24                  MR. ISMAIL:  Objection, 403.
```

Daniel S. Elliott, M.D.

```
 1                    THE WITNESS:  Because you're treating a

 2            quality of life problem, prolapse, and if you

 3            place a device in there that has chronic,

 4            severe, permanent and progressive inflammation,

 5            it's unacceptable to trade a quality of life

 6            problem with a viable, acceptable alternative

 7            and trade it for a chronic, permanent problem.

 8   BY MR. SLATER:

 9            Q.   Contraction of the mesh, and then you have

10   the term excessive.  Tell us what that means and why

11   that is, in your opinion, applicable?

12                    MR. ISMAIL:  Objection, 403, cumulative.

13                    THE WITNESS:  The key with that is, number

14            one, contraction, so the mesh shrinks down as a

15            result of the scarring and inflammation, but

16            then excessive, so it's pulling on the muscles,

17            causing the pain, causing banding, rolling and

18            subsequently causing mesh exposure, so it

19            causes multiple different problems.

20   BY MR. SLATER:

21            Q.   Scar plating and fibrotic bridging,

22   explain that, why that is a result of the Prolift®?

23                    MR. ISMAIL:  Objection, 403, cumulative.

24   BY MR. SLATER:
```

Daniel S. Elliott, M.D.

```
1              Q.   And what you've called medically unsafe

2    Prolift® characteristics?

3                   MR. ISMAIL:  Cumulative.

4    BY MR. SLATER:

5              Q.   Scar plating, fibrotic bridging, Number 3.

6              A.   Thank you.  Again, this goes back to the

7    fundamental problem with the mesh of causing that

8    plating.  It doesn't cause tissue integration, where it

9    goes through those pores.  It causes that plating,

10   which then causes the mesh to contract; bridging, which

11   causes pain for both the partner -- excuse me -- for

12   the patient in sexual activity with the partner also,

13   along with other as far as just ambulation.

14             Q.   Extrusion/exposure/erosion of mesh -

15   complex/recurrent.  What are you talking about there,

16   and why is that an injury caused by a medically unsafe

17   Prolift® characteristic?

18                  MR. ISMAIL:  Objection, 403, cumulative.

19                  THE WITNESS:  Due to the design of this

20             product, what I see in my daily practice,

21             because those pores constrict, because you get

22             this fibrosis or persistent infection, you can

23             get extrusion of the mesh, exposure, and the

24             key here is complex and recurrent, meaning it's
```

Daniel S. Elliott, M.D.

```
1              not just one quick little procedure and it's

2              done.  As that Abbott study showed it comes

3              back multiple times.

4                   MR. ISMAIL:  Objection, move to strike,

5              hearsay.

6    BY MR. SLATER:

7              Q.   Vaginal pelvic pain, which can be chronic.

8    Why is that the result of a medically unsafe Prolift®

9    characteristic?

10                  MR. ISMAIL:  Objection, 403, cumulative.

11                  THE WITNESS:  This is one of the biggest

12             issues which I see in my clinic on a weekly

13             basis is that we now have a quality of life

14             problem of this pelvic organ prolapse.  Woman

15             has fullness, pressure, and then now we've

16             traded it for a chronic, progressive,

17             permanent, unfixable problem, okay.  So the

18             women's quality of life, these are the patients

19             that I have in my clinic, they and their

20             spouse, they're crying because they are ruined

21             because of a quality of life problem when there

22             was a viable other option available.

23                  MR. ISMAIL:  Move to strike,

24             nonresponsive.
```

Daniel S. Elliott, M.D.

1    BY MR. SLATER:

2           Q.   Dyspareunia, which can be chronic, why is

3    that a result of a medically unsafe Prolift®

4    characteristic?

5                MR. ISMAIL:  Objection, cumulative.

6                THE WITNESS:  That's just the same thing

7           as what I just mentioned as far as with the

8           vaginal pain, pelvic pain.  Quality of life

9           problem for permanent progressive problem is

10          not fixable.

11   BY MR. SLATER:

12          Q.   Pelvic floor myalgia, otherwise known as

13   muscle spasms, which can be chronic, why does that

14   result from medically unsafe Prolift® characteristics,

15   in your opinion?

16               MR. ISMAIL:  Objection, 403, cumulative.

17               THE WITNESS:  This is due to those mesh

18          arms going through all those muscles that I

19          mentioned.  When they pull, they tug, the

20          pelvic musculature becomes irritated and

21          painful, and so it's directly due to the

22          presence of that foreign body and the arms in

23          the product.

24   BY MR. SLATER:

Daniel S. Elliott, M.D.

```
1              Q.   Urinary dysfunction, which can be chronic,

2    why is that a result of medically unsafe Prolift®

3    characteristics, in your opinion?

4              MR. ISMAIL:  Objection, 403, cumulative.

5              THE WITNESS:  Okay.  Due to the placement

6         where this is placed, in the vesicovaginal

7         space, in between the bladder and the vagina,

8         where all the nerves for bladder function come

9         in like this, you now have created that foreign

10        body, which is going to cause contraction,

11        erosion, inflammation, and it's going to

12        affecting those nerves causing permanent

13        bladder dysfunction, which you can't fix.

14   BY MR. SLATER:

15             Q.   Mesh removal operations, why do you

16   include that as injuries caused by medically unsafe

17   Prolift® characteristics?

18             MR. ISMAIL:  Objection, 403, cumulative.

19             THE WITNESS:  Every surgery has risks to

20        it, especially as the individual becomes older,

21        there's data out there showing mentation

22        issues, et cetera.  So if the patient undergoes

23        multiple surgeries to try and fix this, besides

24        just the expense of it, the wear and tear on
```

Daniel S. Elliott, M.D.

```
1              the human body, it's not just a one and done,

2              easy fix, office procedure.

3    BY MR. SLATER:

4         Q.   Doctor, you said earlier, and I'll just

5    confirm it, you said you're familiar with the IFU for

6    the Prolift®?

7         A.   Yes, I am.

8         Q.   This profile of injuries, complications

9    that can be caused by the Prolift®, in your opinion, is

10   that adequately warned of in any IFU for the Prolift®

11   that you've ever seen?

12              MR. ISMAIL:  Objection, lack of

13              foundation, lack of qualifications.

14              THE WITNESS:  No.

15   BY MR. SLATER:

16        Q.   Is the medical information that is set

17   forth in this list that you have compiled found in the

18   Prolift® IFU, in your opinion?

19              MR. ISMAIL:  Same objections.

20              THE WITNESS:  No.

21   BY MR. SLATER:

22        Q.   Is it important to not only warn of

23   specific individual risks but also of the entire full

24   spectrum of the risks at the same time?
```

Daniel S. Elliott, M.D.

1      A.   Yes.

2      Q.   Why does that matter?

3      A.   The IFU needs to warn about all the known

4   complications, their severity, their frequency, so you

5   got to -- and the ability to change it.  So you've got

6   to warn for all of those potential factors, which were

7   all known.

8           MR. ISMAIL:  Objection, move to strike

9           under 705.  Sorry.

10  BY MR. SLATER:

11     Q.   Let me ask you this:  Is it important for

12  the entire risk profile and the most severe

13  complications to be fully disclosed to the doctor?

14     A.   Yes.

15     Q.   Why is that?

16          MR. ISMAIL:  Same objection.

17          THE WITNESS:  The doctor, as a surgeon

18          myself, I need to know so I can relay

19          accurately to the patient, a human being that's

20          sitting in my office, I have to be able to tell

21          them, here's what we can expect, I have to be

22          told all known complications, severity and

23          their nature, what is known, so I can

24          accurately consent my patient.

Daniel S. Elliott, M.D.

```
 1   BY MR. SLATER:

 2        Q.   Does that also enter into the risk-benefit

 3   analysis and what recommendations are made and how

 4   they're made?

 5        A.   Absolutely.

 6        Q.   Let's go to the next slide, "Treatment of

 7   Prolift® Complications."

 8        Doctor, this list of treatment of Prolift®

 9   complications, I'll let you just walk through it and

10   just quickly tell us, first of all, are these

11   treatments that are known to be, in your opinion, to be

12   necessary to treat various complications from a

13   Prolift®?

14             MR. ISMAIL:  Objection, cumulative and

15        403.

16             THE WITNESS:  Many times, yes.

17   BY MR. SLATER:

18        Q.   Okay.  Just go through them one at a time.

19   Tell us what you're specifically talking about and just

20   tell us so we understand what they are.

21        A.   Sure.  I did not list the --

22             MR. ISMAIL:  Objection.  Sorry, doctor.

23        I'll let you restart, but objection, cumulative

24        and 403.
```

Daniel S. Elliott, M.D.

```
 1              THE WITNESS:  I did not list these in
 2        level of complexity, which I probably should
 3        have, but starting off with mesh removal
 4        operation, this is to remove the mesh, that can
 5        be removal of an exposure, it's outpatient type
 6        procedure versus the complete removal of the
 7        mesh, which is a major transabdominal belly
 8        procedure, highly complicated thing.  So that
 9        falls in the next point of just surgical care.
10        These are complicated procedures requiring
11        multiple office visits, multiple follow-up,
12        multiple effect upon the individual's usual
13        lifestyle, okay.
14              Pain management/injections, another option
15        for treating pelvic pain.  This is the majority
16        of what I see.  Unfortunately, I have yet to
17        have, in my experience now, since meshes have
18        come out, so now it's, what, ten years now, I
19        have yet to have a successful pain management
20        patient with meshes, I can't fix them.  I have
21        a physical therapy team.  I have a nurse who
22        works in biofeedback.  I have an anesthesia
23        pain clinic, can't fix them.  So it's a
24        permanent problem.
```

Daniel S. Elliott, M.D.

```
 1                   Pelvic floor physical therapy, that's what
 2           I just mentioned, biofeedback, again, an
 3           option.  I have had zero success.
 4           Spinal --
 5      Q.   Let me just stop you there.  Were you
 6  talking about success in terms of completely treating
 7  the condition and making the person completely better?
 8      A.   No.  I'm talking about a significant
 9  reduction in their symptoms.  I'm not -- I do not try
10  to make -- let me back up.
11           I would love to be able to make someone pain
12  free.  I'm realistic, I can't.  I am happy if I can get
13  a significant reduction in their pain.  I can't even
14  get that, and I've got arguably some of the best people
15  around to help me out, and I can't do it.  I wish I
16  could.
17      Q.   Let's go on, spinal stimulator.
18           MR. ISMAIL:  Objection, 403, cumulative.
19           THE WITNESS:  The spinal stimulator
20           evolved with our pain clinic.  It's just
21           another way of injecting pain medication to the
22           spine or locally.
23           Catheterization is dealing for bladder
24           dysfunction that occurs afterwards, where the
```

Daniel S. Elliott, M.D.

```
 1          woman is in retention and can't urinate because
 2          of contraction.
 3              Medication is again going down the lines
 4          of bladder spasm medication or pain medication,
 5          which I allow my pain clinic colleagues to deal
 6          with that.
 7    BY MR. SLATER:
 8          Q.   Okay.  Let's go to the next PowerPoint
 9    slide.  Doctor, I want to ask you about a statement
10    made by David Robinson in his deposition of March 13,
11    2012, Page 52, Line 11 to 15 and ask you a question
12    about it.
13              First of all, you read that deposition; you
14    know this testimony?
15          A.   Yes, I did.
16          Q.   "Data should establish that the benefits
17    far outweigh the risks before the product is sold for
18    widespread use."
19              Did Ethicon ever establish data that would
20    satisfy that criteria?
21              MR. ISMAIL:  Objection to the use of the
22          slide as argumentative, and testimony is
23          cumulative, lack of foundation.
24              THE WITNESS:  No.
```

Daniel S. Elliott, M.D.

1    BY MR. SLATER:

2           Q.   Do you have an opinion to a reasonable

3    degree of medical certainty as to whether or not the

4    overall risk-benefit profile for the Prolift® was

5    medically acceptable?

6                MR. ISMAIL:  Objection, cumulative.

7                THE WITNESS:  It was not medically

8           acceptable.

9    BY MR. SLATER:

10          Q.   And is that for the reasons you've stated

11   throughout your testimony?

12               MR. ISMAIL:  Same objection.

13               THE WITNESS:  Yes.

14   BY MR. SLATER:

15          Q.   Let's go to the next PowerPoint slide.  I

16   want to ask you about some testimony that Ethicon

17   medical affairs directors gave regarding the standards

18   they described for what the warnings of risks needed to

19   communicate.

20          Are you familiar with what that testimony was?

21          A.   Yes, I've read all those depositions.

22          Q.   And is that testimony something that

23   you've relied on in forming your opinions?

24          A.   Yes.

Daniel S. Elliott, M.D.

1      Q.   And do you agree with the descriptions of

2  the criteria for what warnings needed to communicate

3  regarding risks as testified to by the medical affairs

4  directors; do you agree with that testimony?

5           MR. ISMAIL:  Objection to the slide as 403

6           and argumentative and to the testimony as 403,

7           argumentative and without qualification.

8           THE WITNESS:  Yes, I agree to each of

9           those five points I pointed out.

10  BY MR. SLATER:

11      Q.   And just to be clear, Doctor, to meet any

12  objection, in your practice, you have utilized and not

13  only utilized but taught residents the use of the IFU,

14  including risk information?

15      A.   Oh, absolutely, yes.

16      Q.   And, in your experience, is it necessary

17  for you to understand how to read an IFU and literature

18  from a manufacturer to determine how to use that risk

19  information in treating patients?

20      A.   Absolutely.  I have to trust what I read

21  on the IFU, so that's why I relay on to the patients

22  and relay on to my residents during education.

23      Q.   Let's go to the next exhibit, Exhibit

24  P1005.

Daniel S. Elliott, M.D.

1            Doctor, let me start over.  Get a drink of

2    water.

3            Doctor, looking at Exhibit P1005, this is an

4    IFU that Ethicon has advised us was in effect from 2007

5    until, I believe, September 2009.

6            Are you familiar with this IFU?

7            A.   Yes, I am.

8            Q.   And you've talked about it before.  You're

9    familiar with the document and the various bits of

10   information in there?

11           A.   Yes.

12           Q.   I want to just ask you to just run through

13   a few things and ask you brief questions about them.

14   Let's go to the second page.  There is a heading

15   halfway down just below the table that says "Gynecare

16   Gynemesh® PS," and that's the name of the mesh material

17   in the Prolift®?

18           A.   That is correct.

19           Q.   The last sentence of that section says,

20   "The bi-directional elastic property allows adaptation

21   to various stresses encountered in the body."

22           Are you familiar with that statement in this

23   IFU?

24           A.   Yes.

Daniel S. Elliott, M.D.

1          Q.   Have you in all the materials you've

2     reviewed seen whether Ethicon had any data to support

3     making that claim in the IFU?

4          A.   They had none.

5          Q.   Do you have an opinion as to whether or

6     not it was appropriate or inappropriate for Ethicon to

7     make that statement in the IFU?

8               MR. ISMAIL:  Objection, improper expert

9          testimony.

10              THE WITNESS:  It would be inappropriate

11         and misleading to the surgeon.

12              MR. ISMAIL:  Move to strike,

13         nonresponsive.

14    BY MR. SLATER:

15         Q.   Based on your knowledge and experience and

16    familiarity with the literature and the use of IFUs, do

17    you have an opinion as to whether surgeons expect that

18    the information in an IFU is accurate?

19              MR. ISMAIL:  Objection, improper expert

20         testimony.

21              THE WITNESS:  You expect and I used to

22         expect it to be honest and truthful.

23    BY MR. SLATER:

24         Q.   What do you mean by used to?

Daniel S. Elliott, M.D.

```
 1              MR. ISMAIL:  Objection, 403, improper

 2         testimony for an expert.

 3              THE WITNESS:  In my daily practice as a

 4         surgeon, and I had reviewed these, I had

 5         expected in the past to have it be an honest

 6         representation of what was known, so that I

 7         could relay honestly to my patients, people

 8         that I care for and am trained to care for, and

 9         now I do not believe that is true anymore.

10              MR. ISMAIL:  Objection, move to strike.

11   BY MR. SLATER:

12         Q.   Let's go to Page 5 of the IFU, and there's

13   a section under Performance, and it indicates at the

14   very bottom Page 5.  Let's start over.

15         Let's go to Page 5 of the IFU, Doctor.  There's

16   a little number 5 in the bottom right.

17         You see it?

18         A.   Yes.

19         Q.   And at the bottom of the page there is a

20   section that says Performance.

21         A.   Yes.

22         Q.   And in that section regarding the mesh

23   material and the Prolift® it says that it "elicits a

24   minimum to slight inflammatory reaction, which is
```

Daniel S. Elliott, M.D.

1    transient."  I want to stop there.

2          Do you have an opinion as to whether that is an

3    accurate statement or not?

4          A.    I have an opinion, yes.

5          Q.    And what is your opinion?

6          A.    It is wrong.

7          Q.    Why do you say that?

8          A.    Because the foreign body reaction as

9    documented in the literature what I've seen in my

10   personal experience and the internal documentation is

11   not minimum to slight, and it is permanent and

12   progressive.

13              MR. ISMAIL:  Objection, move to strike,

14         hearsay.

15   BY MR. SLATER:

16         Q.    It indicates in the Performance section

17   that there will be "a minimum to slight inflammatory

18   reaction, which is transient, and is followed by the

19   deposition of a thin, fibrous layer of tissue which can

20   grow through the interstices of the mesh."

21              Do you have an opinion as to whether or not

22   that is a fully accurate and fully fair disclosure of

23   what occurs?

24         A.    I have an opinion, yes.

Daniel S. Elliott, M.D.

1          Q.    What's your opinion?

2          A.    That it is incorrect.

3          Q.    Why?

4          A.    Based upon my experience, my physical exam

5    of hundreds of women, it is not a thin, fibrous layer.

6    It's thick, it's bunched up, it's firm.

7                MR. ISMAIL:  Move to strike under 403.

8    BY MR. SLATER:

9          Q.    In the Performance section, about halfway

10   down through that it says, "the mesh remains soft and

11   pliable."

12          Do you see that statement?  Do you have an

13   opinion as to whether that is accurate?

14         A.    It is false.

15         Q.    Why do you say that?

16         A.    That's based upon my own physical exams on

17   patients, review of the literature, review of internal

18   documents.  It gets firm and fixed, rigid.

19               MR. ISMAIL:  Objection, move to strike as

20               hearsay, 403.

21   BY MR. SLATER:

22         Q.    Did you see testimony of Axel Arnaud, the

23   medical affairs director in France with regard to

24   whether the mesh stays soft?

Daniel S. Elliott, M.D.

1           A.   I saw his and other people's depositions,

2    yes.

3           Q.   And what did he say about whether it stays

4    soft over time?

5           A.   It does not.

6           Q.   Now, there are statements in the IFU

7    regarding the indications or contraindications, and I

8    want to ask you a question -- and we'll have to go back

9    to an exhibit we used previously.  I want to ask you a

10   question about who the appropriate patients are for the

11   Prolift® as stated in the IFU.

12          So, first of all, PLT0062 was one of the first

13   exhibits we used.  If you just put that aside, we're

14   going to need that -- let me start over.

15          Doctor, on Page 2 of the IFU it says

16   Indications right towards the top and it says it's

17   indicated for tissue reinforcement and long-lasting

18   stabilization of the fascial structures of the pelvic

19   floor, et cetera.

20          You see that?

21          A.   Yes, I do.

22          Q.   And then on Page 6 there are

23   contraindications listed at the very top.

24          You see that, the very top of the page?

Daniel S. Elliott, M.D.

```
1          A.    Yep.

2          Q.    Is there anywhere in this IFU where it's

3    indicated that the Prolift® is intended only for

4    advanced prolapse Stage III or IV?

5                MR. ISMAIL:  Objection, lack of relevance,

6          403.

7                THE WITNESS:  It does not state anything

8          in regard to indication of a prolapse stage.

9    BY MR. SLATER:

10         Q.    And let's go now in Exhibit PLT0062 to

11   Page 587, the second to last page of that exhibit, and

12   this is the article by the TVM group, the doctors who

13   developed the Prolift®?

14         A.    Yes, by the inventors of the product, yes.

15         Q.    And right in the middle of the conclusion

16   it says, "this technique should be reserved to the

17   management of grade 3 and 4 prolapse, possibly as

18   first-line treatment."

19         Do you see that?

20               MR. ISMAIL:  Objection, hearsay, lack of

21         relevance, 403.

22               THE WITNESS:  Yes, I do.

23   BY MR. SLATER:

24         Q.    Is that of significance to you?
```

Daniel S. Elliott, M.D.

1              MR. ISMAIL:  Same objections.

2              THE WITNESS:  Yes.

3    BY MR. SLATER:

4         Q.   Why?

5              MR. ISMAIL:  Same objection.

6              THE WITNESS:  The surgeons who at this

7         point in time have the largest experience about

8         this product and what it'd be indicated for and

9         including the complications felt that it should

10        be reserved only for the more severe prolapses.

11   BY MR. SLATER:

12        Q.   And when they say possibly as first-line

13   treatment, what does that mean?

14             MR. ISMAIL:  Same objections.

15             THE WITNESS:  It means that for an

16        individual who comes in who has never had a

17        previous prolapse repair, that may be in their

18        opinion for the higher grade prolapses, it can

19        be used as first-line treatment.

20   BY MR. SLATER:

21        Q.   And is that significant to you?

22             MR. ISMAIL:  Same objections.

23             THE WITNESS:  Very much so, as a surgeon.

24   BY MR. SLATER:

Daniel S. Elliott, M.D.

```
 1              Q.   With regard to the information in the IFU,

 2    is that significant to you?

 3              MR. ISMAIL:  Same objections.

 4              THE WITNESS:  Well, absolutely.  As a

 5         surgeon who when papers originally come out,

 6         you look to the original authors to say, help

 7         me, guide me through this and when this is

 8         indicated.  So, yeah, it's a very important

 9         statement for me.

10    BY MR. SLATER:

11              Q.   Do you have an opinion as to whether that

12    information should have been included in the Prolift®

13    IFU?

14              A.   The surgeons --

15              MR. ISMAIL:  Objection.

16    BY MR. SLATER:

17              Q.   Do you have an opinion on that?

18              A.   Yes.

19              Q.   What is your opinion as to whether that

20    information should have been provided?

21              MR. ISMAIL:  Objection, lack of relevance,

22         403.

23              THE WITNESS:  It should have been.

24    BY MR. SLATER:
```

Daniel S. Elliott, M.D.

1          Q.   Why is that?

2               MR. ISMAIL:  Same objections.

3               THE WITNESS:  Because these surgeons are

4          the authority at this point in time.  They have

5          the most experience.  They know the good and

6          the bad of this product, and so they're saying

7          be careful, only put this in high grade

8          prolapses, maybe as a first line treatment.

9          They're not recommending that.  So that's the

10         kind of information I want relayed on by an

11         industry.

12              MR. ISMAIL:  Objection, hearsay, move to

13         strike.

14    BY MR. SLATER:

15         Q.   And when you give that opinion, you're not

16    just talking about for yourself, you're giving that

17    opinion as to what surgeons, in general, would need?

18              MR. ISMAIL:  Same objections.

19              THE WITNESS:  Absolutely, I'm an educator.

20         I'm teaching the next generation of surgeons.

21         I'm also involved in SUFU, the Society of

22         Urodynamics and Female Urology, where we're

23         trying to teach all those out in private

24         practice.  So, yeah, we have to rely on these

Daniel S. Elliott, M.D.

```
1              guidelines to help us point at the best way to

2              treat patients.

3    BY MR. SLATER:

4              Q.   Okay.  We'll go to next exhibit now,

5    PLT0516.  This is an article by Dr. Withagen,

6    "Trocar-Guided Mesh Compared With Conventional Vaginal

7    Repair in Recurrent Prolapse, A Randomized Controlled

8    Trial."

9              Are you familiar with this article?

10             A.   Yes.  And this should be pointed out that

11   this was first study where she's doing this work and

12   then we had a follow-up study that we've already

13   reviewed with the complications as a result of this

14   procedure.

15             Q.   All right.  Let me ask you the question

16   again.

17             Doctor, are you familiar with this article?

18             A.   Yes, I am.

19             Q.   Is this article medically reliable and

20   authoritative?

21             A.   Yes, it is.

22             Q.   Is this something you've relied on in

23   forming your opinions?

24             A.   Definitely.
```

Daniel S. Elliott, M.D.

```
1          Q.   Right on the front it talks about the fact

2     that we with these Prolift® patients, the bottom of the

3     results section, "Mesh exposure was detected in 14 of

4     83 patients (16.9%)."

5          Is that significant to you?

6               MR. ISMAIL:  Objection, hearsay.  Standing

7          objection, please.

8               MR. SLATER:  Yes.

9               THE WITNESS:  Yes.

10    BY MR. SLATER:

11         Q.   Why?

12         A.   Because in this high volume, talented

13    individual or these surgeons, they had essentially 17%,

14    to be specific, 16.9% risk of mesh exposure at only 12

15    months.  Remember, this is a device that's going to be

16    in a woman forever, and at one year already 16.9% have

17    exposure.

18         Q.   Do you have an opinion as to whether that

19    level of a mesh exposure rate is acceptable or

20    unacceptable from a medical standpoint?

21         A.   It is unacceptable, yeah, absolutely it's

22    unacceptable.

23         Q.   Let's go to the last page of the article,

24    Page 250, the last paragraph.  And the second sentence
```

Daniel S. Elliott, M.D.

1   of the last paragraph says, "Because the long-term

2   effects and safety of mesh-reinforced repairs are not

3   yet fully known, surgeons may consider these procedures

4   primarily for recurrent vaginal prolapse after

5   counseling patients on the risks and benefits."

6           Is that statement significant to you?

7       A.   Yes.

8       Q.   Why?

9       A.   Once again, in this high volume surgeon,

10  they're saying that even as of 2011, we still don't

11  know the true complications that can occur with this,

12  and so it only should be reserved for individuals with

13  a recurrent prolapse.  They have already had a surgery

14  and it's failed and it needs surgery again.  So it's

15  reserving it for a very small subgroup.

16      Q.   And, in your opinion, do you think --

17  rephrase.

18          Do you have an opinion as to whether the IFU

19  should have limited the scope of patients who would be

20  acceptable, candidates as listed in that article by

21  Withagen?

22          MR. ISMAIL:  Objection, sorry.  In

23          addition to hearsay, cumulative, 403.

24          THE WITNESS:  Absolutely, I have an

Daniel S. Elliott, M.D.

```
1              opinion about it.

2    BY MR. SLATER:

3              Q.   What is that?

4                   MR. ISMAIL:  Same objection.

5                   THE WITNESS:  It should have been listed.

6    BY MR. SLATER:

7              Q.   Let's go to the next exhibit.

8              Doctor, looking at Exhibit P980, it's some

9    e-mails, January of 2005, about two months before the

10   Prolift® went on the market.

11             Are you familiar with this e-mail chain?

12             A.   Yes, I've seen it.

13             Q.   What I'd like to do is turn to the second

14   page, e-mail from Axel Arnaud, the medical affairs

15   director at Ethicon in France, and he's proposing a

16   warning.

17             And have you seen this e-mail and this proposed

18   warning?

19             A.   Yes, I have.

20             Q.   And just for the record, I'll read it and

21   then I have to ask you a question.

22             "Warning: Early clinical experience has shown

23   that the use of mesh through a vaginal approach can

24   occasionally/uncommonly lead to complications such as
```

Daniel S. Elliott, M.D.

1    vaginal erosion and retraction which can result in

2    anatomical distortion of the vaginal cavity which can

3    interfere with sexual intercourse.  Clinical data

4    suggest the risk of such an complication is increased

5    in the case of associated hysterectomy.  This must be

6    taken in consideration when the procedure is planned in

7    a sexually active woman."

8            Now, do you have an opinion as to whether or

9    not that warning should or should not have been

10   provided in the Prolift® IFU?

11           A.   I have an opinion on it, yes.

12           Q.   What is your opinion?

13           A.   Absolutely, it should have been.

14           Q.   Why do you say that?

15           A.   Well, you have an individual, Arnaud, who

16   knows the data, has seen what's happened with internal

17   documentation, and he is warning -- he saw the problems

18   that were occurring, knew about the problems and wants

19   to put in the IFU a warning to doctors saying patients

20   need to be told about this.

21           MR. ISMAIL:  Objection, move to strike,

22           improper expert testimony.

23   BY MR. SLATER:

24           Q.   With regard to sexually active women, do

Daniel S. Elliott, M.D.

```
 1   you have an opinion as to whether or not a warning was
 2   needed to cull out the specific risks for sexually
 3   active women?
 4          A.   Absolutely, because of the risk of
 5   dyspareunia, yeah.  You need to be able to tell them,
 6   you have a potential for problem and not be able to
 7   have intercourse without pain in the future.
 8          Q.   Doctor, let's go back to the IFU, Exhibit
 9   P1005.  You have it right there.  Okay.  Start over.
10          Doctor, looking at the IFU, let's look at the
11   last page, and it has a list of adverse reactions.
12          Do you see that?
13          A.   Yes, I do.
14          Q.   And it says, "Potential adverse reactions
15   are those typically associated with surgically
16   implantable materials."  I want to stop there.
17          Surgically implantable materials, is that
18   limited -- is that group of materials just mesh, or is
19   that a bigger group?
20          A.   Well, as they state there, surgically
21   implantable materials is anything, that can be a heart
22   valve, knee joint, hip joint.  It could be anything.
23          Q.   In your opinion, is it accurate, medically
24   accurate to say that for mesh, the Prolift® mesh in
```

Daniel S. Elliott, M.D.

1    actual use that the potential adverse reactions are

2    those typically associated with surgically implantable

3    materials in general?

4          A.   No, not at all.

5          Q.   Why do you say that?

6          A.   I mean, the type of complication, the

7    severity, the chronic nature, the progressive nature is

8    different than in other types of implants.  I do

9    implants on different types of things in males.  I'm

10   the number one implanter in the United States, and we

11   don't see what we're seeing with these females.  So you

12   can't -- you can't compare all surgical implants.

13   We're dealing with a vaginal mesh.

14         Q.   Let me read in the adverse reactions,

15   there's certain language.  They mention erosion and

16   extrusion.

17         Do you see those?  They're listed in that list

18   of adverse reactions typically associated with

19   surgically implantable materials?

20         A.   Yes, I do.

21         Q.   Is it adequate, in your opinion, from a

22   medical standpoint to simply list erosion and

23   extrusion, as done there, to communicate the risks of

24   erosion and extrusion?

Daniel S. Elliott, M.D.

1          A.    No, it's wholly inadequate.

2          Q.    Why?

3          A.    It's insufficient, it gives us no idea of

4    the frequency, the severity, recurrent nature, the

5    lifelong risk of erosions and extrusions.

6          Q.    It says with regard to potential adverse

7    reactions typically associated with surgically

8    implantable materials "scarring that results in implant

9    contraction."

10          Do you see that?

11          A.    Yes, I do.

12          Q.    Is that an adequate description of the

13    risk of scarring and implant contraction?

14          A.    No.

15          Q.    Why is that?

16          A.    Again, like I mentioned, it has no idea of

17    the ramifications, the severity of it, the progressive

18    nature of it, the life-changing disability and the

19    inability to fix it.

20          Q.    Doctor, let's go to the next Exhibit

21    P1557.  This is an e-mail written by David Robinson,

22    October 28, 2005.

23          Are you familiar with this e-mail?

24          A.    Yes, I am.

Daniel S. Elliott, M.D.

```
 1            Q.    In this e-mail, David Robinson says he is

 2     aware of four cases of Prolift®s done in folks with

 3     normal preoperative voiding function who post Prolift®

 4     can't void.

 5            Do you see that?

 6            A.    Yes, I do.

 7            Q.    He says a little further down, some have

 8     resolved spontaneously but have taken as long as a year

 9     to do so and asks the person he's writing to if they've

10     seen the -- this complication, this is right before he

11     joined the company as medical director?

12                 MR. ISMAIL:  Objection to the use of this

13            document as hearsay.

14     BY MR. SLATER:

15            Q.    Correct?

16            A.    Yes.

17            Q.    And David Robinson says -- and it's

18     actually addressed to Marty, that would be Marty

19     Weisberg, medical director, if this starts getting

20     reported, it's going to scare the daylights out of

21     doctors.

22            Do you see that?

23                 MR. ISMAIL:  Same objection.

24                 THE WITNESS:  Yes, I do.
```

Daniel S. Elliott, M.D.

```
 1   BY MR. SLATER:

 2          Q.   From your standpoint as a physician in

 3   clinical practice and teaching residents and an author

 4   of articles, is that of significance to you?

 5               MR. ISMAIL:  Objection, hearsay, improper

 6          grounds for expert testimony.

 7               THE WITNESS:  Absolutely, yes.

 8   BY MR. SLATER:

 9          Q.   Why is that significant to you?

10               MR. ISMAIL:  Same objections.

11               THE WITNESS:  Because it's true.  We're

12          trained not to harm people, make them worse.

13          That's the whole goal of medicine.  So now

14          they're saying now they're trying to cover up a

15          potential complication.

16               MR. ISMAIL:  Move to strike,

17          nonresponsive, 403, improper grounds for

18          testimony.

19   BY MR. SLATER:

20          Q.   Let me ask you this question:  Where it

21   says that if this starts getting reported that people

22   were having the inability to void, they were having

23   urinary retention that was lasting for a year or more

24   and if it gets reported it's going to scare the
```

Daniel S. Elliott, M.D.

```
1    daylights out of doctors, why, in your opinion, is that

2    significant?

3                   MR. ISMAIL:  403, cumulative, hearsay,

4            improper grounds for expert testimony.

5                   THE WITNESS:  It's a unique complication

6            that would not necessarily be seen.  You don't

7            see this with traditional repairs.  So this is

8            a unique thing.  They're talking bladder atony,

9            which means there's no function to the bladder,

10           so the nerves going to the bladder have been

11           disrupted by this procedure.

12   BY MR. SLATER:

13           Q.   Does the IFU adverse reactions list warn

14   of urinary complications, such as retention or urinary

15   dysfunction due to the Prolift® itself?

16           A.   No.

17           Q.   Do you have an opinion as to whether or

18   not it should have?

19           A.   Absolutely it should have.

20           Q.   Okay.  Let's go back to Exhibit P1306,

21   patient brochure.  You have it up there from beginning

22   of the dep, it's right there, and I think -- let me

23   take a step back.

24                   Have you in your practice seen and used patient
```

Daniel S. Elliott, M.D.

1    brochures?

2         A.   Yes.

3         Q.   You understand or do you understand the

4    use for which they're supposed to be made?

5         A.   Yes, I do, and I give them out daily.

6         Q.   I want to pull up a slide, the last slide,

7    Prolift® patient brochure, and what we'll do is with

8    the brochure in hand, we'll go through certain things

9    that the brochure says.

10              MR. ISMAIL:  Objection.

11   BY MR. SLATER:

12        Q.   In the interest of time.

13              MR. ISMAIL:  Objection, to the use of the

14              document, 403, lack of relevance in this case.

15   BY MR. SLATER:

16        Q.   Let's do this, looking at the brochure

17   itself, Page 10.  Let's take down the slide -- let me

18   stop.  Let's leave the slide up for a second.  I want

19   to ask you a question about the slide, Doctor.

20              Is this a summary of issues you have with the

21   information provided in the brochure?

22        A.   Yes.

23        Q.   And are we going to now go through those

24   issues specifically within the brochure?

Daniel S. Elliott, M.D.

```
 1            A.    Yes.

 2            Q.    Now let's go to the brochure.

 3                  MR. ISMAIL:  Object to use of the slide on

 4            the same grounds.

 5    BY MR. SLATER:

 6            Q.    Page 10, let me ask you this about the

 7    slide that we have up.

 8            Do you have an opinion -- well, rephrase.

 9    We'll come back to it.  Stop.  Let me clean this up.

10            Looking at the patient brochure, Page 10, it

11    says "What is Gynecare Prolift®" at the very top.  "A

12    revolutionary surgical procedure using Gynecare

13    Prolift® employs a specially designed soft mesh placed

14    in the pelvis to restore pelvic support."

15            Do you have an opinion as to whether or not

16    that is adequate and accurate information regarding the

17    Prolift®?

18                  MR. ISMAIL:  Objection, lack of relevance,

19            403.

20                  THE WITNESS:  Well, it's a long sentence.

21            Certain parts of it are correct, other parts

22            are incorrect.

23    BY MR. SLATER:

24            Q.    Let's talk about it.  Let's talk about
```

Daniel S. Elliott, M.D.

1    calling it a revolutionary surgical procedure.  Is that

2    statement, in your opinion, something that should be

3    included here?

4              MR. ISMAIL:  Objection, lack of relevance,

5         403.

6              THE WITNESS:  I think that is actually an

7         acceptable statement.  It was new, it was

8         different, no one had done it before, and it

9         was revolutionary, and therein lies the problem

10        that many doctors don't know a thing about it,

11        and so they have to be taught.

12   BY MR. SLATER:

13        Q.   It says it was a specially designed

14   supportive soft mesh.

15        Was that an accurate statement, to your

16   knowledge?

17             MR. ISMAIL:  Objection, 403, lack of

18        relevance.

19             THE WITNESS:  It's false.

20   BY MR. SLATER:

21        Q.   And why is that?

22        A.   Because it was designed for hernias, not

23   vaginal meshes.

24        Q.   When it refers to it as being soft mesh,

Daniel S. Elliott, M.D.

```
1    in actual use, does the mesh remain soft?
2               MR. ISMAIL:  Objection, cumulative, 403,
3          lack of relevance.
4               THE WITNESS:  Well, that's what we
5          discussed, in my own personal experience and
6          review of the internal documents and papers,
7          manuscripts, it does not stay soft.  It gets
8          firm, rigid.
9    BY MR. SLATER:
10              Q.   On Page 10 under "What is Gynecare
11   Prolift®," towards the bottom it says, it's "performed
12   through very small incisions inside the vagina."
13              Do you see that?  First paragraph right there
14   under "What is Gynecare Prolift®," the second sentence.
15              A.   Yes, I see it.
16              Q.   Is the Prolift® only placed through very
17   small incisions, or does that accurately describe the
18   trocars and the cannulas?
19              MR. ISMAIL:  Objection, lack of relevance,
20          403.
21              THE WITNESS:  Well, no, it's not only
22          performed through the vagina.  There are also
23          obturator incisions, and the incision is
24          variable from 2 to 4 to 5 centimeters, so it
```

Daniel S. Elliott, M.D.

```
 1            depends how you want to define very small.

 2   BY MR. SLATER:

 3            Q.   Doctor, with regard to the brochure, let's

 4   go to Page 13, and it says, "What are the risks?  All

 5   surgical procedures present some risks.  Although

 6   rare," and I'm going to stop there.

 7            Do you have an opinion as to whether or not it

 8   is accurate to describe the risks with the Prolift® as

 9   rare?

10            MR. ISMAIL:  Objection, lack of relevance,

11            403.

12            THE WITNESS:  It is wrong, incorrect.

13   BY MR. SLATER:

14            Q.   Why do you say that?

15            MR. ISMAIL:  Same objection.

16            THE WITNESS:  It's just not my opinion,

17            that's also Axel Arnaud.  He says it's rather

18            common.

19            MR. ISMAIL:  Objection, move to strike,

20            improper testimony.

21   BY MR. SLATER:

22            Q.   It says at the bottom of the section What

23   are the risks, there is a small risk of the mesh

24   material becoming exposed into the vaginal canal."
```

Daniel S. Elliott, M.D.

1              Do you have an opinion as to whether or not

2       that is an accurate statement?

3                    MR. ISMAIL:  Objection, 403, lack of

4              relevance.

5                    THE WITNESS:  Yes, I do.

6       BY MR. SLATER:

7              Q.   And what is your opinion?

8              A.   False.

9              Q.   Why do you say that?

10                   MR. ISMAIL:  Same objections.

11                   THE WITNESS:  Based upon my clinical

12             experience, the review of the medical

13             literature and internal documents, the risk is

14             actually very common.

15      BY MR. SLATER:

16             Q.   On Page 13, towards the bottom, under "Is

17      Gynecare Prolift® right for me?"  It says, "Pelvic

18      floor repair procedures with Gynecare Prolift® are

19      appropriate for most patients."  I want to stop there.

20             Do you have an opinion as to whether that is an

21      accurate statement?

22                   MR. ISMAIL:  Lack of relevance, 403.

23                   THE WITNESS:  Yes, I do.

24      BY MR. SLATER:

Daniel S. Elliott, M.D.

1          Q.   And what is your opinion?

2               MR. ISMAIL:  Same objection.

3               THE WITNESS:  It's incorrect based upon

4          the medical literature.

5    BY MR. SLATER:

6          Q.   Why do you say that?

7          A.   Because the inventors of the product and

8    other researchers coming out saying it needs to be for

9    high grade and recurrent prolapse.

10              MR. ISMAIL:  Move to strike, hearsay.

11   BY MR. SLATER:

12         Q.   Doctor, do you have an opinion as to

13   whether or not the Prolift® patient brochure provides

14   an accurate picture of the risk-benefit profile for the

15   Prolift® for a doctor or a patient?

16              MR. ISMAIL:  Objection, lack of relevance,

17         403.

18              THE WITNESS:  I have an opinion, yes.

19   BY MR. SLATER:

20         Q.   And what is your opinion?

21              MR. ISMAIL:  Same objection.

22              THE WITNESS:  It is insufficient and

23         inadequate.

24   BY MR. SLATER:

Daniel S. Elliott, M.D.

1          Q.   Doctor, with regard to the Prolift® IFU,

2     do you have an opinion to a reasonable degree of

3     medical certainty as to whether the IFU provides an

4     adequate and accurate picture of the risk-benefit

5     profile for the use of the Prolift®?

6                    MR. ISMAIL:  Cumulative.

7                    THE WITNESS:  I have an opinion, yes.

8     BY MR. SLATER:

9          Q.   What is your opinion?

10                   MR. ISMAIL:  Same objection.

11                   THE WITNESS:  It is insufficient and

12          inadequate.

13    BY MR. SLATER:

14         Q.   And is that for with regard to the patient

15    brochure, your opinion, is that based upon all the

16    things you've told us during your testimony with regard

17    to the nature of the Prolift® and the risks?

18         A.   Absolutely.

19         Q.   With regard to the IFU, is your opinion

20    based upon the information you've given us throughout

21    your testimony regarding the nature of the procedure,

22    the risks and the other things you've told us about the

23    Prolift®?

24         A.   Yes.

Daniel S. Elliott, M.D.

```
 1                    MR. SLATER:  Let's go off.

 2                    THE VIDEOGRAPHER:  The time is 12:24, and

 3           we're off the record.

 4                    (Brief recess.)

 5                    THE VIDEOGRAPHER:  The time is 12:40 and

 6           we are back on the record.

 7                    MR. SLATER:  Dr. Elliott, thank you very

 8           much.  I think there will be some

 9           cross-examination from defense counsel.

10                         CROSS-EXAMINATION

11   BY MR. ISMAIL:

12           Q.   Good afternoon, Doctor.

13           A.   Good afternoon.

14           Q.   Are you prepared to proceed with

15   cross-examination at this time?

16           A.   Yes, I am.

17           Q.   Doctor, you testified this morning about

18   potential complications you believe that are associated

19   with the use of transvaginal mesh for treatment of

20   organ prolapse, correct?

21           A.   Correct.

22           Q.   Now, I will get to your general views

23   later but, can you confirm that not every patient who

24   received transvaginal mesh for treatment of prolapse
```

Daniel S. Elliott, M.D.

1    experienced one of the complications you described this

2    morning?

3              MR. SLATER:  Objection.  You can answer.

4              THE WITNESS:  At this point in time, as of

5         November 21st, 2015, those patients -- not all

6         patients have experienced all those

7         complications.

8    BY MR. ISMAIL:

9         Q.   And that's true for the Prolift® as well,

10   right?

11        A.   That is correct.

12        Q.   Before anyone can conclude that a patient

13   experienced any of the complications from a Prolift®

14   device you would need to consider the specifics of that

15   patient, correct?

16        A.   You have to look at the entire patient,

17   all the medical history and their surgical procedures,

18   yes.

19        Q.   Okay.  So let's just make sure we're

20   making ourselves clear here.  So what you would want to

21   look at to know whether a patient has experienced a

22   complication from a Prolift®, you would want to look at

23   patient medical records, correct?

24        A.   That would be part of it, yes.

Daniel S. Elliott, M.D.

1         Q.   You would want to consider what symptoms

2    the patient reported and when, correct?

3         A.   Chronology of onset of symptoms, yeah,

4    that would be an important factor.

5         Q.   You would want to consider, in this

6    analysis that we're describing, what other procedures

7    or surgeries that patient had in the relevant time

8    frame, correct?

9         A.   Yeah, you would want to look at the

10   concurrent surgeries and past surgeries, yeah, that's

11   right.

12        Q.   You would want to consider the findings of

13   that patient's healthcare provider with respect to the

14   patient's symptoms and complaints, correct?

15        A.   Well, that would be the medical records,

16   yeah, with the caring physician's report, yes.

17        Q.   And you have done none of that with

18   respect to Patricia Hammons, correct?

19        A.   Incorrect.

20        Q.   Let me rephrase.

21        You did not disclose anywhere in your expert

22   report any opinions relating to Ms. Hammons, correct?

23        A.   I did -- not specific to Ms. Hammons, no.

24        Q.   You did not disclose anywhere in your

Daniel S. Elliott, M.D.

```
 1   expert report having reviewed Ms. Hammons' medical

 2   records, correct?

 3        A.   I don't recall if I have reviewed her

 4   records but I didn't -- not in the expert report I

 5   don't believe.

 6        Q.   You didn't disclose anywhere in your

 7   expert report that you reviewed the sworn testimony in

 8   this case, correct?

 9             MR. SLATER:  Objection.

10   BY MR. ISMAIL:

11        Q.   The sworn testimony in Ms. Hammons' case,

12   correct?

13        A.   You mean her --

14             MR. SLATER:  Let me just clarify.  When

15        you say in Ms. Hammons' case, you are talking

16        about of her or --

17             MR. ISMAIL:  I'll clarify.

18             THE WITNESS:  Sworn testimony, you mean

19        her deposition?

20             MR. ISMAIL:  I will rephrase, Doctor.

21             THE WITNESS:  Okay.

22   BY MR. ISMAIL:

23        Q.   Nowhere in your expert report do you

24   disclose that you reviewed the sworn testimony of
```

Daniel S. Elliott, M.D.

1    Ms. Hammons, correct?

2         A.   I don't recall disclosing that, no.

3         Q.   Nowhere in your expert report did you

4    disclose reading the sworn testimony of Ms. Hammons'

5    healthcare providers, correct?

6         A.   I don't believe so.  Again, I'd have to

7    look at the report.  I don't recall making that

8    statement one way or the other actually.

9         Q.   Nowhere in your expert report do you

10   disclose doing a physical exam on Ms. Hammons, correct?

11        A.   That would be correct, yes.

12        Q.   And you have not done a physical exam on

13   Ms. Hammons, correct?

14        A.   No, I have not, no.

15        Q.   So my statement is correct?

16        A.   Yes.

17        Q.   And you have previously said, Doctor, that

18   a physical examination is one of the most important

19   pieces of the puzzle in understanding what happened to

20   a patient, correct?

21        A.   That's a fair statement, yes.

22        Q.   And certainly, Doctor, you can confirm

23   that in some patients Prolift® was effective in

24   relieving symptoms of the patient's pelvic organ

Daniel S. Elliott, M.D.

1    prolapse, correct?

2           A.    That does happen at times, yes.

3           Q.    And not just an improvement in the

4    patient's symptoms, but, actually, a Prolift® can

5    improve a patient's quality of life, that has been

6    reported, correct?

7           A.    That has been reported, yes.

8           Q.    And before you can determine whether a

9    patient has had an improvement in her quality of life

10   you would want to look at the same things we have

11   already discussed; the medical records, the timing of

12   her symptoms, findings of her healthcare providers, et

13   cetera, correct?

14          A.    That is correct.

15          Q.    And nowhere in your expert report do you

16   disclose doing any of that analysis for Ms. Hammons,

17   true?

18          A.    I don't disclose that, you are correct.

19          Q.    Now, you have discussed your views on

20   Prolift® in response to questions from Mr. Slater this

21   morning, right?

22          A.    Yes.

23          Q.    And you did so as a paid witness on behalf

24   of the plaintiff lawyers, correct?

Daniel S. Elliott, M.D.

1        A.   That is correct.

2        Q.   You were first contacted in September of

3    2011; do you recall that?

4        A.   August, September of '11, yes.

5        Q.   Okay.  So I want the jury to understand

6    your experience with Prolift® before the time that you

7    were hired by the plaintiff lawyers in this litigation,

8    okay?

9        A.   Okay.

10       Q.   Now, you, yourself, have never performed a

11   Prolift® surgery for the implantation of a Prolift®,

12   correct?

13       A.   By choice, you are correct, yes.

14       Q.   So when you were walking the jury through

15   this morning, in the event that video is shown at

16   trial, the surgery of a Prolift® being implanted in a

17   patient, you never have done that yourself, correct?

18       A.   That is correct, by choice I did not, yes.

19       Q.   And that surgical video you never saw

20   prior to being retained by the plaintiff lawyers in

21   this litigation, correct?

22       A.   That specific video I did not, you are

23   correct.

24       Q.   In fact, Doctor, you never received any

Daniel S. Elliott, M.D.

1    training whatsoever on Prolift®, true?

2         A.   That would be correct, yes.

3         Q.   You walked through or at least referenced

4    a -- something that Mr. Slater introduced as a

5    professional education PowerPoint.

6         Do you recall seeing that this morning?

7         A.   Yes, I do.

8         Q.   Prior to being hired by the plaintiff

9    lawyers in this case you had never seen any

10   professional education materials submitted by Ethicon

11   on Prolift®, correct?

12        A.   Not that I recall but I've been to

13   their -- their Ethicon booth when this first came out,

14   so I don't recall what I saw back then.

15        Q.   When you say you went to the Ethicon

16   booth, you are saying to the extent Ethicon had a booth

17   at a medical conference, you might have stopped by --

18        A.   Yeah.

19        Q.   -- and you can't recall whether you saw

20   anything on Prolift® in such visit; is that fair?

21        A.   No.  We would have seen it on the

22   Prolift®.  I don't recall what I saw.  It was a long

23   time ago.  It was when it first came out.

24        Q.   All right.  Let me rephrase my question

Daniel S. Elliott, M.D.

1    then.

2         You never attended any type of professional

3    education courses that Ethicon sponsored for Prolift®,

4    true?

5         A.   You are correct, yes.

6         Q.   Now, you never participated in any

7    professional education courses sponsored by any

8    manufacturer of a transvaginal mesh for treatment of

9    pelvic organ prolapse, correct?

10        A.   Well, that -- that's what we clarified

11   earlier.  I was in attendance and an instructor AMS as

12   far as with the sling and then went over and implanted

13   their device on the cadaver.  I was not a formal

14   student because I was an instructor for slings, but,

15   again, I just walked over to the next cadaver and did

16   it.

17        Q.   All right.  Let's make sure the jury

18   understands what you are saying.  When you are saying

19   that's something that I clarified earlier, you recall

20   saying something different in your sworn deposition

21   testimony in this case?

22        A.   My deposition in 2011 or 2012 maybe the

23   year was, I stated I was never a formal student in any

24   class, which is correct.  I was not a formal student.

Daniel S. Elliott, M.D.

1    That's why how do we define it?  I was not a formal

2    student, I did not take a formal class but I have

3    implanted with the instructor there so I don't know how

4    we define myself, to be clear.

5            Q.   All right.  Let me just break that down

6    into chunks if you don't mind, Doctor.

7            Previously when you were asked whether you

8    attended any professional education training for a

9    transvaginal mesh for pelvic organ prolapse your answer

10   was that you had not, correct?

11           A.   Which would be correct, yes.

12           Q.   And what you are trying to clarify is that

13   while you were at a training for a different medical

14   device, you went over to some training happening on a

15   transvaginal kit for -- by a different manufacturer?

16           A.   By AMS, that's correct.

17           Q.   Okay.  So even with the clarification that

18   you have added today, it's still true that you have

19   never attended any professional education for Prolift®?

20           A.   Correct.

21           Q.   And your answer you referenced cadaver

22   training.  Can you please tell us what cadaver training

23   is?

24           A.   It would be a workshop using a non-live

Daniel S. Elliott, M.D.

1    human cadaver, fresh frozen cadaver, where you just

2    have the pelvis to work with to insert the trocars

3    through the obturator foramen, vaginal dissection and

4    those types of things.

5         Q.   And cadaver training is sometimes used for

6    surgeons to gain familiarity with a new surgical

7    procedure?

8         A.   Correct.

9         Q.   And you had never done any cadaver

10   training on Prolift®, correct?

11        A.   Correct.

12        Q.   Now -- one second, Doctor.

13        Here's my question, at the time of your

14   deposition you testified that you never underwent any

15   cadaver lab training with respect to transvaginal

16   placement of mesh, and you still stand behind that

17   comment, true?

18        A.   That's correct.  Again, it's a matter of

19   defining how we define what I did.

20        Q.   Now, before being hired by the plaintiff

21   lawyers in this case you had never observed a surgery

22   involving Prolift®, correct?

23        A.   Probably would be accurate, yes.

24        Q.   Now, you have no research experience on

Daniel S. Elliott, M.D.

1    Prolift® as well; isn't that true, Doctor?

2         A.   Correct.

3         Q.   You have never participated in any

4    clinical trials that relate to Prolift®, true?

5         A.   Specific Prolift®, you are correct, yes.

6         Q.   You haven't participated in any clinical

7    trials relating to transvaginal mesh or the use of

8    transvaginal mesh in the treatment of pelvic organ

9    prolapse; isn't that correct, Doctor?

10        A.   Correct.

11        Q.   You have never done any -- withdrawn.

12             You referenced earlier something called Level 1

13   evidence; do you recall making that reference?

14        A.   I don't recall but I don't doubt I said

15   it.

16        Q.   Is randomized controlled clinical trials

17   an example of Level 1 evidence?

18        A.   Yes.

19        Q.   You have never been involved in any

20   randomized controlled clinical trials involving the use

21   of mesh in any application, correct, Doctor?

22        A.   Meshes, you would be correct, yes.

23        Q.   You've never been involved in any clinical

24   study that used transvaginal mesh to treat pelvic organ

Daniel S. Elliott, M.D.

1    prolapse, true?

2         A.   Transvaginal meshes, I don't recall.  No,

3    I don't believe so.

4         Q.   So my statement is correct?

5         A.   Yes.

6         Q.   You've never been involved in any

7    prospective studies involving the use of mesh, correct?

8         A.   Correct.

9         Q.   You have never been involved in a clinical

10   trial designed to evaluate the safety and efficacy of a

11   transvaginal mesh in any application, correct?

12        A.   Correct.

13        Q.   Are you familiar with meta-analyses,

14   Doctor?

15        A.   Yes.

16        Q.   Can you please tell us what they are?

17        A.   Meta-analysis is just a statistical way of

18   analyzing multiple different studies, studies you have

19   not performed but using other people's datas and

20   analyzing them.

21        Q.   Are meta-analyses a way that researchers

22   can summarize the clinical evidence that have been

23   published on a surgery?

24        A.   Possibly.

Daniel S. Elliott, M.D.

 1          Q.    You have not done any meta-analyses

 2    involving the use of transvaginal mesh, true?

 3          A.    Correct.

 4          Q.    You indicated, Doctor, a couple times that

 5    you currently practice at Mayo in Minnesota?

 6          A.    Correct.

 7          Q.    You're not here today testifying as a

 8    representative of the Mayo Clinic; isn't that correct,

 9    Doctor?

10          A.    That would be -- I guess accurate, yes.

11          Q.    Mayo has not sanctioned your activities

12    working as a paid witness on behalf of the plaintiff

13    lawyers in this case, true?

14                MR. SLATER:  Objection.

15                THE WITNESS:  No, this is on my private

16          time.

17    BY MR. ISMAIL:

18          Q.    In fact, the Mayo Clinic does not even

19    know that you are serving as an expert for the

20    plaintiffs in this case, correct?

21          A.    As I stated, it's all in my private time.

22          Q.    So the answer to my question is what, sir?

23          A.    That is correct, it's all in my private

24    time.

Daniel S. Elliott, M.D.

```
 1            Q.   I'm trying to make a distinction, Doctor,

 2    between you saying it's on your private time and

 3    whether your hospital even knows you are doing this

 4    activity, so let me restate the question so you have it

 5    in mind.

 6            The Mayo Clinic does not even know that you are

 7    serving as an expert on behalf of the plaintiffs in

 8    this litigation, true?

 9            A.   That is correct, it is all done in my

10    private time.

11            Q.   Have you disclosed to the Mayo Clinic the

12    money you have received from the plaintiff lawyers in

13    this litigation?

14            A.   No, I have not.

15            Q.   But you have, in fact, received money from

16    the plaintiff lawyers in this case, correct?

17            A.   That is true.

18            Q.   How much per hour are you being paid, sir?

19            A.   700.

20            Q.   When you say "700", that's $700 per hour?

21            A.   Correct.

22            Q.   How much has Mr. Slater paid you thus far?

23                 MR. SLATER:  You are talking about in this

24            case?
```

Daniel S. Elliott, M.D.

```
1   BY MR. ISMAIL:

2        Q.   I'm asking how much Mr. Slater has paid

3   you since the time Mr. Slater began paying you.

4        A.   I have no idea.  I don't even bill

5   Mr. Slater.

6        Q.   Whom do you bill?

7        A.   Mr. --

8             MR. SLATER:  Let's take a step back here.

9        There's an understanding that witnesses are to

10       be questioned about the fees they're paid in a

11       particular case and that's how it's been done

12       throughout and that's been our understanding in

13       this case.  You may not be aware of that but

14       it's been how it's been handled in the

15       depositions and that was our understanding.

16            So if you are asking about in the Hammons

17       case, you know, that's fine, but to start

18       talking about overall litigation or other

19       cases, it's understood and it's on the record,

20       probably in the deposition of Dr. Weber, that

21       we were not going to get into billing outside

22       the specific case.

23            MR. ISMAIL:  Well --

24            MR. SLATER:  And, in fact, that's how it
```

Daniel S. Elliott, M.D.

1          was handled in the Bellew trial in the MDL and

2          I think that's the understanding everybody has

3          about how we're handling this on both sides.

4              MR. ISMAIL:  So how about he gives the

5          answer -- since we're not going to call him

6          back here and redo this, he gives the answer

7          and if we don't play it to the jury, we don't

8          play it to the jury.

9              MR. SLATER:  I'm not going to allow him to

10         testify beyond what he's been paid in this case

11         because we have an agreement between counsel

12         and I'm not going to have someone walk in on

13         cross-examination and change the ground rules

14         in the middle of cross.

15             MR. ISMAIL:  That's not an agreement to

16         which I am privy.

17             MR. SLATER:  You are bound to it though,

18         co-counsel --

19             MR. ISMAIL:  Can I finish my statement?

20         Not an agreement to which I -- that I've heard

21         of and so I'm going to ask the question and

22         it's up to you as to whether you are going to

23         let him answer.

24             MR. SLATER:  I will only allow him to

Daniel S. Elliott, M.D.

1              answer questions about what he's been paid in

2              this case, so you don't need to ask the

3              questions as a formality because I'm not going

4              to allow him to answer them because we have an

5              agreement with counsel.

6                   MR. ISMAIL:  I'm going to ask the question

7              and you can do what you want.

8    BY MR. ISMAIL:

9          Q.   Dr. Elliott, how much have you been paid

10   by the plaintiff lawyers who are suing Ethicon?

11                  MR. SLATER:  Don't answer the question and

12             the question is improper anyway.

13   BY MR. ISMAIL:

14         Q.   Are you going to refuse to answer the

15   question, Doctor?

16                  MR. SLATER:  No, no, you are not even

17             going to ask him that --

18                  MR. ISMAIL:  Yes.

19                  MR. SLATER:  -- because I have instructed

20             him not to.

21                  MR. ISMAIL:  He has to right to -- you

22             have given your instruction, he can still

23             answer the question if he wants.

24                  THE WITNESS:  I'm following Mr. Slater's

Daniel S. Elliott, M.D.

1          advice to not answer the question.

2                MR. ISMAIL:  I will limit my question.

3    BY MR. ISMAIL:

4          Q.  How much have you been paid with respect

5    to your work on behalf of the plaintiff lawyers in the

6    Prolift® litigation?

7                MR. SLATER:  Objection, same thing, don't

8          answer.

9    BY MR. ISMAIL:

10         Q.  Are you going to refuse to answer my

11   question, Doctor?

12         A.  I'm not going to answer based on

13   Mr. Slater's recommendation.

14         Q.  Isn't it true, Doctor, you submit an

15   invoice every month for your work on behalf of the

16   plaintiffs' lawyers and you have since 2011?

17                MR. SLATER:  Objection.

18                THE WITNESS:  Well, not every month, only

19         if work is done.

20   BY MR. ISMAIL:

21         Q.  How many of the months since 2011 have you

22   submitted an invoice?

23                MR. SLATER:  Objection.  All these

24         questions he's -- obviously, these are back

Daniel S. Elliott, M.D.

```
 1              door -- I'm going to object to the whole line
 2              of questions.  I mean, it's generalized about
 3              how often he submits invoices is fine, but I
 4              object to this.
 5                   I mean, sir, there's an agreement between
 6              counsel.  It's a little frustrating when
 7              someone walks in and says, well, sorry, I
 8              wasn't there.  Maybe they need to prep you
 9              better.
10    BY MR. ISMAIL:
11         Q.   And your answer, sir?
12         A.   Oh, I have no idea, looking back, of how
13    many times I do and don't because there are sometimes I
14    don't do any work for months.
15         Q.   Doctor, have you estimated that you have
16    on average spent 20 to 30 hours a month working on
17    behalf of the plaintiff lawyers in this litigation?
18                   MR. SLATER:  Objection.  Now --
19                   MR. SPECTER:  What's "this litigation"?
20              Beyond that.
21                   MR. ISMAIL:  You can state your objection,
22              you can instruct him not to answer.  We don't
23              have to argue about it.  If it doesn't get
24              played, it doesn't get played.
```

Daniel S. Elliott, M.D.

```
 1              MR. SLATER:  But it's not the point

 2         because if it doesn't get played, it doesn't

 3         get played is not really a legitimate answer to

 4         that because you are creating a record of

 5         things that we had an agreement were not going

 6         to be asked about.

 7              MR. ISMAIL:  And if you're right what's

 8         the --

 9              MR. SLATER:  And it goes both ways, by the

10         way.  Your experts don't want to be asked these

11         questions either.

12              MR. ISMAIL:  If you're right, you're

13         right.  I still don't understand what the --

14         you make your objection and instruct him not to

15         answer.  I don't understand why we're even

16         arguing about it.

17              MR. SLATER:  Well, because it's

18         frustrating that -- you know, you are

19         pretending you don't know there was an

20         agreement.

21    BY MR. ISMAIL:

22         Q.   So let me restate the question so you have

23    it in mind, Doctor.

24         A.   Thank you.
```

Daniel S. Elliott, M.D.

```
1              Q.   Have you worked on average 20 to 30 hours

2    a month on behalf of the plaintiff lawyers since

3    approximately 2011?

4              MR. SLATER:  Objection.

5              MR. SPECTER:  Can I ask you to clarify

6         though, counsel.  Are you asking about the

7         Hammons litigation or are you asking about the

8         litigation in general?

9              MR. ISMAIL:  Well, since the Hammons

10        litigation wasn't filed in 2011, I suspect that

11        would be difficult.

12             MR. SLATER:  Yeah, well, no one knows

13        that.

14             MR. SPECTER:  The jurists know that,

15        counsel.  Please.

16             MR. ISMAIL:  So the question is there.  If

17        you don't want him to answer --

18             MR. SPECTER:  I'm just asking you to

19        clarify your question, counsel.  Are you asking

20        about the Hammons litigation or are you asking

21        about litigation in general?

22             MR. ISMAIL:  My question goes to the issue

23        of bias, the amount of money the witness has

24        been paid and if you don't want him to answer
```

Daniel S. Elliott, M.D.

```
 1              the question, tell him not to answer the

 2              question.

 3                   MR. SPECTER:  I'm not asking about what

 4              the question goes to.  I'm simply asking

 5              whether the question goes to the Hammons

 6              litigation or the TVM litigation in general.

 7                   I take it from what you are saying you are

 8              asking about the TVM litigation in general?

 9                   MR. ISMAIL:  I'll rephrase.

10   BY MR. ISMAIL:

11         Q.   Doctor, the report that you submitted in

12   this case, in Ms. Hammons' case, does that date back to

13   work that you started doing on behalf of the plaintiff

14   lawyers when you were first retained in 2011?

15                   MR. SLATER:  Objection.  You can answer.

16                   THE WITNESS:  I don't quite know how to

17              answer that question.  Not to be evasive by any

18              means, I've been doing work for the past 20

19              years on prolapse and complications so that

20              specific document, I probably have done work

21              earlier that was translated to it as far as the

22              background and those types of things, but,

23              again, I can't be specific.  I just don't know.

24   BY MR. ISMAIL:
```

Daniel S. Elliott, M.D.

1        Q.   I'll rephrase.

2             You have looked at materials that were sent to

3   you by the plaintiff lawyers in this case, correct?

4        A.   Correct.

5        Q.   Mr. Slater has sent you materials,

6   correct?

7        A.   Yes.

8        Q.   You have looked at some internal

9   depositions and documents about the Ethicon employees,

10  correct?

11       A.   Yes.

12       Q.   And you have referenced them during your

13  testimony today?

14       A.   That is correct.

15       Q.   And you have included them in your expert

16  report submitted in this case?

17       A.   That is correct.

18       Q.   Some of the work that you did that

19  resulted in the expert report submitted in Ms. Hammons'

20  case dates back to 2011/2012 time frame, correct?

21       A.   That would be correct, yes.

22       Q.   So with that understanding, Doctor, can

23  you tell me the amount of money that you have been paid

24  by the plaintiff lawyers for that work?

Daniel S. Elliott, M.D.

1          MR. SLATER:  Objection.  Don't answer the

2      question.

3          THE WITNESS:  I'm not going to answer the

4      question based on Mr. Slater's recommendation.

5  BY MR. ISMAIL:

6      Q.   Doctor, Prolift® was designed to treat

7  pelvic organ prolapse, correct?

8      A.   That is correct.

9      Q.   Since we're not exactly sure when the jury

10 is going to see this video, I don't know if this has

11 been defined for them yet, but for the benefit of the

12 jury, pelvic organ prolapse, in a general sense, when

13 one or more of the patient's internal organs drop into

14 the vagina?

15     A.   Correct.

16     Q.   Their internal organs most often involved

17 include the bladder, the rectum, the uterus and the

18 small bowel, correct?

19     A.   Yes, that would be correct.

20     Q.   And I think you told us earlier that what

21 leads to a pelvic organ prolapse is a weakening of the

22 patient's tissues in the pelvic floor, correct?

23     A.   A weakening, a stretching of the tissues

24 that hold it up, yes.

Daniel S. Elliott, M.D.

1          Q.   Now, there are many risk factors that can

2     lead to pelvic organ prolapse, correct?

3          A.   There are several, yes.

4          Q.   These include age, that's a risk factor,

5     right?

6          A.   Yes.

7          Q.   Obesity I think you told us earlier was a

8     risk factor?

9          A.   Yes.

10         Q.   Childbirth is a risk factor?

11         A.   Correct.

12         Q.   Previous surgery for prolapse is a risk

13    factor?

14         A.   Yes.

15         Q.   Previous hysterectomy is a risk factor?

16         A.   Possible, yes.

17         Q.   Menopause?

18         A.   Menopause would be questionable.  It's

19    going to be tough to delineate that data because we

20    also have age and menopause, so it's -- it's not

21    helpful, let's put it that way.

22         Q.   Fair enough.  And what you are saying is

23    age and menopause often go hand-in-hand and it's

24    difficult to tease out which is the menopause and which

Daniel S. Elliott, M.D.

1    is the age?

2            A.    Correct.

3            Q.    Repeated lifting can be a risk factor for

4    pelvic organ prolapse?

5            A.    That's correct.

6            Q.    Smoking has been reported as a risk factor

7    for pelvic organ prolapse?

8            A.    Again, there is going to be studies out

9    there maybe yes, maybe no, but it's possible.

10           Q.    And, of course, a woman can develop pelvic

11   organ prolapse with just one or even none of the risk

12   factors we've just described, correct?

13           A.    That is correct, yeah, with just one, yes.

14   With none it's rare, but it does occur.

15           Q.    Now, pelvic organ prolapse is assessed on

16   a grading scale for how severe the prolapse is,

17   correct?

18           A.    Yeah, how severe the anatomical prolapse

19   is, yes.

20           Q.    And there -- I think you reference there's

21   a few different grading systems that are out there for

22   clinicians to use, right?

23           A.    There's three or four, yes.

24           Q.    One of which I think you reference was

Daniel S. Elliott, M.D.

1    called the POP-Q system?

2           A.    Correct.

3           Q.    Have you ever used the POP-Q system

4    yourself?

5           A.    I use it not as commonly as the

6    Baden-Walker.

7           Q.    Does the POP-Q system assess how far the

8    woman's internal organs have descended into or beyond

9    the opening of the vagina?

10          A.    That's part of it, yes.

11          Q.    What are the grading -- I don't need the

12   definitions yet, but is it -- it's grades 1 through 4,

13   correct?

14          A.    Yeah, but then you are looking at each

15   component, whether it's anterior, posterior, apical,

16   vaginal length, so it's -- yeah, you can do the 1, 2,

17   3, 4 but that's gonna -- simplified form of the POP-Q.

18          Q.    And 4 is the most severe grade of pelvic

19   organ prolapse?

20          A.    That is correct.

21          Q.    The other system you reference is the

22   Baden-Walker system; is that correct?

23          A.    There's Baden-Walker and there's also

24   International Continence Society stages.  They're all

Daniel S. Elliott, M.D.

1    somewhat similar with different bells and whistles one

2    way or the other.

3            Q.   And the Baden-Walker, again, is grades 1

4    through 4, with 4 being the worst?

5            A.   That's correct.

6            Q.   And that's the one that you prefer in your

7    clinical practice?

8            A.   Correct.

9            Q.   What is the criteria for grade 4 under the

10   Baden-Walker system?

11           A.   Same as for the POP-Q, it's complete

12   eversion out of the vagina.

13           Q.   When you say "eversion" --

14           A.   Means that the vagina has -- everted

15   means -- think of the vagina like a tube sock; somebody

16   reaches in, grabs it and everts out, eversion of the

17   vagina.

18           Q.   And in a grade 4, that is the most severe

19   pelvic organ prolapse a physician can grade for a

20   patient?

21           A.   That is correct, yes.

22           Q.   And in clinical application that means the

23   prolapse is actually visible in the vaginal opening,

24   correct?

Daniel S. Elliott, M.D.

1          A.   Correct.  It can also be visible in stage

2     2 also, but, yes, it's like a baby's head coming out of

3     the vagina, basically.

4          Q.   Prolapse can be a serious condition for a

5     woman, correct?

6          A.   It depends how you define serious.  It can

7     be bothersome.  It's very rarely in the United States

8     life-threatening, so it's not along the lines of a

9     cardiac problem that's life and death.  Very rarely,

10    I've never seen that.

11         Q.   You used the description several times

12    today of prolapse being a quality of life condition?

13         A.   Correct.

14         Q.   Meaning that a pelvic organ prolapse can

15    negatively affect a woman's quality of life?

16         A.   That is correct, it can.

17         Q.   A pelvic organ prolapse can be

18    debilitating and troublesome to a woman?

19         A.   Yeah, again, debilitating, yes, that can

20    happen.  It can be bothersome.  I think it's fair to

21    say it's bothersome.

22         Q.   The symptoms that a woman can report

23    include feelings heaviness or pressure, correct?

24         A.   That is something they can feel, yes.

Daniel S. Elliott, M.D.

1          Q.   You've heard of reports of a woman feeling

2   a bulge or seeing the protrusion from the vagina as a

3   result of the pelvic organ prolapse, correct?

4          A.   That is correct, yes.

5          Q.   Difficulty with walking or sitting have

6   been described in women with pelvic organ prolapse,

7   correct?

8          A.   In severe cases, yes, that does happen.

9          Q.   And what we're describing here can be

10  distressing to many women?

11         A.   Yeah, depends how you want to define many,

12  but a lot of women it can be bothersome, I won't deny

13  that at all.  I agree with you.

14         Q.   Let me put it this way, Doctor, you would

15  agree that prolapse can be significant enough that the

16  patient doesn't want to deal with it?

17         A.   That is correct, yes.

18         Q.   You've used this term, dyspareunia, in

19  your testimony.  That, in a general sense, means pain

20  with sexual intercourse, correct?

21         A.   That is correct.

22         Q.   There are some women for whom pelvic organ

23  prolapse can actually cause dyspareunia, correct?

24         A.   That is correct.  We have to define how

Daniel S. Elliott, M.D.

1  severe that dyspareunia is.  There's not just --

2  dyspareunia means only one thing, it can be severity,

3  so I agree with you.

4         Q.   So seeing the description of a patient as

5  having dyspareunia doesn't tell you how severe the

6  dyspareunia is, correct?

7         A.   All it says is like you drive a car, we

8  have no idea of the specifics of it, but it states that

9  there is discomfort with sexual activity.

10        Q.   And, again, without regard to severity,

11  you've confirmed for us already that women with pelvic

12  organ prolapse can have dyspareunia, correct?

13        A.   To a certain degree, yes, they can.

14        Q.   Now, there are I guess a couple different

15  reasons why a woman may not be sexually active who is

16  experiencing pelvic organ prolapse, one of which can be

17  just the pain that pelvic organ prolapse may result for

18  dyspareunia, correct?

19        A.   Correct.

20        Q.   And the prolapsing organ in a woman can

21  actually interfere with sexual activity, correct?

22        A.   It can block it, yes.

23        Q.   But, also, you are aware, Doctor, that for

24  some women the prolapse effects how they feel about

Daniel S. Elliott, M.D.

1    themselves and embarrassment being with their partner

2    or their desire to have sexual intercourse, correct?

3         A.   I agree, the psychological aspect of

4    embarrassment can be a significant issue.

5         Q.   And you are aware, Doctor, that apart from

6    the dyspareunia and the interference with sexual

7    activity, pelvic organ prolapse symptoms can include

8    pelvic pain or voiding problems?

9         A.   It can and -- yeah, the voiding problems,

10   in severe cases, it can do that.  The other aspect of

11   it you said is --

12        Q.   Pelvic pain?

13        A.   Pelvic pain, yeah, that can -- the usual

14   thing I get is described as an aching, even a low back

15   pain because of the prolapse.

16        Q.   And when we say voiding complaints, that

17   would include difficulty urination?

18        A.   In severe cases of anterior prolapse,

19   yeah, you can trouble as far as emptying the bladder.

20   I very rarely see that but it has been described, yes.

21        Q.   And so as you and I just went over for the

22   jury a variety of complications that a woman can

23   experience from a pelvic organ prolapse can result in a

24   woman seeking out medical care to get that repaired,

Daniel S. Elliott, M.D.

1    correct?

2           A.   That is correct, yes.

3           Q.   And, in fact, I think you've told us

4    before pelvic organ prolapse is a condition for which

5    women have sought treatment for thousands of years?

6           A.   I think I stated before as long as women

7    have been having babies, they have been having problems

8    with this, yes.

9           Q.   And as long as there have been doctors who

10   are concerned about caring for women, doctors have been

11   trying to come up with good, satisfactory ways to treat

12   a woman's pelvic organ prolapse, correct?

13          A.   That is correct, yes, sir.

14          Q.   And I think you told us that the treatment

15   options for pelvic organ prolapse include conservative

16   measures and surgical options as well, right?

17          A.   Correct.

18          Q.   One conservative measure you told us about

19   was a wait and see approach?

20          A.   Correct, observation, yeah.

21          Q.   Another -- you used this term -- a

22   pessary, right?

23          A.   That's correct.

24          Q.   And I think you told us that was a plastic

Daniel S. Elliott, M.D.

1    device that can be inserted into the vagina as a way to

2    sort of prop up the falling organ?

3            A.    Correct.

4            Q.    Now, pessaries are not appropriate for all

5    patients, you agree with that, right?

6            A.    They might not work in all patients.  As

7    far as it being appropriate or not, in the rare case of

8    some vaginal erosion, you wouldn't want to put anything

9    in there.  I would think the better statement would be

10   they don't work in all patients.

11           Q.    Fair enough.  So the distinction you are

12   drawing is a doctor, when considering how to treat a

13   woman with a prolapse, would include a pessary on the

14   list and then make a decision whether it's a good or

15   bad idea here?

16           A.    That would be fair to state, yes.

17           Q.    Some women don't want to use a pessary,

18   right?

19           A.    Correct.

20           Q.    If a woman receives a pessary, she has to

21   be followed up periodically with her physician,

22   correct?

23           A.    Correct, yes.

24           Q.    You have seen reports of vaginal discharge

Daniel S. Elliott, M.D.

1   with a pessary, right?

2          A.   That is correct.

3          Q.   You've seen reports of vaginal odor with a

4   pessary?

5          A.   Correct.

6          Q.   There have been reports of ulceration with

7   pessaries, correct?

8          A.   That's correct.

9          Q.   Obviously, that can lead to pain for the

10  patient?

11         A.   It could be, which you take out the

12  pessary and that resolves itself.

13         Q.   There can be bleeding associated with a

14  pessary?

15         A.   Along, yeah, with vaginal erosion that can

16  happen.

17         Q.   Tissue erosion?

18         A.   It can, all those things, yeah.

19         Q.   The symptoms that we've just described

20  that can result from a pessary may lead a woman to

21  discontinue the use of the pessary, right?

22         A.   That is correct, yes.

23         Q.   Of course, it's reasonable to believe that

24  or to expect that a woman who has had a problematic

Daniel S. Elliott, M.D.

```
 1    experience with a pessary that caused her

 2    complications, she would be less likely to accept that

 3    treatment again in the future?

 4          A.    I agree with you.

 5          Q.    And you don't actually even deal with

 6    pessaries yourself in your clinical practice, correct?

 7          A.    Yeah, you're correct.  We discuss it.  If

 8    we feel a patient is a good candidate for it, I send

 9    them to my GYN colleagues.

10          Q.    We've been discussing a pessary as one of

11    the conservative ways to treat a prolapse but you would

12    agree that most of the time prolapse cases treated

13    conservatively, the condition does not get better?

14          A.    Yeah, though it -- prolapse does not

15    frequently or rarely would get better.  It usually

16    stays the same or worsens.

17          Q.    So you would agree, Doctor, with the

18    statement that absent surgery, pelvic organ prolapse

19    tends not to improve?

20          A.    In general, that would be a fair

21    statement.

22          Q.    Now, there have been multiple types of

23    surgeries trying to fix the problem of a prolapse,

24    right?
```

Daniel S. Elliott, M.D.

1          A.    Correct.

2          Q.    Some of those surgeries have been around a

3    long, long time?

4          A.    That is correct.

5          Q.    And over the years some surgeries have

6    been more effective than others?

7          A.    Correct.

8          Q.    Different doctors use different approaches

9    depending on their own experience, skill level, their

10   comfort level as to which surgical option that

11   physician prefers, correct?

12         A.    That's correct.

13         Q.    Transvaginal mesh was developed as one of

14   the options for doctors to use to treat women with

15   pelvic organ prolapse?

16             MR. SLATER:  Objection.

17             THE WITNESS:  Correct, yes.

18   BY MR. ISMAIL:

19         Q.    One of the surgeries you described for us

20   earlier as one of the surgical options was native

21   tissue repair surgeries; do you recall making reference

22   to that?

23         A.    Correct, that's traditional colporrhaphy,

24   yes.

Daniel S. Elliott, M.D.

1        Q.   So there are different types of

2   colporrhaphy procedures depending on which type of

3   prolapse the patient has, correct?

4        A.   Dependent upon the anatomical location,

5   yes.

6        Q.   So if --

7        A.   Well, it's only going to be anterior and

8   posterior, that's the only colporrhaphies.

9        Q.   So anterior being a bladder prolapse?

10       A.   Correct.

11       Q.   And posterior being a rectal prolapse?

12       A.   Correct.

13       Q.   And the idea behind a colporrhaphy is that

14  the surgeon is using the patient's own tissues and

15  sutures as a way to prop up the descending organ,

16  correct?

17       A.   Yeah, you are correct, it's a plication or

18  a bringing together of the tissues that have separated

19  or thinned.

20       Q.   One of the perceived problems with that

21  type of surgery, the native tissue surgery, going back

22  to say the 1990s, was that there were recurrences or

23  failures of that type of surgery, correct?

24       A.   Yeah, recurrence or failure can happen

Daniel S. Elliott, M.D.

1    with any surgery, it can happen with those, yes.

2          Q.   And particularly, Doctor, my question is

3    more of a historical one.  If you go back to the period

4    of time in the 1990s there was a feeling in the medical

5    community that native tissue surgeries for treatment of

6    prolapse had a high rate of failure?

7          A.   I think the best way to say it is we

8    didn't want to have any failure.  I was a resident

9    during that time, in training.  We didn't want to have

10   any failure so there was the pursuit of trying to find

11   something that had a less failure rate.

12         Q.   The -- historically the assessment of what

13   was a success or a failure focused on the anatomical

14   outcome, correct?

15         A.   Historically that was one of the main

16   features of it, yes.

17         Q.   And I think you described for us today

18   that the success or failure of a prolapse surgery can

19   be measured either anatomically or by a review of the

20   patient's symptoms, correct?

21         A.   It depends, yeah.  When you are doing a

22   study you are going to say this is an anatomical study

23   or a functional study or both.  But, yeah, there's

24   different ways of looking at it, but the tradition --

Daniel S. Elliott, M.D.

1    now you've got to look at function.

2            Q.   And my question wasn't just in the context

3    of a study but also with regard to a doctor treating a

4    patient, the doctor can and will assess anatomic

5    function and can and will assess symptomatic function,

6    correct?

7            A.   Yeah, you can assess it but what you care

8    about is the patient happy or not.

9            Q.   And when we're talking anatomic recurrence

10   of a prolapse, we mean the surgeon can -- in examining

11   the patient, has assessed that the prolapsed organ has

12   redescended to a certain degree following the surgery,

13   correct?

14           A.   That's part of the assessment, yes.

15           Q.   And anatomic recurrence of the prolapse

16   was a concern because it exposed women to the risk of

17   incurring the same prolapse symptoms again, right?

18           A.   Possibly, yes.

19           Q.   And I think just so we're focusing on the

20   period of time before Prolift® was developed, you would

21   agree that historically anatomic recurrence was a

22   concern to doctors treating women with pelvic organ

23   prolapse?

24           A.   I think initially, yes, you are right and

Daniel S. Elliott, M.D.

1    then there became the shift overlooking at is the happy

2    patient, quality of life.

3          Q.   It was the recurrence concern that led

4    doctors and surgeons to begin to experiment with the

5    use of mesh to reinforce the pelvic floor, correct?

6          A.   I think that's fair, yes.

7          Q.   And at the time that Prolift® was under

8    development you were familiar with the reports that

9    nonmesh surgical repairs of prolapse had failures up to

10   30 to 40%?

11         A.   Yeah, but, again, you got to look at what

12   paper that is.  Are they looking at stage 2 being

13   abnormal, you know, there is a debate now that is

14   within the realm of normal, so you have to look at the

15   specific studies, but those reports are out there.  I

16   don't agree with them and we don't now agree with it,

17   but I agree there are reports out there.

18         Q.   So, again, this question is going back to

19   the time before the Prolift® was developed, you're

20   aware that there was a concern that there was an

21   unacceptably high failure rate with native tissue

22   surgeries?

23         A.   I think some people had those.  Again, I

24   didn't have those concerns.

Daniel S. Elliott, M.D.

1        Q.    You were in training at the time, right?

2        A.    Yeah.  Well.  Depends when you are

3    talking.

4        Q.    1990s?

5        A.    Yeah, '93 to '99 -- '93 to 2000.

6        Q.    And some of the work that was done that

7    assessed the success or failure of native tissue

8    surgery was actually under the direction of the NIH,

9    right?

10       A.    Correct, you know, A lot of people were

11   looking at it, yes.

12       Q.    And so by that I mean there were

13   researchers who were concerned about the failure rate

14   of native tissue surgery outside of industry or

15   manufacturers, that's fair to say?

16       A.    Oh, yeah, I mean, doctors were very

17   concerned about it.  We wanted to get that recurrence

18   rate down to zero.

19       Q.    So one of the initial uses of mesh in the

20   treatment of pelvic organ prolapse was through an

21   abdominal surgery, correct?

22       A.    The sacrocolpopexy has been around a long

23   time, yes.

24       Q.    And I think you told us earlier that the

Daniel S. Elliott, M.D.

1    mesh used in Prolift® is a polypropylene mesh?

2          A.   Correct.

3          Q.   And mesh used in the abdominal

4    sacrocolpopexy also is polypropylene mesh, correct?

5          A.   It can be and the one I use is.

6          Q.   Most often the mesh used in abdominal

7    sacrocolpopexy, is it polypropylene mesh?

8          A.   I can't speak to everyone out there, some

9    people have used cadaveric tissue and that is becoming

10   more common now but it's -- again, I don't know.  I

11   would suspect there's more polypropylenes than anything

12   else.

13         Q.   Polypropylene has been used in surgical

14   procedures for decades, correct?

15         A.   That is correct.

16         Q.   Polypropylene is used in sutures, some

17   sutures, correct?

18         A.   That is correct.

19         Q.   And the use of polypropylene sutures goes

20   back many decades, true?

21         A.   Correct.

22         Q.   You indicated that polypropylene was used

23   in a hernia mesh; do you recall saying that earlier?

24         A.   That's correct.

Daniel S. Elliott, M.D.

1      Q.   The use of polypropylene hernia meshes

2   goes back many decades as well, correct?

3      A.   It's been around a long time, yes.  Has a

4   well-established track record.

5      Q.   Historically the abdominal sacrocolpopexy

6   was an open abdominal procedure, correct?

7      A.   That is correct.

8      Q.   Where a long incision would be made into

9   the abdomen?

10     A.   Well, it depends how you define long.

11  From the umbilicus to -- the belly button to the pubic

12  bone, so roughly -- however long that is.

13     Q.   And the surgeon would then have to

14  navigate through the abdominal cavity and work their

15  way to place the mesh to repair the organ that was

16  being prolapsed?

17     A.   Correct, it was stated in a very colorful

18  way, navigate through.  Just go down there and get the

19  job done, but, yes, you are right.

20     Q.   And you don't mean to minimize the

21  invasiveness of an open abdominal mesh repair of

22  prolapse, are you, Doctor?

23     A.   No.  It's -- you know, there is an

24  abdominal incision made, there are risks with that and

Daniel S. Elliott, M.D.

1    so I'm not going to say it's a minimally invasive

2    nature compared to doing it robotically, no.

3         Q.   The abdominal sacrocolpopexy performed

4    with mesh has had a high success rate for vaginal vault

5    prolapse, correct?

6         A.   It would be arguably the best, yes.

7         Q.   The use of polypropylene mesh in abdominal

8    sacrocolpopexy was viewed as a advancement in the

9    surgical treatment of pelvic organ prolapse, correct?

10        A.   I think that's correct.  The studies going

11   back looking at cadaveric tissue found a higher failure

12   rate with it.  So polypropylene, through the abdominal

13   route, has been shown with good and acceptable risk

14   versus benefit ratio.

15        Q.   The abdominal surgery for the placement of

16   mesh can be a complicated surgery?

17        A.   Well, I don't know what you mean by -- I

18   mean, I do it routinely, overnight stay in the hospital

19   and they're home.  So complications can occur, I

20   suppose.

21        Q.   The open abdominal placement of mesh can

22   be a surgery that lasts many hours?

23        A.   Better not.  I do it hour and 15 minutes,

24   two days -- last Friday.

Daniel S. Elliott, M.D.

1          Q.   Can it?

2          A.   Well, not in my hands.  I can't speak for

3    other surgeons.  I don't mess around.

4          Q.   Do you agree that transabdominal surgery

5    is associated with increased morbidity compared with

6    vaginal repairs?

7          A.   You have to define what you mean by

8    vaginal repairs.  Transvaginal nonmesh repairs

9    traditionally have been associated with a lower

10   morbidity, perioperative morbidity, but, again, it has

11   to be balanced as far as with success, but now if you

12   are talking about Prolift® meshes, that becomes a

13   different story, which we'll get to later I'm sure.

14          So I think it's fair when you compare

15   abdominal, transabdominal with an incision versus

16   transvaginal without meshes, it's fair to say that the

17   transvaginal without mesh would be a less morbid

18   procedure.

19          Q.   When you say "morbid" in that context,

20   what do you mean?

21          A.   Perioperative, intraoperative

22   complications.

23          Q.   Perioperative means during the procedure?

24          A.   Perioperative -- well, perioperative means

Daniel S. Elliott, M.D.

1    just around the time of the surgery.

2         Q.   And due to the morbidity of the open

3    transabdominal procedure, many patients were unable to

4    tolerate that procedure, correct?

5         A.   Some patients wouldn't.  I mean, my

6    practice is not many, but some don't want to undergo

7    that big of a surgery.

8         Q.   So going back to this period in the 1990s

9    and the early 2000s, researchers were reporting high --

10   higher than desirable failure rates for nonmesh

11   repairs, correct?

12        A.   Done through the vagina.

13        Q.   And there was a recognition that the use

14   of mesh through the transabdominal route resulted in a

15   more stable or durable repair, correct?

16        A.   Correct.

17        Q.   And there was some concern or desire to

18   lower the morbidity of the transabdominal procedure,

19   correct?

20        A.   Correct.

21        Q.   And so you agree, Doctor, it was a

22   worthwhile research objective to investigate whether

23   improvements could be made to the surgical devices and

24   techniques for the treatment of pelvic organ prolapse,

Daniel S. Elliott, M.D.

1    correct?

2           A.   I am an advocate of innovation so if

3    there's a way of making something better, I am for it,

4    but it has to be a safe advancement.

5           Q.   So you agree that even today it's still a

6    worthwhile research objective to find improved ways to

7    surgically repair pelvic organ prolapse, correct?

8           A.   Until we get to the day of 100% success

9    and no complications, it's a worthwhile venture.

10          Q.   Scientists, whether they're affiliated

11   with universities or manufacturers or whatever, always

12   are looking for ways to improve the surgical treatment

13   of pelvic organ prolapse, correct?

14          A.   I can't agree with that, no.

15          Q.   Then let me rephrase.

16          The research into the improvements of the

17   surgical techniques for pelvic organ prolapse has been

18   going on several decades?

19          A.   Yeah, longer than that, yes, I agree.

20          Q.   Fair enough.  You agree that it was

21   admirable to search for a way to make pelvic organ

22   prolapse recurrence -- withdrawn.  Let me start over.

23          You agree it's admirable or it was admirable to

24   search for a way to make the surgical repair of pelvic

Daniel S. Elliott, M.D.

1    organ prolapse result in fewer recurrences of the

2    prolapse?

3            A.   I feel it is a very worthwhile endeavor --

4    if you want to use the word admirable that's okay -- to

5    make a more efficacious and safe prolapse repair.

6            Q.   Now, we've already discussed the

7    hypothesis that polypropylene mesh might allow for a

8    more stable or durable repair of the prolapse, correct?

9            A.   Well, depends if you are talking about

10   transabdominal or transvaginal.

11           Q.   Well, the hypothesis that led to the use

12   of mesh in transabdominal surgery as resulting in a

13   more stable repair, that was actually borne out,

14   correct?

15           A.   That's true.

16           Q.   And so you agree that that was a

17   legitimate hypothesis?

18           A.   Legitimate hypothesis?

19           Q.   If you are having trouble with that word,

20   I'll rephrase.

21           A.   Yeah, let's -- can you use a different

22   word?

23           Q.   The research initiative that resulted in

24   the use of mesh for the abdominal surgery to repair

Daniel S. Elliott, M.D.

1    pelvic organ prolapse, that turned out to be a

2    worthwhile and useful innovation in the treatment of

3    patients who have pelvic organ prolapse?

4           A.    I think as we can state right now the use

5    of transabdominal polypropylene meshes has improved the

6    outcome as far as we know right now.

7           Q.    There was another hypothesis that the use

8    of a transvaginal mesh could cut down on the morbidity

9    of the abdominal surgeries, correct, that was the idea

10   at the time?

11          A.    Well, the idea at the time was to blend

12   meshes and avoid the potential issues of going through

13   the abdomen, so that was their theory, but I can't

14   speak to exactly what they were thinking.  I wouldn't

15   know.

16          Q.    Let me just say it this way, Doctor, the

17   reason and purpose behind the development of

18   transvaginal mesh was to reduce the morbidity seen with

19   the abdominal sacrocolpopexy approach, true?

20          A.    That would be part of it.

21          Q.    And you agree that that was a laudable

22   goal, to search for a different way of doing the

23   surgical procedure?

24          A.    I will never criticize the pursuit of

Daniel S. Elliott, M.D.

```
 1   innovation in improvement, as long as it's balanced and

 2   thought through.

 3        Q.   When the Prolift® was developed it was not

 4   the first time that surgeons implanted mesh

 5   transvaginally, correct?

 6        A.   No, mesh has been done -- not mesh, excuse

 7   me -- foreign body synthetics, manmade products have

 8   been used transvaginally at other times, yes.

 9        Q.   And even before the Prolene was developed,

10   polypropylene mesh had been implanted transvaginally,

11   correct?

12        A.   Before the Prolift, yes, the Gynemesh® had

13   been used, yes.

14        Q.   And even before Gynemesh® transvaginal

15   mesh was used in surgery for other applications,

16   correct?

17        A.   Well, you have to show me exactly what you

18   are talking about.  I mean, Marlex has been used, other

19   products have been used, it had unacceptably high

20   complication rates.  I have to see exactly what product

21   you are talking about.

22        Q.   I'll rephrase.

23        Prior to the use of transvaginal mesh in pelvic

24   organ prolapse, was transvaginal mesh used for
```

Daniel S. Elliott, M.D.

1    treatment of other conditions?

2          A.    Transvaginal mesh for other conditions?

3    Oh, are we talking about like incontinence or something

4    like that?  I guess, yes, for incontinence.

5          Q.    Before you were -- withdrawn.

6          Now, with respect to the Prolift® you're aware

7    that there have been several randomized controlled

8    clinical trials comparing the use of Prolift® to other

9    surgical approaches, correct?

10         A.    Yes, there have been quite a number of

11   studies out there, yes.

12         Q.    So I don't think this has been done yet

13   for the benefit of the jury, but let's just explain

14   what randomized controlled clinical trials are, okay?

15         A.    Okay.

16         Q.    So there's a variety of ways that

17   scientists can undertake research, correct?

18         A.    Yes.

19         Q.    Sometimes you will have animal research,

20   sometimes you have laboratory research and sometimes

21   you have clinical research?

22         A.    Correct.

23         Q.    And one form of clinical research is what

24   we call randomized controlled clinical trials?

Daniel S. Elliott, M.D.

```
1              A.    That's correct.

2              Q.    And in randomized controlled clinical

3    trials you have two groups of patients that you try to

4    have evenly matched?

5              A.    Yes.

6              Q.    And one group receives a treatment method

7    and a different group either receives no treatment or

8    sometimes a different treatment method?

9              A.    Correct.

10             Q.    And then the researchers follow those

11   patients over time and see how they do both from a

12   effectiveness perspective and a safety perspective?

13             A.    Correct.

14             Q.    And you would agree that randomized

15   controlled clinical trials are some of the best quality

16   research that can be done on a surgical procedure?

17             A.    They can be if the study is run correctly,

18   but they're one part of the information that's

19   available.

20             Q.    Now, there have been many randomized

21   controlled studies done on the safety and effectiveness

22   of Prolift® correct?

23             A.    Again, there have been studies done.

24   There have been a number done.
```

Daniel S. Elliott, M.D.

1          Q.   And there have been randomized controlled

2    clinical studies done comparing the Prolift® to the

3    older native tissue surgery, correct?

4          A.   Correct.

5          Q.   And that's something you looked at before

6    you came to talk to the jury about your opinions on

7    Prolift®, correct?

8          A.   Correct.

9          Q.   Some of those randomized controlled

10   clinical trials looked to the relative success of the

11   native tissue surgery compared to the Prolift® in

12   repairing the woman's prolapse, correct?

13         A.   As far as anatomical repairs, yes, that

14   was looked at.

15         Q.   And many of those high quality randomized

16   controlled clinical studies demonstrated that women

17   treated with a Prolift® experienced a lower rate of

18   anatomical recurrence compared to the native tissue?

19         A.   Well, again, you said "many".  There are

20   some that show anatomy success, there are also many

21   that show equivocal results, but, again, anatomy is not

22   what we look at.

23         Q.   Well, Doctor, you're aware that there have

24   been several studies done that -- and again we we're

Daniel S. Elliott, M.D.

1    talk -- withdrawn.

2          When we're talking anatomic success we're

3    talking has the surgery been effective in returning the

4    woman's internal organs to a more anatomically correct

5    position?

6          A.   That's what anatomical studies are about,

7    but the woman doesn't care about that.

8          Q.   And --

9               MR. ISMAIL:  Move to strike as

10              nonresponsive.

11   BY MR. ISMAIL:

12         Q.   Can you answer the question I asked,

13   Doctor?

14         A.   I thought I did.

15         The anatomical studies look at the anatomy of

16   the patient, not the psyche.

17         Q.   Thank you.

18         And several randomized controlled clinical

19   trials have demonstrated that Prolift® has a -- results

20   in a better anatomical fix of the prolapse compared to

21   the native tissue surgery, true?

22         A.   Well, number one, I'd have to see those

23   studies.  Number two, we have to talk about which

24   compartment they're talking about, anterior --

Daniel S. Elliott, M.D.

1        Q.   I appreciate the distinction and I'll

2   clarify.

3             When we talked about -- you've used the times

4   anterior and posterior at times in your testimony?

5        A.   Right.

6        Q.   And just, again, because those aren't

7   terms that laypeople often use, just to define them,

8   anterior we're talking about, essentially, a bladder

9   prolapse, correct?

10       A.   Correct.

11       Q.   And a posterior, we're talking about a

12  rectal prolapse?

13       A.   Correct.

14       Q.   So let me focus on the anterior prolapse,

15  okay.

16            Many randomized controlled clinical trials have

17  demonstrated that surgery with a Prolift® results in a

18  better anatomical repair of an anterior prolapse

19  compared to a native tissue surgery, true?

20       A.   Well, I'd have to somewhat disagree.

21  There are going to be some studies out there that show

22  better anatomy, but I have to look at those specific

23  studies, but they also show equivocal.  So, again, how

24  do you want to define many?  You know, say 100, five,

Daniel S. Elliott, M.D.

1    one?  So I just have to see.

2            Q.   Okay.  How many are you aware of?

3            A.   I have reviewed 450 manuscripts, I can't,

4    off the top of my head, come up with them.

5            Q.   Certainly, Doctor, you wouldn't dispute

6    that Prolift® has been shown to result in a better

7    anatomical repair of an anterior prolapse compared to a

8    native tissue surgery?

9            A.   You know, I've never really argued against

10   anatomic repair, that's not an issue for me, it's the

11   patient's quality of life is.  So an anterior, you can

12   find studies that show better or equivocal in anatomic

13   repair.  Posterior and apical, it's a different story.

14           Q.   Agree that nobody -- you agree that

15   nobody, including you, would dispute anatomic success

16   with mesh is very strong?

17           A.   I would agree with you that it has been

18   shown to work, again, but that's not the issue that I'm

19   concerned about in our patients.

20           Q.   Thus far, Doctor, we've been talking about

21   anatomic success of the surgery and you, as you just

22   did, want to make reference to another measure of

23   success and that is symptomatic --

24           A.   Correct.

Daniel S. Elliott, M.D.

```
1              Q.    -- outcomes, correct?

2              A.    You are correct.

3              Q.    Symptomatic outcomes have been measured as

4     well in some of these studies that we've discussed,

5     correct?

6              A.    Correct.

7              Q.    Including in some randomized controlled

8     clinical trials, correct?

9              A.    Correct.

10             Q.    Patients with a Prolift® surgery have

11    demonstrated improvement in symptomatic results,

12    correct?

13             A.    Yes, that has happened, yes.

14             Q.    Patients implanted with a Prolift® have

15    demonstrated improvements in quality of life, correct?

16             A.    That has been demonstrated, yes.

17             Q.    You referenced earlier biologic or cadaver

18    tissue being used in pelvic organ prolapse; is that

19    right?

20             A.    Correct.

21             Q.    Surgical experience with those techniques

22    revealed the biological or cadaver tissue in

23    sacrocolpopexy had a high failure rate?

24             A.    With specifically sacrocolpopexy it --
```

Daniel S. Elliott, M.D.

1    several different studies have shown it was not as

2    strong.

3           Q.   So the biologic tissues that you

4    referenced in your testimony are not as strong as the

5    polypropylene mesh for repair, right?

6           A.   Well, we're talking about transabdominal.

7    Transabdominal I agree with you.

8           Q.   Now, there were other polypropylene

9    transvaginal mesh kits developed other than the

10   Prolift®, correct?

11          A.   That is correct.

12          Q.   Developed by different manufacturers?

13          A.   Correct.

14          Q.   What are some of the other manufacturers

15   who have developed polypropylene transvaginal mesh kits

16   for prolapse repair?

17          A.   Coloplast, AMS, Bard, Boston Scientific,

18   and there may be some more in there.  Those are the

19   ones I see the most.

20          Q.   And do you believe, Doctor, you have done

21   a comprehensive review of the scientific literature on

22   the randomized controlled trials involving transvaginal

23   mesh for all these products?

24          A.   I reviewed the PubMed, which is the

Daniel S. Elliott, M.D.

```
 1   world's largest search engine, 24 million articles I

 2   recall, and I have reviewed -- you know, it's as

 3   comprehensive as I'm going to be able to get.

 4           Q.   Can you confirm, Doctor, that the Prolift®

 5   has been studied in more randomized controlled clinical

 6   trials than any other transvaginal mesh used in

 7   prolapse repair?

 8           A.   I don't doubt that, no.

 9           Q.   Doctor, you made some comments earlier

10   about the amount of clinical trials that had been done

11   on the Prolift® at various points in time; do you

12   recall that in your testimony?

13           A.   I don't recall that.

14           Q.   You don't?

15           A.   I'm sure I've been asked that question,

16   yes.

17           Q.   One of the procedures that you described

18   that you are aware of at your institution is the

19   robotic abdominal sacrocolpopexy?

20           A.   Correct.

21           Q.   Now, at the time that you participated in

22   that surgery, when you first started doing that

23   surgery, you were not aware of any randomized

24   controlled trial anywhere in the world, correct?
```

Daniel S. Elliott, M.D.

1          A.   I and my colleague were the first in the

2    world to do it, so there's no way of having a

3    randomized controlled trial.

4          Q.   And even today there is not a randomized

5    controlled clinical trial on the use of robotic

6    abdominal sacrocolpopexy for the treatment of prolapse,

7    correct?

8          A.   No, there's been laparoscopic versus

9    robotic, I have reviewed those papers, those papers are

10   out there.

11         Q.   When did those come out?

12         A.   Oh, those came out years ago.

13         Q.   When?

14         A.   I reviewed -- I have no idea.  I reviewed

15   them, they asked me to review it because of my

16   expertise so there are going to be those trials out

17   there.  I don't -- right now as I sit here can't think

18   of one robotic versus open.

19         Q.   Let me -- by the way, with respect to the

20   robotic procedure you just described, you don't operate

21   the robot in that procedure?

22         A.   No, my colleague does.

23         Q.   See how we're doing on time, Doctor.

24              Now, with respect to this robotic abdominal

Daniel S. Elliott, M.D.

1   sacrocolpopexy procedure that you participate in, do

2   you use polypropylene mesh?

3           A.   Yes.

4           Q.   And you continue to use mesh in that

5   procedure, correct?

6           A.   For that specific procedure, yes.

7           Q.   And you have for the last ten years?

8           A.   Longer than that.  Probably 2003 with the

9   robotically and then prior to that was transabdominal.

10          Q.   The mesh that you use in your practice is

11   called InterPro?

12          A.   InterPro by AMS.

13          Q.   The InterPro mesh that you use in your

14   practice you believe is a large pore mesh, correct?

15          A.   No.

16          Q.   Do you believe the InterPro mesh that you

17   use in your clinical practice is a lightweight mesh?

18          A.    No.  It would probably be -- I would have

19   to look up the specific numbers, it would probably be a

20   moderate weight.  I don't recall the exact numbers.

21   They're quite similar to Gynemesh®.

22               MR. ISMAIL:  I'm going to mark this as

23               Exhibit 1 and we'll remark it for trial

24               purposes later.

Daniel S. Elliott, M.D.

```
 1              (Document marked for identification as

 2              Deposition Exhibit No. 1.)

 3    BY MR. ISMAIL:

 4         Q.   First of all, Doctor, you indicated in

 5    your last answer that the mesh you use in your clinical

 6    practice is a polypropylene mesh that's very similar to

 7    the mesh that's used in the Prolift®, correct?

 8         A.   I didn't say very similar.  I said it's

 9    similar to.

10         Q.   Okay.  I will rephrase.

11              You agree, Doctor, that the mesh you use in

12    your clinical practice is a mesh that's very --

13    withdrawn.

14              The mesh you use in your clinical practice is

15    similar to the polypropylene mesh used in the Prolift®,

16    correct?

17         A.   Correct.

18         Q.   I've handed you what we've marked for

19    identification as Exhibit 1.

20              Is this an article that you are listed as an

21    author on?

22         A.   That's correct.

23         Q.   And it is on the use of robotic

24    sacrocolpopexy in prolapse repair?
```

Daniel S. Elliott, M.D.

1         A.    That is correct.

2         Q.    And in this article, Doctor, do you tell

3    the medical community what materials you use in the

4    procedure?

5         A.    Yes, we do.

6         Q.    And do you describe the polypropylene mesh

7    that you use in your procedure?

8         A.    Yes.

9         Q.    If you turn to Page 2 of the article, in

10   the left column.

11        A.    Yes.

12        Q.    And in there you inform the medical

13   community on the technique for this robotic procedure

14   that you are describing in the article, right?

15        A.    That is correct, yes.

16        Q.    And if you work your way down in that left

17   column, above the anatomical cartoon there, you make

18   specific reference to the polypropylene mesh that you

19   use in your procedure, right?

20        A.    That is correct.

21        Q.    Do you say, quote, Next, a Y-shaped large

22   pore, lightweight polypropylene graft (InterPro;

23   American Medical Systems) is sutured into the vagina?

24        A.    That's what we state, yes.

Daniel S. Elliott, M.D.

1          Q.   So you, in your article that you published

2     to the medical community, describe InterPro as a large

3     pore lightweight polypropylene mesh, correct?

4          A.   That is correct.

5          Q.   The date of this article, sir, was -- is

6     what?

7          A.   2015.

8          Q.   In fact, it was submitted and received by

9     the journal on May 26, 2015, correct?

10         A.   That's correct.

11         Q.   That's some -- that's several years after

12    you had begun work already on behalf of the plaintiff

13    lawyers in this case?

14         A.   That is correct.

15         Q.   It's after you formed your opinions about

16    Gynemesh®, correct?

17         A.   That's correct.

18         Q.   So when you published for the medical

19    community -- withdrawn.

20              You published in the medical community that

21    InterPro, the mesh you use, is large pore, right?

22         A.   That's correct.

23         Q.   You talked about pore size with Mr. Slater

24    several times earlier today, correct?

Daniel S. Elliott, M.D.

```
 1          A.    Correct.

 2          Q.    You agree that the porosity of the mesh

 3   used in Prolift® is similar to InterPro, correct?

 4          A.    Well, Prolift® is only a transvaginal

 5   procedure.  So transvaginal versus transabdominal,

 6   we're talking different procedures there.

 7               MR. ISMAIL:  Move to strike as

 8          nonresponsive.

 9   BY MR. ISMAIL:

10          Q.    Do you remember my question, Doctor?

11          A.    No, I do not.

12          Q.    I'll restate it.

13          The polypropylene mesh you use, InterPro, has a

14   porosity similar to Gynemesh®?

15          A.    That is correct.

16          Q.    The porosity of Gynemesh® is similar to

17   the mesh used in the Prolift® kit, correct?

18          A.    Should be the same.

19          Q.    So the answer to that is yes?

20          A.    Yes.

21          Q.    And you described your -- the mesh you use

22   as large pore, correct?

23          A.    That is correct.

24          Q.    You also described the mesh you use as
```

Daniel S. Elliott, M.D.

```
 1    lightweight, correct?

 2           A.    Correct.

 3           Q.    The mesh -- the polypropylene mesh you use

 4    is -- has a similar weight to the Gynemesh®, correct?

 5           A.    That is correct.

 6           Q.    And the Gynemesh® would have a similar

 7    weight to that used -- the mesh used in the Prolift®

 8    kit, correct?

 9           A.    That's correct.

10           Q.    By the way, Doctor, do you know whether

11    the mesh you use in your practice has bi-directional

12    elasticity?

13           A.    It doesn't.

14           Q.    It does not?

15           A.    No.

16           Q.    So the missing characteristic of

17    bi-directional elasticity hasn't stopped you from using

18    InterPro mesh in your practice, right?

19                 MR. SLATER:  Objection, lack of

20           foundation, mischaracterization of direct.

21                 THE WITNESS:  Because I'm using it through

22           an abdominal route, just like Gynemesh® is

23           still available for abdominal route, so you

24           can't compare the two surgeries.
```

Daniel S. Elliott, M.D.

```
 1   BY MR. ISMAIL:

 2        Q.   I haven't compared anything, Doctor.  My

 3   question was different.  Do you remember it or do you

 4   want me to restate it?

 5        A.   Please restate it.

 6        Q.   The missing characteristic of

 7   bi-directional elasticity has not stopped you from

 8   using InterPro mesh in your procedures, correct?

 9             MR. SLATER:  Objection,

10        mischaracterization and lack of foundation.

11   BY MR. ISMAIL:

12        Q.   You can answer the question.

13        A.   Yeah, I can't give you -- I think it would

14   be unfair to give you a yes or no.  I have to say I'm

15   doing it through a different route.

16             If I were doing it through the vagina,

17   absolutely.  Through the abdomen I have not seen that

18   issue.

19             MR. ISMAIL:  Move to strike as

20        nonresponsive.

21   BY MR. ISMAIL:

22        Q.   Again, it's not -- I have not compared it

23   to transvaginal surgery or not.  It's a very simple

24   question, Doctor.
```

Daniel S. Elliott, M.D.

1          A.   And I feel I need to explain it to be

2    accurate.

3               MR. ISMAIL:  Move to strike as

4               nonresponsive.

5    BY MR. ISMAIL:

6          Q.   Do you have my question in mind?

7          A.   No, I still do.

8          Q.   Well, let me restate it, just for the

9    benefit of the record.

10              The mesh that you use in your clinical practice

11   you believe does not have bi-directional elasticity,

12   correct?

13         A.   Correct.

14         Q.   And that has not stopped you from using

15   that mesh in your abdominal sacrocolpopexy procedure,

16   correct?

17         A.   As you are specifically stating there, you

18   are correct, through the abdomen, I agree with you.

19              MR. ISMAIL:  Okay.  When did we start,

20              12:40.  Everyone doing okay?

21              THE WITNESS:  Can I get something to

22              drink?

23              MR. SLATER:  Take five minutes.

24              MR. ISMAIL:  Sure.

Daniel S. Elliott, M.D.

1          THE WITNESS:  I can get something.  I'm

2     out of fluid here.

3          THE VIDEOGRAPHER:  The time is 1:47 and we

4     are off the record.

5          (Brief recess.)

6          THE VIDEOGRAPHER:  The time is 1:53.  And

7     we are back on the record.

8  BY MR. ISMAIL:

9     Q.   Doctor, I want to turn now to something in

10 your prior testimony regarding the instructions for use

11 that you offered.

12      Now, prior to being retained by the plaintiff

13 lawyers, you had never before looked at a

14 manufacturer's internal standards for what to include

15 in the instructions for use, correct?

16     A.   That is correct.

17     Q.   And if we were to consider your articles

18 that you've published in the literature, you've never

19 before published on the standards that a manufacturer

20 uses for instruction for use, correct?

21     A.   Correct.

22     Q.   With respect to the Prolift® instructions

23 for use, before you got involved in this case you had

24 never even read the Prolift® instruction for use,

Daniel S. Elliott, M.D.

1    correct?

2         A.   Well, again, I know I did not read the

3    Gynemesh®, I know that, but I visited the booth at

4    Ethicon and, as I recall, looked at the IFU, looking at

5    it online.  I can't recall specific dates.

6         Q.   One moment, Doctor.

7              MR. SLATER:  If you are going to pull a

8         transcript or something just let me know so I

9         can look for it.  Is it the Bellew transcript

10        or something else?

11             MR. ISMAIL:  This will be the witness'

12        deposition.  I have a copy for you if you'd

13        like.

14             MR. SPECTER:  That would be great.  Thank

15        you.

16             MR. SLATER:  Yeah, sure.  Splendid.

17             MR. ISMAIL:  I'll give one to you too in a

18        minute, Doctor.

19             Doctor -- ready to proceed everyone?  I'll

20        give you page and line when we get there.

21        Adam.

22             MR. SLATER:  What's that?

23             MR. ISMAIL:  Ready to proceed?

24             MR. SLATER:  Oh, yeah.  I figured you

Daniel S. Elliott, M.D.

```
 1              would tell us the page and line before you --

 2              MR. ISMAIL:  I will.

 3   BY MR. ISMAIL:

 4        Q.  Doctor, you referenced earlier you gave a

 5   deposition in this case, correct?

 6        A.  Correct.

 7        Q.  And when you gave that deposition you took

 8   an oath to tell the truth, correct?

 9        A.  That's correct.

10        Q.  Same type of oath that you took today?

11        A.  Correct.

12        Q.  And you understood when you took that oath

13   that it was as if you were in court?

14        A.  Correct.

15        Q.  There was a court reporter there who was

16   taking down the questions that were asked and the

17   answers that you gave, correct?

18        A.  Correct.

19        Q.  I ask, Doctor, if you turn to Page 391 of

20   your deposition?

21              MR. SLATER:  Just one thing for the

22         record, I just -- I'm looking what you asked,

23         just -- well, actually, I'll withdraw it.  You

24         go ahead.  What page did you say?
```

Daniel S. Elliott, M.D.

```
 1                    MR. ISMAIL:  391, Line 1.

 2   BY MR. ISMAIL:

 3         Q.   Doctor, were you asked this question:

 4         "Before becoming engaged in this litigation,

 5   had you ever reviewed the Prolift® instructions for

 6   use?"

 7         Is that the question you were asked?

 8         A.   Before I -- you're on Line 9?

 9         Q.   Line 1.

10         A.   Oh, Line 1.  I'm sorry.

11         Q.   Let me begin again.

12         A.   I'm sorry.

13         Q.   Doctor, were you asked this question and

14   did you give this answer:

15         "Question:  Before becoming engaged in this

16   litigation, had you ever reviewed the Prolift®

17   instructions for use?

18         Answer:  No, I had not."

19         Was that your sworn testimony, sir?

20         A.   That's what I gave then, yes.

21         Q.    Before being involved in this litigation

22   had you ever read the instruction for use for

23   Gynemesh®?

24         A.   Gynemesh®, I don't recall ever reading
```

Daniel S. Elliott, M.D.

1    that, no.

2           Q.   So when you discussed earlier that you had

3    used instructions for use in your interaction with

4    residents, do you recall giving testimony to that

5    effect?

6           A.   Yes.

7           Q.   That was a more general statement

8    regarding how using instructions for use in other

9    contexts besides the Prolift®, correct?

10          A.   Correct.

11          Q.   So you never taught or interacted with

12   residents before this litigation on the Prolift®

13   instruction for use, correct?

14          A.   I think that would be fair.  We looked it

15   up online, what was available, but it was not a formal

16   teaching.  It was more of an idea of what happens with

17   the procedure.

18          Q.   Now, you're not suggesting, Doctor, that

19   the instruction for use is the only way surgeons obtain

20   information about the surgeries they perform, are you?

21          A.   It is not the only way.  It is one of the

22   ways.

23          Q.   Surgeons obtain information pertinent to

24   surgery from numerous sources, right?

Daniel S. Elliott, M.D.

1          A.    Possibly.  It depends upon the surgeon.

2          Q.    So surgeons obtain information relevant to

3    surgery from their own education, right?

4          A.    Well, I can't speak for all surgeons out

5    there.  Everybody is different.  There are different

6    levels of surgeons and different levels of motivation

7    and different levels of quality delivered, so I can't

8    speak for everybody.

9          For me, at an institution I am in and the

10   ability to travel all over the world for meetings, the

11   IFU takes less of a meaning.  If I'm out in the middle

12   of USA somewhere, they become more important.  So,

13   again, I can't speak for everybody.

14         Q.    Let me rephrase.

15         You are aware, Doctor, that surgeons can rely

16   on their education and training to understand the risks

17   and benefits of surgeries that they perform?

18         A.    They can, yes.

19         Q.    Surgeons can rely on the medical

20   literature to understand the risks and benefits of the

21   surgeries they perform?

22         A.    That is another avenue for it, yes.

23         Q.    Surgeons can look to medical conferences

24   as another source of information about the risks and

Daniel S. Elliott, M.D.

1    benefits of surgeries they perform, correct?

2          A.   Possibly, if they're able to go to the

3    meetings, yes.

4          Q.   Surgeons can rely on their own clinical

5    experience when understanding the risk and benefits of

6    the surgeries they perform, correct?

7          A.   Possibly, if they performed the procedure

8    before.

9          Q.   Surgeons -- have you ever heard --

10   withdrawn.

11         Have you ever heard of a surgical guide?

12         A.   Yes.

13         Q.   Surgical guides have been prepared in

14   addition to instructions for use, correct?

15         A.   That's a generic statement for everything,

16   but there are surgical guides available for some

17   procedures.

18         Q.   And surgeons can look to a surgical guide

19   or a monograph to learn information about the risks and

20   benefits of a surgery they can perform?

21         A.   If that's available, they can do that,

22   yes.

23         Q.   When you were on direct examination with

24   Mr. Slater you did not discuss the surgical guides or

Daniel S. Elliott, M.D.

 1    monographs with Prolift®, correct?

 2              MR. SLATER:  Objection.

 3              THE WITNESS:  I wasn't asked.

 4    BY MR. ISMAIL:

 5         Q.    So the answer to my question is correct?

 6         A.    Yes, you are correct.

 7         Q.    Mr. Slater asked you some questions about

 8    design standards; do you recall that?

 9         A.    Correct.

10              MR. SLATER:  Objection,

11              mischaracterization.

12    BY MR. ISMAIL:

13         Q.    Prior to being retained by the plaintiff

14    lawyers in this case had you ever been aware of the

15    internal design standards that a manufacturer uses to

16    develop a new surgical device?

17         A.    Specifically that?  I mean, I have patents

18    of my own on a product, was involved in the early

19    stages of designing of a product as a resident, but as

20    you narrow it down there are specific industry

21    standards, my level of knowledge would be not as much

22    as it is now.

23         Q.    When you say "not as much as it is now,"

24    you mean through your work as a paid witness on behalf

Daniel S. Elliott, M.D.

1    of the plaintiffs, right?

2         A.   Yes and no to that.  It's through my work,

3    yes, definitely through the litigation, but also as my

4    internal curiosities, what are the standards industry

5    is required to do, because I'm a surgeon implanting

6    devices and I kind of want to know what really goes on

7    behind the scenes.

8         Q.   Okay.  So if we focus on the period of

9    time as of when you were first retained by the

10   plaintiff lawyers, you would agree that you did not

11   have experience with the internal design standards a

12   manufacturer uses to develop a new surgical device,

13   correct?

14        A.   Well, no, if you look at my CV, I was

15   involved in transurethral enzymatic ablation of the

16   prostate, which I worked with a researcher and the

17   founder of the company and working with the FDA as far

18   as getting it approved, that's when I was a resident.

19        I worked with the design of a new artificially

20   designed urinary sphincter for males by Timm, T-i-m-m

21   is the name of him, so we were working on the standards

22   with the companies, and then my own patent.  And so it

23   depends how extensive a level of knowledge.

24        I'm not an FDA -- I'm not employed by the FDA.

Daniel S. Elliott, M.D.

```
 1    I didn't design any FDA regulations but I have working

 2    knowledge of what would be required.

 3          Q.   Let me rephrase my question.  And I'm

 4    talking about internal --

 5               MR. SLATER:  Can I -- I'm sorry, I just

 6          got a text and I have to call somebody back

 7          really quick.  I don't want to -- if it's a bad

 8          spot, I just -- it has nothing to do with work.

 9               MR. ISMAIL:  Off the record.

10               MR. SLATER:  Thanks.

11               MR. ISMAIL:  Sure.

12               THE VIDEOGRAPHER:  The time is 2:03 and we

13          are off the record.

14               (Brief recess.)

15               THE VIDEOGRAPHER:  The time is 2:07 and we

16          are back on the record.

17    BY MR. ISMAIL:

18          Q.   Doctor, let me rephrase my prior question

19    to make it more specific.

20          Prior to being retained by the plaintiff

21    lawyers in this litigation you had no experience on the

22    internal design standards a manufacturer uses for the

23    development of a new surgical device for treatment of

24    pelvic organ prolapse, correct?
```

Daniel S. Elliott, M.D.

```
 1              A.   I don't know.  I would have to say that is

 2    only partially correct.  As I mentioned previously, as

 3    far as my experience designing, as far as the

 4    transenzymatic ablation of the prostate, which was

 5    going through the FDA, we had FDA people come in,

 6    working in with them, the -- an artificially made

 7    sphincter for male incontinence with Dr. Timm, working

 8    and designing to the point of implanting in humans.

 9    And then with my patent, working with it.  So those are

10    all looking at safety, complications, ramifications.

11              MR. ISMAIL:  Move to strike as

12         nonresponsive.

13    BY MR. ISMAIL:

14              Q.   Doctor, I'm not intending to ask anything

15    about the FDA in my question, okay?

16              A.   Okay.

17              Q.   And you agree you are not an FDA expert,

18    right?

19              A.   I know what the standards they are going

20    after, but I have not been employed by the FDA.

21              Q.   So my question is very specific.  I would

22    ask that you only answer that question.

23              Prior to being retained by the plaintiffs in

24    this litigation, you did not have experience on the
```

Daniel S. Elliott, M.D.

1    internal design standards a company used to develop a

2    new surgical device for pelvic organ prolapse, true?

3            A.   Correct, I have never been an employee of

4    any industry designing those issues.

5            Q.   You earlier referenced, Doctor, the

6    results of the TVM group in France; do you recall that,

7    in the early development work on the Prolift®?

8            A.   Yeah, we discussed two or three earlier

9    studies.

10           Q.   And you used the clinical study report in

11   reference to the results of their success rate in the

12   surgical use of the Prolift®, correct?

13           A.   That is correct.  As long as we're

14   talking, it was Plaintiff Exhibit P0049, I assume we're

15   talking about that one.

16           Q.   Yes.  And there were two arms to the TVM

17   study, correct, one in Europe and one in the United

18   States?

19           A.   Oh, yes, yes.  I'm sorry, I misunderstood,

20   yes.

21           Q.   And the data that you went over with

22   Mr. Slater only related to the European TVM data?

23           A.   That is correct, yes, not the American.

24           Q.   Doctor, do you agree that pelvic organ

Daniel S. Elliott, M.D.

1    prolapse surgeries -- withdrawn.

2          I think you told us earlier that all surgeries

3    have risks associated with them, correct?

4          A.   Well, all surgeries have their unique

5    complications of it, severity, frequency, but surgeries

6    can have some complications.  Again, we have to define

7    what surgery we're talking about.

8          Q.   All right.  Let's break it down.

9          All surgeries have sort of general risks

10   related to surgery; anesthesia, potential infection,

11   any time you are cutting tissue there is a potential

12   risk, right?

13         A.   Again, if you are talking about -- I'm not

14   trying to be difficult, but I don't want to make a

15   general statement.  If we're talking about a skin

16   biopsy in a dermatologist's office is different than

17   cardiac surgery.  So, again, that's why -- as a surgeon

18   I have to define what I'm talking about, what

19   procedure.

20         Q.   Then we'll be specific.

21         With any pelvic organ prolapse surgery, even in

22   the hands of the most skilled surgeon, there can be

23   complications, correct?

24         A.   Each surgery has its own unique

Daniel S. Elliott, M.D.

1    complications, frequency and ability to treat those

2    complications.

3           Q.   And even yourself, Doctor, you would never

4    guarantee a patient that a surgery you performed will

5    be free of complications, correct?

6           A.   You are correct.

7           Q.   With any surgery in -- for pelvic

8    reconstruction you have potential problems with

9    bleeding, right?

10          A.   It can happen.  Certain procedures have

11   higher risk, others have lower risk, but it can happen.

12          Q.   Any surgery for pelvic reconstruction has

13   risks associated with the use of anesthesia, correct?

14          A.   Yeah, unless you are using a local

15   anesthetic for biopsy, yeah, but, again, I don't like

16   making a general statement.  A procedure takes three

17   hours versus one that takes ten minutes, there's

18   different risks so everything is -- again, I don't want

19   to be difficult by any means, but I'm a surgeon so we

20   look at each specific procedure.

21          Q.   The potential surgeries that could be used

22   for repair of pelvic organ prolapse all carry a

23   potential risk of infection, correct?

24          A.   It depends.  If you are using a foreign

Daniel S. Elliott, M.D.

```
 1    product, foreign body, the risk goes up.  If you are

 2    not, I have -- I have, in my experience, never had a

 3    transvaginal procedure using native repair get

 4    infected.

 5         Q.   Do you have the -- I guess this is a

 6    different.  Sorry, forgot to give you the other day but

 7    feel free to hold on to that.  Not to add to your

 8    paper, Doctor, but here you go.

 9         Doctor, I've handed you a transcript of

10    testimony you gave on March 4, 2015; is that correct?

11         A.   March -- you gave me March 3rd and

12    March 4.

13         Q.   I would like you to focus on March 4,

14    please.

15         A.   Okay.

16         Q.   And you swore to tell the truth in that

17    deposition, correct?

18         A.   That is correct.

19         Q.   I'm going to ask you to turn to Page 513

20    of your testimony.

21         A.   Okay, I'm there.

22         Q.   Line 21.  Was this your question -- it was

23    a question asked of you and was this your answer under

24    oath:
```

Daniel S. Elliott, M.D.

1            "And with any surgery, no matter what it is,

2    you've got problems of -- potential problems with

3    bleeding or infection or anesthesia problems, and so

4    forth; correct?

5            Answer:  In a general sense, yes."

6            Were you asked that question and did you give

7    that answer under oath?

8            A.   Yeah, and I agree with that answer still.

9            Q.   And once you go on to the specific surgery

10   at issue, there are potential complications with each

11   specific surgery, correct?

12           A.   Each surgery has its own unique

13   complications.

14           Q.   And that's true with surgeries in the

15   pelvic floor, correct.

16           A.   That is correct.

17           Q.   There is a potential of serious injury

18   with sacrocolpopexy, correct?

19           A.   Well, it depends on when you are talking

20   about injury to what?  Again, that's not to be

21   difficult but injury to the heart?  No.  Injury to the

22   organs --

23           Q.   To the patient?

24           A.   To the patient in general, there is the

Daniel S. Elliott, M.D.

```
 1    potential for -- yeah, there is potential risk there.

 2          Q.   There is a potential risk of serious

 3    injury to the patient with a colporrhaphy procedure?

 4          A.   Not in my experience there hasn't been,

 5    but, I mean, again, I need to know what kind of

 6    complication you are talking about.  I think we need to

 7    be clear.

 8          Q.   Doctor, I ask that you turn to transcript

 9    that I gave you earlier of your deposition taken on

10    November 16th.

11               MR. SLATER:  Objection.

12    BY MR. ISMAIL:

13          Q.   First transcript I gave you, Doctor.

14          A.   I have it, yes.

15          Q.   Page 244.

16          A.   344?

17          Q.   244.

18          A.   I don't have a 2 -- mine starts at 200

19    something.

20          Q.   I'll give you that.

21               MR. SLATER:  Stingy with the transcripts.

22               MR. ISMAIL:  There you go.

23               MR. SLATER:  That's what I heard about

24          you.
```

Daniel S. Elliott, M.D.

```
 1              THE WITNESS:  244.

 2   BY MR. ISMAIL:

 3          Q.   Yes, sir.

 4          A.   244, I'm there.

 5          Q.   All right, Doctor.  This, again, was sworn

 6   testimony you gave and the date of this was

 7   November 16, 2012; is that correct?

 8          A.   Correct.

 9          Q.   I'm sorry, 243, Doctor.

10          A.   Okay.  I'm there.

11          Q.   Line 11.

12          "Question:  Would you agree that there's a

13   potential risk of serious --

14          Sorry, Line 7.

15          "Would you agree that there is a potential risk

16   of serious injury with the sacrocolpopexy?

17          Answer:  Yes."

18          Is that the question you were asked and answer

19   you had given?

20          A.   Yes, and I agree with that.

21          Q.   Were you also asked is there "... a

22   potential risk of serious injury with the sacrospinous

23   ligament fixation?"

24          Your answer, "In a magnitude and frequency and
```

Daniel S. Elliott, M.D.

 1    intensity and delayed onset difference but, yes,

 2    there's a risk."

 3             And then you were asked at Line 19:

 4             "Would you agree that there's a potential risk

 5    of serious injury with a sacrospinous ligament

 6    fixation?

 7             Answer:  There is -- there is a risk there for

 8    serious injury, yes."

 9             Were you asked that question and were you

10    giving that answer under oath?

11             A.   Yes, and I agree with that.

12             Q.   And then on Page 244, what I really

13    intended to direct you to in the first place, Line 2,

14    would you agree that there's a serious risk with

15    colporrhaphy?

16             What was your answer under oath?

17             A.   "Yes."

18             Q.   There are risks with hysterectomies,

19    correct, Doctor?

20             A.   Yes.

21             Q.   All prolapse surgeries have -- carry the

22    risk to other organs, correct?

23             A.   Again, yes.  We have to define what organ

24    but --

Daniel S. Elliott, M.D.

1        Q.    Right, I'm not talking about the heart.

2    I'm talking about the organs near the surgery that

3    you're performing.

4        A.    Correct, that -- that is an inherent risk

5    with operating in that region, yes.

6        Q.    There is an inherent risk of operating in

7    that region of injuries to the nerves of the patient,

8    correct?

9        A.    Well, it depends what nerves you are

10   talking about and it depends what prolapse surgery,

11   that's why sacrospinous fixation I was very specific

12   on, okay, or semi-specific.

13        The risks of sacrospinous fixation are comp --

14   significantly different than abdominal sacrocolpopexy

15   or more significant than anterior colporrhaphy.

16        So, again, as far as nerve injury, it depends

17   what nerves that we're talking about.

18        Q.    Page 89 of the November 15, 2012

19   testimony.

20        A.    Okay.  I'm there.

21        Q.    Line 21, were you asked this question:

22        "All prolapse surgeries have a risk to nerves?"

23        What was your sworn answer, Doctor?

24        A.    You know, yeah, I see that, I say --

Daniel S. Elliott, M.D.

1          Q.   My question is what was your sworn answer,

2   Doctor?

3          A.   "Yes."

4          Q.   Thank you.

5          All prolapse surgeries have a risk of pain,

6   correct?

7          A.   Again, I'd have to define the severity,

8   the frequency, et cetera, but pain, to a certain

9   degree, is a risk of all prolapse surgeries.

10         Q.   That's inherent to the surgery, right?

11         A.   That's inherent to that specific surgery,

12   correct.

13         Q.   All prolapse surgeries have a potential

14   risk of pain with sexual intercourse, correct?

15         A.   Yes.  Again, as I'll state over and over,

16   it depends upon the severity, the frequency, the

17   progressive nature, but, yes, dyspareunia, pain with

18   intercourse, can't happen with all of them, but they

19   might not all have the severity of the pain.

20         Q.   Page 90 of your testimony, Doctor, Line 2:

21         "Question:  All prolapse surgeries have a

22   potential risk of dyspareunia; correct?"

23         What was your answer, sir?  Line 4.

24         A.   Yeah, yes, I state it that there, as I've

Daniel S. Elliott, M.D.

1    clarified today.

2            Q.   All prolapse surgeries have a potential

3    risk of pelvic pain, correct?

4            A.   Again, dependent upon the procedure and

5    the severity, they can be different, but they can all

6    have pain, but, again, it depends upon that specific

7    procedure.

8            Q.   Line 5 of Page 90 of your testimony:

9            "Question:  All prolapse surgeries have a

10   potential risk of pelvic pain; correct?"

11           What was your sworn answer under oath, sir?

12           A.   "Yes," with the clarifier I just did.

13           Q.   In fact, persistent pain is a complication

14   of prolapse surgeries other than the Prolift®, correct?

15           A.   Again, that depends upon the severity and

16   frequency.  There's clarifiers.

17           Q.   Turn to page -- of the November 16

18   testimony, Doctor.  Line 21.

19           A.   What page?

20           Q.   I'm sorry.  454.

21           A.   454, Line 21, okay, I'm there.

22           Q.   "Question:  Persistent pain is a potential

23   complication with other prolapse surgeries besides

24   Prolift®, correct?"

Daniel S. Elliott, M.D.

1           What was your sworn testimony under oath, sir?

2           A.   Yeah, as I said --

3           Q.   What was your testimony, sir?

4           A.   I agree with that statement, yes, with the

5      clarifiers I added today.

6           Q.   You didn't add those clarifiers at the

7      time when you were giving your sworn testimony, true?

8           A.   I did not, no, you are correct.

9           Q.   As a surgeon any time you perform a

10     prolapse surgery, re-operation is a potential risk

11     going into the surgery, correct?

12          A.   That is correct, yes.

13          Q.   And just like you've never guaranteed a

14     patient that a surgery will be complication-free,

15     you've never guaranteed a patient that a surgery

16     necessarily will be effective, correct?

17          A.   Effective as far as treating the symptoms

18     and the anatomical occurrence, I agree with you, yes.

19          Q.   There can be re-operation because of a

20     failure of the prolapse surgery in doing its intended

21     job of fixing the prolapsing problem, correct?

22          A.   That is a risk, yes.

23          Q.   And that's inherent to all prolapse

24     surgeries, correct?

Daniel S. Elliott, M.D.

1        A.    I don't know of any procedure that is 100%

2    perfect.

3        Q.    There could also be a need for

4    re-operation to -- because a complication has occurred,

5    that necessitates some surgical intervention, correct?

6        A.    Well, again, re-operation can occur, but,

7    again, we have to look at what type of complication it

8    is, how severe it is and can we fix it, but, yes, in a

9    general sense, I agree with you.

10        Q.    And that's inherent to all prolapse repair

11    surgeries, correct?

12        A.    Yes, as I mentioned with all those

13    different qualifiers on there.

14        Q.    You testified this morning about the term

15    mesh exposure; do you recall?

16        A.    Yes.

17        Q.    And you indicated that sometimes the

18    terminology in this area can get -- get confusing

19    because folks use different terms to describe different

20    things?

21        A.    That is correct.

22        Q.    And so whenever you're reviewing any

23    document that talks about complications for mesh

24    surgery, you want to make sure you understand whether

Daniel S. Elliott, M.D.

1    the author -- what the author means by a mesh exposure

2    versus mesh erosion, et cetera?

3         A.   That is correct, including the term

4    palpable.

5         Q.   Mesh exposure is a well known risk of any

6    surgery involving mesh, correct?

7         A.   That is true.

8         Q.   Whether the mesh is placed transvaginally

9    or transabdominally, correct?

10        A.   Correct.  Again, there is going to be

11   differences in frequency and severity, but, yes.

12        Q.   And so when we're talking about mesh

13   exposure we're talking about when the implanted mesh

14   becomes visible or palpable?

15        A.   In the vagina, correct, not in the bladder

16   or another organ, that's different.

17        Q.   Correct.

18             And that's called a mesh erosion, right?

19        A.   It should be called that but there will be

20   different terms, that's why it gets confusing for

21   everybody.

22        Q.   So that goes back to how we started this

23   part of our discussion, the terms exposure and erosion

24   sometimes are used interchangeably, but, in your view,

Daniel S. Elliott, M.D.

1    there's a clear distinction between them?

2         A.   Correct.  You would have to look, when

3    going through medical records, of what the doctor is

4    actually really describing, what they actually saw.

5         Q.   The amount of mesh exposed can be small,

6    correct?

7         A.   It can be, yes.

8         Q.   Mesh exposure actually can be

9    asymptomatic, right?

10        A.   It can be, yes.

11        Q.   When we say "asymptomatic," that means the

12   patient is not experiencing any symptoms from the mesh

13   exposure, correct?

14        A.   That is correct, yes.

15        Q.   When dealing with a mesh exposure the

16   physician can try conservative measures to treat it,

17   right?

18        A.   That is one of the options, yes.

19        Q.   And you certainly advocate conservative

20   methods to treat a mesh exposure, correct?

21        A.   It depends on the severity of the mesh

22   exposure.  If it's large, highly symptomatic, then, no.

23   If it's small, asymptomatic, then, yes, as initial

24   treatment.

Daniel S. Elliott, M.D.

1        Q.   Okay.  I appreciate the clarification but

2   just so it's clear, a doctor should consider, in the

3   first instance, whether conservative treatment of a

4   mesh exposure is warranted or whether something more

5   invasive would be appropriate; is that fair to say?

6        A.   That is correct, yes.

7        Q.   Now, with regard to the Prolift®, you

8   agree that approximately 50% of mesh exposures can be

9   treated conservatively?

10        A.   That is, I'd say, old data.  If you look

11   at Abbott, et.al., no, they disagree with that, but of

12   those 50% treated conservatively, 50% of those went on

13   to surgery.  So the old data, yes, but not the new

14   data.

15             MR. ISMAIL:  Move to strike as

16        nonresponsive.

17   BY MR. ISMAIL:

18        Q.   If you have your November 15 --

19        A.   2012, yeah, because that's old.

20        Q.   All right.  Well, let me make sure we're

21   clear.

22        A.   Sure.

23        Q.   At the time you gave your sworn testimony

24   in this case you agreed that approximately 50% of mesh

Daniel S. Elliott, M.D.

1   exposures can be treated conservatively, true?

2              MR. SPECTER:  Counsel -- pardon me,

3         counsel.  I object.  When you say "in this

4         case" are you talking about the Hammons case or

5         the transvaginal mesh litigation generally?

6              MR. ISMAIL:  I will rephrase.

7              MR. SPECTER:  Thank you.

8   BY MR. ISMAIL:

9         Q.   At the time of your November 2012

10  deposition did you agree, Doctor, that approximately

11  50% of mesh exposures can be treated conservatively?

12        A.   Yes, I agree with you specifically in

13  2012, but that's what I'm saying, new data has come out

14  to say that I was incorrect at that time.

15             MR. ISMAIL:  Move to strike as

16        nonresponsive and hearsay everything after

17        "yes."

18  BY MR. ISMAIL:

19        Q.   The conservative ways of treating a mesh

20  exposure with Prolift® would include just watching and

21  observing the patient to see how she is doing?

22        A.   It has to be a case by case situation.

23        Q.   We've described that conservative

24  treatment of a mesh exposure is sometimes available for

Daniel S. Elliott, M.D.

1    a physician and patient, correct?

2           A.    Correct.

3           Q.    And I'm trying to define for the jury what

4    that means when we say "conservative treatment," okay?

5           A.    Okay.

6           Q.    When we say conservative treatment of a

7    mesh exposure, what we're saying is the physician and

8    patient can do nothing but observation to see if the

9    problem improves, correct?

10          A.    That is a treatment option based upon a

11   case by case situation.  You have to evaluate all the

12   variables.

13          Q.    And sometimes a conservative treatment

14   option would include use of a topical estrogen cream,

15   correct?

16          A.    That is one of the options, yes.

17          Q.    Less conservative treatment would include

18   excising the exposed mesh, correct?

19          A.    That is correct.

20          Q.    The -- if a -- withdrawn.

21          Sometimes an excision of exposed mesh can be

22   done in a ten or 15 minute procedure, correct?

23          A.    I can't speak to that.  I have not done

24   that.

Daniel S. Elliott, M.D.

1        Q.   You're aware, Doctor, that some exposed

2   meshes that have gone on to excision can be done in a

3   ten or 15 minute procedure?

4        A.   I don't doubt that it can be done.  The

5   question is how effective it is.

6        Q.   Now, this other term that you used,

7   erosion, that was a term that you used with Mr. Slater

8   this morning, correct?

9        A.   That is correct.

10        Q.   And you've defined a mesh erosion to mean

11   when the mesh enters an adjacent organ, correct?

12        A.   Correct, that would be the current

13   terminology.

14        Q.   And that's different than a vaginal

15   exposure of mesh, correct?

16        A.   That is correct, yes, but we have to be

17   careful on who is doing the defining on medical records

18   and things, but, yeah.

19        Q.   Mesh erosion is a well-known risk of any

20   mesh surgery using -- withdrawn.

21        Mesh erosion is a well-known risk of any mesh

22   surgery, correct?

23        A.   Yeah, but, again, it's going to depend

24   upon which -- you are talking anti-incontinence

Daniel S. Elliott, M.D.

```
 1   procedure, prolapse, transabdominal, robotic.  There is
 2   going to be different risks, severity of the risk of
 3   frequency, but, yes, I agree with you.
 4            Q.   You mentioned urinary dysfunction this
 5   morning in some of your answers to Mr. Slater; do you
 6   recall that?
 7            A.   Yes, I do.
 8            Q.   Urinary dysfunction can be a complication
 9   of numerous prolapse surgeries other than with a
10   Prolift®, correct?
11            A.   Again, as I've mentioned, severity,
12   frequency, ability to treat it is going to be
13   different, but it can occur.
14            Q.   In fact, a woman can have voiding
15   dysfunction just from a prolapse in her bladder,
16   correct?
17            A.   That can occur.  It's relatively rare,
18   but, yes, it can occur.
19            MR. ISMAIL:  Mr. Slater, during the course
20            of my examination we have sought clarification
21            for the agreement that you say exists regarding
22            payments to witnesses and the feedback that
23            we've gotten -- that I've gotten is that my
24            line of question is perfectly appropriate.
```

Daniel S. Elliott, M.D.

1           MR. SLATER:  Who did you speak to?  You

2      want to do this on the record?

3           MR. ISMAIL:  Do I want to -- say what now?

4           MR. SLATER:  Do you want to have this

5      conversation on the record?

6           MR. ISMAIL:  I'm telling you that I'm --

7           MR. SLATER:  Who did you talk to?

8           MR. ISMAIL:  We've been doing it by

9      e-mail.

10           MR. SLATER:  With who?

11           MR. ISMAIL:  With the -- I think you

12      called them national folks.

13           MR. SLATER:  No, the national folks

14      weren't in the room when it was made so --

15           MR. ISMAIL:  Well, who -- okay, then

16      perhaps.

17           MR. SLATER:  It was during the deposition

18      of Dr. Weber, the Tucker Ellis lawyers.

19           MR. ISMAIL:  That what?

20           MR. SLATER:  Look, I don't know what

21      they're telling you so --

22           MR. ISMAIL:  Wait a minute.

23           MR. SLATER:  That was what was agreed and

24      look at what they questioned Dr. Weber on, look

Daniel S. Elliott, M.D.

```
1              at the questioning in the other depositions.

2                   MR. ISMAIL:  Wait.  So you are saying that

3              in our examination of Dr. Weber we agreed not

4              to ask Dr. Weber --

5                   MR. SLATER:  Total amount she was paid

6              outside the case, yes.  She was only asked

7              about what she was paid in this case.

8                   MR. ISMAIL:  And the agreement was inn

9              exchange for what?

10                  MR. SLATER:  We would do the same with

11             your experts.

12                  MR. ISMAIL:  But did you ask our experts

13             about how much they were paid.

14                  MR. SLATER:  I didn't.

15                  Yeah, in this case.

16                  MR. ISMAIL:  No, no, in other cases.

17                  MR. TOMASELLI:  Ms. Baldwin.

18                  MR. SLATER:  Well, I don't know what to

19             tell you about that.  Someone should have

20             objected, but, you know, I can just tell you

21             that --

22                  MR. ISMAIL:  Okay.  So --

23                  MR. SLATER:  I don't know why you are

24             shaking your head.  This is the agreement.  If
```

Daniel S. Elliott, M.D.

```
 1          she asked a question like that, maybe someone

 2          in the room could have said to her, hey, did

 3          you forget about the deal?  And then she -- if

 4          she forgot she would have said okay, but I'm

 5          not going to change, okay.

 6               Dr. Elliott didn't prepare to talk about

 7          total amounts he was paid and that's not what

 8          we're going to get into today.  That was the

 9          agreement in this litigation.  In the

10          conversations I was in and with the experts I'm

11          handling, that's how it's been done.  If

12          Ms. Baldwin went beyond because she forgot,

13          someone on your side should have been awake and

14          said, hey, we have an agreement, and I'm sure

15          she would have said, oh, I forgot.

16               MR. ISMAIL:  Or that's not the agreement.

17               MR. SLATER:  I think that it clearly was.

18          Did you look at Dr. Weber's transcript?

19               MR. ISMAIL:  I actually have had a chance

20          to read Dr. Weber's transcript.

21               MR. SLATER:  Did you see what she was

22          asked about?

23               MR. ISMAIL:  I know what she was asked

24          about.  Whether Dr. Weber was asked or not does
```

Daniel S. Elliott, M.D.

1           not make it an agreement.

2                MR. SLATER:  Was it placed on the record,

3           on the transcript or was it just agreed with me

4           and Mr. Moriarity and he's not telling you what

5           we talked about?  I mean, you think he didn't

6           ask her about what she's been paid in total

7           because he didn't feel like it?

8                MR. ISMAIL:  So I'm just --

9                MR. SLATER:  I know for a fact we made

10          this agreement.

11               MR. ISMAIL:  Okay.

12               MR. SLATER:  So I'm not going to change my

13          position because when I make a deal with

14          somebody, I abide by it and I expect them too

15          also and not send two new lawyers in to pretend

16          they didn't know about it.

17               MR. ISMAIL:  Okay.  We have --

18          Mr. Moriarity is one of the lawyers with whom

19          we checked.

20               MR. SLATER:  He is the one I reached the

21          deal with so I will be happy to speak to him

22          directly.

23               MR. ISMAIL:  Terrific.  So my reference

24          to --

Daniel S. Elliott, M.D.

1              MR. SLATER:  Want to take a break and put

2         him on the telephone?

3              MR. ISMAIL:  Jesus, can I actually finish

4         my statement?

5              MR. SLATER:  I don't know, can you?

6              MR. ISMAIL:  You keep interrupting me.

7              MR. SLATER:  Sorry.

8              MR. ISMAIL:  So our understanding of what

9         you describe as a deal regarding expert

10        payments and bias is different.  Your

11        colleagues in this litigation have not acted as

12        if there is an agreement to that issue.  You

13        have asked and your team has asked those

14        questions so we don't think your standing on

15        some blanket objection to covering this with

16        Dr. Elliott is appropriate and to the extent

17        you are correct and some time down the line the

18        Court agrees with you, then that won't get

19        played, but we're all here on a Saturday to

20        accommodate Dr. Elliott's schedule --

21             MR. SLATER:  We're not doing it.

22             MR. ISMAIL:  -- and the appropriate thing

23        to do is to let him answer the question so that

24        we don't have to reconvene testimony of

Daniel S. Elliott, M.D.

```
1          Dr. Elliott to get what would be bias

2          information because you don't want to do it

3          now, and if you're right, then it doesn't get

4          played to the jury so you are not prejudiced.

5               MR. SLATER:  We're not doing it.  In fact,

6          if you talk to national counsel in the MDL you

7          will find that is the agreement throughout the

8          national litigation on both sides.

9               Have you spoken to them?

10               MR. ISMAIL:  Who is the national counsel

11          in the MDL?

12               MR. SLATER:  Butler Snow.

13               MR. ISMAIL:  Yeah, we've checked with them

14          too.

15               MR. SLATER:  And there's -- in the MDL

16          people are not limiting it to the amount you

17          were paid in that case?

18               Judge Goodman ruled that when a witness

19          testifies in these trials it's not to be asked

20          about.

21               MR. ISMAIL:  I understand, but the rules

22          in Pennsylvania are different.

23               MR. SPECTER:  Actually, counsel, the rules

24          in Pennsylvania are informed by Maughan versus
```

Daniel S. Elliott, M.D.

```
 1          Hahnemann, which I suggest you read.

 2               MR. ISMAIL:  I did check the rules on

 3          whether bias can be -- and whether a witness

 4          has been -- has received a significant amount

 5          of income testifying on behalf of a certain

 6          side, that information is relevant and goes to

 7          the jury.

 8               So I'm offering these observations and

 9          inviting you to do the sensible thing here and

10          let the witness answer and we can fuss later

11          what gets played to the jury.  If we're right,

12          it gets played; if you're right, it doesn't get

13          played.

14               MR. SLATER:  We abide by our agreements,

15          nor do we fabricate different agreements.

16               MR. ISMAIL:  Okay.

17               MR. SLATER:  I once heard someone say

18          that.

19               MR. ISMAIL:  So for the purposes of

20          preserving my record, you're going to instruct

21          Dr. Elliott to refuse to answer any questions

22          about the amount of money he has been paid,

23          other than the time relating to Ms. Hammons,

24          correct?
```

Daniel S. Elliott, M.D.

1           MR. SLATER:  Exactly, because that's the

2      agreement we have in this litigation.

3           MR. ISMAIL:  All right.  And so no matter

4      how I phrase the question as to the amount of

5      money that Dr. Elliott has been paid by the

6      plaintiffs to testify against Ethicon in

7      particular or other manufacturers, you are

8      going to instruct him not to answer, correct?

9           MR. SLATER:  If you ask him beyond

10     Hammons, he's not going to answer.

11          MR. ISMAIL:  When did he begin working on

12     Hammons, so I know how to phrase the question?

13          MR. SLATER:  I have no idea.  Why don't

14     you ask him?

15          MR. ISMAIL:  Well, I don't think he knows

16     either.

17          As of what date are you going to let him

18     answer the question?

19          MR. SLATER:  Why don't you ask him "how

20     much money have you been paid in this case to

21     your knowledge," and he will do his best to

22     answer the question.

23          MR. SPECTER:  You are talking about the

24     Hammons case, Adam?

Daniel S. Elliott, M.D.

```
 1              MR. SLATER:  Yeah, in the Hammons case.

 2              MR. ISMAIL:  I suspect we're going on --

 3         never mind.  Okay.  We can go back on the

 4         record.

 5              THE VIDEOGRAPHER:  Never off.

 6              MR. ISMAIL:  We have been on the record

 7         this whole time?

 8              THE VIDEOGRAPHER:  Yes.

 9              MR. ISMAIL:  Excellent.  Glad all that was

10         on the record.

11    BY MR. ISMAIL:

12         Q.   Okay.  Now we can go back with the

13    questioning, Doctor.

14              Among the specific risks that are well known

15    with any pelvic floor surgery is the risk of

16    dyspareunia following the surgery, correct?

17         A.   Again, as I've mentioned, the severity,

18    frequency and ability to treat is going to be different

19    between the procedures, but there is a known risk with

20    each procedure.

21         Q.   During your fellowship you were aware that

22    there was a risk of dyspareunia with prolapse surgeries

23    you were being trained on, correct?

24         A.   Again, as I mentioned, severity and
```

Daniel S. Elliott, M.D.

1    frequency and ability to treat is going to be different

2    between each procedure.

3              Q.   So the answer to that is yes?

4              A.   Well, again, I have to -- I can't just

5    give a yes or no because it's dependent upon each

6    specific procedure.  Sacrospinous ligament fixation is

7    different than uterosacral, it's different than

8    anterior colporrhaphy and posterior colporrhaphy.

9              Q.   So let's focus on the colporrhaphy

10   procedure.  Those are the native tissue surgeries

11   that -- some of the older surgeries that were used to

12   treat a prolapse, correct?

13             A.   Correct.

14             Q.   You were aware -- withdrawn.

15             You acknowledge that women with -- who have

16   anterior colporrhaphy can suffer from pain with sexual

17   intercourse after they've had the surgery, correct?

18             A.   Again, with the issue of the severity,

19   frequency and ability to treat it, yes.

20             Q.   During your residency you were aware that

21   there was a potential risk of painful sexual

22   intercourse with colporrhaphy surgeries, correct?

23             A.   I don't know.  We're going back a long

24   time there.  I didn't learn much in residency on

Daniel S. Elliott, M.D.

1    prolapse, that's why I did a fellowship.

2         Q.   All right.

3         A.   So I can't speak with accuracy of what I

4    knew then.  Fellowship is a different story.

5         Q.   Let me rephrase my question so -- to make

6    it easier for you.

7              During your medical training you were aware

8    that there was a potential risk of dyspareunia, painful

9    intercourse with colporrhaphy surgeries, true?

10        A.   Again, I was aware of that issue

11   occurring, but, again, the severity, frequency and

12   ability to treat it is going to be different, but, yes.

13        Q.   When it comes to posterior colporrhaphy

14   the risk of painful sexual intercourse is actually

15   higher than with the anterior repair, correct?

16        A.   You can have papers saying both ways as

17   far as higher and lower, depending upon are you doing a

18   spot repair, are you doing a standard plication, are

19   you using -- so, again, if you compare anterior versus

20   posterior, posterior is going to have a potentially

21   higher risk.

22        Q.   Now, there are many factors that can lead

23   to dyspareunia, correct?

24        A.   Multifactorial is a correct answer, yes.

Daniel S. Elliott, M.D.

1    Q.   There are many different things that have

2    to be and should be considered when evaluating a woman

3    for dyspareunia, correct?

4    A.   Multiple factors should be considered,

5    yes, that's true.

6    Q.   We talked earlier about the fact that

7    women can have dyspareunia from a prolapse itself,

8    correct?

9    A.   That can happen.  It's going to be a

10   different type of dyspareunia but dyspareunia, again,

11   it's a generic term.  We're talking if they have a

12   major vault prolapse, they are going to have a

13   different level of discomfort than a sacrospinous

14   fixation or more specific prolapse.

15   Q.   Vaginal atrophy can lead to dyspareunia,

16   correct?

17   A.   Yeah, and usually it's treatable or

18   reducible.

19   Q.   One of the -- and just so we explain to

20   the jury what we mean by vaginal atrophy, one of the

21   things that can occur as a result of menopause is that

22   the woman doesn't make as much estrogen following

23   menopause, correct?

24   A.   Correct.

Daniel S. Elliott, M.D.

1        Q.   And the decline or decrease in estrogen

2   can lead to vaginal atrophy, correct?

3        A.   Correct.

4        Q.   And vaginal atrophy is something that is

5   associated with menopause, correct?

6        A.   Correct.

7        Q.   And vaginal atrophy is a condition that

8   women have that can progress or get worse as women age,

9   correct?

10       A.   If left untreated, yes.

11       Q.   A vaginal hysterectomy carries the risk of

12   dyspareunia, correct?

13       A.   Yeah.  Again, it depends upon the

14   condition being treated.  If it's a uterine prolapse,

15   dyspareunia goes -- or is reduced.  If it's for some

16   other reason, it could be increased.  So, again, we

17   have to look at the specifics.

18       Q.   I just want to make sure you have my

19   question in mind because I'm not sure -- it seemed like

20   you are answering a different question.

21            The question is, Doctor, a vaginal hysterectomy

22   carries the risk of dyspareunia, true?

23       A.   Yeah, I was being -- I was being more

24   specific as the cause, the etiology of the prolapse.

Daniel S. Elliott, M.D.

1    If you just took a generic hysterectomy, can

2    dyspareunia be associated with that?  To some extent

3    the answer to that is yes.

4         Q.   Now, let me ask it this way:  You would

5    agree that there's a background rate of women who have

6    dyspareunia who have never had any prolapse surgery,

7    correct?

8         A.   That is correct, there is a given

9    percentage that probably increases with age, but,

10   again, we don't know the severity of that and ability

11   to treat it.

12        Q.   The question of whether dyspareunia is

13   associated with prolapse surgery, is something that has

14   been evaluated in randomized controlled clinical

15   trials, correct?

16        A.   Off the top of my head I can't think of

17   the study that has looked at that, but, yeah, I mean,

18   that is a very -- or it should be a very common thing

19   to look at.

20        Q.   You are aware, Doctor, for your work in

21   this litigation that randomized controlled clinical

22   trials have considered whether patients who are

23   surgically -- had prolapse surgically repaired develop

24   dyspareunia, correct?

Daniel S. Elliott, M.D.

```
 1              MR. SLATER:  Objection.

 2              THE WITNESS:  Correct, I would want to

 3         look at those specific studies because you have

 4         to look at how they are framed, but there are

 5         studies out there.  I think Lowman, et.al.

 6         perhaps is the name.  There's going to be

 7         others.

 8   BY MR. ISMAIL:

 9         Q.   I'm not referring to a specific article

10   now, Doctor, I'm just asking whether you are aware, as

11   part of your work in this case, that randomized

12   controlled clinical trials, some of them, have looked

13   at whether a patient who had a surgical repair of

14   prolapse developed dyspareunia?

15              MR. SLATER:  Objection to this, vague

16         types of questioning.  Subject to tie up, you

17         can answer it.

18              THE WITNESS:  You know, looking at the

19         totality of studies out there, yeah, there are

20         studies out there which dyspareunia is a

21         component what they look at.  If you are

22         looking at one specifically on dyspareunia and

23         long term, those are going to be fewer.

24   BY MR. ISMAIL:
```

Daniel S. Elliott, M.D.

1          Q.   You're aware that there are randomized

2     controlled clinical studies that have compared the

3     development of dyspareunia following surgery with a

4     group of patients who have had a Prolift® and a group

5     of patients who had native tissue repair?

6          A.   Those studies have been done, yes.

7          Q.   And what those studies allow you to do is

8     see whether -- which group of patients developed

9     dyspareunia and at what rates, correct?

10         A.   Yes and no.  During that study period,

11    yes, but it doesn't say anything beyond that.

12         Q.   Then let me rephrase.

13         One of the things that randomized controlled

14    clinical studies can do in this context that we've been

15    discussing is see, for example, whether during the

16    study period more patients who had the native tissue

17    surgery developed dyspareunia compared to the Prolift®,

18    correct?

19         A.   Yes, as you phrased it there, during the

20    study period, I agree with you.

21         Q.   And you are familiar that those kinds of

22    studies have been done comparing Prolift® to native

23    tissue surgery, true?

24         A.   There have been several studies out there

Daniel S. Elliott, M.D.

1    along those lines, yeah.

2          Q.   Certain randomized controlled clinical

3    studies have also assessed whether patients reported an

4    improvement in sexual function following prolapse

5    surgery, correct?

6          A.   Again, I'd want to see the specific study

7    we're referring to.

8          Q.   I'm just asking about your awareness of

9    the body of scientific information when you came to

10   testify today.

11         A.   I'm aware of many studies looking at many

12   things, but each study has to be analyzed very

13   specifically.

14         Q.   I'm just asking generally, Doctor, whether

15   you're aware whether there are randomized controlled

16   clinical studies that have examined whether women have

17   reported improvements in sexual function following

18   prolapse surgery?

19         A.   Yeah, there are studies out there that

20   looked at sexual function following surgery, whether

21   they improve or are worsened.

22         Q.   And you're aware, Doctor, that certain

23   women report improvement in sexual function following

24   surgery with a Prolift®, right?

Daniel S. Elliott, M.D.

1         A.   Yeah.  Again, we have -- I need to see

2   specifics, but in a very general sense that has been

3   reported during that study period.  I can't speak to

4   afterwards though.

5         Q.   You earlier, Doctor, read some portion

6   of -- withdrawn.

7         You made some -- withdrawn.

8         As you come here today having considered the

9   information that you've described for us earlier with

10  respect to the Prolift® or the Gynemesh® you have not

11  seen any study that has shown a dyspareunia rate of 60%

12  in women using the Prolift®, true?

13        A.   60%?  I mean, I'm not going to be --

14        Q.   That's the number you used earlier in your

15  testimony which is why I asked.

16             MR. SLATER:  Objection,

17             mischaracterization and foundation.

18             THE WITNESS:  Yeah, I'd have to see what I

19             said.  I don't know what we're -- it's been a

20             long day so I don't recall those specifics.

21             I'd have to see what I said.

22  BY MR. ISMAIL:

23        Q.   Then let's clarify.

24        As you sit here now, Doctor, you are not trying

Daniel S. Elliott, M.D.

1    to suggest to the jury that there are studies that

2    report a 60% dyspareunia rate with Prolift®, are you?

3          A.   I'm not prepared -- without looking at the

4    literature, I can't say one way or the other it was

5    60%, no.

6          Q.   I want to make -- I think we had a double

7    negative in there.

8          You agree, as you sit here today, you are not

9    suggesting to the jury that there are studies reporting

10   a 60% dyspareunia rate with Prolift®, true?

11         A.   Yeah, right now as I sit here, I can't

12   recall that study.

13         Q.   And, Doctor, you're aware of randomized

14   controlled clinical studies that have shown during the

15   study period that Prolift® has no higher rate of

16   dyspareunia compared to native tissue surgery, true?

17         A.   Well, again --

18              MR. SLATER:  Objection.

19              MR. SPECTER:  Pardon me, counsel.

20              MR. SLATER:  Objection.

21              MR. SPECTER:  Let me just interpose an

22         objection if I may, counsel.  You have several

23         times now made reference to literature without

24         showing it to the witness, without asking if

Daniel S. Elliott, M.D.

1              it's authoritative.  That can't be evaluated by

2              the witness or by opposing counsel so I object

3              to all those questions, including that past

4              one, for that reason.

5                   MR. SLATER:  That was part of my objection

6              previously too, when I asked about tie up

7              because I don't think it's appropriate.

8                   MR. ISMAIL:  Well, first of all, I'm not

9              sure who is objecting and who isn't anymore

10             but --

11                  MR. SPECTER:  We both were.

12                  MR. ISMAIL:  Clearly.

13   BY MR. ISMAIL:

14             Q.   Doctor, here is my question and if you

15   tell me you don't know, then you tell me you don't

16   know.

17             Are you aware of randomized controlled clinical

18   trials that have shown that for the study period

19   Prolift® was not associated with an increased risk of

20   dyspareunia?

21                  MR. SLATER:  Objection, same reasons

22             previously stated and --

23                  THE WITNESS:  Again --

24                  MR. SLATER:  And one second -- and we're

Daniel S. Elliott, M.D.

```
 1              going to move to strike all these questions at
 2              the appropriate time because they're
 3              inappropriate.
 4                   THE WITNESS:  Again, this is very
 5              frustrating for me because I need to see these
 6              papers and whenever I bring up a paper's name,
 7              you move to strike it and so now when you are
 8              asking, I ask for the paper and so I can't see
 9              it.  So I need to look at the paper, the
10              quality of the paper and let's discuss each
11              paper.
12                   MR. ISMAIL:  Move to strike as
13              nonresponsive.
14     BY MR. ISMAIL:
15         Q.   You can't answer my question, Doctor?
16         A.   I just did.  I can't -- you are correct,
17     as you are phrasing it, I can't.  I want to see those
18     papers.
19         Q.   All right.  Do you have your testimony
20     that you gave on March 4, 2015, sir?
21         A.   Yes, I do.
22         Q.   Page 539, Line 24.
23         A.   539.
24         Q.   Yes, sir.
```

Daniel S. Elliott, M.D.

1          A.    539, Line 4.  I'm there.

2          Q.    Sorry, Line 23.

3          A.    Oh, I'm sorry.  23, yes.

4          Q.    "Question:  And as reported in the

5    studies, am I correct that there has been no difference

6    or no showing among the studies we've talked about to

7    suggest that Prolift® has a higher rate of dyspareunia

8    than the native tissue?

9          Answer:  I agree with -- as you stated that

10   question, I agree with the caveat as I mentioned

11   before."

12         And then you were asked to answer that question

13   yes or no.

14         And at Line 13 you said, I agree with you as

15   stated, yes.

16         Is that your sworn testimony?

17         A.    That's what I state there.  I don't know

18   what studies we're referring to.

19         Q.    So you can put that aside, Doctor, and let

20   me ask it this way: without reference to the testimony,

21   do you now recall, Doctor, that there are randomized

22   controlled clinical trials that have demonstrated for

23   the study period that Prolift® is not associated with

24   an increased rate of dyspareunia compared to native

Daniel S. Elliott, M.D.

1    tissue surgeries?

2           A.   Again, I was very specific with that

3    testimony and being consistent, you know, there are a

4    lot of clarifiers you have on there.  During the study

5    period, randomized control, I would want to see those

6    studies.  We can talk about each one individually, but

7    that's what I stated on March 4.  I stand by that.

8           Q.   My question is different, Doctor.  I'm not

9    asking with regard to the testimony.  I'm asking about

10   your recollection now.

11          A.   Okay.

12          Q.   My ques -- my purpose was to refresh your

13   recollection, okay?

14          A.   Okay.

15          Q.   So here's my question:  Do you recall, as

16   you sit here today, that there are randomized

17   controlled clinical studies that have shown for the

18   study period that Prolift® is not associated with an

19   increased risk of dyspareunia compared to native

20   tissues?

21               MR. SLATER:  Objection, it's the same

22          objection.  And I just want to say one other

23          thing, I've looked at the testimony now, your

24          foundation is -- it's a mischaracterization and

Daniel S. Elliott, M.D.

```
1              lack of foundation for this line of questioning
2              about RCTs versus the testimony you read.  You
3              should look at the line of questioning.  It's
4              not based on an RCT, but go ahead.
5                   MR. ISMAIL:  So I will restate my question
6              so you have it in mind.
7                   THE WITNESS:  Well, no --
8                   MR. ISMAIL:  No, I will and to address
9              Mr. Slater, I have the option of refreshing the
10             witness' recollection without showing the
11             testimony and that's what this question is,
12             okay?
13                  MR. SLATER:  Without showing the
14             testimony?
15                  MR. ISMAIL:  Yes, on the screen to the
16             jury, that's what refreshing recollection is.
17             You don't publish it to the jury.  So which
18             I --
19                  MR. SLATER:  No, I'm just telling you that
20             what you did was, in my opinion, inappropriate
21             and a mischaracterization of what actually was
22             going on there.
23                  MR. ISMAIL:  I got your question -- I got
24             your objection, so here's my question.
```

Daniel S. Elliott, M.D.

1    BY MR. ISMAIL:

2         Q.   Doctor, without reference to the

3    testimony, let me start over, okay.  You can put it

4    aside.

5         As you sit here today, sir, do you have a

6    recollection that there are randomized controlled

7    clinical studies that have shown for the study period

8    that Prolift® is not associated with an increased

9    increase of dyspareunia compared to native tissue

10   surgeries?

11        A.   Okay.  With my hands being somewhat tied,

12   because I can't look at these studies, I do have a

13   recollection of there being studies, in the short term,

14   that can show it being equivocal or not statistically

15   different between Prolift® and the native repairs.

16        Q.   Okay.  And when you say "not statistically

17   different" in your last answer, just so that the jury

18   is clear, researchers perform a statistical

19   significance test often when doing clinical research,

20   correct?

21             MR. SLATER:  Objection,

22        mischaracterization, lack of foundation.

23             THE WITNESS:  Correct.

24   BY MR. ISMAIL:

Daniel S. Elliott, M.D.

1          Q.   And when we talk about statistical

2     significance in clinical research, that is a process by

3     which you say is the observation we're looking at

4     potentially by chance or is it -- you know, fairly

5     represent what the outcomes with the treatment being

6     offered, correct?

7          A.   Correct, if it's by chance or if it's a

8     real finding.

9          Q.   And your last answer was -- withdrawn.

10          One second.  Let's break for one minute.

11               THE VIDEOGRAPHER:  Off the record.  2:52

12          and we are off the record.

13               (Brief recess.)

14               THE VIDEOGRAPHER:  The time is 3:16 and we

15          are back on the record.

16     BY MR. SLATER:

17          Q.   Dr. Elliott, you were just asked some

18     questions about whether or not one can attribute

19     complications to a Prolift® where a woman has issues

20     after a Prolift® surgery, do you remember you were

21     asked about that by defense counsel a while back?

22          A.   Yes.

23          Q.   If a patient as a mesh erosion, are you

24     able to say, just knowing that, that the Prolift® is a

Daniel S. Elliott, M.D.

1    factor in that complication?

2              MR. ISMAIL:  Objection, incomplete

3         hypothetical.

4              THE WITNESS:  Yes.

5    BY MR. SLATER:

6         Q.   And why is that?

7         A.   Without mesh there would be no erosion.

8         Q.   If a patient has mesh contraction and that

9    is causing symptoms, are you able to say that the mesh

10   and the Prolift® itself is a part of a factor in

11   causing that complication?

12        A.   Yes, without mesh there's no contraction.

13        Q.   During the questioning by defense counsel

14   you were asked several questions about the risks of the

15   Prolift® through the vagina versus the other types of

16   surgery, for example, abdominal sacrocolpopexy, and I

17   think you were trying to draw some distinctions.  I'd

18   like to give you an opportunity now to explain what the

19   distinctions are in terms of the various complications

20   or issues that can arise from these different

21   surgeries?

22        A.   Okay.  Just in general?

23        Q.   Sure.

24              MR. ISMAIL:  Objection to the narrative.

Daniel S. Elliott, M.D.

```
1                   THE WITNESS:  You have to look at the --
2          what is done during the two procedures, Number
3          one, abdominal versus going through the vagina,
4          so the risk of contamination of the mesh is
5          going to be different.  You have to look at the
6          shape of the mesh.
7               There are no arms for sacrocolpopexy, not
8          going through any muscles, so you can't have
9          that contraction pulling on muscles.
10              You can get the mesh to lay flat because,
11         again, it's not being pulled like we talked
12         about earlier with the mesh arms.
13              The volume of mesh is significantly
14         different, like when we showed -- when I picked
15         up the mesh.  In general, those are the
16         specifics.
17   BY MR. SLATER:
18         Q.   You were asked by defense counsel if there
19   are some patients who have had some improvements in
20   their quality of life and you acknowledged, yes, some
21   patients have had improvement with the Prolift®.
22         Do you remember that?
23         A.   Yes.
24         Q.   Have there been patients who have had
```

Daniel S. Elliott, M.D.

```
1    complications with the Prolift®?

2          A.   Oh, yes, yeah.

3          Q.   Have there been patients who have had

4    severe life-changing complications with the Prolift®?

5          A.   Yeah.

6               MR. ISMAIL:  Objection, lack of

7          foundation, repeating direct.

8               THE WITNESS:  Devastating complications.

9    BY MR. SLATER:

10         Q.   You were asked multiple questions about

11   suture surgeries and suture repairs.

12              Do suture surgeries have mesh-related risks?

13         A.   No.

14         Q.   You were asked a question a few minutes

15   ago and I think counsel said something about older

16   procedures that were used to treat prolapse and he

17   mentioned colporrhaphy I think a few minutes ago.

18              Is colporrhaphy done today?

19         A.   It's the most common procedure done today.

20         Q.   So it's not an older procedure in the

21   sense that it's something people used to do but don't

22   do anymore; is that fair?

23         A.   No, it's considered what we say is the

24   traditional surgery, been done for many years and will
```

Daniel S. Elliott, M.D.

```
 1   continue to be done.

 2          Q.   Is anybody performing Prolifts® today?

 3               MR. ISMAIL:  Objection, 403, subsequent

 4          remedial measure.

 5               THE WITNESS:  No.

 6   BY MR. SLATER:

 7          Q.   You were asked about studies, RCTs in

 8   particular that study dyspareunia.

 9          Are you familiar with the fact that in the

10   Altman RCT they found a 7% de novo dyspareunia rate

11   with the Prolift® and only 2% with colporrhaphy?

12               MR. ISMAIL:  Objection, hearsay, leading.

13               THE WITNESS:  That's what they state in

14          the report, yes.

15   BY MR. SLATER:

16          Q.   You were asked if there were some women

17   who report improvement in sexual function after the

18   Prolift®?

19          A.   Correct.

20          Q.   Are there some women who report quite

21   different results with their sexual function after the

22   Prolift®?

23          A.   Yes.

24          Q.   For example?
```

Daniel S. Elliott, M.D.

1          A.   Worsening, devastated or gone, that's what

2     I see in my clinic.

3               MR. ISMAIL:  Objection, move to strike.

4     BY MR. SLATER:

5          Q.   Doctor, do you have handy the transcript

6     that counsel asked you about from March 4, 2015?

7          A.   Yes, I have it right here.

8          Q.   What I'm going to do is go back and look

9     at it a little bit and let's see what you were actually

10    asked about at that time.  And if you look at Page 536,

11    Line 9, the article that was identified --

12         A.   I'm sorry.  I'm sorry, let me just get

13    there.

14         Q.   Sure.  Page 436, Line 9, the article that

15    was identified is the Lowman article?

16         A.   That is correct.

17         Q.   You know that study, you are familiar with

18    that?

19         A.   Yes.

20              MR. ISMAIL:  Objection, hearsay.

21              MR. SLATER:  I'm sorry, didn't you

22         question him about it, sir?

23              MR. ISMAIL:  No, I didn't question him

24         about 536.  I was his own transcript and asking

Daniel S. Elliott, M.D.

1          him a question about it, and said here's a

2          statement of him.

3     BY MR. SLATER:

4          Q.   If you read forward, and you can scan

5     forward from Page 536 where it was identified and if

6     you get to this testimony you were actually asked about

7     by defense counsel, Page 539, Page 540, that's all

8     asking about the Lowman article, correct?

9          A.   Yes, that is all the Lowman article.

10         Q.   All right.  Well, we happen to have that

11    here --

12              MR. ISMAIL:  Objection, hearsay.

13              MR. SLATER:  And here it is, PLT302.  Here

14         you go, counsel.

15              MR. ISMAIL:  Thank you.

16    BY MR. SLATER:

17         Q.   And I'm just going to try to do this

18    fairly quickly.  This is the published article where

19    they in the results say there was a de novo rate of

20    dyspareunia of 16.7%.

21              You see that?

22              MR. ISMAIL:  Objection, hearsay.

23              THE WITNESS:  Correct, that's what they

24         state.

Daniel S. Elliott, M.D.

```
 1    BY MR. SLATER:

 2         Q.   Now, let's look at Exhibit PLT1096, which

 3    is the abstract that predated the published article.

 4    And in the abstract look at the conclusion --

 5              MR. ISMAIL:  Sorry.  Objection, hearsay

 6         and this is not a material that Dr. Elliott

 7         disclosed.  It's beyond the scope of his

 8         disclosure so it's improper.

 9              MR. SLATER:  Okay.  Well, you brought it

10         up.

11              MR. ISMAIL:  No, I didn't actually, but go

12         ahead.  The objection is hearsay and improper

13         disclosure of material.

14    BY MR. SLATER:

15         Q.   Doctor, the conclusion to the abstract by

16    Lowman about whether the Prolift® causes dyspareunia,

17    just read for me the first sentence, please --

18              MR. ISMAIL:  Objection, hearsay.

19              MR. SLATER:  -- of the conclusion.

20              MR. ISMAIL:  Improper disclosure.

21              THE WITNESS:  The abstract which was

22         presented at the --

23    BY MR. SLATER:

24         Q.   I'm not -- Doctor, I'm talking about the
```

Daniel S. Elliott, M.D.

1    abstract I just handed to you.

2         A.   Yeah, no, and I can say it was presented

3    at the GYN surgeons meeting in 2008.  Just so we're

4    clear what I'm reading here, under conclusion, "The

5    Prolift® procedure may be associated with a high (24%)

6    de novo dyspareunia rate..."

7         Q.   So when they presented it originally they

8    said 24%, a high rate, and then when they published

9    they went down to 16.7%?

10             MR. ISMAIL:  Objection, leading, improper

11        disclosure, hearsay.

12             THE WITNESS:  That is correct.

13   BY MR. SLATER:

14        Q.   And in the article if you turn to page e5?

15        A.   Okay, I'm there.

16        Q.   And in the center column, if you just read

17   through it, they assess dyspareunia by two different

18   methods, by a validated questionnaire versus a chart

19   review.

20             MR. ISMAIL:  Objection.

21   BY MR. SLATER:

22        Q.   Do you see that?

23             MR. ISMAIL:  I'm sorry.  Objection,

24        hearsay.

Daniel S. Elliott, M.D.

```
 1                THE WITNESS:  Yes, and a telephone

 2           interview.

 3  BY MR. SLATER:

 4           Q.  And, ultimately, if you read through this

 5  they say they ultimately chose the chart review, which

 6  gave them the 16.7% rate instead of the validated

 7  questionnaires that they reported at 24%, didn't they?

 8                MR. ISMAIL:  Objection, leading and

 9           hearsay.

10                THE WITNESS:  That's what they state in

11           there, yes.

12  BY MR. SLATER:

13           Q.  These validated questionnaires, these are

14  validated through professional societies and academics

15  and people who know a lot in this field; aren't they?

16                MR. ISMAIL:  Objection, leading, hearsay.

17                THE WITNESS:  That is correct, yes.

18  BY MR. SLATER:

19           Q.  Okay.  Now, you were asked a bunch of

20  questions by counsel about the use of polypropylene to

21  treat pelvic conditions, you remember he asked you

22  about that, it's been used in a lot of products by

23  different ways?

24           A.  Correct.
```

Daniel S. Elliott, M.D.

1        Q.   And he asked you about Bard Marlex; do you

2   remember that?

3        A.   Correct.

4        Q.   Are you familiar with the Bard Avaulta?

5        A.   Oh, yes.

6             MR. ISMAIL:  Objection, beyond the scope.

7        I didn't ask him anything about Marlex.

8             MR. SLATER:  You mentioned it.

9             MR. ISMAIL:  No, I didn't.  He did.  He

10       misunderstood my question.

11            THE WITNESS:  No, I did not misunderstand.

12       I understood it, but I did bring it up.

13   BY MR. SLATER:

14       Q.   Remember you were asked by counsel about

15   Marlex and that that was one of the materials used to

16   treat patients?

17            MR. ISMAIL:  Objection, actually misstates

18       the record, beyond the scope.

19            THE WITNESS:  I remember the discussion.

20   BY MR. SLATER:

21       Q.   You were asked about the use of mesh

22   transvaginally?

23       A.   Correct.

24       Q.   All right.  And one of the ways that's

Daniel S. Elliott, M.D.

```
 1   done -- was done was by the Bard Avaulta, right?

 2              MR. ISMAIL:  Object, leading.

 3              THE WITNESS:  Correct.

 4   BY MR. SLATER:

 5         Q.   And I've given you now the MSDS, the

 6   Material Safety Data Sheet, for the Marlex material in

 7   the Bard Avaulta and on the -- and you've seen this

 8   before, right?

 9         A.   Yes, I have.

10         Q.   Marked as Plaintiff's Trial Exhibit P2402

11   and if you look right on the front page -- let me start

12   again.

13              If you look on the front page of this Exhibit

14   P2402, what does it say?  There is a medical

15   application caution, what does that say?

16              MR. ISMAIL:  Objection, hearsay, beyond

17              the scope, not disclosed in this case by the

18              witness.

19   BY MR. SLATER:

20         Q.   What does that say?

21         A.   It says "Medical Application Caution:  Do

22   not use this Phillips Sumika Polypropylene Company

23   material in medical application involving permanent

24   implantation in the human body or permanent contact
```

Daniel S. Elliott, M.D.

1    with internal body fluids or tissues."

2         Q.   And then what does it say in the next --

3              MR. ISMAIL:  Objection --

4    BY MR. SLATER:

5         Q.   -- paragraph?

6              MR. ISMAIL:  I'm sorry.  Objection, 403,

7         hearsay, beyond the scope.

8              MR. SLATER:  Sure.

9    BY MR. SLATER:

10        Q.   Does it basically say that, again, don't

11   use this polypropylene material in the human body for

12   medical applications?

13             MR. ISMAIL:  Same objections and now

14        leading.

15             THE WITNESS:  Yes, but it goes on saying

16        "involving brief or temporary implantation in

17        the human body."

18   BY MR. SLATER:

19        Q.   Okay.  And that's -- this is the

20   polypropylene used in one of those mesh devices used

21   transvaginally that counsel asked you about, correct?

22             MR. ISMAIL:  Objection, leading, hearsay,

23        403, beyond the scope.

24             THE WITNESS:  It's one of the meshes used

Daniel S. Elliott, M.D.

1              in one of the products, yes.

2    BY MR. SLATER:

3         Q.   Okay.  Now, you were asked by counsel

4    about conservative treatment of exposure erosion,

5    remember that, counsel asked you a bunch of questions?

6         A.   Yes, I do.

7         Q.   Do you have handy or can you get handy

8    PLT1095, it's the article by Heesakkers and Withagen.

9    I actually have another copy of it here, if it will

10   save time.

11              MR. ISMAIL:  Which one?

12              MR. SLATER:  It's the one I gave you at

13         the start of the day today.

14              MR. ISMAIL:  Thank you.

15   BY MR. SLATER:

16        Q.   And what I want to do -- this is the

17   article by that urologist that you said you knew from

18   SUFU.

19        A.   Yeah, John Heesakkers.  Not from SUFU,

20   from European Urology Association.

21        Q.   Ah, sorry.  And if we look now at Page

22   1399 of this article which you already testified

23   about --

24              MR. ISMAIL:  Objection, hearsay, 403.  I

Daniel S. Elliott, M.D.

```
 1              didn't ask him about the article, you did.

 2                   So beyond the scope, 403, hearsay and this

 3              is the article that, as we pointed out before,

 4              was not disclosed by the witness before today.

 5    BY MR. SLATER:

 6              Q.   Okay.  Doctor, during the

 7    cross-examination counsel asked you about the efficacy

 8    of using conservative treatments to treat mesh

 9    erosions; do you remember that?

10              A.   Correct.

11              Q.   And if we look at Page 1399 of this

12    article, and you look at the left-hand column, first

13    full paragraph it says, "Mesh-related complications

14    were unsuccessfully treated conservatively with

15    estrogen cream, antibiotics and/or physiotherapy prior

16    to mesh excision in 63% of patients."

17              Is that significant --

18                   MR. ISMAIL:  Objection, hearsay --

19    BY MR. SLATER:

20              Q.   -- to you?

21                   MR. ISMAIL:  Sorry.  Objection, hearsay,

22              403, improper disclosure.

23                   MR. SLATER:  You have a standing objection

24              for hearsay, counsel.
```

Daniel S. Elliott, M.D.

```
1              MR. ISMAIL:  Okay.  Thank you.  I'm

2         actually adding to the objection, but thank

3         you.  Did I get them all?

4              403, improper disclosure, beyond the

5         scope.  Thank you.

6              THE WITNESS:  Yes, it's quite significant.

7    BY MR. SLATER:

8         Q.   Why is that?

9              MR. ISMAIL:  Same objections.

10             THE WITNESS:  Traditionally, and if you

11        look at what I answered in 2012 deposition, is

12        that 50% of these mesh extrusions can be

13        treated conservatively and that's it.

14             Researchers like this Dutch group, along

15        with Abbott, are now saying that 50% of those

16        which are treated conservatively ultimately go

17        on to surgery, and this one actually says 63%,

18        so it's actually a higher percent than Abbott,

19        et.al.

20   BY MR. SLATER:

21        Q.   Okay.  Now, you were asked a bunch of

22   questions by counsel about RCTs and how many studies

23   there are of the Prolift®; do you remember that

24   questioning?
```

Daniel S. Elliott, M.D.

1          A.    Yes, I do.

2                MR. SPECTER:  RCT.

3    BY MR. SLATER:

4          Q.    Randomized controlled trials, right?

5          A.    Correct.

6          Q.    That's when they take a few different

7    procedures and they compare them, basically.

8          A.    A two-armed study, yes.

9          Q.    Okay.  And are you -- well, let me hand

10   you this.  This is going to be Exhibit 2503.

11               And this is a letter from the FDA to Mr. Brian

12   Kanerviko, a worldwide director of regulatory at

13   Ethicon.

14               You see this?

15         A.    Yes, I do.

16         Q.    Okay.  And you are familiar -- are you

17   familiar or not with the interaction between Ethicon

18   and the FDA regarding the 522 studies?

19         A.    Yes, I've read those.

20         Q.    Okay.  And what I'd like to do is to cut

21   to the chase, let's turn to Page 4 of this letter.

22               MR. ISMAIL:  Counsel, if you wouldn't mind

23          giving me a second when you hand me an exhibit

24          to see what it is.

Daniel S. Elliott, M.D.

```
1              I object to this exhibit as beyond the
2         scope, 403, beyond the time period at issue in
3         this case and potentially subject to a
4         stipulation that you proposed.
5   BY MR. SLATER:
6         Q.   In Paragraph 10 of this letter to the FDA
7   I just want to read a little bit and then I'm going to
8   ask you a few questions.  It says, "For GYNECARE
9   PROLIFT® Pelvic Floor Repair Systems, you provided 2
10  published articles with the clinical data collected
11  under two randomized controlled trials to satisfy the
12  522 orders.  However, these studies do not address
13  several questions in the 522 order."
14        Do you see that?
15        A.   Yes I do.
16             MR. ISMAIL:  Same objections and also
17        hearsay.
18  BY MR. SLATER:
19        Q.   And just simply, the 522 orders were where
20  the FDA wrote and told Ethicon you need to do some very
21  high level studies in order to prove these are -- this
22  is a safe product, the Prolift®?
23             MR. ISMAIL:  Same objections and now with
24        leading.
```

Daniel S. Elliott, M.D.

```
1              THE WITNESS:  Right, it's a response
2         saying there's an application and here's where
3         we have concerns.
4   BY MR. SLATER:
5         Q.  And the FDA talks about which two RCTs
6   they're talking about and it's Withagen and Altman,
7   correct?
8              MR. ISMAIL:  Objection, leading, hearsay.
9         403.
10             THE WITNESS:  Yes.
11  BY MR. SLATER:
12        Q.  Let me ask the question differently.
13             THE COURT REPORTER:  One at a time,
14        please.
15  BY MR. SLATER:
16        Q.  Rephrase.
17             Which of the two articles, if you look in the
18  body of these two bullet points that the FDA is
19  describing that Ethicon had submitted to try to satisfy
20  the 522?
21             MR. ISMAIL:  Just let me make my
22        objections noted which didn't get last time,
23        because it was talked over.
24             Hearsay, 403, beyond the scope and
```

Daniel S. Elliott, M.D.

```
 1              improper disclosure.  Thank you.

 2                   THE WITNESS:  Withagen, et.al. and Altman,

 3              et.al.

 4   BY MR. SLATER:

 5        Q.   And according to this did the FDA accept

 6   those articles as satisfying the FDA's concerns and

 7   need for a 522 order, study?

 8                   MR. ISMAIL:  Objection, hearsay, 403,

 9              beyond the scope and improper subject for

10              expert testimony.

11   BY MR. SLATER:

12        Q.   What did they say at the bottom of that

13   section?  It says "Based on these limitations ..."

14                   MR. ISMAIL:  Same objections.

15                   THE WITNESS:  To answer your question

16              initially, no, they did not say it was

17              satisfying.  And then, "Based on these

18              limitations, the publications provided are not

19              adequate to satisfy the 522 order."

20   BY MR. SLATER:

21        Q.   And now I'll hand you exhibit we marked as

22   P2452 and this is a letter from the FDA to Brian

23   Kanerviko, worldwide director regulatory in Ethicon,

24   July 9, 2012.
```

Daniel S. Elliott, M.D.

1          And you've seen this before?

2          A.   Yes.

3          Q.   And it says in the letter that the FDA had

4   completed its review of Ethicon's response to the 522

5   order requesting that the study be suspended, and they

6   say, "This request is based on the plan to discontinue

7   manufacture and marketing of the device in the United

8   States within 120 days of the date of your letter.  We

9   agree to your request and will place the 522 order on

10  hold until September 7, 2012 with the following

11  conditions:"

12          Is that what the letter says?

13          MR. ISMAIL:  Objection, hearsay, 403,

14          beyond the scope, subsequent remedial measure,

15          improper subject of expert testimony.

16          THE WITNESS:  That's what it states.

17  BY MR. SLATER:

18          Q.   And the first condition there is "Cease

19  marketing by September 7, 2012."

20          Is that what it says?

21          MR. ISMAIL:  Please note the same

22          objections.

23          THE WITNESS:  That what it states.

24  BY MR. SLATER:

Daniel S. Elliott, M.D.

1          Q.   And then just below the conditions, it

2     says, "FDA reminds you that you are obligated, under

3     Section 522 of the act, to complete a postmarket

4     surveillance study of your device to address the issues

5     cited in FDA's letter dated January 3, 2012.

6     Accordingly, you must submit us new study plan to your

7     PS study informing" -- meaning post market surveillance

8     study -- "informing FDA if commercial distribution of

9     your device begins."

10          Is that what the letter says?

11          MR. ISMAIL:  Please note the same

12          objections.

13          THE WITNESS:  That's what it states, yes.

14     BY MR. SLATER:

15          Q.   And is it consistent with your

16     understanding that after Ethicon said they weren't

17     going to do the 522 studies and withdraw the products,

18     that they actually withdrew the Prolift® from the

19     market and no longer sell it?

20          MR. ISMAIL:  Objection, leading, 403,

21          beyond the scope, subsequent remedial measure,

22          lack of foundation.

23          THE WITNESS:  Yes, it was --

24          MR. ISMAIL:  Sorry.  Improper subject for

Daniel S. Elliott, M.D.

 1              expert testimony.  Sorry, Doctor.

 2                   THE WITNESS:  It was pulled from the

 3              market, yes.

 4                   MR. ISMAIL:  Move to strike as

 5              nonresponsive.

 6                   MR. SLATER:  No other questions.

 7     BY MR. ISMAIL:

 8              Q.   Doctor, just briefly.

 9              You were asked -- earlier I showed you your

10     sworn testimony from 2012 and you indicated that 50% of

11     mesh exposures can be treated conservatively, correct?

12              A.   Correct.

13              Q.   What was the date of the article that

14     counsel showed you just now in response to that

15     testimony, Exhibit 1095?

16              A.   Looks like it was published in 2011.

17              Q.   In the event counsel's question regarding

18     the Altman study on redirect -- redirect is allowed, I

19     have some follow-up on that provisionally.

20              You were asked to -- he provided you what he

21     characterized as the data on dyspareunia between

22     Prolift® surgery and the native tissue surgery in that

23     study, correct?

24              A.   Correct.

Daniel S. Elliott, M.D.

```
1              Q.   And he gave you some data points where

2     numerically the rate of dyspareunia was higher with

3     Prolift®.

4              Do you recall that was the information he gave

5     you?

6              A.   That is correct.

7              Q.   Do you recall from your own memory, sir,

8     that the dyspareunia rate between Prolift® and native

9     tissue surgery in that Altman study was not

10    statistically significant?

11             A.   In the Altman study?

12             Q.   Yes.

13             A.   I don't have the Altman study in front of

14    me.  If you are telling me it's statistically equal, I

15    have no reason to doubt you.

16             Q.   Okay.  So let me ask it this way:  When

17    you were answering Mr. Slater's questions when he gave

18    you data points regarding that study, you did not

19    recall, from your own recollection, whether the data he

20    was giving you was at all accurate, correct?

21                  MR. SLATER:  Objection.  By the way, I

22             just want to preserve my objections on this

23             line of questioning.

24                  THE WITNESS:  With -- actually, I'm sorry,
```

Daniel S. Elliott, M.D.

```
 1            could you repeat your question.

 2   BY MR. ISMAIL:

 3            Q.   Just so everything is clear as to where

 4   this is coming from, just now, a few minutes ago

 5   Mr. Slater represented to you certain data from a study

 6   known as Altman, correct?

 7            A.   Correct.

 8            Q.   He gave you the numbers from that study in

 9   his question, but would I be fair to assume you didn't

10   recall them yourself?

11            A.   No, I -- no, you are correct, I don't

12   recall them, but the Altman study has major issues

13   that --

14            Q.   I didn't bring it up.

15            MR. SLATER:  Don't interrupt him in the

16            middle of the answer, please.  Let him finish.

17   BY MR. ISMAIL:

18            Q.   Doctor, I just want to make sure --

19            MR. SLATER:  No, no, hang on, hang on, he

20            was talking.  Let him finish.  He is going to

21            finish.

22            MR. ISMAIL:  Then I will move to strike

23            and we try again.

24            MR. SLATER:  That's fine but you should
```

Daniel S. Elliott, M.D.

```
 1              let him finish his answer.

 2              MR. ISMAIL:  Okay, okay, calm down.

 3              THE WITNESS:  Point well-taken.

 4              But as I mentioned earlier, the Altman

 5              studies have major ethical issues, which I

 6              questioned the data.  But to answer your

 7              question, I do not recall off the top of my

 8              head those numbers.

 9              MR. ISMAIL:  Move to strike.

10   BY MR. ISMAIL:

11         Q.   Doctor, quite simply, when Mr. Slater

12   represented to you what the data were from the Altman

13   study, you did not, and still as you sit here now, do

14   not know whether that data he gave you was the true

15   reported data from that study, correct?

16         A.   I don't recall those specific numbers out

17   of the hundreds of studies I read, no.

18         Q.   That's fine, and I'm not -- withdrawn.

19              And as you sit here today you can't recall

20   whether the rate of dyspareunia comparing Prolift® to

21   native tissue repair in the Altman study, if there was

22   a numerical difference, whether that was statistically

23   significant or not, true?

24         A.   As I recall it was not statistically
```

Daniel S. Elliott, M.D.

1    different.

2           Q.   Okay.  And so the proper interpretation of

3    a study where there are comparison between one surgical

4    treatment and another surgical treatment, if it's not

5    statistically significant, the proper interpretation of

6    that is you would say the study does not show a

7    difference for that outcome, correct?

8           A.   Yeah, the proper way to state it is there

9    was a percentage difference but not a statistical

10   difference.

11          Q.   Right.

12          And when you say there is not a statistical

13   difference, earlier when we were talking about

14   statistical significance, that's a way researchers can

15   assess whether the observed difference is real or due

16   to chance, correct?

17          A.   That is correct.

18          Q.   And if there's no statistically

19   significant difference, one would conclude that there

20   is -- that any observed difference between the two

21   groups of patients in this study is potentially due to

22   chance, correct?

23          A.   Correct, during the frame of -- time frame

24   of that study, that is correct.

Daniel S. Elliott, M.D.

1          Q.   And in the Altman study, as you've just

2     confirmed, where there's no statistically significant

3     difference in the outcome of dyspareunia, the proper

4     interpretation of that study is that the Altman study

5     does not establish -- withdrawn.

6          The proper interpretation of the Altman study

7     is that there was no statistical difference shown in

8     the risk of dyspareunia comparing Prolift® to native

9     tissue surgery, true?

10              MR. SLATER:  Just for the record, I've

11         clearly stated an objection to this whole line

12         of questioning.

13              THE WITNESS:  To answer your question, you

14         are correct as it is stated in the document,

15         with the reservations I've had as far as the --

16         is it a true study.

17     BY MR. ISMAIL:

18          Q.   Okay.  But as to the data that Mr. Slater

19     gave you, it wasn't -- I didn't give you that data, he

20     gave you that data, right?

21          A.   Correct.

22          Q.   And if you were going to interpret the

23     data he gave you, where there was an absence of

24     statistical significance, you would conclude the Altman

Daniel S. Elliott, M.D.

1    study does not show an increased risk of dyspareunia

2    comparing Prolift® to native tissue surgery, true?

3              MR. SLATER:  Same objection.

4              THE WITNESS:  As I review any study, not

5         just this, not just for this litigation, you

6         have to look at the percentage, the true

7         numbers and then the statistical significance

8         and you cannot -- if they're statistically

9         equal, then you have to state that

10        statistically they were equal.

11   BY MR. ISMAIL:

12             Q.  And that was true with respect to the risk

13   of dyspareunia in the Altman study that Mr. Slater gave

14   you just now, correct?

15             A.  That is correct, yes.

16             MR. ISMAIL:  Thank you.  No further

17        questions.

18             MR. SLATER:  Just for the record, make it

19        very clear, the questioning on Altman was

20        conditional in case any of the vague

21        questioning on cross-examination regarding

22        studies, without establishing them as being

23        authoritative, would be permitted in any way.

24             I have no other questions.

Daniel S. Elliott, M.D.

1          THE VIDEOGRAPHER:  The time is 3:41 and

2     this concludes the videotape deposition of

3     Dr. Daniel Elliott.

4          (Witness excused.)

5          (Mr. Slater leaves the deposition room.)

6          MR. ISMAIL:  We have requested the

7     stenographic record note that the deposition

8     remains open due to the instructions not to

9     answer.  Mr. Slater was advised but was outside

10     the deposition room.

11                    – – –

12

13

14

15

16

17

18

19

20

21

22

23

24

Daniel S. Elliott, M.D.

```
1              C E R T I F I C A T I O N

2                   I, MARGARET M. REIHL, a Registered

3         Professional Reporter, Certified Realtime

4         Reporter, Certified Shorthand Reporter,

5         Certified LiveNote Reporter and Notary Public,

6         do hereby certify that the foregoing is a true

7         and accurate transcript of the testimony as

8         taken stenographically by and before me at the

9         time, place, and on the date hereinbefore set

10        forth.

11                  I DO FURTHER CERTIFY that I am

12        neither a relative nor employee nor attorney

13        nor counsel of any of the parties to this

14        action, and that I am neither a relative nor

15        employee of such attorney or counsel, and that

16        I am not financially interested in the action.

17

18

19                  -------------------------------

                    Margaret M. Reihl, RPR, CRR, CLR

20                  CSR #XI01497  Notary Public

21

22

23

24
```

Daniel S. Elliott, M.D.

```
 1                    - - - - -

                   E R R A T A

 2                    - - - - -

 3    PAGE   LINE   CHANGE

 4    _____  _____  _____

 5      REASON:  _____

 6    _____  _____  _____

 7      REASON:  _____

 8    _____  _____  _____

 9      REASON:  _____

10    _____  _____  _____

11      REASON:  _____

12    _____  _____  _____

13      REASON:  _____

14    _____  _____  _____

15      REASON:  _____

16    _____  _____  _____

17      REASON:  _____

18    _____  _____  _____

19      REASON:  _____

20    _____  _____  _____

21      REASON:  _____

22    _____  _____  _____

23      REASON:  _____

24    _____  _____  _____
```

Daniel S. Elliott, M.D.

```
 1              ACKNOWLEDGMENT OF DEPONENT
 2
                I,_____, do
 3   hereby certify that I have read the
     foregoing pages, and that the same
 4   is a correct transcription of the answers
     given by me to the questions therein
 5   propounded, except for the corrections or
     changes in form or substance, if any,
 6   noted in the attached Errata Sheet.
 7

     _____
 8   DANIEL S. ELLIOTT, M.D.          DATE
 9
10
11
12
13
14
     Subscribed and sworn
15   to before me this
     _____ day of _____, 20_____.
16
     My commission expires:_____
17
18   _____
     Notary Public
19
20
21
22
23
24
```