Peter Zenthoefer, M.D.

```
 1            IN THE UNITED STATES DISTRICT COURT

 2         FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

 3

 4   IN RE: ETHICON, INC.,      )
     PELVIC REPAIR SYSTEM       ) File No. 2:12-MD-02327
 5   PRODUCTS LIABILITY         ) MDL 2327
     LITIGATION                 ) JOSEPH R. GOODWIN
 6   _____) U.S. DISTRICT JUDGE
     BARBARA SMITH and GARY     )
 7   SMITH,                     )
              Plaintiffs,       )
 8       vs.                    ) No. 2:12-CV-04791
     ETHICON, INC., et al.,     )
 9   Defendants.                )

10

11

12

                    VIDEOTAPED DEPOSITION OF
13                   PETER ZENTHOEFER, M.D.

14

15

                    Cathedral City, California
16                     January 31, 2017

17

18

                        Reported by:
19      Karen I. Pearson-Bell, R.P.R., C.S.R. NO. 3557

20

21

22

23               GOLKOW TECHNOLOGIES, INC.
           877.370.3377 ph|917.591.5672 fax
24                  deps@golkow.com

25
```

EXHIBIT 1
Page 1 of 26

Peter Zenthoefer, M.D.

---

Page 2

```
1   APPEARANCES:
2
3      For Plaintiffs:
4         DOYLE LOWTHER, LLP
          BY:  CHRISTOPHER CANTRELL, ESQ.
5         4400 NE 77th Avenue
          Suite 275
6         Vancouver, Washington 98662
          T: 360.818.9320
7         E: ccantrell@doylelowther.com
8
9      For Defendant:
10        DRINKER BIDDLE & REATH LLP
          BY:  MELISSA A. MERK, ESQ.
11        One Logan Square
          Suite 2000
12        Philadelphia, Pennsylvania 19103-6996
          T: 215.988.2700
13        F: 215.988.2757
          E: melissa.merk@dbr.com
14
15
16     ALSO PRESENT:
17        Darnell Brown - Videographer
18
19
20
21
22
23
24
25
```

---

Page 3

```
1            - - -
2           INDEX
3            - - -
4
    VIDEOTAPED DEPOSITION OF
5
    PETER ZENTHOEFER, M.D., JANUARY 31, 2017
6                      PAGE
7   APPEARANCES                2
    PROCEEDINGS                5
8
9
    EXAMINATION OF:
10  PETER ZENTHOEFER, M.D.
11  BY MS. MERK            6, 93
    BY MR. CANTRELL         64, 94
12
13
14
15  ACKNOWLEDGEMENT OF DEPONENT   (signature waived)
16  CERTIFICATION             98
17  ERRATA                    99
18  LAWYER'S NOTES               100
19
20
    INDEX OF VIDEOTAPES
21
    Tape No. 1            5
22
23        •_____•
24
25
```

---

Page 4

```
1            - - -
             EXHIBIT INDEX
2            - - -
3   EXHIBIT       DESCRIPTION          PAGE
4   Zenthoefer-1  Curriculum Vitae of Peter      8
                  Zenthoefer (2 pages)
5
    Zenthoefer-2  Amended Notice of Video        19
6                 Deposition (10 pages)
7   Zenthoefer-3  Medical Records bearing various 21
                  Bates numbers beginning with
8                 SMITHB_PSR_00145 (64 pages)
9   Zenthoefer-4  Gynecare patient brochure on   55
                  stress urinary incontinence,
10                TVT, Bates ETH.MESH.08003279 to
                  3294 (16 pages)
11
    Zenthoefer-5  Document headed Medical Devices, 58
12                FDA Public Health Notification
                  (3 pages)
13
    Zenthoefer-6  Document headed Potential Risks  60
14                of Non-Mesh POP Surgery (2 pages)
15
16
17
18
19
20
21
22
23
24
25
```

---

Page 5

```
1        CATHEDRAL CITY, CALIFORNIA;
2     TUESDAY, JANUARY 31, 2017; 9:12 A.M.
3            - - -
4        MS. MERK:  Prior to the deposition, counsel
5   for plaintiffs and counsel for Ethicon discussed
6   that counsel for plaintiffs is not bringing an
7   action based on the TVT-O product, only on Prolift.
8   As a result, my questions today will be limited to
9   the doctor's knowledge of Prolift and much less so
10  as to TVT.
11       MR. CANTRELL:  And that's correct.
12       (Off the record 9:13 - 9:15.)
13       THE VIDEOGRAPHER:  Good morning.  We are
14  now on the record.  My name is Darnell Brown, and I
15  am the videographer with Golkow Technologies.
16       Today's date is January 31st, 2017, and the
17  time is 9:15 a.m.  This videoed deposition is being
18  held in Cathedral City, California, in the matter
19  of Smith v. Ethicon for the United States District
20  Court for the Southern District of Virginia.  The
21  deponent is Dr. Peter Zenthoefer.
22       Counsel, please identify yourselves for the
23  record.
24       MR. CANTRELL:  Chris Cantrell from Doyle
25  Lowther on behalf of the plaintiffs.
```

---

EXHIBIT 1
Page 2 of 26

Peter Zenthoefer, M.D.

Page 6

1    MS. MERK:  Melissa Merk on behalf of
2  Ethicon and Johnson & Johnson.
3    THE VIDEOGRAPHER:  The court reporter is
4  Karen Bell, who will now swear in the witness.
5       - - -
6       PETER ZENTHOEFER, M.D.
7       - - -
8  having been duly administered an oath in
9     accordance with the California Code of Civil
10    Procedure Section 2094, was examined and
11    testified as follows:
12       - - -
13       EXAMINATION
14       - - -
15  BY MS. MERK:
16    Q.  Doctor, can you please introduce yourself
17  for the jury.
18    A.  I am Peter Zenthoefer.
19    Q.  And do you understand that we are here
20  today to talk about your care and treatment of
21  Mrs. Barbara Smith?
22    A.  I do.
23    Q.  Okay.  Do you remember Ms. Smith?
24    A.  Just a little bit.
25    Q.  Okay.  Did you implant TVT-O and Prolift in

Page 7

1  Ms. Smith?
2    A.  I did.
3    Q.  Did you at any time recommend that
4  Ms. Smith file a lawsuit?
5    A.  No.
6    Q.  Have you ever given the opinion that
7  Prolift is defective?
8    A.  No.
9    Q.  Do you understand that I represent Ethicon
10  and Johnson & Johnson?
11    A.  I do.
12    Q.  And do you understand that this is our only
13  opportunity to speak with you about your care and
14  treatment of Ms. Smith?
15    A.  I do.
16    Q.  Okay.  Have we ever spoken before today?
17    A.  We have not.
18    Q.  Other than a few minutes of small talk
19  before we got started, have you and I met or
20  interacted in any other way before today?
21    A.  No, we have not.
22    Q.  Did you speak with anyone from plaintiffs'
23  attorney's office?
24    A.  No, I did not.
25    Q.  Okay.  What did you do, if anything, to

Page 8

1  prepare for your deposition today?
2    A.  I read the medical record that was sent to
3  me.
4    Q.  Okay.  Anything else?
5    A.  No.
6    Q.  Before we came here today, you had provided
7  a copy of your curriculum vitae in an email.
8    A.  Yes.
9    MS. MERK:  Okay.  I'm going to mark this as
10  Exhibit 1, please.
11    (Zenthoefer Exhibit 1 was marked for
12    identification by the Reporter and is annexed
13    hereto.)
14  BY MS. MERK:
15    Q.  And is this a copy of your CV?
16    A.  (No response.)
17    Q.  The body of it, anyway?
18    A.  It is.
19    Q.  Okay.  Can you please, for the jury,
20  describe your educational background, starting with
21  college.
22    A.  So I attended Oregon State University from
23  1973 to 1976.  I started out in biochemistry,
24  biophysics.
25    I applied to medical school a year early

Page 9

1  and got accepted, and I attended the Oregon Health
2  Sciences School of Medicine in Portland, Oregon,
3  from '76 to '80.
4    The Air Force helped me through medical
5  school and, in return, I had to spend some time in
6  the Air Force.  So I did my residency in obstetrics
7  and gynecology from 1980 to 1984, and then my
8  service obligation was at Fairchild Air Force Base
9  in Washington, near Spokane, and I was there from
10  1984 to 1987.
11    Q.  And are you licensed?
12    A.  I have an emeritus license right now.
13    Q.  And what does that mean?
14    A.  That allows me to do volunteer work only.
15  I cannot charge for services.
16    Q.  And in what state or states do you hold
17  that license?
18    A.  In Oregon only.
19    Q.  When did you --  When did your license
20  become an emeritus license?
21    A.  So this --  I just renewed it for the
22  second time.  So starting January 1st, 2016, it
23  became an emeritus license.  I retired
24  September 2015.
25    Q.  Okay.  Before you retired, so during the

Peter Zenthoefer, M.D.

Page 10

1  course your career, what state or states did you
2  hold an active license in?
3      A.   The last -- For most of my career, in the
4  State of Oregon.  Early on in training, I had a
5  license in California, I had a license in
6  Washington, and also in the State of Washington.
7  But most of the time, especially the latter years,
8  only in Oregon.
9      Q.   And are you Board certified?
10     A.   I was Board certified in obstetrics and
11 gynecology, and I let that expire the end of 2016.
12     Q.   Okay.  Do you have any academic or teaching
13 experience?
14     A.   A little bit.  The last year before I
15 retired, we were affiliated with the urogynecology
16 training program at the Oregon Health Sciences
17 Center.  So we were teaching fellows.  They rotated
18 through our Kaiser Medical Center.
19     Q.   Can you also briefly explain your
20 professional career, your practice.
21     A.   So I was trained as an
22 obstetrician/gynecologist, and then, over the
23 years, I developed a special interest in the area
24 of urogynecology.  I took a lot of continuing
25 education courses in that area.

Page 11

1          And then, approximately in 2009, I became
2  a full-time urogynecologist at Kaiser Sunnyside.  I
3  stopped delivering babies and doing obstetrics, and
4  I did primarily urogynecology.
5      Q.   And did you continue to do primarily
6  urogynecology through 2015?
7      A.   Yes.
8      Q.   Were you a member of any professional
9  organizations?
10     A.   I was a member of AUGS, the American
11 Urogynecology Society.  I was also a member of
12 IUGA, the International Urogynecology, I think
13 Association or...[pause].
14     Q.   When did you first learn about pelvic organ
15 prolapse?
16     A.   I think in my training, my residency
17 program.  So that would have been 1980.
18     Q.   And is that one of the conditions that you
19 treated?
20     A.   Yes.
21     Q.   And same question for stress urinary
22 incontinence.  When did you first learn of it?
23     A.   Probably 1980.
24     Q.   Okay.  And is that also one of the
25 conditions that you treated during your practice?

Page 12

1      A.   Yes.
2      Q.   Can you approximate for me how many
3  patients you treated for pelvic organ prolapse?
4      A.   Over what period of time?
5      Q.   Throughout your career.
6      A.   That would be difficult because those are
7  such, you know, very common problems, and we saw
8  many, many, many patients with those problems.
9      Q.   Okay.  Can you estimate for me what
10 percentage of your practice involved the treatment
11 of pelvic organ prolapse?
12     A.   So beginning in 2009, when I became a
13 full-time urogynecologist at Kaiser Sunnyside,
14 pretty much all of it.  I would say, you know, more
15 than 95 percent.
16     Q.   In the time frame of 2005 and 2006, were
17 you starting to develop this interest in
18 urogynecology?
19     A.   I was doing primarily urogynecology.  At
20 that time I was still on the call schedule at night
21 and I delivered babies.  But during the day, during
22 the workweek, it was primarily urogynecology.
23     Q.   Okay.  And so that would have been
24 primarily the treatment of pelvic organ prolapse?
25     A.   Uh-huh.

Page 13

1      Q.   I'm sorry.  Is that a yes?
2      A.   Yes.
3      Q.   Okay.  I should have asked you before.
4  Have you had a deposition taken before?
5      A.   I have.
6      Q.   And that was in another mesh case; correct?
7      A.   You know, I have -- I -- over -- Over my
8  career, I have given a few depositions.  Some
9  were -- There was one other mesh case, there was
10 an OB case or two, there was a gynecology case.
11     Q.   Okay.  I am not going go through all the
12 instructions for a deposition because I think you
13 are familiar with them.  But if from time to time I
14 have to ask you is that a yes, please know I am not
15 trying to be rude; I'm just trying to protect our
16 record.
17     A.   No worries.
18     Q.   Okay.
19     A.   I'm...[pause].
20     Q.   Was Prolift one of the products that you
21 used to treat pelvic organ prolapse?
22     A.   It was.
23     Q.   Are you able to estimate the number of
24 times that you used Prolift to treat pelvic organ
25 prolapse prior to 2006?

EXHIBIT 1
Page 4 of 26

Peter Zenthoefer, M.D.

Page 14

1    A.  I'm not sure how many times we used it
2  prior to 2006.
3    Q.  If you are not able to give a number, can
4  you tell me approximately how often you had used
5  it?
6    A.  I know we were using it in 2005 already,
7  and -- and we were using it quite a bit.  There
8  were -- At Kaiser Sunnyside there were four
9  urogynecologists, and three of us, you know,
10  started using it a fair amount.
11    Q.  Is it fair to say that by 2006 it was a
12  product that you were comfortable with?
13    A.  Yes.
14    Q.  And that you were familiar with?
15    A.  I think so, yes.
16    Q.  Can you estimate the number of patients
17  that you used Prolip -- Pro -- I'm going to do it
18  again.  Try it one more time.
19        Can you estimate the number of patients in
20  whom you used Prolift to treat pelvic organ
21  prolapse during the course of your career?
22    A.  I want to say maybe 25 or 30.
23    Q.  Okay.
24    A.  You know, that ballpark.
25    Q.  Were you trained on any type of non-mesh

Page 15

1  surgery to treat pelvic organ prolapse?
2    A.  Yes.
3    Q.  What procedures did you use?
4    A.  So, you know, in my residency training
5  from 1980 to 1984, a lot of the gynecologic surgery
6  that we did was for the treatment of different
7  aspects of pelvic organ Prolift [sic], so --
8    Q.  I have given it to you now.  You mean
9  prolapse?
10    A.  -- we did -- we did anterior
11  colporrhaphies, we did posterior colporrhaphies, we
12  did colpocleisis, we did abdominal sacral
13  colpo-suspensions.  We did some sacrospinous
14  suspensions.  I might be leaving something out,
15  too.
16    Q.  Was 2005 the first time that you used mesh
17  to treat pelvic organ prolapse?
18    A.  No.
19    Q.  What other mesh products did you use?
20    A.  So, you know, for a number of years prior
21  to that, we were using mesh abdominally to do -- to
22  treat pelvic organ prolapse.  We were doing
23  abdominal sacral colpo-suspensions using different
24  kinds of mesh products.
25    Q.  Would you have been using kits for that

Page 16

1  procedure or did you use a piece of mesh that you
2  cut to the right size?
3    A.  We used a piece of mesh that we then
4  custom-tailored and cut to fit the patient.
5    Q.  Other than Ethicon's Prolift kit, did you
6  use any other mesh kits for pelvic organ prolapse?
7    A.  I believe, for a short time prior to that,
8  we used another product, but primarily, you know,
9  our group, you know -- after doing a review of the
10  different products on the market, our group decided
11  to use the Prolift.
12        We thought that that was, you know, the --
13  one of the best products on the market.  So as a
14  group, we reviewed the information and picked that
15  one to use.
16    Q.  Did you continue using Prolift throughout
17  your career?  After you had started, obviously.
18    A.  We -- we ended up stopping using it.  I
19  don't recall exactly when, but there was a point
20  that we -- we ended up not using it anymore and we
21  did other surgeries instead.
22    Q.  Do you recall why that was?
23    A.  There were a number of reasons.  The --
24  the main -- One of the main reasons for using
25  Prolift was that it gave us an option that was much

Page 17

1  more patient-friendly.  Prior to using Prolift, we
2  would make a big incision in the abdomen and
3  patients would have this really big surgery and
4  have a long hospital stay, and there was morbidity
5  and complications.  And a lot of our patients were
6  older and -- and some of them, you know, just
7  barely squeaked by.
8        Prolift was a much smaller -- The Prolift
9  surgeries, they were done in combination with
10  vaginal surgeries that we had done for years and
11  years.  They were much more patient-friendly.  They
12  had much less pain, much less morbidity, much
13  shorter hospital stays, and they -- they promised,
14  you know, to give the same long-lasting results.
15        And after we had several years' experience
16  with Prolift, we -- we -- you know, after seeing
17  our own patients, we saw that the results overall
18  were pretty good, but they weren't quite as good as
19  we hoped.  And, you know, every surgery has
20  complications, and the complication rate with
21  Prolift was maybe a little bit higher.
22        And then, at that time we learned how to
23  do laparoscopic, you know, sacral
24  colpo-suspensions, and we felt that laparoscopic
25  sacral colpo-suspensions were a better way to go.

EXHIBIT 1
Page 5 of 26

Peter Zenthoefer, M.D.

Page 18

1 They had the -- the short hospital stay, low
2 morbidity, and we felt they had better -- better
3 results long term and...[pause].
4    Q.  At what point did you start doing the
5 laparoscopic procedures?
6    A.  You know, it's been a while.  Could have
7 been, I don't know, 2008, 2007, or 2009, somewhere
8 in there.
9    Q.  Okay.  Did you attend any Ethicon
10 professional education events?
11    A.  I did.
12    Q.  Okay.  Do you remember when?
13    A.  Well, before we started using the Prolift,
14 we went to an Ethicon surgical training conference,
15 and I believe it was in Wisconsin, in Milwaukee or
16 some city there.  I remember flying in with my
17 partner, Audrey, and we had a weekend conference
18 where we, you know, actually sat in and watched
19 surgery being done and...[pause].
20    Q.  Was that just one Ethicon event that you
21 attended?
22    A.  One Ethicon training program regarding
23 Prolift.  I went to others involving TVT-Os and
24 TVTs and --
25    Q.  Understood.  Did you find the Ethicon

Page 19

1 professional education event regarding Prolift
2 helpful?
3    A.  Very helpful.  It was done very well.
4    Q.  Do you recall receiving any materials at
5 that event?
6    A.  I believe we received a little certificate
7 saying that we completed the training.  There were
8 some materials, I think, regarding the product, you
9 know.  I don't recall exactly.  It's been a --
10 quite a while.
11    Q.  Sure.  Do you agree that Ethicon's
12 professional education event provided you with
13 information on how to perform a procedure, but it
14 didn't teach you how to be a pelvic floor surgeon?
15    A.  I would agree with that.  I think we were
16 all pelvic floor surgeons, and -- and this -- this
17 gave us additional information.  It was a helpful
18 adjunct to what we were doing.
19    Q.  I'm going to talk to you about some of your
20 medical records related to Ms. Smith.
21    Before I do that, though, I'm going to mark
22 as Exhibit 2 a copy of the notice of deposition in
23 this case.
24    (Zenthoefer Exhibit 2 was marked for
25    identification by the Reporter and is annexed

Page 20

1 hereto.)
2 BY MS. MERK:
3    Q.  I just placed it right here.  I can't reach
4 you over there.
5    A.  What am I supposed -- what am I supposed
6 to do with this?
7    Q.  Have you seen this document before?
8    A.  I think so, yes.
9    Q.  If you turn to the third page, it's
10 entitled Schedule A.  You are there.  It's
11 double-sided.
12    A.  Oh, here.  Okay.
13    Q.  And it identifies a number of documents
14 that I had asked you to search for and bring with
15 you today.  Did you find any documents that were
16 responsive to these requests?
17    A.  No.  I -- I retired, and I -- I don't
18 have, you know, things like this anymore.
19    Q.  Okay.  Did you bring any documents with you
20 today?
21    A.  I did -- I did not.
22    Q.  Okay.
23    A.  Just what you sent me.
24    MS. MERK:  Now I am marking as Exhibit 3
25 some medical records.

Page 21

1    (Zenthoefer Exhibit 3 was marked for
2    identification by the Reporter and is annexed
3    hereto.)
4 BY MS. MERK:
5    Q.  And I'm going to ask you some questions
6 about these.  And these are some of the records
7 that we received from plaintiffs' counsel in this
8 litigation.
9    We have not received the full records yet
10 from Kaiser Permanente.  I understand that they are
11 a little behind on their records production.  But
12 we do have some of your records, and those are the
13 ones I'm going to ask you about.
14    A.  Okay.
15    Q.  And are these the records that we provided
16 to you before the deposition?
17    A.  Well, without going through every single
18 page, it appears to be about -- appears to be the
19 same thing.
20    Q.  Okay.  The first page of Exhibit 3, which
21 is Bates stamped 145 at the bottom, is a record
22 from a visit dated January 30th, 2006.  Do you see
23 that?
24    A.  I do.
25    Q.  Okay.  And Mrs. Smith was 64 years old at

Peter Zenthoefer, M.D.

Page 22

1  the time; correct?
2      A.   Yes.
3      Q.   What was the reason for her visit?
4      A.   In her own words, she said:  "It feels
5  like my insides are falling out."
6          And she had additional complaints other
7  than that.  She had some complaints of mild stress
8  urinary incontinence.
9      Q.   Did you conduct a physical exam on this
10 date?
11     A.   Yes.  She was also complaining of
12 difficulty starting her urine stream.  She would
13 have to change position, sometimes leans to the left
14 or the right in order to get her stream to start
15 and empty her bladder.
16         She also had difficulty eliminating or
17 passing bowel movements.  She had to insert her
18 fingers either inside the vagina or push on the
19 perineal body and -- and help express stool.
20         She was also incontinent of flatus.
21     Q.   Did you perform a physical exam that day?
22     A.   I did.
23     Q.   What were your findings on physical exam?
24     A.   The first thing I noticed was that the
25 perineal body was somewhat attenuated.  It looked

Page 23

1  like it had been damaged in childbirth.  And her
2  largest baby was nine pounds.  It was a forceps
3  delivery.  And forceps deliveries often cause
4  damage to the pelvic floor.  So it wasn't
5  surprising.
6          She had a large cystocele.  So the upper
7  vaginal wall and the bladder were falling down.
8          She also had a moderately large rectocele.
9          I thought the vaginal cuff was fairly well
10 supported, but I was examining her lying down, so
11 that could always be different standing up.
12         She had had a hysterectomy, so she didn't
13 have a cervix and uterus and -- and ovaries
14 anymore.
15         And we did a uroflow, and she had a fairly
16 normal flow.  Her post-voids residuals were okay.
17         We did systematic testing, so we were
18 testing to see how well the nerves in her bladder
19 were working, how well, you know, sensed
20 feelings.  And that all seemed pretty normal for
21 sensation.  When she first felt some water in her
22 bladder was about 50 milliliters, second sensation
23 150, and then she was -- felt very full at 400.  So
24 this was all pretty normal.
25         And then we had her cough.  So her bladder

Page 24

1  was dropping down.  When that happens, the urethra
2  kinks and patients don't leak much urine.  So we
3  actually pushed the bladder up and had her cough,
4  and we were able to demonstrate some urine leakage
5  with coughing.  And that's stress urinary
6  incontinence.
7          Did cystoscopy, and things looked pretty
8  normal in the bladder.
9          Did urethroscopy, and the urethra seemed
10 to close nicely, so it was functioning pretty well.
11         And that was most of the exam.
12     Q.   Okay.  You had noted that she'd had a
13 hysterectomy in the past.
14     A.   Yes.
15     Q.   And on the first page of that record which
16 is 145 at the bottom, it states:
17          "The OB-GYN encountered severe
18          adhesive disease."
19          What does that mean?
20     A.   And she was -- I quoted the patient.  She
21 said that her doctor described it as her abdomen
22 being filled with a bucket of glue.
23         So adhesions are scar tissue, and severe
24 adhesive disease is when everything is scarred
25 together, when there is dense scar tissue between

Page 25

1  loops of bowel, between bowel and bladder, you
2  know, small bowel and rectum and -- and the -- and
3  the ureters and the peritoneal lining.
4          And what's also interesting is that she
5  says that her hysterectomy surgery, when it was
6  done, was -- took seven hours.  This is an
7  incredibly long time.  Normally a hysterectomy
8  should be, you know, one and a half, two, two and a
9  half hours.  Seven hours is just extraordinarily
10 long.
11         And -- and that, I think, is an indication
12 that -- that this -- she had some -- that what was
13 said earlier, that she had severe adhesive disease,
14 was actually true.
15     Q.   And how, if at all, did this history enter
16 into your treatment of Mrs. Smith?
17     A.   So I think when you hear this, when you
18 get this kind of information in the history, it
19 sends the message or it tells you that you should
20 not do surgery in this patient's abdomen, that it
21 is incredibly risky, and only in a
22 life-threatening, life-and-death situation should
23 you enter that -- that person's abdomen.
24         So for the kind of surgery that we do,
25 even though pelvic relaxation and the problems

EXHIBIT 1
Page 7 of 26

Peter Zenthoefer, M.D.

Page 26

1 associated with that, even -- even though that is
2 very distressing and upsetting for the patient,
3 it's not a life-and-death situation. And so -- so
4 the conclusion -- I think my conclusion was that
5 in no way would I want to make an incision in her
6 abdomen.
7       So continuing on, she was the ideal
8 candidate for a vaginal repair and she was an ideal
9 candidate for a Prolift.
10  Q.  Did you discuss Prolift as a possible
11 option with her during this first visit?
12  A.  Probably not very much.  Generally, at the
13 first visit, I try to avoid talking about surgery.
14 I try to talk about nonsurgical treatments.
15  Q.  What nonsurgical treatments were available
16 to her?
17  A.  Well, I think -- I think one of the most
18 important treatments is physical therapy.  And so
19 under -- my plan, you know, was -- was physical
20 therapy referral.
21       The tissues in the pelvic floor and the
22 vaginal area, they become stronger, they improve in
23 their functional ability with estrogen hormone
24 cream.  So I recommended that.
25       And -- and sometimes incontinence issues,

Page 27

1 you know, have some -- some -- some dietary kind of
2 provocative factors.  So I recommended some diet
3 modification, usually cutting out caffeine and soda
4 pop, things like that.
5  Q.  At the time that she came to see you, had
6 she already failed with a pessary?
7  A.  You know, I was going to say that.
8 Ordinarily we would recommend pessaries.  That
9 would probably be the mainstay, the sort of the
10 main way, nonsurgically, that we treat prolapse.
11       And she had seen Dr. Miksovsky, another
12 obstetrician-gynecologist, and my notes say that he
13 treated her with two pessaries, and both were
14 unacceptable to the patient.
15       The first one was painful, and the second
16 one caused bleeding, so the patient stopped using
17 the pessary.  And I don't think she was willing to
18 try a pessary again.  Otherwise we would have done
19 that.
20  Q.  When she came to see you in January of
21 2006, in what way was pelvic organ prolapse
22 affecting her life?
23  A.  Well, her own words were that she felt
24 like her insides were falling out.  She couldn't
25 pee normally.  She couldn't eliminate stools

Page 28

1 normally.  She was incontinent of flatus and urine.
2       I think it was affecting her life quite a
3 bit.  She was -- She had seen Dr. Miksovsky, you
4 know, at least a couple of times before that.
5  Q.  Move forward to the page ending in 153 at
6 the bottom.  This is a record from a visit on
7 April 6, 2006.
8  A.  Okay.
9  Q.  Okay.  And under Reason for Visit, it says
10 counseling.  Do you see that?
11  A.  Yes.
12  Q.  Okay.  Can you describe for me what that
13 means, a counseling visit?
14  A.  Well, in -- March 14th, on the previous
15 page, the patient called my office and spoke to
16 Claudia Peterson, our nurse, and it says that she
17 was referred for conservative therapy, but she
18 would like to have surgery, and she wanted to have
19 an appointment with me to discuss surgery.  She did
20 not want to do physical therapy.
21       Our nurse, Claudia, was a really strong
22 proponent of conservative surgery, physical
23 therapy, using pessaries.  So I'm -- It was her
24 normal routine to really encourage patients, you
25 know, and really, really encourage them to -- to

Page 29

1 give conservative, you know, measures a good try.
2       So after talking to the -- Mrs. Smith on
3 the phone, she didn't want to pursue that anymore.
4 Instead she wanted to come see me.  So the
5 appointment was made on the 6th of April to talk
6 about surgery.  She was done with conservative
7 therapy.
8  Q.  And what did you discuss with her as it
9 relates to Prolift?
10  A.  So we discussed doing an anterior and a
11 posterior colporrhaphy with Prolift.  We discussed
12 doing a mid-urethral sling.  And it was our
13 preference to do a TVT type of sling, but, because
14 a TVT sling actually enters the abdominal cavity
15 and she had the history of severe adhesions, we
16 decided to do the transobturator sling, which
17 avoids going into the abdomen.
18  Q.  Did you consider using native tissue?
19  A.  You know, my understanding is that native
20 tissues, you know, did not -- were not helpful and
21 did not -- were not associated with improved
22 results, and so I don't think we discussed that.
23       We -- I think we discussed doing -- so
24 we -- I think we discussed doing a native tissue
25 repair, just an anteroposterior repair, but I

EXHIBIT 1
Page 8 of 26

Peter Zenthoefer, M.D.

Page 30

1 guess -- I guess what I should have said is we --
2 we didn't discuss using other tissues, like from --
3 from animal sources, you know, collagen from animal
4 sources and things like that.
5      Q.  What was it about the Prolift product that
6 made you decide to recommend it to her?
7      A.  I think the reason that I recommended
8 Prolift is that it gave -- it was associated with
9 better long-term results.  You know, I had been
10 doing anteroposterior repairs since my residency
11 program in the 1980s, and -- and they just have a
12 very high failure rate.
13      When you use the patient's own tissues,
14 which we call a native tissue repair, they just
15 have very high failure rates.  And using mesh is
16 associated with better long-term results.
17      Q.  Was Prolift a reasonable and appropriate
18 option for Ms. Smith?
19      A.  Yes, it was.
20      Q.  And in your hands, did Prolift work to
21 treat your patients with prolapse?
22      A.  Yes, it did.
23      Q.  On Page -- the following page of your
24 packet there, it ends in 820 at the bottom, this is
25 the informed consent that Ms. Smith signed on

Page 31

1 April 12th, 2006.  It says in the middle "PARQ
2 discussion held"?
3      A.  Right.
4      Q.  What is that?
5      A.  So this -- this is a form --  This page
6 was not included in the information that was sent
7 me.  So I'm really glad you found this.
8      Q.  Okay.
9      A.  This is the informed consent form.  And
10 "PARQ" stands for "procedure alternatives risk
11 questions" discussed.
12      Q.  What risks did you discuss with her?
13      A.  Well, you know, I spent a lot of time
14 talking about risks to patients because I think
15 surgery is a big deal.  So, you know, you start out
16 with the obvious ones.  You know, there is a small
17 chance could you die.
18      There could be major morbidity.  You know,
19 you could have a heart attack, you could have a
20 stroke, you could have blood clots.
21      There could be infections.  The surgery
22 can fail.  There is no guarantee that a surgery
23 for -- to correct pelvic organ prolapse, there is
24 no guarantee that it will work, either in the short
25 term or in the long term.

Page 32

1      You know, medical complications, you know,
2 from a -- drug reactions, allergic reactions,
3 infections, whether they be where we do the surgery
4 or in other parts of the body like -- like lungs,
5 bladder, kidneys.
6      And then, you know, there's all the risks
7 and complications of a surgery where we don't use
8 mesh.
9      And then, when we do use mesh, there is a
10 whole 'nother discussion that that then -- that we
11 go into.  And the most common, I think,
12 complication with mesh is vaginal mesh erosion.
13 That's probably the most common one.
14      Q.  How would you --  I'm sorry.
15      A.  Sure.
16      Q.  How would you have explained vaginal mesh
17 erosion to her?
18      A.  Basically, the mesh sort of coming through
19 the vaginal skin, coming out the vagina.
20      Q.  Did you discuss any complications
21 associated with vaginal mesh erosion with her?
22      A.  Yes, I'm sure I did.
23      Q.  And what would those have included?
24      A.  So when mesh -- so --  And I also mention
25 that mesh can also internally erode into other

Page 33

1 structures, you know, other organs and things.
2      But specifically vaginal mesh erosion, the
3 most common things that patients would notice would
4 be vaginal bleeding, vaginal spotting, vaginal
5 discharge.  If they are sexually active, their
6 partner --  The most common person that notices it
7 is actually their partner because, during vaginal
8 intercourse, they feel -- the male partner feels
9 the mesh and it feels like sandpaper, and they have
10 discomfort.  They get poked.  And so those are
11 things I discussed with everybody.
12      I also discussed, you know, the
13 possibility of having a second surgery to deal with
14 mesh erosion.  And, you know, if it's -- and then,
15 you know, the mesh can also erode into the rectum,
16 it can erode into other abdominal organs.  And so
17 it was -- it was all discussed.
18      Q.  Did you discuss with her the possibility of
19 pain associated with mesh erosion?
20      A.  You know, any -- any kind of pelvic
21 surgery is -- can be associated with pain, and --
22 and so that -- that was also discussed.
23      Q.  Did you discuss a risk of other urinary
24 symptoms that could result after the surgery?
25 Urinary dysfunction, for instance?

EXHIBIT 1
Page 9 of 26

Page 34

1    A.  You know, when we talk about doing slings
2  under the bladder, you know, I had a spiel, sort of
3  a standard discussion in which I told patients that
4  tensioning the sling was very tricky, was very
5  critical.  If we didn't tension the sling tight
6  enough, you know, their stress urinary
7  incontinence, their urine leakage problem wouldn't
8  be better or wouldn't be improved enough that they
9  would be happy.  And if we made it too tight, then
10  they would have trouble emptying their bladder.
11  So, you know, we had that discussion too.
12    Q.  Anything else that you would have discussed
13  related to the risks?  I just wanted to make sure
14  you had a chance to finish your answer before I
15  move on to something else.  I know I interrupted
16  you a couple times.
17    A.  So dyspareunia, pelvic pain, different
18  kinds of morbidity, need for further surgeries down
19  the road, nerve injuries, bowel injuries, bladder,
20  rectal injuries.  That pretty much, I think, covers
21  it.
22    Q.  Approximately how long would it take you to
23  have that risk discussion with your patients?
24    A.  So I had 30 minutes for the pre-op
25  appointment, and I generally always went over.  I

Page 35

1  generally always took 45 minutes.
2        And most of that time was going over the
3  consent form because, by the time they come to the
4  pre-op visit, you know, we have already established
5  a surgical plan.
6        In a few cases the patient might say,
7  "Well, I want this additional thing done," or, "I
8  don't want this done," or, "I want it done
9  differently."  But most of the time, when the
10  patients came to the pre-op visit, the plan was
11  established, accepted.
12        The physical exam was pretty brief.  You
13  know, heart, lungs, are you healthy, are you
14  coughing, are you sick, are you well.  And most of
15  the discussion was all about the surgery, the
16  risks, the alternatives, and answering questions.
17    Q.  After having that discussion, did Ms. Smith
18  elect to go -- proceed with the procedure?
19    A.  She did.
20    Q.  I'm going to ask you to turn to your
21  operative report, which starts at Page 681, a few
22  pages back from you are.  I'm sorry the pages
23  aren't in numerical order at the bottom.  We try to
24  keep them in chronological order.
25    A.  681.  Is that a page number or is that --

Page 36

1    Q.  At the bottom here [indicating].
2    A.  Okay.
3    Q.  Okay.  And does this look to be the
4  operative report following Ms. Smith's implant
5  procedure?
6    A.  It does.
7    Q.  Okay.  And the date of her procedure was
8  April 17, 2006; right?
9    A.  It was.
10    Q.  Were there any complications during this
11  procedure?
12    A.  I don't recall any complications.
13    Q.  Did the procedure essentially go as
14  planned?
15    A.  It went very well.  I did it with my
16  partner, Audrey Curtis, who was a very skilled
17  surgeon, and we worked very well together
18  and...[pause].
19    Q.  One record that we have not yet found were
20  your discharge instructions.  What were your
21  standard discharge instructions following a Prolift
22  procedure?
23    A.  Well, there were --  The most obvious ones
24  were restrictions in lifting.  So, you know,
25  usually I told patients, you know, not to lift

Page 37

1  like -- like more than 10 pounds for the first
2  couple of weeks and no more than 15 pounds for the
3  next month after that.
4        We told patients they should not put
5  anything in the vagina.  So, you know, no vaginal
6  intercourse, no douching, no vaginal estrogens with
7  applicators.
8        We had discussions about urinary
9  retention, voiding problems, bladder infections.
10  Those were all common issues after surgery.
11        And -- and encouraged the patient again
12  and again and again to call my office if there was
13  anything out of the ordinary or if they had any
14  concerns or questions.
15    Q.  I want to move on to your post-operative
16  care of her.  If you'd turn to the next page, which
17  has a stamp of 163 at the bottom, the date of this
18  visit was April 25th, 2006, so eight days after her
19  procedure.
20        How was she doing at this time?
21    A.  So I always liked to see my patients
22  one week after surgery, especially the ones that I
23  did put slings under the urethra, because if the
24  sling was too tight, at this time, one week after
25  surgery, we were still within that small window of

EXHIBIT 1

Peter Zenthoefer, M.D.

Page 38

1  time where we could go back to the OR and loosen it
2  and have good results.
3       So she came and saw me one week after the
4  surgery. And my note says -- and I don't -- my
5  note says that when she was discharged from the
6  hospital, she had a little right leg pain, but this
7  was now completely resolved. She was voiding
8  normally. She no longer had stress urinary
9  incontinence. She was taking tub baths. And she
10  had no concerns at all.
11       And then I examined the incisions, and
12  they were all healing well. I inserted a very
13  small speculum into the vagina and very gently,
14  carefully examined her, and all the incisions
15  inside were healing.
16       Could not see any mesh and -- and I
17  thought she was doing very well. And then, when --
18  I encouraged her to start using estrogen cream when
19  she was more comfortable.
20    Q.  The next time that you saw her was just
21  over a month later, on May 31st of 2006, and that's
22  on Page 165. I think --
23    A.  Oh, April 25th and now 31 May. Okay.
24    Q.  Okay. And how was she doing at this
25  post-op visit?

Page 39

1    A.  My notes say that she was doing very well,
2  patient is very pleased, she no longer splints
3  bowel movements.
4       So one of her main problems was she was
5  having a lot of difficulty with bowel movements.
6  She would have to insert her fingers and push on
7  the lower vaginal wall and try to get that stool to
8  come out, and she -- and that -- and she wasn't
9  doing that at all anymore.
10       And she has -- she had no stress urinary
11  incontinence. So that was another one of her
12  complaints. She had no urgency symptoms. And we
13  always asked about urgency because urgency symptoms
14  sometimes, you know, could be a sign that the sling
15  is too tight under the urethra. And so she had
16  none of that.
17       She was complaining of her urine being a
18  little cloudy and a little bit of burning, and she
19  wondered if she had a bladder infection.
20    Q.  Did you start her on Premarin cream at this
21  time?
22    A.  My notes say that I did.
23    Q.  Why did you do that?
24    A.  That was our routine. The tissues in the
25  pelvic floor in the vaginal area, they are

Page 40

1  different than tissues elsewhere in the human body.
2  They are estrogen-dependent. They need estrogen to
3  be healthy, to be strong. And without estrogen,
4  especially when somebody is 65, they atrophy, they
5  become thin, they become weak, and then the
6  incidence and the likelihood and the probability of
7  mesh erosion increases quite a bit.
8       So pretty much for -- for all of our
9  patients who had pelvic floor reconstruction
10  surgery, we recommended, you know, vaginal estrogen
11  for everybody. We felt that the local effects
12  were -- were very important.
13       The amount of systemic absorption was
14  small, and -- and unlike oral estrogen, which has
15  other risks, we felt that this was very, very safe.
16    Q.  Do you want to go off the record now a
17  second?
18    A.  Pardon?
19    Q.  Do you need to go off the record for a
20  second?
21    A.  I'm all right. I'm just going to put a
22  cough drop in.
23    Q.  Sure. You also noted during this visit
24  that there was a small stitch visible at the
25  vaginal cuff apex. Do you see that under A?

Page 41

1    A.  I do.
2    Q.  What did that mean?
3    A.  Well, the stitches that we used were
4  absorbable, but they took, you know, two months,
5  three months, four months, you know, longer --
6  There are different kinds of absorbable sutures.
7  Some are reabsorbed more quickly than others. So
8  this was normal.
9    Q.  Okay.
10    A.  Excuse me.
11    Q.  Sure. You saw her again in April of two --
12  I'm sorry, in August of 2006. And that is at Page
13  175. Do you see that?
14    A.  So April 15th?
15    Q.  It's August 15th.
16    A.  Or August 15th.
17    Q.  It was my fault. I said it first.
18    A.  Okay. I see it.
19    Q.  Was she still doing well at this time?
20    A.  So it looks like August 15th was a -- was
21  a nurse visit.
22    Q.  Okay.
23    A.  And I actually saw her August 23rd.
24    Q.  And that's at Page 177?
25    A.  Yes.

EXHIBIT 11
Page 11 of 26

Peter Zenthoefer, M.D.

---

Page 42

1    Q.  Okay.  How was she doing on August 23rd?
2    A.  So on August 23rd, my note says she was
3  very pleased with the results of the surgery.  She
4  states that the problems she had with bowel
5  movements before the surgery, that is, splinting,
6  having to put her fingers in and provide -- and
7  push and help evacuate stools, was completely
8  resolved.
9        So sometimes when we do the surgery,
10  sometimes patients still have to splint, but not as
11  often, and sometimes the success is partial.  In
12  her case, it was completely resolved.  So she was
13  very happy about that.
14    Q.  Moving to -- I'm going to skip a couple of
15  appointments just for the sake of time.  Moving to
16  the page that's 198 at the bottom, and the date of
17  the visit is July 18, 2007.
18    A.  Okay.  I found it.
19    Q.  How was Mrs. Smith doing at this time?
20    A.  So, you know, I don't have any independent
21  recollection, so I will just read my note.
22    Q.  Uh-huh.
23    A.  It says that she doesn't have any urinary
24  incontinence during the day now.  So during the
25  daytime, when patients are active, when they are

---

Page 43

1  lifting, when they are walking, when they are going
2  up and down stairs, that's when they usually leak.
3  When patients are lying down at night, sleeping,
4  that is a time when they are much less likely to
5  leak.
6        So she was telling me that -- that she had
7  no -- she had no incontinence during the day, but
8  she has a little leakage at night.  So that's a
9  little -- I wasn't quite sure what to think about
10  that.  Her pad was a little wet.  She had to get up
11  three times at night.  That's pretty common when --
12  you know, when people are in their sixties.
13        She says she is able to walk to the
14  bathroom okay at night without leaking, but she --
15  when she arises from the supine position, she leaks
16  a little bit.  So when people stand up, they have
17  to strain a little bit.  So that's not too unusual.
18        Then my note says she complains of
19  frequent urinary tract infections, that she feels
20  like she always has a urinary tract infection.  The
21  last one was in December.  So this note was in
22  July, and the last one was in December.  She
23  frequently takes cranberry juice when she feels she
24  has symptoms.
25        And she had a urethral discharge that was

---

Page 44

1  slightly green in color.  She said she was using
2  estrogen cream.  Rarely sexually active.  She had
3  told me her husband was pretty ill.  She stated
4  that the surgery had helped her 90 percent, and she
5  no longer -- she was happy she no longer leaked
6  urine with activities in the daytime.
7    Q.  Was the Prolift still successful in
8  treating her prolapse?
9    A.  And then she also said that she had a
10  little bloody discharge from the urethra.  And then
11  on my examination -- So I did measurements on
12  this -- on this day.
13        And the bladder -- it looks like the
14  bladder was fairly well supported.  The posterior
15  vaginal wall was fairly well supported.  So yes,
16  things -- it looked like the surgery was -- was --
17  was still successful.
18    Q.  I'm going to move ahead to 2011, April 5th
19  of 2011, and the page number at the bottom is 388.
20  At this time did she report to you that she had no
21  complaints or problems except the high cost of the
22  vag E cream?
23    A.  ROS is Review of Symptoms, and I wrote
24  down that she has some urgency symptoms like when
25  she had a urinary tract infection in the past.  So

---

Page 45

1  I think that was her only concern that day.
2    Q.  Can we move ahead to the page that's
3  labelled 390.  It says, about a third of the way
4  down:
5        "Spent 25 minutes with patient
6        today.  More than 50 percent of
7        visit was face-to-face counseling,
8        discussing mesh erosion, vaginal
9        atrophy, and urgency symptoms."
10        Why did you have that discussion with her
11  on that date?
12    A.  Well, I did an examination.  So on Page
13  389, when I examined her, at the -- towards the
14  bottom of the page, where it says cuff, that's the
15  very top of the vagina, I wrote:
16        "At the apex there is about a
17        1 centimeter area of mesh that was
18        exposed.  No abnormal induration or
19        purulent discharge."
20        So no sign of infection.  And I did a
21  rectal exam, and I did not find any mesh inside the
22  rectum.  So we had a long discussion about the mesh
23  in the vagina.
24        And -- and the other thing I noticed when
25  I examined her is that her tissues were very

---

Peter Zenthoefer, M.D.

Page 46

1  atrophic, they were very thin, very fragile, very
2  weak.
3      Q.   Was that one of the things that you
4  referred to earlier could lead to a mesh erosion,
5  when the tissue has become thin and weak?
6      A.   Right.  And we spent a lot of time talking
7  about the importance of using vaginal estrogen.
8      Q.   Moving forward to the page labeled 401, the
9  date of the visit was June 24th, 2011.  Are you
10 there?
11     A.   Uh-huh.
12     Q.   Okay.  What was her chief complaint during
13 this visit?
14     A.   So I saw her in January, and that's when
15 we first noticed a little bit of mesh erosion.  So
16 sometimes when patients -- sometimes that will heal
17 over, the vaginal skin will grow over the mesh and
18 you get reepithelization.
19         So in June, when I saw her, this was an
20 appointment that was scheduled to see if things
21 had -- had healed, if reepithelialization had
22 occurred, you know, with using the estrogen cream.
23 That was the purpose of this visit.  It does not
24 appear that she had any complaints.
25     Q.   Was she experiencing any pain associated

Page 47

1  with that mesh erosion?
2      A.   It's not mentioned here in my note.
3      Q.   Would you have mentioned that?
4      A.   I would have if she would have told me.
5      Q.   Okay.
6      A.   Generally, mesh erosion is not associated
7  with pain.  And -- and the patient themselves is
8  generally unaware of that.  They may notice a
9  little bit of funny vaginal discharge.
10         More typically, their partner notices it
11 during intercourse.  Their partner has pain.  Not
12 the patient, but their partner.  And she was not
13 sexually active.
14     Q.   If we move forward to the page marked 414,
15 did you recommend removing that part of the mesh
16 that was eroded?
17     A.   So that had been the plan that was made in
18 January, that we do conservative therapy using the
19 vaginal estrogen cream, and we did that for about
20 six months.
21         And then, if it doesn't heal, then we do
22 surgery and remove the mesh and then sew the
23 vaginal skin edges together and give it a chance to
24 heal.  So yes.
25     Q.   Okay.  Move forward a few more pages to the

Page 48

1  page marked 549.
2      A.   549.
3      Q.   Yes.
4      A.   549?
5      Q.   Yes.
6      A.   Because the last one I have is 453.
7      Q.   Yeah.  They're out of order.  It's just a
8  couple pages past where we were.
9      A.   Oh, here it is.  Okay.
10     Q.   Okay.  This, I believe, is the operative
11 report for the procedure to remove that piece of
12 exposed mesh -- or not the full report, but a note
13 concerning it.  I'm sorry.  I don't believe that we
14 have actually obtained the record of the operative
15 report.
16     A.   So it was my custom to dictate an op note
17 even on little procedures that I did in the
18 outpatient surgery area.  So this says H & P
19 Update.  So this was something we had to do right
20 before we did the surgery.  So I don't -- I don't
21 see any other summary dictation here.
22     Q.   Okay.  We may have not obtained it yet.
23     A.   Right.
24     Q.   Would you have discussed any risks of this
25 surgery with her?

Page 49

1      A.   Oh, yes.
2      Q.   And what were those risks?
3      A.   Well, you know, this -- this was a much
4  shorter surgery, but -- but, you know, still --
5  still there are associated risks.
6          The location of the mesh exposure is very
7  close to the bladder, very close to the rectum,
8  very close to pelvic nerves, very close to ureters.
9  So all of those things could be -- could be
10 injured.  Doesn't happen often, but could be.
11         I always did a cystoscopy, that is,
12 putting a scope in the bladder, making sure that
13 things were functioning, making sure that the
14 ureters were making urine, making sure there were
15 no injuries to the bladder.  So that was done at
16 this time.
17         Patients are always told that there's no
18 guarantee that -- that -- that this is going to
19 heal okay.  You know, I think I told patients there
20 was maybe an 80 percent chance that this would heal
21 and there was maybe a 20 percent chance that they
22 would have a mesh erosion down the road again.
23         I always emphasized the importance of
24 using estrogen in the vagina.
25         And then I think at one of the later

EXHIBIT 1
Page 13 of 26

Page 50

1 notes, when I was reviewing the chart, I read that
2 the patient wasn't actually putting estrogen in the
3 vagina. She was just putting it on the outside.
4 So even though my note says she was using estrogen
5 daily, later on, in retrospect, I figured out that
6 she really wasn't using it at all up at the top of
7 the vagina, she was just using it on the outside.
8      Which didn't really help where the mesh
9 was exposed.
10     Q.  So can that -- I'll call it a failure --
11 can that failure to use the estrogen in the way
12 that you had recommended have contributed to the
13 mesh erosion?
14     A.  Absolutely.
15     Q.  Understanding that we don't have the
16 operative report, I'm going to move to the next
17 visit after you had removed that portion of the
18 mesh.
19     So the page I am on is 437, and it's
20 actually the back of one of the pages.  Okay.  How
21 was she doing following the removal of that portion
22 of the mesh?
23     A.  So on this visit --  This visit is with my
24 nurse, Carleen Pompeii.  And she says that she came
25 in for a voiding trial.  So I don't have the -- all

Page 51

1 the chart information, but it sounds like they
2 filled -- that my nurse put 275 cc's of sterile
3 water in her bladder with a Foley catheter.
4      So it sounds like she maybe went home with
5 a Foley catheter from the surgery, like she
6 couldn't pee, and now she is in the office to see
7 if -- if -- if -- with resolution of the swelling,
8 with healing, if she can now pee.
9      And my nurse discovered that she voided
10 normally.  So the catheter was removed and she went
11 home that day.
12     Q.  Okay.
13     A.  And my nurse doesn't write that the
14 patient was having any problems or concerns.  If
15 the patient would have said something, she would
16 have -- she would have called me.
17     Because, you know, either -- either I was
18 in the office that day, too, or one of my partners.
19 So when she sees patients for a voiding trial, if
20 they have any concerns at all, they always get a
21 doc or urogynecologist, then have the doc examine
22 the patient, talk to the patient.
23     So the way I interpret this is that she
24 was doing fine, didn't have any problems, she peed
25 okay and went home.

Page 52

1      MS. MERK:  I want to go off the record for
2 a few minutes, please.
3      THE VIDEOGRAPHER:  The time is now 10:25.
4 Going off the record.
5      (Recess taken.)
6      THE VIDEOGRAPHER:  Time is now 10:35, and
7 we are back on the record.
8 BY MS. MERK:
9     Q.  Doctor, do you agree with me that no
10 surgery is a hundred percent risk-free?
11     A.  Absolutely.
12     Q.  And is it fair to say that you familiarized
13 yourself with the safety information about mesh
14 before using it for the first time?
15     A.  I think so.
16     Q.  How were the ways that you educated
17 yourself?  We have already discussed the Ethicon
18 professional education event.  What are the other
19 ways that you educated yourself about mesh?
20     A.  Well, you know, I was a member of
21 professional societies, like AUGS and IUGA.  I read
22 their publications regularly.  I attended
23 continuing education conferences regularly.
24     Q.  Did you also have discussions with your
25 colleagues at Kaiser?

Page 53

1     A.  Frequently.
2     Q.  Do you agree that all pelvic floor
3 surgeries have basic known risks?
4     A.  Again, yes.
5     Q.  Does a bad outcome mean that there was
6 something wrong with the surgery?
7     A.  No.
8     Q.  Does a bad outcome mean that there was
9 necessarily something wrong with the product?
10     A.  No.
11     Q.  With regard to Prolift, if Ms. Smith did,
12 in fact, experience erosion, does that mean that
13 there was something wrong either with the surgery
14 or with the product?
15     MR. CANTRELL:  Object to the form.
16     You can answer the question.  I'm just
17 objecting for the record.
18     THE WITNESS:  No.  I think --  And again, I
19 just want to add that I think her noncompliance,
20 her failure to use estrogen inside and at the top
21 of the vagina, at the vaginal apex, a common area
22 of mesh erosion, I think was a contributing factor.
23 BY MS. MERK:
24     Q.  In your hands, did you find that the
25 benefits of Prolift for your patients outweighed

Peter Zenthoefer, M.D.

Page 54

1  the risks of Prolift?
2      MR. CANTRELL:  Object to the form.
3      THE WITNESS:  I think so.
4  BY MS. MERK:
5      Q.  And was that true during the entire time
6  that you used Prolift in your patients?
7      A.  Yes.
8      Q.  Did you find that Prolift was a safe and
9  effective treatment in your patients?
10     A.  Right.  With -- Again, you know, no
11 surgery is guaranteed safe, but yes.
12     Q.  That was something that you knew before you
13 implanted the first Prolift product into one of
14 your patients; correct?
15     A.  Yes.
16     Q.  Do you generally provide patient brochures
17 to your patients?
18     A.  We had some brochures in our clinic that
19 all the urogynecologists used that talked in
20 general terms about pelvic organ prolapse and
21 treatment for that.  So --
22     Q.  Some doctors that we have spoken to used it
23 to go through risks with their patients and others
24 just left it out in the waiting room for their
25 patients to pick up.

Page 55

1      How did you use brochures, if at all?
2      A.  Well, you know, I -- I -- it was my
3  custom, my practice to draw pictures and to show --
4  because I think a picture just conveys ideas and
5  information much better than just talking.  So I
6  always drew pictures out, and I sent those home
7  with patients.
8      And I showed them, you know, where their
9  bladder, vagina, rectum was, where the mesh would
10 be and...[pause].
11     Q.  I am going to -- Well, first I'm going to
12 ask you.  Do you have an independent recollection
13 or do any of the records that we have reviewed
14 today indicate that you gave a brochure to
15 Mrs. Smith?
16     A.  There is nothing mentioned here.  So I --
17 I don't have an independent recollection.
18     MS. MERK:  I'm going to mark as Exhibit 4 a
19 brochure for Prolift.
20     (Zenthoefer Exhibit 4 was marked for
21 identification by the Reporter and is annexed
22 hereto.)
23     MR. CANTRELL:  Well, if you're going to ask
24 him questions about this, I'm going to object for
25 the record, because this is a 2008 version.  So it

Page 56

1  wasn't the version that was even applicable at the
2  time she had her surgery.
3      MS. MERK:  Okay.
4      Q.  Can you turn to the page that's 292 at the
5  bottom.  All right?
6      A.  All right.
7      Q.  There is a statement of risks associated
8  with Prolift here, and it states:
9          "All surgical procedures present
10         some risks.  Complications
11         associated with the procedure
12         include injury to blood vessels of
13         the pelvis, difficulty urinating,
14         pain, scarring, pain with
15         intercourse, bladder and bowel
16         injury.  There is also a risk of
17         mesh material becoming exposed.
18         Exposure may require treatment.
19         For a complete description of these
20         risks, please see the attached
21         product information.  Synthetic
22         mesh is a permanent medical device
23         implant.  Therefore, you should
24         carefully discuss the decision to
25         have surgery with your doctor and

Page 57

1          understand the benefits and risks
2          of mesh implant surgery before
3          deciding to treat the condition."
4      Do recall ever reading that paragraph?
5      A.  I don't recall seeing this brochure.
6      Q.  Okay.  Were you aware -- Prior to the time
7  that you implanted Prolift in Ms. Smith in 2006,
8  were you aware of each of the risks that are stated
9  here?
10     A.  Yes.
11     Q.  Prior to implanting Prolift in Mrs. Smith
12 in 2006, were you aware that some of the
13 complications associated with pelvic surgery
14 involving mesh included injury to blood vessels of
15 the pelvis?
16     A.  Yes.
17     Q.  And of difficulty urinating?
18     A.  Yes.
19     Q.  And pain?
20     A.  Yes.
21     Q.  Scarring?
22     A.  Yes.
23     Q.  Pain with intercourse?
24     A.  Yes.
25     Q.  Bladder and bowel injury?

EXHIBIT 1
Page 15 of 26

Peter Zenthoefer, M.D.

Page 58

1   A.  Yes.
2   Q.  And are these all risks that you discussed
3   with Mrs. Smith?
4   A.  Yes, they are.
5   Q.  You can put that one aside.
6       I have marked as Exhibit 5 a statement from
7   the FDA, and it is issued October 20th, 2008.
8       (Zenthoefer Exhibit 5 was marked for
9       identification by the Reporter and is annexed
10      hereto.)
11  BY MS. MERK:
12  Q.  And my question for you is if you have ever
13  seen this document before.
14  A.  I believe I have.
15  Q.  After you received this document, did you
16  continue to use Prolift in your patients?
17  A.  I believe we did.
18  Q.  You can put that document aside.
19  A.  My partners and I, you know, we -- we
20  regularly had -- you know, with our nurses, we had
21  urogynecology meetings, and I can recall seeing
22  this and discussing this.
23      But it wasn't too long after this that we
24  started doing more laparoscopic, you know,
25  surgeries and less Prolifts.  This was sort of when

Page 59

1   directions seemed to change.
2   Q.  The laparoscopic surgery, was that a new
3   procedure that you had not done before?
4   A.  So the procedure we had done before by
5   making a big incision in the patient.  And then we
6   would take mesh and -- and attach it to the vagina,
7   on the anterior wall and the posterior wall, we
8   made a Y shaped graft, and then we would attach it
9   to the anterior ligament of the sacrum.
10      So what was different was that this very
11  long, difficult surgery that required a big
12  incision, we were now doing it laparoscopically
13  through little incisions.
14      And -- and -- and, you know, in the
15  beginning, I didn't think we could ever do it, you
16  know, but -- but then, you know, with this trick
17  and that trick and this technique and this change
18  in technique, you know, eventually we were able to
19  do it.  But they were just incredibly long
20  surgeries.  I mean, the first one we did, I don't
21  know, six, seven hours?
22      And then, you know -- you know, we were on
23  the bottom of the learning curve, and then we got
24  better.  And then -- so anyway...[pause].
25      MS. MERK:  I have next marked as Exhibit 6

Page 60

1   a chart that we have prepared, and I'm going to ask
2   you some questions about it.
3       (Zenthoefer Exhibit 6 was marked for
4       identification by the Reporter and is annexed
5       hereto.)
6   BY MS. MERK:
7   Q.  This chart lists some of the potential
8   risks of non-mesh pelvic organ prolapse surgery.
9   I'm going to go through them each and ask if you
10  were aware of these as risks of non-mesh surgery.
11      Acute and/or chronic pain with intercourse.
12  Was that a risk that you were aware --
13  A.  Yes.
14  Q.  -- of with non-mesh surgery?
15      Acute and/or chronic pain?
16  A.  Yes.
17  Q.  Vaginal scarring?
18  A.  Yes.
19  Q.  Infection?
20  A.  Yes.
21  Q.  Urinary problems?
22  A.  Yes.
23  Q.  Organ and nerve damage?
24  A.  Yes.
25  Q.  Bleeding?

Page 61

1   A.  Yes.
2   Q.  Wound complications?
3   A.  Yes.
4   Q.  Inflammation?
5   A.  Yes.
6   Q.  Fistula formation?
7   A.  Yes.
8   Q.  Neuromuscular problems?
9   A.  Yes.
10  Q.  Repeated surgeries to treat an adverse
11  event?
12  A.  Yes.
13  Q.  Recurrence or failure?
14  A.  Yes.
15  Q.  Foreign body response?
16  A.  (No response.)
17  Q.  For non-mesh --
18  A.  Yes.
19  Q.  -- surgery, so including --
20  A.  Yes.
21  Q.  -- other products that --  Okay.
22      Erosion or exposure of extrusion -- or
23  extrusion, excuse me, of sutures or grafts?
24  A.  Yes.
25  Q.  Contraction or shrinkage of tissues?

EXHIBIT 1
Page 16 of 26

Page 62

1    A.    Yes.
2    Q.    And were you aware of all of these
3 potential risks of non-mesh surgery before you
4 implanted Prolift in Mrs. Smith?
5    A.    Yes.
6    Q.    Were you aware that if one of these
7 complications resulted from a non-mesh surgery,
8 that the complication could be temporary or it
9 could be chronic in nature?
10    A.    Yes.
11    Q.    And were you aware that some of these
12 risks, the complications could be mild, moderate,
13 or severe?
14    A.    Yes.
15    Q.    On the back we have added a list of
16 potential surgeries with mesh and non-mesh
17 surgeries.  Were you aware that all of the risks
18 listed under the mesh column could be potential
19 risks associated with mesh repair for pelvic organ
20 prolapse?
21    A.    Yes.
22    Q.    And were you aware of all of these risks
23 before you implanted Prolift in Mrs. Smith?
24    A.    Yes.
25    Q.    Were you aware, with respect to mesh

Page 63

1 procedures, that each of these potential risks
2 could be chronic or they could be temporary?
3    A.    Yes.
4    Q.    And were you aware that they could be mild,
5 moderate, or severe?
6    A.    Yes.
7    Q.    And is that information that you took into
8 account when doing your risk-benefit analysis with
9 respect to Mrs. Smith?
10    A.    Yes.
11    Q.    Doctor, have you seen any record or do you
12 have any independent knowledge of whether Ms. Smith
13 experienced a foreign body reaction?
14    A.    (No response.)
15    Q.    Let me restate the question.
16        After implanting Mrs. Smith with Prolift,
17 did you find any evidence that she had been harmed
18 by a foreign body reaction?
19    A.    No.  The mesh expose -- the mesh exposure
20 at the top of the vagina seemed to be pretty
21 asymptomatic.  I am the one that noticed it on a
22 routine exam.
23    Q.    Have you seen any evidence that Mrs. Smith
24 experienced any cytotoxicity?
25    A.    No.

Page 64

1    Q.    And that, can we agree, means cell death?
2    A.    Well, that's --
3    Q.    Simply stated.
4    A.    -- what the term means.
5    Q.    Right.  Did you see anything in the record
6 to indicate that Mrs. Smith's mesh had degraded in
7 any way?
8    A.    No.
9    Q.    Or that she had roping or curling of the
10 mesh?
11    A.    No.
12    Q.    Was there any evidence of infection with
13 the mesh?
14    A.    No.  And my note specifically said that
15 there was no purulent drainage, so no pus.  And no
16 induration.  So none of the hallmark signs of
17 infection.
18        MS. MERK:  Okay.  I'm going to reserve the
19 rest of my time for rebuttal.
20            - - -
21        EXAMINATION
22            - - -
23 BY MR. CANTRELL:
24    Q.    Doctor, I have a few questions for you.  I
25 probably won't be quite as long.  I'll try not to

Page 65

1 repeat a question, but if I do, forgive me.
2        Now, you understand that Ms. Smith is not
3 making any allegations that you did anything
4 improper or negligent in any way in your treatment
5 of her.  Is that correct?
6    A.    I understand that, yes.
7    Q.    Okay.  And I believe you stated earlier in
8 your deposition testimony that pelvic organ
9 prolapse is a functional disorder and not a
10 life-threatening disease.  Is that correct?
11    A.    In the vast majority of cases, it's very
12 distressing to the patient.  It can be somewhat
13 limiting in terms of their ability to engage in
14 social activities and leave the home.  And -- and
15 rarely, in a very small number of cases, it can be
16 threatening -- life-threatening.
17        For example, if the prolapse is so
18 advanced that the bladder is completely outside the
19 vagina and patients can't pee at all, their bladder
20 just gets bigger and bigger.  I mean, that's
21 life-threatening.  But that's rare.  That's
22 unusual.
23    Q.    And what about in the case of Ms. Smith?
24 Her --her -- her pelvic organ prolapse was not
25 life-threatening.  Is that fair?

EXHIBIT 17
Page 17 of 26

Peter Zenthoefer, M.D.

Page 66

1    A.  I don't think it was life-threatening, no.
2    Q.  Are you aware that Dr. Arnaud, who was
3  Gynecare's Scientific Director of Europe, said that
4  because pelvic organ prolapse is a functional
5  disorder and not a life-threatening disease, the
6  treatment for it must not lead to serious
7  complications?
8    MS. MERK:  Object to form.
9    You can answer.
10    THE WITNESS:  I don't -- I don't recall
11  hearing this quote from this doctor.
12  BY MR. CANTRELL:
13    Q.  Okay.  Do you agree with that statement?
14    A.  Well, I think, in general, any surgery
15  should not lead to serious complications.  And I
16  don't think -- I think every surgeon and every
17  patient, when they plan a surgery, is planning on
18  the outcome to be without complications and the
19  outcome to be good.  Nobody plans a surgery with
20  complications in mind.
21    Q.  Certainly.  But you would agree with me
22  that there is a risk-benefit analysis to take place
23  depending upon the type of injury, the more
24  dangerous or life-threatening it is --
25    A.  Yes.

Page 67

1    Q.  -- the more risks that the surgeon and the
2  patient are apt to take with regard to the surgery.
3  Is that fair?
4    A.  Yes.
5    Q.  Okay.  And I want to ask you a few
6  additional questions about your training.  I
7  believe you mentioned it occurred at Saint Joseph's
8  in Milwaukee in 2005.
9    A.  I did not say Saint Joseph's.
10    Q.  Okay.  I'm sorry.
11    A.  I don't recall the name of the hospital we
12  were at.  I just remember flying to Wisconsin.  I
13  think it was Milwaukee.
14    And when we were in the airport, there
15  were people wearing funny hats, and they called
16  themselves Cheeseheads, and I had never heard that
17  term before.  And I remember ordering a salad at
18  dinnertime, because I wanted to be healthy, and,
19  when it came, they had it in this tall glass, and
20  half of it was cheese.  I couldn't believe it.
21    But I remember being there a weekend.  I
22  was there with Dr. Curtis.  There was another
23  doctor there.  And we watched a few surgeries.
24    We actually scrubbed.  We were in the
25  operating room.  And it was a -- There was some

Page 68

1  lecture and some surgery, you know, portion to the
2  training.
3    Q.  Okay.  And I want to ask you a few
4  questions about the lecture portion, if I can.
5    Did you believe that the information that
6  was being presented to you at this Ethicon training
7  would be fair and balanced in the sense that they
8  would tell you both the positive aspects of the
9  Prolift and any negative aspects of it?
10    A.  I think so.  I mean, I think -- I think we
11  were all -- always just a little bit skeptical when
12  we were going to training programs put on by the
13  manufacturer, but I think, by and large, yes.
14  And...[pause].
15    Q.  Now, prior to this training seminar, I
16  assume that you had not implanted a Prolift at that
17  point.
18    A.  That's correct.
19    Q.  Had you implanted any type of pelvic organ
20  prolapse kit using synthetic mesh?
21    A.  I believe, prior to that time, we were
22  doing TVTs for stress urinary incontinence.
23    And I believe we were also doing another
24  vaginal procedure where we -- we had -- or we
25  custom-cut a piece of mesh and then sewed it to a

Page 69

1  synthetic material and then anchored it where the
2  sacrospinous ligaments were.
3    Q.  Okay.
4    A.  I remember, I think, going to Texas, you
5  know, a different manufacturer, and we did training
6  there in cadaver labs.  So we had done that.
7    But when the Prolift became available, it
8  was -- just seemed like a much better product, and
9  the -- the trocars, the guides, the whole system
10  just was more patient-friendly.  It just worked a
11  lot better.
12    Q.  And I realize it was a long time ago, but
13  to the extent you have a recollection of it, what
14  do you remember being told about the development of
15  the Prolift?
16    A.  I'm not sure what you mean by
17  "development."
18    Q.  Well, did they discuss with you how it came
19  to be developed?  For example, that it was
20  developed by -- in part by a group of French
21  surgeons?
22    A.  I remember something about it being
23  developed by French surgeons.  I don't remember too
24  much else.
25    Q.  Okay.  Are you aware that, in April 2006,

EXHIBIT 18
Page 18 of 26

Peter Zenthoefer, M.D.

Page 70

1 those doctors who developed the Prolift procedure
2 told Ethicon that they needed to develop a safer
3 mesh because of problems with contraction and
4 erosion of the mesh, and those discussions were
5 ongoing even actual -- even after the actual launch
6 of the Prolift in 2005?
7      MS. MERK: Objection.
8 BY MR. CANTRELL:
9    Q.  Are you aware of that?
10   A.  No.
11   Q.  Would that have been something that you
12 would like to have known in weighing your decision
13 on whether to put the Prolift in your own patients?
14   A.  Yes.
15   Q.  Did anyone at the seminar tell you that the
16 same French doctors who developed the Prolift, as
17 early as 2003 told Ethicon that they were concerned
18 about erosions and contraction associated with the
19 Prolift mesh?
20      MS. MERK: Objection.
21      THE WITNESS: No.
22 BY MR. CANTRELL:
23   Q.  Okay.  Again, is that something you would
24 have liked to have known in making your own
25 risk-benefit assessment on whether to use that

Page 71

1 product in your own patients?
2      MS. MERK: Objection.
3      THE WITNESS: You know, yes.  I think we
4 would be interested in knowing as much information
5 as possible.
6 BY MR. CANTRELL:
7    Q.  How long after the session was it that --
8 that you implanted your first Prolift?
9    A.  You know, I don't -- I don't recall
10 exactly.
11   Q.  Okay.
12   A.  I can't recall.
13   Q.  Well, let me --  Maybe I can ask it this
14 way.  I know it was a long time ago, Doctor, and
15 it's not a memory test.
16      But was Ms. Smith your first patient that
17 you implanted --
18   A.  No.
19   Q.  -- Prolift --  Okay.
20   A.  No.  I don't think so.
21   Q.  And you mentioned that there became some
22 point in time that you stopped using the Prolift.
23 Is that correct?
24   A.  Right.  You know, different technique, you
25 know, this -- the laparoscopic sacral

Page 72

1 colpo-suspension became available, and we gradually
2 went in that direction and did less and less
3 Prolift surgeries.
4    Q.  When was the last time you did the
5 transvaginal implantation of a Prolift?
6    A.  Don't know exactly.
7    Q.  Okay.  And I think you gave an estimate of
8 use -- of implanting the Prolift in approximately
9 25 to 30 of your patients during your career?
10   A.  I believe our group did about 75, you
11 know, Prolift surgeries, something like that.  And
12 there were three of us that were doing it.  So I
13 figure I did maybe a third or...[pause].
14   Q.  Okay.  Do you recall how many of those
15 patients received Prolifts both anteriorly and
16 posteriorly, like Ms. Smith?
17   A.  I can't say.
18   Q.  Okay.  Was it the norm, though, that they
19 received Prolift both anteriorly and posteriorly?
20   A.  I did a number that way.  I think I did
21 quite a few where I did only the posterior Prolift,
22 but I did a number of total Prolifts.  But I -- I
23 can't give you exact numbers.
24   Q.  And I believe your testimony was you
25 stopped using the Prolift and went to this

Page 73

1 laparoscopic approach --
2    A.  Right.
3    Q.  -- because the complication rate is higher
4 with the Prolift transvaginal implantation versus
5 laparoscopic.  Is that correct?
6      MS. MERK: Objection.
7      THE WITNESS: I think the main reason we
8 sort of went in that direction is that the success
9 rate is higher.  The biggest problem with pelvic
10 organ, you know, reconstructive surgery has always
11 been, you know, recurrent prolapse problems.
12      And we felt that -- In our Prolift
13 patients, we felt that the success rate wasn't
14 quite as good as we'd hoped it would be.  We were
15 seeing a little bit more, you know, recurrent
16 prolapse than we wanted to see.
17      And we felt that the laparoscopic patients,
18 you know --  For a time we were doing both, hand in
19 hand, and then we -- it was our opinion that we
20 just got better results with -- with the
21 laparoscopic approach.
22      And then we were also seeing, I think, more
23 vaginal mesh erosions than we wanted to see or --
24 or, you know, that -- so it was a little bit of
25 both, I think.

EXHIBIT 1
Page 19 of 26

Peter Zenthoefer, M.D.

Page 74

BY MR. CANTRELL:

Q. Now, I know were you shown a copy of the FDA advisory in 2008. Are you familiar with a second FDA health advisory in 2011 regarding transvaginal mesh?

A. I believe I saw that also.

Q. Okay. And in that one, they announced that severe complications related to the transvaginal implant plantation of mesh are not rare. Is that your recollection?

A. I think by 2011 we weren't doing Prolifts anymore.

Q. Certainly. Okay. That was my question.

I wanted to try and narrow down the time frame, to the extent possible, to make sure that you had stopped prior to that or was that something that --

A. I remember --

Q. -- precipitated your stopping?

A. I remember that -- that -- When the second FDA announcement came, I remember that -- that our group felt good about going in the direction of laparoscopic, you know, surgeries, and we felt good that we had gone that way and that we weren't doing Prolift anymore.

Page 75

Q. And I want to ask you something about -- You mentioned that Mrs. Smith had adhesive disease at the time you implanted the Prolift. Is that correct?

A. So the very first time I saw her, she told us that when she had her hysterectomy, that it took seven hours or something like that, and her surgeon told her that it was like somebody dumped a bucket of glue in her belly and everything was stuck to everything. So that was what she told us at the very first visit.

Q. Okay. But, obviously, the fact that she had that condition or she told you that she had that condition, you didn't feel that made her an inappropriate candidate for the Prolift; is that fair?

A. If anything, that made her a very good candidate for Prolift because, with the Prolift procedure, we do not enter the abdominal cavity.

And the alternative at that time that we were offering patients was a big abdominal incision and using mesh on the inside, and that was -- that was clearly too risky to consider.

So she was an excellent candidate for Prolift. Excellent.

Page 76

Q. Now, at this point -- I believe her implantation was in April of 2006 -- there were some surgeons, urogynecological surgeons that were implanting transvaginal mesh laparoscopically at that time; is that correct?

A. Well, transvaginal mesh by definition means you are implanting it vaginally, and -- and I don't think anybody would take a vaginal mesh kit and implant that mesh lap- -- I've never heard of that. So --

Q. Yeah. Forgive me. That was a poorly phrased question. Let me --

A. So the mesh that we implanted laparoscopically was usually something we fashioned out a big piece of mesh. There were some companies that actually had little Y grafts. But we -- we just used the big piece of mesh and cut our own and custom-fitted it to the patient.

Q. My question, though -- and I agree, it was poorly phrased, so forgive me for that -- my question was, at the time of Ms. Smith's surgery in 2006, there were some surgeons that were implanting mesh laparoscopically for the treatment of pelvic organ prolapse. Is that correct?

A. I think -- I don't recall exactly. That

Page 77

certainly was not common practice. It was certainly not standard of care. I think some surgeons were experimenting with that a little bit.

Clearly, at that time, that was way beyond our ability. That was not something that was being done at the medical school in Portland. Our program had close ties to the medical school. We tried to, you know, sort of be in step with them and be aligned with them.

Q. And, certainly, that wasn't meant to be any criticism of your --

A. Right.

Q. -- I'm just asking questions. So thank you.

A. And Mrs. Smith would never be a candidate for laparoscopic surgery also because of all the adhesions.

Q. Okay. So in your opinion, she wouldn't be a candidate for laparoscopic surgery either?

A. Laparoscopic surgery would even be much more dangerous than making an open incision. Much more dangerous.

When somebody has lots of adhesions, we favor a laparotomy where we make a big incision over a laparoscopic approach.

Page 78

1    Q.  I'm going to ask you a couple of questions
2  about the informed consent --
3    A.  Okay.
4    Q.  -- page that was in the medical records
5  there, if you would get that.  I believe it was --
6    A.  All right.
7      MS. MERK:  3.
8  BY MR. CANTRELL:
9    Q.  Let me see which page it was.
10    A.  Looks like it's 820.  Is that the page you
11  are referring to?
12    Q.  I think that's right.
13      Now, the form itself doesn't specify
14  exactly what risks that you told Ms. Smith other
15  than mentioning the -- what is it, the PA -- PARQ
16  discussion?
17    A.  Right.  That's correct.
18    Q.  Okay.  And you don't have an independent
19  recollection, sitting here today, of your
20  conversation with Ms. Smith 11 years ago, do you?
21    A.  I do not.
22    Q.  Okay.  So your testimony about what
23  conversation you had with her about your risk is
24  just based on your -- your recollection of what you
25  generally do in these cases; is that fair?

Page 79

1    A.  That's correct.
2    Q.  Okay.  And it would also be fair to say
3  that your discussion with Ms. Smith at that time
4  was based upon the risks and complications that you
5  were aware of in 2006 relative to the Prolift; is
6  that fair?
7    A.  Yes, that's correct also.
8    Q.  And I want to ask you a couple questions
9  about the -- the erosion surgery that you performed
10  on Ms. Smith.  I think -- We don't have the op
11  report in there, but I think it was referenced on
12  the -- 549.
13    A.  549.
14    Q.  And I recognize that we don't have the op
15  report, but if you wouldn't mind just telling the
16  jury in kind of general detail what that surgery
17  would entail.
18    A.  So we don't have the operation report.
19  You know, it was my custom to dictate an op note
20  when I -- so in a situation like this, you know,
21  we -- I always did cystoscopy with this procedure.
22  Sometimes I did it first just to establish that
23  everything was normal in the bladder, and then I
24  did it a second time at the conclusion of the
25  surgery.

Page 80

1      So in general, the patient was started
2  under general anesthetic.  We generally, I think,
3  only rarely used a regional anesthetic.  And then
4  the patient was positioned so that we had access to
5  that area.
6      And then we would put retractors inside,
7  and this was all after the nurses prepped her with
8  antimicrobial, you know, preparation soaps, and
9  then retractors were placed inside, and then a
10  careful examination was made.
11      Because the examination in the office is
12  always somewhat limited because it's always
13  uncomfortable for the patient.  So in the operating
14  room, when we had anesthesia, we can do a much,
15  much better examination.
16      So the first thing we do is always a very,
17  very careful examination to make sure there aren't
18  any other places where there is mesh erosion.
19  Sometimes mesh erosion occurs in multiple places.
20      And then, once we have determined, you
21  know, the extent of the problem, then what we
22  generally do is we infiltrate the vaginal
23  epithelium with a dilute solution of a local
24  anesthetic agent containing epinephrine.  The
25  epinephrine constricts blood vessels and minimizes

Page 81

1  bleeding.  And it's not that there is a great deal
2  of blood loss with this, but -- but by minimizing
3  the bleeding, it keeps the operative field cleaner
4  and we can see better.
5      And then, using sharp dissection, using a
6  scalpel, using scissors, we basically sort of
7  undermine the normal vaginal skin around the mesh.
8  We then excise the mesh.  And then we put in a few
9  stitches to pull the skin together again without
10  tension and then -- so it has a chance to heal.
11    Q.  Okay.  And just to give the jury a picture
12  of this, when -- is --  The patient, I would
13  assume, is placed in a supine position and her legs
14  in stirrups.  Is that correct?
15    A.  That's correct.
16    Q.  Okay.  And then you would enter vaginally
17  to excise --
18    A.  That's correct --
19    Q.  -- the mesh --
20    A.  -- this is all done vaginally.  And then,
21  when the patient wakes up, she really has very,
22  very minimal pain from this and very, very minimal
23  discomfort.
24      This is an outpatient surgery.  It usually
25  takes an hour or less, you know.

Peter Zenthoefer, M.D.

Page 82

1    Q.   Now, how is it excised?  With scissors?  A
2  scalpel?
3    A.   Yes.
4    Q.   Which one?  I'm sorry, Doctor.
5    A.   Both.
6    Q.   Both.  Okay.
7    A.   So the initial incision I usually made
8  with a scalpel, and then I finished it with
9  Metzenbaum scissors.
10   Q.   Now, it would be -- and again, I recognize
11 we don't have the op report -- but it would be
12 typical in that situation for you to send the --
13 any explanted material to pathology.  Is that
14 correct?
15   A.   Always.  That was our routine.
16   Q.   And I will represent to you that you did.
17 I mean, we have the operative report.  I'm not sure
18 why we don't have it here today, but that's okay.
19 You did do that in this circumstance, I'll
20 represent to you.
21       In your medical opinion, was this surgery
22 to remove the eroded mesh medically necessary?
23   A.   Yes.
24   Q.   If I represented to you that the final
25 pathologic diagnosis for this mesh said:

Page 83

1       "The mesh caused an inflammatory
2       reaction in Ms. Smith's vagina and
3       that was a foreign body giant
4       reaction,"
5       what does that mean?
6    A.   Well, whenever there is an injury or
7  foreign body or anything, there is always an
8  inflammatory reaction.  That's very, very common in
9  path reports.
10      So when you tell me those terms, that
11 basically just tells me that this was, you know, a
12 synthetic material and this was how her body was
13 sort of handling this, dealing with this.
14   Q.   So is it fair to say it's the body's
15 reaction to a permanent implant like the Prolift?
16   A.   Yes.
17   Q.   Would it surprise you to know that
18 Ms. Smith had another surgery in August 2012 to
19 repair two additional eroded areas of mesh as well
20 as chronic abscesses?
21       MS. MERK:  Objection.
22       THE WITNESS:  I'm sorry.  I was coughing.
23 Can you repeat that?
24 BY MR. CANTRELL:
25   Q.   Certainly, Doctor.  I was just asking would

Page 84

1  it surprise you to learn that Ms. Smith had an
2  additional surgery in August of 2012 to repair two
3  additional areas of eroded mesh from the Prolift as
4  well as chronic pelvic abscesses?
5       MS. MERK:  Objection.
6       THE WITNESS:  I guess I am a little
7  surprised, you know.
8  BY MR. CANTRELL:
9    Q.   Yeah.  And she was hospitalized for almost
10 two weeks for that procedure.  Would that surprise
11 you, as well?
12       MS. MERK:  Objection.
13       THE WITNESS:  Yes, it would.
14 BY MR. CANTRELL:
15   Q.   Okay.
16   A.   I haven't heard from her in a long time.
17   Q.   Certainly.  I think that was the last --
18   A.   And by and large, you know, every visit
19 that I had with her was friendly, amicable.  I seem
20 to recall her being -- laughing and cheerful.
21       And, you know, sometimes patients change
22 insurance.  You know, it's always kind of a mystery
23 to me why she -- I didn't see her back again and --
24       But, you know, developing abscesses,
25 that's something that I told -- that's -- that can

Page 85

1  happen after any surgery, and it's more common when
2  you put a mesh in somebody, whether you do it
3  abdominally, through a laparotomy, or
4  laparoscopically or vaginally.
5    Q.   Let me ask you this.  You mentioned that
6  you thought that could be something you told her
7  back in 2006.
8       How did you know that was a risk or
9  complication of the mesh back in 2006?
10   A.   Well, you know, we had been doing mesh
11 surgeries for many years where we made a big
12 abdominal incision and put mesh inside.  And some
13 of those patients developed, you know, abscesses
14 and were very sick and were sometimes in the
15 hospital for a week or two after surgery.  So we
16 had experience with that.
17       And there was no reason to think that
18 putting mesh in a patient transvaginally instead of
19 abdominally, and we're almost in the same area,
20 couldn't lead -- couldn't occasionally lead to the
21 same -- you know, a similar problem.
22   Q.   Okay.  Do you recall --
23   A.   In general, I tried to --  You know, in
24 general, I tried to always paint kind of a bad
25 picture, you know.  It was sort of like -- like --

Peter Zenthoefer, M.D.

Page 86

1  like talk about every complication, talk about the
2  worst, talk about everything, you know, sort of
3  prepare for the worst and hope for the best, you
4  know, when I did informed consents.
5      Q.  Okay.  Do you recall if, at this training
6  seminar in 2005, someone from Ethicon told you that
7  that kind of chronic pelvic abscess could result
8  from the Prolift implant?
9      MS. MERK:  Objection.
10      THE WITNESS:  I don't recall.
11  BY MR. CANTRELL:
12      Q.  Okay.  And I know we talked about this a
13  few minutes ago, about the FDA health advisory in
14  2011, and you said you had some vague recollection
15  of that or some recollection of that.
16      A.  (Witness moves head up and down.)
17      Q.  Are you aware that the FDA at that time
18  recommended that any surgeon considering implanting
19  mesh transvaginally for the treatment of pelvic
20  organ prolapse informed patients that the
21  implantation of the mesh is permanent and that some
22  complications associated with the implanted mesh
23  may require additional surgery that may or may not
24  correct the complication?
25      A.  So you are asking me if I was aware of

Page 87

1  that?
2      Q.  Yes.
3      A.  Yes.
4      Q.  Okay.  Are you aware that they also
5  determined that in most cases pelvic organ prolapse
6  can be treated successfully without mesh, thus
7  avoiding the risk of mesh-related complications?
8      A.  And, you know, it was our practice to
9  always really, really encourage patients to try
10  nonsurgical things first.  So with Mrs. Smith, we
11  tried pessaries, we tried physical therapy, we
12  tried hormone therapy, you know, with the estrogen.
13      And -- and she was the one that didn't
14  want to try another pessary.  She was the one who
15  didn't want to do physical therapy.  Our nurses
16  were sort of, like, really strong proponents of --
17  of using pessaries.  Our clinic, probably more than
18  other -- any other in the City of Portland probably
19  had the biggest selection of pessaries in the
20  clinic, you know, fitting pessaries and others.  We
21  probably fit more -- fitted more patients with
22  pessaries than anybody else.
23      And in our setting in Kaiser, which is an
24  HMO, it's very different than private practice.  In
25  private practice, when a doctor does surgery, they

Page 88

1  get paid a lot of money.  When I did surgery, I
2  didn't get paid anything extra.  And if anything,
3  there was just more risk and more work.  You know,
4  I had to come in earlier and do rounds, I had to
5  come in -- I had to stay later.  There was really
6  no incentive for us to do unnecessary surgery.
7      And it was Mrs. Smith who was really
8  pushing for surgery.  Our staff, we would have
9  gladly treated her longer nonsurgically.
10      Q.  Oh, I understand that.  And I appreciate
11  you discussing the nonsurgical treatments that were
12  available.
13      But let's focus on the surgical treatments
14  available.  The implantation of transvaginal mesh
15  was not the only surgical option available for the
16  treatment of pelvic organ prolapse at that time,
17  was it?
18      A.  That's correct.
19      Q.  There were other surgical options
20  available, such as native tissue repair?
21      A.  That's correct.
22      Q.  There were biologic grafts available at
23  that time; is that correct?
24      A.  That's correct.
25      Q.  And I want to go back and talk a little

Page 89

1  more about the 2011 FDA health advisory and the
2  subsequent committee determinations made by them.
3      Are you aware that they determined that the
4  risk of transvaginal mesh for the treatment of POP
5  outweighed benefits and that it should be used only
6  as a matter of last resort?
7      MS. MERK:  Objection.
8      THE WITNESS:  I remember reading that.  And
9  in 2011, we weren't using transvaginal mesh
10  anymore.  Unless you consider TVTs and TOTs, you
11  know -- I mean, those would be the only
12  transvaginal mesh surgeries we were doing at the
13  time.
14  BY MR. CANTRELL:
15      Q.  Certainly.  But those are for the treatment
16  of stress urinary incontinence and not pelvic organ
17  prolapse; correct?
18      A.  That's correct.
19      Q.  Do you have any reason to disagree with
20  that statement from the advisory committee?
21      A.  I do not.
22      Q.  Okay.
23      A.  They have lots of experts that they use,
24  and I -- I have no reason to disagree with that.
25      Q.  At the time you implanted the Prolift in

EXHIBIT 1
Page 23 of 26

Peter Zenthoefer, M.D.

Page 90

1  Ms. Smith, was it your understanding that the
2  Prolift had been approved by the FDA for the
3  treatment of pelvic organ prolapse?
4     A.  Yes.
5     Q.  Did someone from Ethicon tell you that it
6  was FDA-approved?
7     A.  Yes.
8     Q.  Okay.  Would you be surprised to learn that
9  that's not true?
10     MS. MERK:  Object to the form.
11     THE WITNESS:  Yes, I would.
12  BY MR. CANTRELL:
13     Q.  Okay.  It wasn't FDA-approved until 2008 --
14     MS. MERK:  Object to the form.
15  BY MR. CANTRELL:
16     Q.  -- by the FDA.  Were you aware of that?
17     MS. MERK:  Same objection.
18     THE WITNESS:  No.
19  BY MR. CANTRELL:
20     Q.  Now, given that knowledge, that it was not
21  FDA-approved at the time of 2006, would you have
22  still implanted a non-FDA-approved medical implant
23  in Ms. Smith?
24     MR. CANTRELL:  Objection.
25     THE WITNESS:  Quite possibly.  I mean, in

Page 91

1  medicine, lots of things that are -- are done that
2  are not FDA-approved and -- whether it's using
3  medications, you know, like Terbutaline to stop
4  labor.
5     There's a big, expensive process to get FDA
6  approval, and -- and if there is a large body of
7  medical evidence, you know, suggesting that
8  something is safe and effective and that's in
9  common use, even if it's not FDA-approved, you
10  know, that can be the standard of care in medicine.
11  BY MR. CANTRELL:
12     Q.  Would it be fair to say, though, that you
13  would have relayed that to Ms. Smith that you were
14  using a non-FDA-approved implant in her at the time
15  of her surgery so she could weigh that into her
16  determination --
17     A.  I think I would have, yeah.
18     Q.  And the things you talked about, for
19  example, the medication, I think, you mentioned --
20  and I'm not going to try and pronounce it -- that's
21  what we would call off-label use; correct?  Meaning
22  it's approved by the FDA for one use, but it may
23  have --
24     A.  Yes.
25     Q.  -- you know, value in some other use;

Page 92

1  correct?
2     A.  Yes.
3     Q.  Okay.  But that's not what we are talking
4  about here.
5     The Prolift at this time had not been
6  approved for any reason by the FDA.
7     A.  (Witness moves head up and down.)
8     Q.  So I'm going to ask you that question one
9  more time.  Given that knowledge, would you still
10  have implanted that into Ms. Smith?
11     MS. MERK:  Objection.
12     THE WITNESS:  I don't know.  Maybe, maybe
13  not.  I don't know.
14  BY MR. CANTRELL
15     Q.  That's fair enough, Doctor.  That's fine.
16     I don't have anything further at this time.
17  I may have some additional questions after
18  rebuttal.
19     MS. MERK:  Could we go off the record for a
20  minute?
21     THE VIDEOGRAPHER:  The time is now 11:21.
22  We are going off the record.
23     (Off the record.)
24     THE VIDEOGRAPHER:  The time is now 11:22,
25  and we are back on the record.

Page 93

1             - - -
2          REEXAMINATION
3             - - -
4  BY MS. MERK:
5     Q.  Doctor, you testified about the different
6  approaches that you used as time went on and that
7  you would use a piece of mesh that you cut and
8  customized for your patient.  What mesh product
9  would you use?
10     A.  As far as I know, we used Gynemesh, the
11  exact same mesh that was used in Prolift and TVTs
12  and TOTs.
13     Q.  And did your experience with Gynemesh enter
14  into your risk-benefit analysis when deciding to
15  use the Prolift product in Mrs. Smith?
16     A.  Yes.  We had -- we had a lot of history, a
17  lot of experience with Gynemesh.  And that was a
18  big improvement over the meshes that we used before
19  that.
20     Q.  Putting yourself back at the time that you
21  implanted in Ms. Smith, but knowing what you know
22  now, do you agree that Prolift was a safe and
23  effective treatment for her?
24     A.  I think -- I think -- Since, you know,
25  her surgery, I think we have perhaps appreciated

Peter Zenthoefer, M.D.

Page 94

1 that the risk of mesh exposure is greater than we
2 thought at that time.
3       And -- and -- and then, again, you know,
4 Mrs. Smith was noncompliant.  She didn't use the
5 estrogen vaginally.  I think that's a big factor.
6 I think that's a big reason why she had so many
7 problems.
8       And the other issue is that she was a
9 smoker.  I believe she stopped in 2008, but she was
10 a smoker.  And smokers have many more problems
11 with -- or their risk of mesh exposure is greater.
12 And that's something I think we didn't understand
13 as well in 2006 either.
14    Q.  Fair to say that medicine generally evolves
15 as you learn more?
16    A.  Yes.  It's always evolving.  I tell people
17 that the questions are always the same, it's just
18 the answers that change in medicine.
19       MS. MERK:  I have no further questions,
20 Doctor.  Thank you.
21           - - -
22       REEXAMINATION
23           - - -
24 BY MR. CANTRELL:
25    Q.  I just have one quick question, Doctor, I

Page 95

1 neglected to ask you earlier, when we were talking
2 about her estrogen use.
3       Now, the estrogen, you think it may have
4 had -- played a role in the erosion that she
5 suffered from.  Now, that estrogen was prescribed
6 after you discovered the erosion; is that correct?
7       MS. MERK:  Objection.
8       THE WITNESS:  It was -- it was prescribed
9 after her first surgery.  We prescribe that for
10 everybody after pelvic reconstruction surgery, with
11 mesh and without mesh, in everybody.
12       This was something that our group of
13 urogynecologists felt was very, very important.
14 There was -- there were lots of evidence in the
15 literature that -- that showed that -- that the
16 connective tissue stayed stronger in women longer
17 who used estrogen, and it quickly became weaker if
18 they failed to use vaginal estrogen.  So we
19 recommended it in everybody.  We felt it was very
20 safe and...[pause].
21       We perhaps increased the frequency of use,
22 you know, so -- so, after surgery, we might
23 recommend it two or three times a week.  And if
24 somebody has a mesh erosion, we might recommend it
25 every -- you know, daily.  But it's recommended in

Page 96

1 everybody from their first surgery.
2       Even before surgery.  We like to start it
3 before surgery.
4 BY MR. CANTRELL:
5    Q.  Okay.  Now, in -- One of the things you
6 check when do you an exam -- a vaginal exam of a
7 patient, you confirm whether their vaginal cavity
8 is sufficiently -- estrogenized?  Is that a proper
9 term?  Is that correct?
10    A.  (Witness moves head up and down.)
11    Q.  Is there any indication in your notes
12 there -- and if there isn't, perhaps I -- perhaps
13 there isn't, I didn't see it -- that her vaginal
14 cavity was not sufficiently estrogenized?
15    A.  You know, this is very subjective, and she
16 was sixty, I think, four when she had her first
17 surgery.  Sixty-four is in the menopausal period.
18 Everybody has some atrophy when they are 64.
19       And, you know, if somebody is severely
20 atrophic, you know, we might postpone their
21 surgery.  We might not do surgery and instead might
22 put them on estrogen therapy for several months.
23       I think, in her case, that wasn't -- she
24 didn't have severe atrophy, but she had some
25 atrophy, which was normal for a 64-year-old.

Page 97

1       MR. CANTRELL:  Okay.  Nothing further.
2       MS. MERK:  Nothing further.
3       THE VIDEOGRAPHER:  The time is now 11:27.
4 This concludes the deposition.  We are going off
5 the record.
6       THE REPORTER:  Do you do any signature
7 stipulation?
8       MS. MERK:  It's up to you.  You have the
9 option of reviewing the transcript for accuracy and
10 signing it or you can waive it.
11       THE WITNESS:  I can waive that.
12       (The deposition concluded at:  11:28 a.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25

EXHIBIT 1
Page 25 of 26

Peter Zenthoefer, M.D.

Page 98

```
 1              CERTIFICATION
 2
 3        I, Karen I. Pearson-Bell, Certified
 4   Shorthand Reporter, in and for the State of
 5   California, do hereby certify under the laws of the
 6   State of California:
 7        That the witness named in the foregoing
 8   deposition was, before the commencement of
 9   the deposition, duly administered an oath in
10   accordance with the California Code of Civil
11   Procedure Section 2094; that the testimony
12   and proceedings were reported
13   stenographically by me and later transcribed
14   into computer-aided transcription under my
15   direction; that the foregoing is a true
16   record of the testimony and proceedings taken
17   at that time.
18        IN WITNESS WHEREOF, I have subscribed
19   my name this 1st day of February.
20
21
22   _____
23      Karen I. Pearson-Bell, RPR, CSR No. 3557
24
25
```

Page 99

```
 1           - - - - -
 2             ERRATA
 3           - - - - -
 4   PAGE/
 5   LINE  | CHANGE
 6   _____ | _____
 7   _____ | _____
 8   _____ | _____
 9   _____ | _____
10   _____ | _____
11   _____ | _____
12   _____ | _____
13   _____ | _____
14   _____ | _____
15   _____ | _____
16   _____ | _____
17   _____ | _____
18   _____ | _____
19   _____ | _____
20   _____ | _____
21   _____ | _____
22   _____ | _____
23   _____ | _____
24   _____ | _____
25   _____ | _____
```

Page 100

```
 1           - - - - -
 2         LAWYER'S NOTES
 3           - - - - -
 4   PAGE/
 5   LINE  | CHANGE
 6   _____ | _____
 7   _____ | _____
 8   _____ | _____
 9   _____ | _____
10   _____ | _____
11   _____ | _____
12   _____ | _____
13   _____ | _____
14   _____ | _____
15   _____ | _____
16   _____ | _____
17   _____ | _____
18   _____ | _____
19   _____ | _____
20   _____ | _____
21   _____ | _____
22   _____ | _____
23   _____ | _____
24   _____ | _____
25   _____ | _____
```