# Exhibit A

```
 1                IN THE UNITED STATES DISTRICT COURT

 2                    FOR THE DISTRICT OF OREGON

 3   BARBARA SMITH,              )
                                 )
 4            Plaintiff,         )  Case No. 3:20-cv-00851-MO
                                 )
 5       v.                      )
                                 )
 6   ETHICON, INC., et al.,      )  March 29, 2022
                                 )
 7            Defendants.        )  Portland, Oregon
     _____)
 8

 9

10

11

12

13

14                         Oral Argument

15                   TRANSCRIPT OF PROCEEDINGS

16           BEFORE THE HONORABLE MICHAEL W. MOSMAN

17         UNITED STATES DISTRICT COURT SENIOR JUDGE

18

19

20

21

22

23

24

25
```

```
 1
 2                              APPEARANCES
 3

 4   FOR THE PLAINTIFF:      Mr. John Lowther
                             Doyle Lowther LLP
 5                           4400 N.E. 77th Avenue, Suite 275
                             Vancouver, WA 98662-6857
 6

 7                           Mr. Daniel L. Duyck
                             Duyck & Associates, LLC
 8                           111 S.W. Columbia Street, Suite 715
                             Portland, OR 97201
 9

10

11   FOR THE DEFENDANTS:     Mr. Kenneth P. Conour
                             Mr. Jin Yoshikawa
12                           Butler Snow LLP
                             150 Third Avenue South, Suite 1600
13                           Nashville, TN 37201

14

15                           Ms. Diane R. Lenkowsky
                             Bullivant Houser Bailey PC
16                           One S.W. Columbia Street, Suite 800
                             Portland, OR 97204
17

18

19   COURT REPORTER:         Bonita J. Shumway, CSR, RMR, CRR
                             United States District Courthouse
20                           1000 S.W. Third Avenue, Room 301
                             Portland, OR 97204
21                           (503)326-8188
                             bonita_shumway@ord.uscourts.gov
22

23

24

25
```

(P R O C E E D I N G S)

(March 29, 2022; 11:00 a.m.)

* * * * *

1    THE COURTROOM DEPUTY:  We are here today for oral

argument in Case No. 3:20-cv-851-MO, Smith, et al. versus

Ethicon, Inc., et al.

Counsel, please state your name for the record.

MR. LOWTHER:  John Lowther, Doyle Lowther, on behalf

of plaintiff.

MR. DUYCK:  Dan Duyck, Duyck & Associates -- excuse

me.  Dan Duyck, Duyck & Associates, on behalf of plaintiff.

MR. CONOUR:  Good morning.  Ken Conour on behalf of

defendants.

MS. LENOWSKY:  Diane Lenowsky, also on behalf of

defendants.

MR. YOSHIKAWA:  Jin Yoshikawa, also on behalf of

defendants.

THE COURT:  Thank you all for being here today.  Let

me start with my tentative thoughts on the two motions in front

of me.

The first involves plaintiff's motion to strike J &

J's experts, or at least some of them.  As you all know --

forgive me for stating the obvious, but as you all know,

there's more than one lens through which we look at expert

testimony.  There's the lens of the expert witness testifying

1    as such, frequently -- usually otherwise disconnected from the

2    case but offering independent expert testimony.  And that lens

3    is provided both by the FRE and the FRCP.  And there are

4    hurdles to go through to get such a witness ready for trial.

5         And then there's the lens of witnesses who simply

6    offer expert opinions but may not be looked at through the lens

7    of the FRCP, just witnesses who offer what's labeled as expert

8    opinion testimony under FRE 702.  And they may not have to go

9    through those same hurdles.  The classic example of that is the

10   treating physician who, contrary to what some people say,

11   clearly is offering expert testimony under 702, but hasn't been

12   required to, for example, go through the notice and report

13   requirements of the FRCP.

14        And here I think we're in that realm.  And so it's

15   clear to me that there's a hard rule in this case that the

16   defendants get five expert witnesses.  And I read that to mean

17   five what I'll call independent experts.  I'm not sure that the

18   retained versus non-retained matters so much as just are they

19   independent experts not offering perception and personal

20   involvement testimony in the case.

21        So the defense has those five experts.  They have one

22   alternate which is off the table, as I understand it from the

23   defense anyway.  So those five independent experts who, as I

24   understand it, have in fact gone through the procedural hurdles

25   of the FRCP are qualified for our purposes today, at least, for

1   trial.

2          Then the remaining numerous witnesses who have 702

3   testimony to offer are, if I understand it correctly, all

4   people who have -- we'll call it company involvement in the

5   device.  Is that right?

6          MR. CONOUR:  That's correct, Your Honor.

7          THE COURT:  How many are there?

8          MR. CONOUR:  There are 12.  Ten were actual current

9   or former employees, and two were doctors that were advisors in

10  the development of the product.

11         THE COURT:  So we've seen this in many of these

12  cases, and so the struggle there is I think it would be, in my

13  view, nonsensical to read the MDL order as prohibiting such

14  testimony or only allowing a grand total of five, since this is

15  a case which involves engineers and scientists and advising

16  doctors.  And so to say, well, you only get five people who

17  have specialized knowledge beyond the ken of the jury would

18  essentially end the case.

19         So what we have to do is come up with a way in which

20  those people are allowed to testify and offer 702 testimony as

21  it relates to their personal involvement but not sneak in

22  through the back door independent expert testimony by a bunch

23  of people who sort of pile on and add to and say they agree

24  with the independent experts in the case.

25         One typical way to do that, of course -- well, one

1  good tether is to say that these people can only testify to

2  what they were involved in and not, you know, independently

3  testify about things they weren't personally involved in.

4         The second pretty good tether in a lot of cases is to

5  say, well, were they deposed?  And if they were deposed --

6  Well, let me back up.  Of course the FRCP, all of the

7  protections in the FRCP about experts are generated, in my

8  view -- not to put too fine a point on it -- are generated

9  because for lawyers, experts are slippery creatures, and if you

10  give them much room, they will wiggle away from you in ways

11  that are unfair for trial.  And so we try to put them in a box,

12  and the box we put them in for FRCP is a report, and in my

13  courtroom, experts, they're pretty much stuck with what they

14  said in their report.  If they didn't say it in their report,

15  too bad.

16         So for these folks, there is no report, but let's

17  start with -- let me just start by asking.  Is there a

18  deposition of all 12 of them?

19         MR. CONOUR:  All 12 of them have been deposed.

20  There's 58 days of depositions for the 12 witnesses.

21  Plaintiffs have designated deposition testimony from nine of

22  the 12 already, but all 12 of them have been deposed in the

23  MDL.

24         THE COURT:  So another -- so there are two good sort

25  of semi boxes to put people like these, which I put in the

1    analytical category of treating physicians, who often, for

2    example, have chart notes and a deposition, so there are no

3    surprises.  And the way to have no surprises here is, one, a

4    sort of an almost ideological limit, and that is that you've

5    got to stick with what you were involved with.

6              I'm going to teach you a great word just because it

7    comes up right now.  It's one of my favorite big words.

8    Ultracrepidarian.  Ultracrepidarian comes from -- it's a Greek

9    word -- it's a Latin word from an earlier Greek word in which a

10   sculptor was sculpting a human statue and wanted the advice of

11   a cobbler on how to get the sandals just right.  And so he did.

12   He brought in a cobbler, and the cobbler advised him how to get

13   the sandals just right.  And then the cobbler being there and

14   sort of in the glow of having been asked his opinion, started

15   to offer more than that.  You know, "Well, while I'm here, I

16   don't think the knees look right," or whatever, and the

17   sculptor said essentially to him, "Nothing above the shoes."

18   And that's what ultracrepidarian means: "nothing above the

19   shoes."

20             So these folks, they're stuck with what they did,

21   nothing else.

22             And then the other way to prevent surprise is, well,

23   they've got to stick with what they said in their depositions.

24   Again, that's the sort of functional trade-off for not having

25   an expert report but letting him offer expert opinion

1  testimony.

2          That's my tentative view on how to handle these 12

3  folks, 12 plus five.  The five, there's no dispute, they're in.

4  Again, I'm not making a trial ruling that their whole testimony

5  is in, just I don't view plaintiff's motion that I'm dealing

6  with right now as seeking to strike those five.

7          The alternate is out.  So we're really talking about

8  these 12 people, and my intention -- tentative -- is to let

9  them testify to what they were involved with even if that

10 testimony sounds like 702 testimony, limited by their own

11 personal involvement and by the fact that they've been deposed.

12          Since that's my tentative ruling on your motion, I'll

13 hear from plaintiff first.

14          MR. LOWTHER:  That's exactly what we want, Your

15 Honor.  I did not want our motion viewed, as I was listening to

16 your discourse to us, to mean that we wanted these witnesses

17 struck from the record, period.  Mr. Conour is right.  The

18 defense is correct, we did designate testimony from a number of

19 these witnesses.  We want their testimony.  We want their

20 testimony at trial.  So we submit to Your Honor's tentative,

21 and I have nothing further.

22          THE COURT:  Are you okay with that tentative ruling?

23          MR. CONOUR:  One clarification?

24          THE COURT:  Yes.

25          MR. CONOUR:  They've also testified at trial, so I

1    would request that their testimony be limited both to their

2    deposition testimony and their prior trial testimony.  That's

3    also been made available to plaintiff's counsel.

4         THE COURT:  The whole point is no surprise.  Are you

5    familiar with their prior trial testimony?

6         MR. LOWTHER:  I'm familiar with some of it.  We would

7    like it limited to -- I'm familiar with some of it.  I'm not

8    familiar with all of it.  This is a new twist.  Your Honor is

9    right.  We were trying to prevent them from coming in under 702

10   or some of these other expert provisions, just coming in and

11   saying whatever they wanted.  We had 70 pages, essentially, of

12   designations, and I had no idea what these people were going to

13   come say and do.

14        THE COURT:  Why don't you take a look at that,

15   because I am going to allow their deposition testimony.  You

16   look at their prior trial testimony.  You don't have to go

17   through line by line, but if you feel like they previously

18   testified, for example, as a retained expert in some trial, if

19   that happened, well, then that's going to be a problem for me.

20   So you take a look at it and let me know if there's a specific

21   piece of prior trial testimony you view as problematic as a

22   source of what they can testify -- identified source of what

23   they can testify to in our trial.

24        MR. LOWTHER:  Yeah.  And the reason the question is

25   so difficult is there have been so many trials all over the

1    country, all with differing standards.  My other fear is that

2    hey, well, this court ruled on this particular witness in this

3    trial to let this in, so, Your Honor, you should let it in,

4    too.  I'm contemplating what are going to be the knock on

5    effects.  So I'd like to take a look, and maybe the appropriate

6    way to handle this in the future will be via a motion to

7    exclude or some sort of in limine process where we can put it

8    before you --

9            THE COURT:  It's up to you to try to eliminate trial

10   testimony you view as unfair in some way, whether it's under

11   403 or some other way.

12           MR. LOWTHER:  Okay.

13           THE COURT:  So for now I am granting in part and

14   denying in part your motion.  We'll allow the five designated

15   experts.  I won't allow the alternate.  We'll allow these 12

16   people to testify at trial, limited to their personal

17   involvement, and limited by their prior deposition, and for now

18   we'll say probably trial testimony subject to further motion

19   practice in advance of trial.

20           The second motion is the motion to exclude the

21   case-specific testimony of Dr. Elliott.  I agree with

22   plaintiffs that this motion is a second bite of an apple

23   forbidden by earlier scheduling.  Had it been merely limited to

24   updated opinions after Ms. Smith's new medical exam, maybe, but

25   it isn't limited to that.  So my only concern -- so I think the

1    motion should be denied as violating the briefing schedule in

2    this case.

3            My other concern again is a similar one, only now

4    running the other direction, and that is by just denying the

5    motion -- well, I'm not concerned about denying the motion

6    substantively on a straight-up *Daubert* challenge.  So, for

7    example, while I'm denying it, tentatively denying it

8    procedurally, if I were to take up, for example, the

9    differential diagnosis issue, I'd disagree with the defendants

10   and say it was sufficient.

11           There's one issue, though, that raises a similar kind

12   of cabining question, and that is that one challenge is that

13   Dr. Elliott doesn't specifically link an identified defect in

14   the product with a harm to plaintiff in his report.  So because

15   I'm denying the motion procedurally, that's not an issue for

16   admissibility under *Daubert*.  That's just waived.  But

17   typically, as I said a moment ago, we would limit experts to

18   what they say in their reports.  That's the point of having

19   them produce reports.

20           I got the impression from the briefing that you

21   wanted to try, because again the idea being there's no surprise

22   to this, from his prior testimony or depositions, you wanted to

23   try to close that gap at trial by having him identify something

24   he did not identify in his report, and that is the specific

25   causal link.  Is that correct?

1       MR. LOWTHER:  Your Honor, we do believe the specific

2   causal link is in his specific report.  However, he's

3   designated as both a general and a specific expert, and he has

4   de bene esse trial testimony that is incorporated into his

5   general report, and we think it's fair play to be able to rely

6   on those statements as well.

7       THE COURT:  Well, my concern is solved if you feel --

8   I don't mean solved like I'm ruling on it today, but my concern

9   that we need to identify a limiting principle here is solved if

10  you think that what you need to get out of him is already in

11  his report.  If that's your view, then we don't need to take it

12  further.  It's really a concern I'm raising not so much for how

13  to rule on this motion, since the ruling would be procedural,

14  but how to handle what I viewed as an upcoming issue.

15      MR. LOWTHER:  In other words, if Dr. Elliott

16  testified at other trials around the country, no, we are not

17  going to seek to introduce that trial testimony.  But he is

18  designated as -- I apologize if I'm misunderstanding --

19      THE COURT:  Let me explain my question a little bit

20  better.  I feel like I didn't do a very good job of that.

21      So if, as I think I'm going to do, I deny this motion

22  as violating the briefing schedule, then we don't have a ruling

23  on the merits, and this particular *Daubert* challenge to your

24  witness Dr. Elliott doesn't get run through a second *Daubert*

25  filter.  That's fine.  That's what procedural rulings do.

1            But there is an issue raised that doesn't affect the
2    merits of a procedural ruling but would come up at trial.  What
3    I would expect at trial is -- so a defense theory about your
4    Dr. Elliott is that he doesn't close the causal link, and
5    therefore doesn't do what an expert is required to do to
6    satisfy *Daubert*.  Well, if we ignore that problem for *Daubert*
7    challenge purposes because the motion is procedurally too late,
8    it is still something that would come up at trial.  They still
9    would be allowed to object at trial or do something, object at
10   trial if you tried to close that loop.  If there was this gap
11   in his report that gets ignored for today's purposes but comes
12   up at trial when you try to close the gap at trial and get him
13   to say here's the causal link, because then the objection isn't
14   procedurally defaulted, it's not so much a *Daubert* objection
15   anymore.  Now it's a trial objection that the witness is
16   testifying to something not in his expert report.

17           And if that motion were made at trial, your response
18   would be what?

19           MR. LOWTHER:  My response would be he was deposed in
20   this case.  That deposition testimony should be permitted.  It
21   was the defendants' deposition.  They wanted it.

22           THE COURT:  Deposed before or after his report was
23   written?  I assume after?

24           MR. LOWTHER:  Deposed after his report, but then we
25   requested, because Mrs. Smith had additional procedures, we

1    requested of Judge Acosta that we be allowed to go through a

2    second IME process.  So, in fact, Dr. Elliott did two

3    examinations, and the defendants were afforded the same

4    opportunities.  So there were two rounds of independent medical

5    examinations, at which point both sides submitted amended

6    reports following that deposition.

7            THE COURT:  All right.  So you're really telling me

8    two answers.  One answer I thought you were giving me is that

9    the causal link is in his expert report, you think you can find

10   it there.  Right?

11           MR. LOWTHER:  Yes.  And also I believe the causal

12   link is in his deposition testimony.

13           THE COURT:  We'll get to that.

14           MR. LOWTHER:  Okay.

15           THE COURT:  But those are two very different things

16   because, as I said, the point of the report is if you have an

17   expert report, you don't have to search the country for

18   deposition testimony or prior testimony at trial or other

19   articles he may have written.  The report allows you as the

20   opponent of this expert to say, here's the universe I must

21   master to cross-examine this witness.

22           So your answer number one works well for trial; that

23   is, well, no, it is in the report.  We can litigate that later.

24   I'm not accepting that as true, I'm just saying that's one

25   answer that works.

1      The other answer needs to be dealt with today, and

2  that is if it isn't in there sufficiently, it's in his

3  deposition in this case.  Right?

4      MR. LOWTHER:  So let me see if I can assuage the

5  Court that we are not going to search the United States for

6  Dr. Elliott's transcripts, testimony in other cases.  What we

7  are going to cite is essentially what is already on the docket

8  in our opposition.  It's going to be his case-specific report,

9  the amended version; it's going to be his deposition in this

10  case; and it is also going to be his general report and his de

11  bene esse testimony which is incorporated into that general

12  report.  That's cited in our brief, in our opposition.  This

13  was put forward in the MDL.

14      So if you're looking for the playing ground the

15  plaintiffs are seeking, that is our operative universe, Your

16  Honor, along with the documents, the other testimony that

17  Dr. Elliott references at length in his case-specific report,

18  his other documents and testimony that he refers to in forming

19  his opinions.  But yes, that will be our universe.

20      THE COURT:  Thank you.

21      Let's start with the procedural ruling.  I said it

22  was tentative.  I want to give you a chance to tell me I

23  shouldn't make that procedural ruling.

24      MR. CONOUR:  I'd like to do that.

25      Your Honor, what we have here is an expert who has

1    given three reports.  The last one was in June 30th, 2021.

2    That was after we filed our original *Daubert* motion.  And in

3    his third report, the June 2021 report, he includes in that

4    materials that he didn't have in his prior reports.

5    Specifically, his second medical examination of the plaintiff

6    is incorporated into that report.  That's a case-specific

7    report.  It's supposed to provide the basis for his specific

8    causation opinions.  And he bases that not only on the prior

9    records but also on this IME that took place after his prior

10   report.  So we're handcuffed.  How can we attack his

11   case-specific opinions if we don't have those case-specific

12   opinions until June 2021?

13            THE COURT:  I should be clear.  If I viewed today's

14   *Daubert* motion as limited to the most recent reports, new

15   statements, new opinions, post last IME, then I think it would

16   not be procedurally improper.  My problem is I don't view it

17   that way.  I view it as a second general attack on this

18   witness, making arguments that could have been made prior to

19   the last IME.

20            But you're correct.  You had under the rules a

21   scheduling order in this case, providing the opportunity to

22   file a new *Daubert* motion against just what's new.  In my view,

23   the problem you're having, in my view, is you didn't do that.

24   You filed a second more general *Daubert* motion against stuff

25   that predates it, or at least your theory is one that could

1  have been filed earlier.

2      MR. CONOUR:  Here's the problem I have with that,

3  Your Honor, is after --

4      THE COURT:  Is your microphone on?

5      MR. CONOUR:  I'm sorry, let me get closer.

6      THE COURT:  Okay.

7      MR. CONOUR:  After we filed our original *Daubert*

8  motion, the plaintiff underwent subsequent surgeries and had

9  subsequent diagnoses, including a fistula that developed from

10 the erosion that was found.  So her medical condition evolved

11 after that, and plaintiff argued that because her medical

12 condition has evolved, we should be allowed a second

13 examination and we should be allowed then to provide another

14 report identifying what's caused these complications.

15     THE COURT:  I understand that.

16     MR. CONOUR:  With that --

17     THE COURT:  Is it your view that your motion today

18 that we're dealing with against Dr. Elliott is limited in scope

19 to opinions he's rendered that are only based on what is found

20 from her last round of medical examination?

21     MR. CONOUR:  Well, that's the problem, though.  His

22 opinions were stated earlier to some extent, but they evolved

23 based upon her subsequent surgeries, her subsequent development

24 of a fistula, and his subsequent examination.  At any point in

25 time he could have said, these conditions were caused by this

1    defect.  The fact that he did it before, but he continues to do

2    it now should not preclude us from being able to make that

3    argument based entirely on his new report.

4         If you look at our motion, it is aimed entirely at

5    his new report.  We could not have made the arguments based on

6    what his current opinions are back in 2019, before he had the

7    second IME and the third report.  We might have been able to

8    make similar arguments, but he could always revise those

9    opinions and change them, evolve them based upon what's

10   happened to her and what he's done with her and any other

11   research or what have you he may have done related to her

12   specific conditions.

13        THE COURT:  Let's take the argument that his opinion

14   doesn't close the causal loop.  Is that an argument you could

15   have made in your first round of *Daubert* motions against this

16   opinion?

17        MR. CONOUR:  Oh, absolutely.  We could have made that

18   opinion.  But he also could have changed his opinion based upon

19   the Court's order allowing him to do a further IME and a

20   further report.  So we're basically stuck with a further report

21   that details what his current opinions are regarding specific

22   causation without any means to challenge that.  And that's

23   where we say that's not appropriate.

24        THE COURT:  Well, so your argument works well if

25   you're facing something Dr. Elliott is saying that you've never

1   seen before and never could have attacked before.  Then your

2   argument has a lot of strength.  "We're stuck, Your Honor, he

3   shifts, he changed, and we need to attack him now for what he's

4   now saying."  I agree with that position as far as that goes.

5           Where I struggle is when you make an argument that

6   you could have made before, then at least your argument that

7   we're in an impossible position doesn't work.  You're not in an

8   impossible position.  You could have attacked it before, you

9   just didn't.  And so it's essentially giving you a chance to do

10  now what you didn't do earlier but could have done earlier.

11          Why should I allow that?

12          MR. CONOUR:  What we're stuck with then is basically

13  preventing defendants from making an argument that they would

14  otherwise be entitled to make solely by virtue of a stipulation

15  that can be read one way or another, when in fact plaintiffs

16  were allowed to amend their report.  They could have added

17  other opinions.  They could have made -- tied up that causal

18  link, which they haven't done, and it just seems that we're

19  putting the form over substance.

20          THE COURT:  Is there a tactical or strategic reason

21  why you wouldn't have attacked this causal gap when you first

22  had the opportunity to do so in your first round of motions but

23  would have sensibly chosen to wait until later to attack it?

24          MR. CONOUR:  Part of the problem was that in the MDL,

25  Dr. Goodwin was not ruling on case-specific motions, and he

1    wasn't looking at specific case law applicable to those
2    motions, and so we were stuck without really having a basis to
3    argue state-specific law, and that's primarily what we think we
4    get into when we talk about the causal link and what's needed
5    under Oregon law to make that causal link.  So that's part of
6    the argument there is that it was a strategic choice, that's
7    true, but it's based upon the circumstances of the MDL and the
8    fact that we weren't getting rulings based on state-specific
9    laws having to do with causation.

10            THE COURT:  Assume just for a moment -- I'm not
11   announcing a loss at this point.  Assume just for the moment
12   that we had to move on and that you lost this motion because it
13   doesn't follow the briefing schedule.  Then we'd be picking up
14   this point that while you contend there's a causal language, at
15   trial they're going to want to try to close that link.  One way
16   they want to close it is completely acceptable if my ruling is
17   correct on the procedural grounds, and that is they can just --
18   they just contend the report itself doesn't have that gap in
19   it.

20            But the other way they want to close it is they want
21   to say it's in his deposition.  Let's just start with that.
22   It's in his deposition, and so let's close the gap in his
23   report with his deposition testimony at trial.

24            It's a little bit funny, I guess, because I'm
25   previewing something that's going to come up at trial, but why

1    not try to deal with it now.

2            So what would your position be in that moment?

3            MR. CONOUR:  Sure.  You began the hearing by talking

4    about the two different lenses that you look at experts, and

5    the experts that are not independent -- excuse me, the experts

6    that are independent that are retained.  There's a rule and a

7    procedure for dealing with those experts, and that rule and the

8    procedure is that they are to provide their opinions in a

9    written report.  It's the four corners of that report that

10   gives you the parameters of what they're to testify at trial.

11   They don't cure that report through deposition.  We may explore

12   the parameters of their opinions at deposition, we may check

13   the basis for their opinions at deposition, but they're not

14   allowed to expand their opinions based upon the deposition.

15   The rule is clear that it's their report, and the case law

16   interpreting that rule is clear that's the report that's to

17   provide the four corners of what they're to testify at trial.

18           There is a recent case -- I wasn't prepared to

19   address this because I didn't expect this to come up in this

20   manner at the hearing, but there was a recent case where

21   plaintiffs tried to do just this with their experts in another

22   Ethicon case -- and I can provide that citation this

23   afternoon -- where plaintiffs argued that the report may be

24   lacking in some respects, but the expert cured that through his

25   deposition.  And the Court ruled precisely that no, you can't

1  cure the report.  You can't expand the report to provide

2  additional different opinions in a deposition.  That's not the

3  purpose of the deposition.  That's the purpose of the report.

4          THE COURT:  Were you the deposition lawyer?

5          MR. CONOUR:  No, I was not, Your Honor.

6          THE COURT:  Do you know whether causation was

7  inquired into, his opinion on the causal link was inquired into

8  at the deposition?

9          MR. CONOUR:  Yes.  The opinions that he has stated --

10          THE COURT:  My question was imprecise.  Do you know

11  if the defense inquired into his opinions on the causal link at

12  the deposition or was it just brought up by plaintiff?

13          MR. CONOUR:  No, it was inquired into in terms of --

14  specifically with regard to the differential diagnosis.  He was

15  asked why he didn't include specific conditions that plaintiff

16  had, which were vaginal atrophy, smoking, and the prior

17  hysterectomy.  They asked why he didn't include that in the

18  differential diagnosis, and he talked generally about, well, I

19  don't believe in the reports of smoking, linking it to mesh.

20  Although there are certainly medical literature out there that

21  does do that, I just disagree.

22          We asked why the hysterectomy wasn't linked, and in a

23  roundabout way his answer was consistent with his report,

24  because he's not actually saying that the mesh caused the

25  pelvic pain.  He's saying that the mesh surgery has not changed

1  the pelvic pain.  And that's in his new report, too.

2        And then third, regarding the vaginal atrophy, his

3  answer was essentially that atrophy has existed in women as --

4  since the beginning of time.  It doesn't really cause any

5  problems unless, of course, the woman is sexually active.  And

6  he didn't address the fact that the atrophy actually has been

7  identified by many experts and also medical literature as

8  causing or contributing to the development of mesh exposure,

9  which they contend here is the injury.

10        THE COURT:  Thank you.  I will invite you to submit

11  the case you're referencing later today.

12        Do you wish to be heard further?

13        MR. LOWTHER:  Yes, Your Honor.  And I have a good

14  working relationship with the defense, but I will say I am

15  particularly sensitive to this notion of a second bite at the

16  apple, and if I could just revisit the history of why I think

17  your tentative should be adopted.

18        There have been multiple attempts at second bites of

19  the apple in this case.  After filing summary judgment, they

20  tried to file another one, even when I frankly thought they

21  told us they weren't going to do that.  And Judge Acosta got on

22  the phone and shot that down.

23        There were attempts after the close of discovery to

24  start deposing even more doctors after discovery had closed.

25  So that is why I made it a point, an affirmative point with

1   Judge Acosta in getting this second round of IMEs, I wanted any
2   challenge to be limited as Your Honor so indicated.  And we got
3   that limitation.  We thought that was going to be honored, and
4   then here comes this motion which is not limited to just new
5   opinions, it is a wholesale attack which absolutely could have
6   been brought in the MDL.

7        A few more points on this, Your Honor.  Number one, I
8   reject the notion that we couldn't have gotten a ruling because
9   it's state specific.  We always knew this case was coming back
10  to Oregon.  We always knew Oregon law was going to apply.  We
11  made no arguments to the contrary.

12       And further, when you ask about the tactic, if you'll
13  forgive me if this sounds like I'm casting an aspersion -- I'm
14  not -- but what I think the attack here is, these cases have
15  been remanded all over the country, and you're getting various
16  opinions from jurisdictions, in some cases with wildly
17  differing law concerning the admissibility under 702, and that
18  causal link that you need to establish.  And what I think the
19  tactic is -- because we're seeing it -- is get an opinion that
20  favors the defense in this one jurisdiction and then bring it
21  into another jurisdiction where the standard for admissibility
22  may be far more lenient.

23       Your Honor, I think that's exactly what happened
24  here, because they cite to you as their chief case the *Sluis*
25  case out of Texas, never addressing the Ninth Circuit standard,

1  which I think we properly identify in *Messick* and in *Phelps*.

2  We also cite Your Honor's opinion in *Pearson*, a markedly

3  different standard for admissibility, and that is the tactic,

4  in my opinion.  That is why this motion wasn't brought

5  originally.  They were losing at the MDL.  They were losing

6  every time they tried to challenge these causation opinions, so

7  hold it in abeyance until these things have been remanded, then

8  we'll get a couple of opinions that we can file late in the

9  game and take our last best shot to derail trial.

10          And, again, I hope it doesn't sound like I'm casting

11  aspersion -- I'm not -- but that is what I think the tactic is.

12  And, again, we told Judge Acosta we wanted a firm limit on the

13  second bites of the apple.  This is not the first time it's

14  happened.

15          THE COURT:  All right.  Thank you.  I think I've got

16  your point there.

17          Secondly, if I did make this timeliness or procedural

18  ruling, then we're left with the second question, and I guess I

19  want to think about whether this question is squarely in front

20  of me right now today.  I think the answer is no, and I might

21  just need to wait.  I think probably the better course of valor

22  is not to rule today but just to say that I see an upcoming

23  issue even if I make this procedural ruling, which is --

24  probably needs to be resolved in the -- either in trial itself

25  or in motions in limine, and that is that to prevent this

*Daubert* challenge under *Daubert*, as an opinion that's
insufficiently conclusive on the point that makes it relevant
at trial, to prevent that attack on Dr. Elliott does not
prevent a subsequent attack that says this witness right now is
offering opinion not to be found anywhere in his report.

And so I just want that to be clear so that when that
day comes, you won't be lulled into thinking that I've somehow
ruled that no further attack can be made against Dr. Elliott.
I see the possibility of this further attack and, in fact, it's
quite a serious one if, as I said earlier, I adhere to the
general idea that experts are stuck with what's in their
report.

I'm not going to rule on that today.  I just want the
parties to know that's where we're headed, and you'll be ready
to litigate that at a more appropriate time.

Any questions about that?

MR. CONOUR:  No, Your Honor.

THE COURT:  All right.  Thank you.

I am going to make final my tentative rulings in both
scores, then.  Plaintiff's motion to strike defendants' expert,
that will be my ruling, the one I expressed earlier, and I do
find that this is the proverbial second bite of the apple.
It's an attack on Dr. Elliott on grounds that aren't prompted,
in my view, by events subsequent to the first round of *Daubert*
motions, but raise arguments that readily could have been made

1    earlier, and therefore shouldn't be made now in a second

2    occasion.

3           It's good news-bad news because that same motion,

4    which I'm denying, raises an issue that will be prominent later

5    at trial, and that is, is Dr. Elliott stuck with his report.

6    We'll see where that goes.

7           Anything further today from plaintiff?

8           MR. LOWTHER:  A couple of housekeeping measures, if

9    you'll permit, Your Honor.

10          THE COURT:  Yes.

11          MR. LOWTHER:  Number one, Judge Goodwin in the MDL,

12   he wanted us to submit full transcripts.  I think the judge got

13   simply tired of seeing full transcripts.  I was just wondering

14   what is Your Honor's preference or chamber's preference when

15   we're relying on a transcript.  Do you want us to submit the

16   full transcript or do you prefer pages?  Just asking the

17   preference, deposition testimony.

18          THE COURT:  So you want to designate a piece of

19   deposition testimony, and you're asking whether I want the

20   designated pieces or the entire transcript for the entire

21   deposition?

22          MR. LOWTHER:  You said that better than I.

23          THE COURT:  That sounds like a real easy question to

24   me.  I don't want the entire transcript.

25          MR. LOWTHER:  Okay.

```
 1              Second housekeeping measure -- and I haven't spoken

 2    with this on defendants.  The next motion that is pending is

 3    our motion to amend on punitive damages.  And I'm wondering,

 4    having seen the defendants' opposition -- and we're going to

 5    file our reply in a week -- I'm wondering if Your Honor

 6    wouldn't accept a request from us at this time to have a

 7    hearing, to have oral argument on that motion.  I didn't think

 8    it was going to be necessary.  Now I do, and would be willing

 9    to do whatever schedule the defense deems necessary.  We can do

10    it video, telephone, in person, whatever you prefer.  But I

11    think it would help the Court if we could have a hearing on

12    that motion.

13              THE COURT:  Thank you.  I don't know the answer yet.

14    Your request for oral argument is noted.  I haven't dived into

15    it enough to know whether I want oral argument or not.  If I

16    view it as helpful, I will.

17              MR. LOWTHER:  Thank you.

18              THE COURT:  Anything further from the defense?

19              MR. CONOUR:  A question regarding the scope of your

20    rulings, Your Honor.

21              THE COURT:  Could you move that microphone a little.

22              MR. CONOUR:  I'm sorry again.

23              Your Honor, a question regarding the scope of your

24    ruling.  Does it apply to the argument regarding the TVT-O

25    claims?  We have been around and around for several years now
```

1   on whether or not there's going to be a claim regarding TVT-O,

2   and at this point I think we need to get a decision before

3   trial.

4           THE COURT:  I'm glad you raised that, because I guess

5   I finished the briefing not sure whether that was something

6   coming up at trial through this witness.  You sort of

7   referenced that it's -- that this sort of background

8   information he offers might be useful, but it's not an opinion

9   I assumed you were going to be relying on at trial through

10  Dr. Elliott on this.

11          Where are you on this?

12          MR. LOWTHER:  The answer is at this time and I don't

13  think in the future we're going to be seeking a cause of action

14  and damages on the TVT-O, but yeah, he could have some helpful

15  opinions that touch upon the TVT-O, including where he rules

16  out the TVT-O.  And we think this is simply best left for

17  trial.  If Your Honor thinks we're going beyond where we should

18  be, that could be dealt with very easily with some sort of

19  sidebar, a limiting instruction.

20          THE COURT:  The second piece is, like almost every

21  lawyer I've ever known, you've been somewhat qualified in your

22  statements, so I don't know whether this is a claim at trial or

23  not.  Do you know?  And if you don't, when will you know?

24          MR. LOWTHER:  There is no claim for damages pursuant

25  to the TVT-O.  I don't believe there is going to be.  When are

1  we going to know?

2       THE COURT:  Well, if you say today there is no claim

3  for damages related to TVT-O, then I'm not going to allow you

4  to change your mind later.  We're too close to trial to have

5  you flip-flop on that.  So if there's no claim today, there's

6  no claim at trial.

7       Do you know if there's no claim today?

8       MR. LOWTHER:  You've asked me a direct question, I'm

9  going to give you a direct answer, which is no, there is no

10  TVT-O injury today that we can claim.

11       The one proviso, if you'll permit me, Your Honor, is

12  just what if her medical condition happens to change between

13  now and trial.  And, again, I don't think so.  It hasn't

14  happened in the number of years.  I would only ask for that --

15  the smallest of windows, just in case that were to happen, just

16  to protect Mrs. Smith in that eventuality.  But no, we have no

17  claim on the TVT-O.

18       THE COURT:  All right.  So no claim on TVT-O.  If

19  something happens, we'll deal with it.  The better course is

20  probably a separate complaint, but we'll see where we are on

21  that.

22       MR. LOWTHER:  Okay.

23       THE COURT:  So then you have an avenue in which you

24  think you might nevertheless want Dr. Elliott to testify about

25  TVT-O, and so I guess where are you on that?  You don't have a

1   claim -- it sort of seems to me like maybe this is something

2   where you'd say, well, I challenge this piece of his testimony

3   not under *Daubert* but under 403 even or 401, for that matter.

4          MR. CONOUR:  It could be 403, could be 401, it could

5   be any of that.  But here's the problem.  We're operating under

6   an amended complaint, Docket No. 13, that includes a claim

7   against TVT.  That claim has not been dismissed.  Nonetheless,

8   when we took depositions of the treaters here, plaintiffs

9   represented that they were not pursuing a claim regarding the

10  TVT product, and we said fine, we will not go into that product

11  in detail with these doctors.

12         THE COURT:  Well, let's first of all clear up that

13  problem.  You've said there's no claim for TVT-O, and to make

14  it clear for our trial purposes, I'm going to dismiss that

15  claim.  You can reraise it if the small window you've asked for

16  comes up, and we'll deal with it then.  So it's not with

17  prejudice.

18         That still leaves us with -- I guess the main thing

19  that has to happen next is some way of identifying, since

20  there's no claim in the case, what piece of what has been said

21  about this you still consider relevant for trial purposes.

22  It's probably too much on the fly right now to ask you to do

23  that today.  So what's the best mechanism to have you commit to

24  what pieces of his testimony which is in a claim that's gone

25  but may have relevance to claims that are in, what piece of his

1  testimony you're actually proposing he speak at trial?

2          MR. LOWTHER:  I can say today, Your Honor, I think

3  what he would speak about, number one, perhaps that the TVT-O

4  did not --

5          THE COURT:  Well, actually, I'd prefer that you not

6  say today.  I'd prefer that you submit something that says here

7  are the pieces of the TVT-O testimony by Dr. Elliott that we

8  still intend to use at trial in support of, you know, existing

9  claims.

10          MR. LOWTHER:  Yes, we could do that.  We could do

11  that designation.  I understand the import of your question.

12  Yes, it is quite a bit to do on the fly.  To the extent we're

13  going to have TVT-O testimony, we will let the defense and Your

14  Honor know in advance.

15          THE COURT:  How soon could you do that, to just give

16  an outline of the pieces of TVT-O testimony you intend to

17  introduce at trial such that we could pretrial litigate its

18  admissibility as opposed to on the fly at trial?  I'm not

19  opposed to -- there's a lot of things that happen on the fly at

20  trial.  I'm fine with that.  But if we can litigate that part

21  of trial, it would probably make the trial smoother.

22          MR. LOWTHER:  Would a month before trial be

23  appropriate for your purposes, Your Honor?

24          THE COURT:  Yes.  And then you can include that in

25  the round of motions that happen.  Actually, it should be a

1    month before the PTC, not trial.  That's coming right up.

2            MR. CONOUR:  Your Honor, I would just suggest in

3    other cases we've encountered this before where there have been

4    multiple products but a claim is only made against one of the

5    products, and we've been able to reach stipulations as to what

6    evidence will come in regarding the other product.  And I think

7    that with Mr. Lowther, we should be able to do that today --

8    not today, but we should be able to do that in the case, if not

9    in the whole, in great part so we can limit what's in dispute.

10            THE COURT:  I encourage you to work on that goal.  If

11   you don't, we have a mechanism now for litigating it.

12            Anything else from the defense?

13            MR. CONOUR:  No, Your Honor.

14            THE COURT:  Thank you all.  We'll be in recess.

15            MR. CONOUR:  Thank you.

16            THE COURTROOM DEPUTY:  Court is in recess.

17            (Proceedings concluded at 11:46 a.m.)

18

19

20

21

22

23

24

25

--oOo--

        I certify, by signing below, that the foregoing is a correct transcript of the record of proceedings in the above-entitled cause.  A transcript without an original signature or conformed signature is not certified.


/s/Bonita J. Shumway                April 12, 2022
_____             _____
BONITA J. SHUMWAY, CSR, RMR, CRR    DATE
Official Court Reporter